<u>Robert Bertoldo</u>
NAME

<u>C-94377</u>
PRISON NUMBER

<u>Corcoran II  B1-259L</u>
CURRENT ADDRESS OR PLACE OF CONFINEMENT

<u>Corcoran, CA.93212-5248</u>
CITY, STATE, ZIP CODE

*Original*

**FILED**

AUG 2 1 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

<u>ROBERT BERTOLDO</u>,
(FULL NAME OF PETITIONER)
                                    **PETITIONER**

v.

<u>K. CLARK (Warden) ET AL.</u>,
(NAME OF WARDEN, SUPERINTENDENT, JAILOR, OR AUTHORIZED
PERSON HAVING CUSTODY OF PETITIONER [E.G., DIRECTOR OF THE
CALIFORNIA DEPARTMENT OF CORRECTIONS])

                                    **RESPONDENT**
                and

<u>JERRY BROWN</u>,
The Attorney General of the State of
California, Additional Respondent.

Civil No. **'08 CV 1551 IEG PCL**
(TO BE FILLED IN BY CLERK OF U.S. DISTRICT COURT)

**PETITION FOR WRIT OF HABEAS CORPUS**

UNDER 28 U.S.C. § 2254
BY A PERSON IN STATE CUSTODY

1. Name and location of the court that entered the judgment of conviction under attack: _____
Superior Court of the State of Cal.  County of Los Angeles

2. Date of judgment of conviction: NOT AVAILABLE

3. Trial court case number of the judgment of conviction being challenged: Superior
Court case # from privious petition

4. Length of sentence: 19 to Life

5. Sentence start date and projected release date: August 1984 - release date to be determined by Board of Prison Hearings.

6. Offense(s) for which you were convicted or pleaded guilty (all counts): 2nd. Degree Murder, Grand thief, Weapon (knife) enhancement.

7. What was your plea? (CHECK ONE)
   (a) Not guilty       ☒
   (b) Guilty           ☐
   (c) Nolo contendere  ☐

8. If you pleaded not guilty, what kind of trial did you have? (CHECK ONE)
   (a) Jury        ☒
   (b) Judge only  ☐

9. Did you testify at the trial?
   ☐ Yes  ☒ No

## DIRECT APPEAL

10. Did you appeal from the judgment of conviction in the **California Court of Appeal**?
    ☒ Yes  ☐ No

11. If you appealed in the **California Court of Appeal**, answer the following:
    (a) Result: Judgement of conviction confirmed.
    (b) Date of result, case number and citation, if known: Not available. The Criminal conviction is not in dispute.
    (c) Grounds raised on direct appeal: Not Available.

12. If you sought further direct review of the decision on appeal by the **California Supreme Court** (e.g., a Petition for Review), please answer the following:
    (a) Result: Denied.
    (b) Date of result, case number and citation, if known: Not Available.
    (c) Grounds raised: Not Available

13. If you filed a petition for certiorari in the **United States Supreme Court**, please answer the following with respect to that petition:

    (a) Result: _Not Applicable._

    (b) Date of result, case number and citation, if known: _____

    (c) Grounds raised: _N/A_

## COLLATERAL REVIEW IN STATE COURT

14. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the **California Superior Court**?
☐ Yes  ☒ No

15. If your answer to #14 was "Yes," give the following information:

    (a) **California Superior Court** Case Number: _____

    (b) Nature of proceeding: _____

    (c) Grounds raised: _____

    (d) Did you receive an evidentiary hearing on your petition, application or motion?
      ☐ Yes  ☐ No

    (e) Result: _____

    (f) Date of result: _____

16. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the **California Court of Appeal**?
☐ Yes  ☒ No

17. If your answer to #16 was "Yes," give the following information:

    (a) **California Court of Appeal** Case Number:_____

    (b) Nature of proceeding: _____

    _____

    (c) Grounds raised: _____

    _____

    _____

    _____

    (d) Did you receive an evidentiary hearing on your petition, application or motion?
    ☐ Yes  ☐ No

    (e) Result: _____

    (f) Date of result: _____

18. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the **California Supreme Court**?
☐ Yes  ☒ No

19. If your answer to #18 was "Yes," give the following information:

    (a) **California Supreme Court** Case Number:_____

    (b) Nature of proceeding: _____

    _____

    (c) Grounds raised: _____

    _____

    _____

    _____

    _____

    (d) Did you receive an evidentiary hearing on your petition, application or motion?

    ☐ Yes  ☐ No

    (e) Result: _____

    (f) Date of result: _____

20.  If you did *not* file a petition, application or motion (e.g., a Petition for Review or a Petition for Writ of Habeas Corpus) with the **California Supreme Court**, containing the grounds raised in this federal Petition, explain briefly why you did not:

The criminal conviction is not in dispute in this Federal Petition.

The denial of Parole by the Board of Prison Hearings is challenged by

Petitioner after exhausting the State remedies.  Please refer to the

attached memorandum of Points and Authorities and exhibits of proof of

exhaustion.

## COLLATERAL REVIEW IN FEDERAL COURT

21.  Is this your **first** federal petition for writ of habeas corpus challenging this conviction?
☐ Yes ☒ No    (IF "YES" SKIP TO #22)
  (a)  If no, in what federal court was the prior action filed? _____
   (i) What was the prior case number? _____
   (ii)  Was the prior action (CHECK ONE):
      ☐ Denied on the merits?
      ☐ Dismissed for procedural reasons?
   (iii) Date of decision: _____
  (b)  Were any of the issues in this current petition also raised in the prior federal petition?
      ☐ Yes ☐ No
  (c)  If the prior case was denied on the merits, has the Ninth Circuit Court of Appeals given you permission to file this second or successive petition?
      ☐ Yes ☐ No

---

**CAUTION:**

- **Exhaustion of State Court Remedies:**  In order to proceed in federal court you must ordinarily first exhaust your state court remedies as to each ground on which you request action by the federal court.  This means that even if you have exhausted some grounds by raising them before the California Supreme Court, you must first present *all* other grounds to the California Supreme Court before raising them in your federal Petition.

- **Single Petition:**  If you fail to set forth all grounds in this Petition challenging a specific judgment, you may be barred from presenting additional grounds challenging the same judgment at a later date.

- **Factual Specificity:**  You must state facts, not conclusions, in support of your grounds.  For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do.  A rule of thumb to follow is — state who did exactly what to violate your federal constitutional rights at what time or place.

---

## GROUNDS FOR RELIEF

22. State *concisely* every ground on which you claim that you are being held in violation of the constitution, law or treaties of the United States. Summarize *briefly* the facts supporting each ground. If necessary, you may attach pages stating additional grounds and/or facts supporting each ground.

   (a) **GROUND ONE**: THE BOARD OF PRISON TERM'S DENIAL OF PAROLE SUITABILITY LACKS EVIDENTIARY SUPPORT AND VIOLATED PETITIONER'S DUE PROCESS RIGHTS TO LIBERTY INTEREST GUARANTEED UNDER THE FOURTEENTH AMENDMENT.

Supporting FACTS (state *briefly* without citing cases or law) ON AUGUST 29, 2006. THE BOARD OF PRISON TERMS CONDUCTED A HEARING TO DETERMINE PETITIONER'S SUITABILITY FOR PAROLE. THE BOARD CONSIDERED AS EVIDENCE PETITIONER'S PRISON FILE, THE TRANSCRIPT OF PREVIOUS PAROLE HEARINGS, TESTIMONY BY PETITIONER, SUPPORTING LETTERS, OPPOSING WITNESSES OF RELATED PERSONS NEXT TO KIN, DEPUTY DISTRICT ATTORNEY ARGUMENT, COMMITMENT OFFENSE, AND PRIOR HISTORY. AT THE END OF THE HEARING THE BOARD ORALLY CONCLUDED "THAT PETITIONER IS NOT SUITABLE FOR PAROLE AND THAT HE POSES AND UNREASONABLE RISK OF DANGER TO SOCIETY OR A THREAT TO PUBLIC SAFETY IF RELEASED FROM PRISON (see Exhibit "A"). THE BOARDS DECISION WAS BASED ON THE FOLLOWING FACTORS: (1) THE NATURE OF THE COMMITTED OFFENSE, THE BOARD FOUND "petitioner commitment offense to be especially cruel and of callous menner", (2) PETITIONER'S CRIMINAL HISTORY, THE BOARD FOUND PETITIONER HAS ESCALATING PATTERN OF CRIMINAL CONDUCT, (3) THE BOARD FOUND PETITIONER HAS "an unstable social history", AND (4) THAT PETITIONER INSTITUTIONAL BEHAVIOR AS FAR AS PROGRAMMING WAS LIMITED IN MANNER, AND THAT PETITIONER HAS FAILED TO UPGRADE EDUCATIONAL AND VOCATIONAL SKILLS. THAT PETITIONER STILL NEEDS THERAPY, AND SELF HELP PARTICIPATION. HOWEVER, THE BOARD

    **Did you raise GROUND ONE in the California Supreme Court?**
    ☒ Yes ☐ No.

Continued:
Please see page two of ground one.

CIV 68 (Rev Dec 1998)

K:\COMMON\FORMS\CIV-68

Continued from page six.

(a) **GROUND ONE:** CONSIDERED THE POSITIVE ACCOMPLISHMENTS AND COMMENDED
PETITIONER IN THOSE PERSPECTIVES AS FOLLOWS: (1) PETITIONER SUSTAINING
DISCIPLINARY FREE FOR NOW A PERIOD OF SEVEN YEARS, (2) OBTAIN
CERTIFICATES IN VOCATIONAL DRAFTING, AND EARNED HIS OBTICIANS LICENSE.
(3) PARTICIPATION IN AA AND NA, (4) SELF-HELP BREAKING BARRIERS
PROGRAM, AND RELIGIOUS PROGRAMS OFFERED AT THE INSTITUTION, WHICH
SHOULD HAVE OUT WEIGHED THE BOARD'S CONCLUSION THAT PETITIONER IS
NOT SUITABLE FOR RELEASE ON PAROLE (see Exhibit A THRU Q ).

**23.** Do you have any petition or appeal **now pending** in any court, either state or federal, pertaining to the judgment under attack?
☐ Yes ☒ No

**24.** If your answer to #23 is "Yes," give the following information:

   (a) Name of Court: _____

   (b) Case Number: _____

   (c) Date action filed: _____

   (d) Nature of proceeding: _____

   _____

   (e) Grounds raised: _____

   _____

   _____

   _____

   _____

   (f) Did you receive an evidentiary hearing on your petition, application or motion?
   ☐ Yes ☒ No

**25.** Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

   (a) At preliminary hearing: Not known.

   (b) At arraignment and plea: Not known.

   (c) At trial: Barry L. Plotkin.

   (d) At sentencing: Barry L. Plotkin.

   (e) On appeal: Not known.

   (f) In any post-conviction proceeding: Not known.

   (g) On appeal from any adverse ruling in a post-conviction proceeding: Not known.

8.

26. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
☒ Yes  ☐ No

27. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
☐ Yes  ☒ No

    (a) If so, give name and location of court that imposed sentence to be served in the future:

    _____

    (b) Give date and length of the future sentence: _____

    _____

    (c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
        ☐ Yes  ☐ No

28. Date you are mailing (or handing to a correctional officer) this Petition to this court: _____

_____

Wherefore, Petitioner prays that the Court grant Petitioner relief to which he may be entitled in this proceeding.

_____

SIGNATURE OF ATTORNEY (IF ANY)

I declare under penalty of perjury that the foregoing is true and correct.  Executed on

_July 23, 2008_                    _[signature]_

(DATE)                              SIGNATURE OF PETITIONER

9.

GROUND FOR RELIEF:

THE BOARD OF PRISON TERM'S DENIAL OF PAROLE SUITABILITY LACKS EVIDENTIARY SUPPORT AND VIOLATED PETITIONER'S DUE PROCESS RIGHTS TO LIBERTY INTEREST GUARANTEED UNDER THE FOURTEENTH AMENDMENT:

SUPPORTING FACTS:

On August 29, 2006. The Board of Prison Terms conducted a hearing to determine petitioner's suitability for parole. The Board considered as evidence petitioner's prison file, the transcript of previous parole hearings, testimony by petitioner, supporting letters, opposing witnesses of related persons next of kin, deputy district attorney argument, commitment offense, and prior history.

At the end of the hearing the Board orally concluded "that petitioner is not suitable for parole and that he poses an unreasonable risk of danger to society or a threat to public safety if released from prison (see Exhibit A).

The Board's decision was based on the following factors: (1). The nature of the committed offense, the Board found "Petitioner's commitment offense to be especially cruel and of callous manner", (2). Petitioner's criminal history, the Board found Petitioner has escalating pattern of criminal conduct, (3). The Board found Petitioner has "an unstable social history", and (4). That Petitioner's Institutional behavior as far as programming was limited in manner, and that Petitioner has failed to upgrade educational and vocational skills.

That Petitioner still needs therapy, and self help participation.

However, the Board considered the positive accomplishments and commended Petitioner in those perspectives as follows: (1). Petitioner sustaining disciplinary free for now a period of seven years, (2). Obtain certificates in vocational "Opticianry" and "Drafting", (3). participation in AA and NA, (4). Self-help Breaking Barriers program, and religious programs offered at

the Institution, which should have outweighed the Board's conclusion that

Petitioner is not suitable for release on parole. (see Exhibits A thru O).

### RELEVANT FACTUAL PROCEDURAL HISTORY

On August 17, 1993. Petitioner attended a Board of Prison Hearings and was

found unsuitable for release on parole, and denied for two years (see Exhibit

D).  On June 1, 1995. Petitioner attended a Board of Prison Hearing and was

found unsuitable for parole, and denied parole for five years (see Exhibit

C).  On November 20, 2002. Petitioner attended a Board of Prison Hearings and

was found unsuitable for parole, and denied parole for two years (see Exhibit B)

### COMMITMENT OFFENSE

In 1984, Petitioner was sentenced by this Court, case no.A527117, to 19 years

to life for 2nd degree murder, assault with a deadly weapon and grand theft.

Summarily, Petitioner was found guilty by jury.  Petitioner was committed

to prison on 10-22-84. Petitioner's minimum eligible parole date (MEPD) was

July 7, 1995.

### PRELIMINARY REQUIREMENTS

Petitioner is confined by the Department of Corrections Rehabilitations at

Chuckawalla Valley State Prison at Blythe California, J.F. Salazar, Warden.

Habeas Corpus is the remedy for due process violations by BPT.  In re Powell

(1988) 45 Cal. 3d 894,903.) This Court original jurisdiction to issue the writ

(Cal. Const. Art. V1,§ 1508) and venue to adjudicate the petition.  (Griggs

v Superior Court (1976) 16 Cal. 3d 341; see In re Sena (2001) 94 Cal. App.

4th 836,841 (jurisdiction does not lie in county of confinement).

CALIFORNIA PAROLE DETERMINANTS

Parole determination by the Board of Prison Terms (BPT) comprises two steps.⌡

A BPT panel must first determine if the prisoner is suitable for parole. (Pen. C. §3041; 15 CCR §§ 2401,2402 (a). That decision and all fact finding, must be based on good cause, defined as a preponderance of the evidence on the subject (15 CCR § 2000 (b) (48), and must take into account all relevant, reliable evidence (15 CCR § 2402 (b).

The pivotal factor in determining whether a prisoner is "suitable" or "unsuitable" for parole is whether his or her parole would pose "an unreasonable risk of danger" or "a threat to public safety". (Pen. C. § 3041 (d); 15 CCR §2401). The panel must determine the term and parole date for each suitable prisonerprisoner (15 CCR §§ 2401, 2403 (a); Pen. C. §3041).

The statutes require parole to be "granted" in most cases once the prisoner's minimum eligible parole date has lapsed (Pen. C. § 3041 (a) (panel) "shall⌡ normally set a parole release date").

The Governor appoints BPT commissioners based on political and ante-parole leaning (former Legislators and former law enforcement and peace officers); with no psychiatric or behavior prediction training.

A panel's determination of an inmate's parole risk must therefore be based on evaluations, recommendations and conclusions of forensic experts, the staff psychologists and psychiatrists hired and trained to regularly assess such risk, prior to their parole hearings prisoners are subjected to such evaluations addressing their current and future violence potential and parole risk in the free community.

Summarily, then unless a preponderance of such evidence indicates that the prisoners parole currently poses "an unreasonable risk of danger" or a threat to "public safety", the panel must find the prisoner to be suitable for parole

and must set his or her prison term and parole date commensurate with the gravity of the particular commitment offense (see Exhibits G(1) thru L).

Petitioner was denied parole from 1993 thru 2006, each time based on his commitment offense, prior history, unsupported evidence, not found in the record. 1/ (Exhibits A thru L).

The Board continues to use the gun which is not part of Petitioner's record nor was Petitioner convicted or sentenced under penal code section 12022.5. (Exhibit A(1) ).

Moreover, the psychiatrist reports are purported and were prepared by unreasonable determinations from staff that did not thoroughly investigate or interview Petitioner. Petitioner advised the Board of this arbitrary preparation, but the Board preceeded with each of Petitioner's BPT hearing, regardless of the invidious criteria of the psychiatrist purported evaluations (see Exhibit F(2006),and G-L).

---

1/ "The Board purports to use as some evidence that Petitioner used a gun in his crime, however, the jury and trial judge determined that Petitioner was not the shooter and did **not** convict Petitioner for use of a firearm because the evidence did not support the facts. Furthermore, the Board is violating Petitioner's due process rights based on factors not in the record and are untrue (see Exhibits E thru E2 - L),and the fact Petitioner waived his suitability in 2000 and 2005 to show the Board that Petitioner wanted to better himself by getting his release on parole (Exhibits E-E1).

MEMORANDUM OF POINTS AND AUTHORITIES

The Board of Prison Terms made findings contrary to facts to justify denial of parole.

Petitioner has served 25 years on a 2nd degree murder, in which the Boards "some evidence " standard deprives Petitioner of the statutorily conferred presumptive right to be released on parole.

In In re Scott (2005) 34 Cal. Rptr. 3d 905, the court held that, "we require whether some evidence in the record before the Board supports the decision to deny parole, based on factors specified by statute and regulations (see also In re Rosenkrantz, (2000) 29 Cal. 4th 616,659 ; In re Elkins (2006)___Cal. Rptr. 3d___(WL3072139); In re lee (2006)___Cal. Rptr. 3d___(WL2947968); Sanchez v Kane F. Supp. 2d___(2006) (C.D. Cal. WL2252640); Martin v Marshall,___F.Supp. 2d___(N.D. Cal. 2006) (WL1344584) ("sole reliance on circumstances of Petitioner's offense and conduct prior to the offense indenying parole constituted a due process violation").

The Board's reliance on "some evidence" standard given the lapse of 25 years and the exemplary rehabilitative gains made by Petitioner over that time, continued reliance on those aggravating facts of the crime and prior conduct before the offense, no longer amount to "some evidence", supporting denial of parole (see Scott, supra (II); Elkins; Lee; Sanchez; Martin; Rosenkrantz) (Exhibits A-L).

In Biggs v Terhune, 334 F.3d 910,916 (9th Cir. 2003), the court held that , "over time... should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs offense and prior conduct would raise serious questions involving his "liberty interest "in parole". (Id.at 916); see also Sass v California, 461 F3d 1123 (9th Cir. 2006); McQuillion, 306 F3d 895 (9th Cir. 2002).

14.

In In re Lee, supra, the Attorney General argued, so long as "some evidence" "which may be as little as a "modicum", supports the Governor and the court must affirm. citing Rosenkrantz, at pp.676-677; In re Smith (2003) 114 Cal. App.4th 343,361; In re McClendon (2003) 113 Cal.App.4th 315,321. The Court concluded, "The Governor erred, holding that "the test is not whether some evidence supports the reasons the governor sites for denying parole, but, whether some evidence indicates a parolee's release unreasonably endangers public safety (Cal. code of Regulations Title 15,§ 2402 (b) (parole denied if prisoner will pose an unreasonable risk of danger to society if released from prison"), (see e.g. Scott, 133 Cal. App. 4th at p.595).

Clearly Petitioner's crime has little, if any predictive value for future criminality, The Board simply forms from Petitioner's past (commitment offense and prior conduct) crimes which are over 25 years ago and purports their usefulness in foreseeing likelihood as if committed 5 to 10 years ago (see Scott, at p.595) ("past crime's value for predicting future crime diminishes over time")

Thus, whether the crime was particularly henious, atrocious, or cruel, the Board is to consider whether, the offense was carried out in a dispassionate and calculated manner, such as an "execution-style murder (CCR 15 §2402 (C) (L) (B).

Petitioner's murder that the Board describes is not at all like an execution-style murder pursuant to CCR § 2402 (C) (1) (B).

Furthermore, Petitioner was found guilty and the judge determined that Petitioner's crime committed was in the second degree, inwhich an execution-style murder calls for punishment of 1st degree, or life without the possibility for parole, or the death penalty.

However, Petitioner takes full responsibility for his irresponsible disregard for human life which he allowed drugs to control his actions at the time of the incident.

Moreover, the Board's decision resting on the gravity of the offense, described as heinious, atrocious and brutal as out weighing the positive factors is purported and unpersuasive and lacks evidence.

The Board's assumption that a prisoner may be deem unsuitable for release on the basis of the commitment offense alone is correct, (Citation), but the proposition must be properly understood.

The commitment offense is one of only two factors indicative of unsuitability a prisoner cannot change, other being his previous record of violence. Reliance on such immutable factors without regard to or consideration of subsequent circumstances, may be unfair and run contrary to the rehabilitative goals espoused by the prison system and could result in a "due process" violation (see Scott II).

Courts have held that the Board cannot properly rely on the commitment offense and criminal record to find unsuitability unless the crime is specified in section 2402(c). Petitioner has reached a point where denial of parole can no longer be justified by reliance on such an unchanging event under mines the use of prison as a rehabilitative "tool".

Thus putting aside the factors relating to Petitioner's commitment offense and prior conduct, clearly indicates that the Board's some evidence standard is not supported by evidence presented. The Board's indifferences to the large body of evidence significantly "distorts" the nature and gravity of Petitioner's commitment offense and denies Petitioner the right to "individualized consideration" of all relevant factors specified in the California Code Regulations (see Rosenkrantz, at p.655; In re Minnis (1972) 7 Cal. 3d. 639, 646.) (see Exhibits G thru L collectively).

### DUE PROCESS AND LIBERTY INTEREST

The Board's decision to continue to deny Petitioner parole violated Petitioner's right to procedural and substantive due process because the grounds stated are unsupported by any evidence contrary to the record, are irrelevant to prescribed

16.

basis for parole determination and thus "arbitrary in the extreme."

California law requires that the majority of inmates serving sentences "shall" be granted a parole date once the minimum parole date has lapsed and the inmate no longer poses an "unreasonable risk of danger" or a threat to public safety (Pen. c. Z 3041(a); CCr 15 § 2401).

The Boards' recitations of their boilerplate statement that Petitioner poses a danger to public safety is "arbitrary" because it is unsupported by evidence addressing Petitioner's current parole risk. Furthermore, the Board's action is arbitrary and denies substantive due process because it is based solely on false and negative factors or factors irrelevant to Petitioner's being found suisuitable for parole, and utterly inapposite to the record and categorically excludes overwhelming evidence compelling parole under the State's statutes and regulations, and based solely on the Board's personal and political goals (see Exhibits A thru L).

The due Process Clause of the Fourteenth Amendment and the California Constitution prohibits the State from, "depriving any person of liberty, life or property without due process of law" (U.S Constitution XIV, Cal. Constitution Art. 1, 7(a).)

Personal liberty, a "fundamental interest, second only to life itself", is protected by the due process clause (Wolff v McDonnell, 418 U.S. 539, 556(1974); In re Roger S.(1977) 19 Cal.3d 921 927; Kentucky Dep't of Correction v Thompson, 490 U.S. 454,460(1989); Biggs v Terhune, 334 Frd at p.913).

Due process protection is required "when the state is involved to any significant degree "in thwarting one's liberty (In re marilyn (1993)4 Cal. 4th 295,306; Sass v California, 461 Frd 1123 (9th Cir.2003).

Accordingly, the Board's actions violates state law, the California's Constitution and Petitioner's due process rights, because the Board's decision is based soley on factors perceived as negative concerning Petitioner's commitment offense

17.

and prior conduct.

The Board is to consider all the factors and weigh the codified suitability and and unsuitability factors listed in CCR 15 §2402(c)(d), and all these factors must be applied when considering parole. However, the Board erroneously did not weigh such evidence or mentioned them (Exhibits G thru L collectively).

The Board egregiouly omitted all relevant factors when making its decision and simply listed the negative aspects of the record to support their denial of parole (see Exhibuts A thru L).

In Scott, the court noted that denying parole must be based on all relevant, reliable evidence in the record, not a list of selected "negative" factors (Id. at p.905); see also Ramirez, at pp571-572; In re Dunham, 16 CAl. 3d at 66; Rosenkrantz, at pp 425-427; In re Stanley,54 Cal. App.3d at p.1308).

Moreover, not a speck of evidence listed nor existed in the Board's decision supports their conclusion on which the Board based their denial of parole being granted because Petitioner poses a danger to public safety if released (see In re Powell, at pp.894,904; Cato v Rushen, 824 F2d 703,705 (9th Cir.1987) (see Exhibit A thru L collectively). The 'liberty' referred to in the Constitution may be in future liberty, but it must be more than "an abstract need or desire" (Board of Regents of State College v Roth(1972)408 U.S. 564,577 and must be based on more than "a unilateral hope". (Connecticut Board of Pardons v Dumschat(1981)452 U.S. 458,465). Petitioner has neither a general constitutional right nor an inherent liberty interest on parole (Greenholtz v Inmates of Nebraska,Penal and Correctional Complex (1979)442 U.S.1,7). But states may, by their "laws" create a liberty interest in parole (Kentucky Dept. of Corrections v Thompson, 490 U.S. 454 (1989); Board of Pardons v Allen,482 U.S.369,373,n.3(1987)(ALLEN)("prisoner's liberty interest in parol derived solely from the existence of a system that permits criminal offenders to serve their sentence on probation or parole."); Meachum v Fano (1976) 427 U.S. 215,226 ("A prisoner's liberty  interest is protect

18.

evenwhen it is statutory creation of the State."); <u>Flores v Messes</u>, 942 F3d 1352

1370 (9th Cir. 1991) (con. opn. Norris.)

Liberty interest protected by the Fourteenth Amendment derive from the due

process clause or a State's laws (<u>Hewitt v Helms</u>, 459 U.S. 460,466.) A protected

liberty interest may be created by statutes, administrative or parole regulations,

published prison policy, or parole rules or regulations (<u>Bermudez v Dueñas</u>, 936

F2d 1064, 1067(9th Cir. 1991); see <u>HHewitt, supra, 459U.S. at pp.470-471,S. CT

864, 74 L.ED.2d 675 (1983)</u>; <u>Mendoza v Blodgett</u>, 960 F2d 1425, 1428-1429 (9th Cir.

1992); <u>Toussaint v McCarthy, 801 F2d 1080, 1089 (9th Cir. 1989)</u>.

Ifstate parole laws use "explicitly mandatory language ",i.e. directives to

the decision maker that if the regulations' substantive predicatives are present,

a particular outcome must follow, the state has created a constitutional liberty

interest in parole release, protected by the Fourteenth Amendment (<u>Thompson,

supra,</u> 490 U.S. at 376-378; <u>Bermudz v Duenas, supra,</u> 936F2d at 1067; <u>Kelly v

Risely,</u> 865 F2d 201,203 (9th Cir. 1989) (parole eligibility statutes).

Regulations or laws directing a state parole Board to grant parol "unless"

certain factors are present, satisfy this test and create a liberty interest

(Allen, 482 U.S. at 377).

Penal Code section 3041(b) states that BPT "shall set a release date unless

it determines that "public safety" requires further confinement due to the gravity

of the offense (emphasis added).  This language is mandatory in character and

creates a "concrete" liberty interest in parole once the inmate's release does

not pose a public safety (Allen, 482 U.S.at 377).

Once a liberty interest is established, the state may "<u>not</u>" extinguish it

without affording due process which requires basic procedural and substantive

due process. .

Petitioner claims his liberty interest because the Board's action has extended

his prison term indefinitely based on evidence not supported on the record or

19.

consistent with the State's parole laws, statutes and regulations (see Saudin

v Connor, 515 U.S.472, 483-484).

The Supreme Court and Ninth Circuit hold that, Saudin does not require a

prisoner's vested interest as a prerequisite to proffering a substantive due

process claim, e.g. that a parole decision was arbitrary, lacked evidentiary

support, or was contrary to the record or the State's parole statutes or

regulations (Burnworth v Gunderson,179 F3d 771, 774-775 (9th Cir.1999); citing

Superintendent v Hill, 472 U.S. 445,454-455 (1985).

Where as here, a State adopts a statutory to regulatory scheme for determining

parole, it is required by the Fourteenth Amendment to determine parole in accordance

there with and its decision must provide substantive due process (Ohio Adult

Parole Authority v Woodard, 523 U.S.272,292-293 (1998).)  In particular, parole

grants by BPT defined by California courts as bestowing "liberty" on their

recipients which the same due process protection afforded to parolees (see In

re prewitt (1977) 47 Cal. 3d 576,593).

Parole decision discretion is restricted by state law (Allen,482 U.S. at 375-

376; Bergen v Spauling, 881 F2d 719,721(9th Cir.1989); In re Powell, supra,45

Cal. 3rd at p902) A decision denying parole unsupported by evidence or contrary

to the record is, by definition arbitrary and capricious and devoid of substantive

due process. (Powell v Gomez,33 F3d 39,40 (9th Cir. 1994); Meachum v Fano, 427

U.S.at p.226(The touchtone of due process is protection of the individual against

arbitrary action of government"); Fetterly v Paskett,997 F2d 1295,1300; See

also Terhune v Superior Court (Whitely)(1988) 65 Cal. App.4th 864,872-873;

In re Prewitt, supra, 8 Cal. 3d at p.474; In re Johnson(1995) 35 Cal. App.4th

160,170).

Administrative regulations such as the CCR Title 15 parole determination

regulations cited have the force and effect of statutory law, in this the Penal

Code statutes cited from which they derive, and their limitations bind the

decision maker (In re Stanworth (1982)33 Cal.3d 176,181; See also United States

v Nixon,418 U.S.683, 695-696; Vargus v U.S. Parole Commission,865 F2d 191,193-

194).

Actions by the government or agents that subjects a prisoner to deprivation

of liberty in contravention of constitutional guarantees or state law triggers

the substantive component of Due Process Clause. (DeShaney v Winnebago County

Social Services,489 U.S.189,200 (DeShaney).  The purpose of the Clause is to

prevent Government from exercising its power arbitrary or as an instrument

of oppression (DeShaney, 489 U.S.at 195; Davidson v Cannon,474 U.S.344,348

i.e. "to protect people from the state." (DeShaney,489 U.S.at 196; Wolff v

McDonnell,418 U.S.at 558.).

Its paramount function is "to provide a guarantee of fair procedure in connection

with any deprivation of life, liberty or property by state."  Substantive due

process "protects individual liberty against certain government actions regardless

of the fairness of the procedure used to implement them." (Gray v Whimore(1971)17

Cal. App.3d 1,21;  see Collins v City of Harken Heights,503 U.S.115,125;  Daniels

v Williams,474 U.S.327,331(1996);  Kelch v Director,Nevada Department of Corrections,

10 F3d 684,687(9th Cir.1993).

"Freedom from arbitrary adjudicative procedures is a substantive element of

one's liberty."  (People v Ramirez (1979)25 Cal. 3d 260,268.)  "The presence

of a large measure of discretion in a parole system does not alter the fundamental

due process limitation against capricious decision making a legislative grant

of discretion does not amount to a license for arbitrary behavior." (In re Fain

(1983) 139 Cal. App.3D 295,307.).

When an individual is subjected to deprivatory governmental action, he always

has a due process liberty interest in both fair and unprejudiced decision making

(Ramirez,25 Cal. 3d at 268.).

Thus,because parole determination is based on a prisoner's current and future parole risk (all prisoners were violent and high risk at the time they committed their life offenses), and due process does not permit parole denial based on facts of the offense unless the decision explains a rational connection between the facts of the offense recited and the prisoner's "current" parole risk. (In re Rosenkrantz, at pp.425-426; see Montoya v U.S.Parole Comm., 908 F2d 742,475 (10th Cir.1990).

The Board's reliance in Petitioner's case on allegations concerning the commitment offense and prior conduct to conclude that Petitioner currently "poses" an undue parole risk is unsubstantiated. Wherein Penal Code Section 3041(b) may be read to allow postponement of parole due to a particularly egregious commitment offense, Petitioner is not in that category when compared to other murders, nor does the statute allow parole post-ponement on such a basis to be "indeterminable", as recently explained by the Court of Appeal.

> "Thecircumstances of any past offense, even any murder, are not necessarily a cufficient ground for the Board to refuse to set a parole release date.
> All violent crimes demonstrate the perpetrator's potential for posing a grave risk to public safety, but the Legislature has clearly expressed its intent when murders who are the great majority of inmates serving indeterminate sentences-approach their minimum eligible parole date, the Board shall normally set a release date. (Pen. Cl§3041(a).)
> The Board's authority to make an exception based on the gravity of a life term inmate's current or past offense should "not" operate so as to swallow the rule that parole is normally to be granted.  otherwise
> Othewise, the Board's cases-by case ruling would destroy the proportionality contemplated by Pen.C.§3041(a), and also the murder stautes...
> Therefore, a life term offense must be particularly egregious to justify the denial of parole dates.
> Tn order to comply with the parole policy established by the legislature in Pen. C.§3041, the Board must weigh the inmate's criminal conduct not against oridinary social norms, but against other instances of the same crime or crimes.

The Board must also consider the length of time the inmate
has served in relation to the term prescribed by the
Legislature for the offense under consideration... (<u>In
re Ramirez</u>, at pp.569-571.).

The factors the Board cites for Petitioner's unsuitability for parole were
the crime themselves, which the Board characterized as "<u>atrocious</u>".

The Board may deny parole if a defendant committed his crimes "in an espeially
heinous, atrocious or cruel manner". (Cal. Code Regs. Tit.15 §2402(c)(1).)

Notwithstanding the Board's description of Petitioner's crimes, they were not
"<u>atrocious</u>"or at least were no more atrocious than whenever one human being kills
another and were not committed "in an especially heinous, atrocious or cruel
manner." Furthermore, the measure of atrociousness is not general notions of
common decency or social norms, for by that yardstick, all murders are atrocious
(see <u>In re Scott</u>,supra, 119 Cal.App. 4th at p.891 ('all second degree murders
by definition involve some callousness - i.e., lack of emotion or sympathy and
suffering of others.")

The Board's inquiry rather should be whether among murders as Petitioner's
was it committed in a particularly heinous, atrocious or cruel manner. (see <u>In
re Ramirez</u> (2001)94 Cal. App.4th 549,570.). By measuring Petitioner's crime,
the Board would have found that Petitioner's crime was more commonplace than
egregious. Comparing Petitioner's crime to defendants for whom the Board has
properly denied parole because of defendant's crimes were atrocious is illuminating
(see <u>In re Rosenkrantz</u>,29 Cal. 4th at p.678; <u>In re Dannenberg, 34 Cal. 4th at</u>
p.1095; <u>In re McClendon</u>, 113 Cal.App. 4th at pp.321-322; <u>In re Burns</u>, (2006)136
Cal.App.4th 1318,1327-1328; <u>In re Van Houten</u>,116 Cal. App.4th at pp.346,351;
<u>In re De Luna</u>,126 Cal.App.4th at 593; <u>In re Lowe</u>,130 Cal.App.4th at p.1414;
<u>In re Morrall</u>,102 Cal.App.4th 280.).

Petitioner's crimes do not measure against the foregoing offenses as
"especially heinous, atrocious or cruel manner."

They were instead much like those in In re Smith,114 Cal. App.4th at 343.367.)

In Smith, the defendant "wanted to go job hunting, but the victim said she had other plans.  He became suspicious and very emotional, and when she further announced the (sic) neither she nor anyone else wanted to see him, he immediately got his gun and shot her three times in the head, presumably killing her instantly.

The Court stated, "was the crime callous, Yes.  However, are the facts of the crimes "some evidence" that Smith acted exceptionally callous disregard for the victim's suffering, or do the facts distinguish this crime from other second degree murders as exceptionally callous ? No." (is.at p.367,fn. omitted.).

Petitioner's crimes have little, if any, predictive value for future criminality. Simply from the passing of time, Petitioner's crime of 25 years ago have lost much of its' usefulness in foreseeing the likelihood of future offenses than if he had committed them five or ten years ago.(See In re Scott,133 Cal.App.4th at p.595(past crime value for predicting future crime diminishes over time.").

Moreover, Petitioner's motivation for the crime, his desperate rage against the victim drove him toward murder and suicide augurs against future offenses. (see In re Lee,(WL2947968)___Cal.Rptr.3d___.)

As the Scott court explained, "a defendant's motivation for the offense tends to show suitability when it was the result of significant stress in defendant's life ,especially if the stress has built over a long period of time." (Id.at p.596.).  The Board fails to acknowledge the fact that "all murders represent the basest form of human behavior.  Our laws, however, provide for mechanisms by which even murderers in limited circumstances are entitled to be paroled. The judiciary has an obligation to execute those laws.

Petitioner's record establishes that he does not pose an unreasonable risk to public safety, and any contrary conclusion that it does by the Board lacks any evidentiary support. (see Exhibits F(1)-9L).  To avoid such an absurd result as the Board's denial of suitability for parole, the court must apply the bare

minimum test to how Petitioner actually committed his crime, not to how the Board is pleading Petitioner's crime.

Furthermore, the Board purports that Petitioner has limited manner while incarcerated, not sufficiently participated in beneficial self-help programs is unpersuasive and of indevious criteria, something other than the true.

Petitioner has achieved remarkable behavioral chronos, therapeutic help, and educational and vocational gain (see Exhibits F(1)-(L).

When the psychiatrist prepared Petitioner's psych-evaluations reports in the years 2004 and 2006 they did not include Petitioner's favorable achievements, extensive therapy participations, upgraded educational and vocational gains, performance ratings and accolades, and the fact Petitioner has been disciplinary freeand abstinence from drugs and alcohol (see Exhibits F).

All these completions and extensive programming has been the Boards' some evidence standard when finding Petitioner unsuitable for parole (see Exhibits A thur L.).

The Board's decision flunks the Ramirez test because it failed to justify a parole denial based on his commitment offense, which was committed 25 years ago, and minimum parole date has lapsed long ago, has been disciplinary free for 7 years (substantial period), achieved remarkable behavioral chronos, self-help programming, which was not up-dated in his evaluation report prepared by the prison psychiatrist before appearing before the Board in 2004 and 2006 (see Exhibits F-L).

However, Petitioner told the board about his achievements, but the Board did not consider them when determining whether Petitioner should be found suitable for parole, even though that is one of the factors of suitability.

The Board's decisions were based on inappropriate criteria and its decision that Petitioner is not suitable for parole release is not supported by "some evidence" standard (see Exhibits A thru L collectively).

2/When the psychiatrist prepared Petitioner's "Lifer's Evaluation reports in
2004,2006, BPT back -log was based on an emergency move to get lifer schedule
for their parole hearings, therefore, they sent psychs who did not thoroughly
review Petitioner's C-File and present all relevant documents to assist the
Board in determining whether Petitioner has achieved any goals (see ExhibitF.),

SUMMARY

Nocrime is more abhorred by our society and, therefore, more severely punished

by our laws, then murder.  These laws also require that once an inmate's minimum

eligible prole date has lapsed and the record and evaluations demonstrate that

parole no longer pose an unreasonable risk of danger or threat to public safety,

the prisoner is suitable for parole and "entitled" to have a term and parole

set.  Petitioner was convicted of second degree murder, use of a deadly weapon,

a knife, and grand theft, and sentenced to 19 years to life, with a minimum

term of approximately 11 years.

Petitioner has sought and completed extensive therapy, self-help programming,

achieved and maintained disciplinary-free conduct for a period of 7 years after

turning his life over to the Lord Jesus Christ, sustained from drugs and alcohol,

and received moderate performance from prison staff and rating and accolades,

moderate forensic evaluations that would have been low had the psychiatrist

presented all Petitioner documents of achievements in his Central file, which

would have overwhelming presented evidence that was excluded by the forensic's

arbitrary and capricious actions (see Exhibits G thur L).

   Furthermore, the Board's process was egregious.  The Board compiles a list

of every conceivable negative factor concerning the inmate's former criminal

conducdt, followed by a conclusion that the inmate is therefore not suitable

for parole based on personal and political goals (see Exhibits A-F).

   Petitioner remains imprisoned long after both of his dates have lapsed.

26.

Petitioner's record shows that the only thing Petitioner has not accomplished is to change his commitment offense and prior conduct.

Despite the law requiring parole to occur after the minimum term lapses and the prisoner's parole no longer poses an undue risk to the public, despite Petitioner having achieved that long ago, and despite meeting all requirements to be found suitable for parole and there being nothing further he can acheive, Petitioner will remain in prison until his "death" unless and until a court intervenes (see Exhibits G thru L collectively).

Respectfully

Robert Bertoldo
Petitioner and Appillant
In Pro per

27.

CONCLUSION

Petitiner's right to substantive due process as abrogated by the Board of Prison Terms' action invalidating my overdue parole because it was based on and required an unconstitutional "some evidence" standard that rendered parole illusory by requiring across-the board parole denial to an entire class of prisoners irrespective of their statutory qualifications because it was rendered by an admittedly and inherently biased decisionmakers based on their announced personal and political motives, without gubernatorial review of the entire record as required by the authorizing statute.

Due to apathy, intolerance for crime, and ignorance, the public in general could care less about the matter, except, of course for those citizens who are friends or family members of such an inmate.

Thousands of affected prisoners and tens or hundred of thousands of their family members who do care are but a small minority. Why should the courts care ? Because, the guilty are almost the first to suffer those hardships which are afterwards used as precedent against the innocent (see People v Reyes (1980) 107 Cal. App. 3d 976981.)

Wherefore, Petitioner prays that this Court will grant his Habeas petition and order the Board to grant suitability for parole based on the above facts and Petitioner's right to liberty interest under the Fourteenth Amendment of the Due Process Clause.

Respectfully

Robert Bertoldo
Petitioner and Appellant
In Pro Per

28.

<u>PRAYER FOR RELIEF</u>

(1). Petitioner's Habeas Petition be granted,

(2). The Board of Prison Terms be ordered to grant Petitioner suitability for parole release based on the evidence presented,

(3). Petitioner be granted an evidentiary hearing,

(4). Petitioner be appointed counsel to represent him upon this Court findings, and

(5). Petitioner be granted relief consistent with the views presented or what this Court deems appropriate based on the facts and his constitutional rights being violated under the Fourteenth Amendment of the Due Process Clause and Liberty Interest.

<u>DECLARATION</u>

I Robert Bertoldo hereby declare:

I am the Petitioner in the above action before this Honorable United States

District Court Southern District Of California;

    All facts alleged in the above documents, not otherwise supported by

citations to the record, exhibits, and other documents are true of my own personal

knowledge.


I declare under penalty of perjury that the above is true and correct and this

declaration was executed on _23_ day of July 2008 , at Corcoran Level II,

Corcoran, California.


                        Robert Bertoldo
                        DECLARANT, PETITIONER,
                        AND APPELLANT
                        IN PRO PER.

BY DENYING THE RELIEF REQUESTED WITHOUT THE ISSUANCE OF AN
ORDER TO SHOW CAUSE TO COMPORT WITH THE PROCEEEINGS, THE
SUPERIOR COURT ASSUMED A PARTISAN ROLE IN THIS HABEAS PETITION
RESULTING IN PREJUDICE TO PETITIONER.

The Court should be neutral, not an adverse party pleading
its cause. "It is fundamental that an action must be prosecuted
by one who has a beneficial interest in the outcome.  In a mandamus
proceeding, it is the parties [in the underlying proceeding],
not the courts [whose rulings are challenged], which have a
:beneficial interest" in the outcome of the case; the role of
the respondent court is that of a neutral party." (Municipal Court
v. Superior Court (Gonzalez), (1993) 5 Cal. 4th  1126,  1129,  22
Cal. Reptr. 2d  504, 587 P.2d 325).

"The apparent premise underlying the Court's decision[] in
Gonzalez...is that the court should not assume a partisan role.
As noted in 8 Witkin, California Procedure (3d ed. 1985)
Extraordinary Writs, section 148, page 789, '...if certiorari,
prohibition or mandamus is sought against a court, the respondent
judge, as in an appeal from a judgment, is a neutral party in
the controversy between the plaintiff and defendant in the main
action.  The adverse party in that action is the real party in
interest...' Such neutrality is also demanded by the duty of
impartiality imposed upon judges by the California Code of Judicial
Ethics (see canon 3). "(Ng v. Superior Court, (1997) 52 Cal. App. 4th
1010, 1016, 61 Cal. Reptr. 2d 49.

As the court of Appeal stated in Omaha Indemnity Co. v.
Superior Court,(1989) 209 Cal. App. 3d 1266, 1273, 258, 258

Cal. Reptr. 66, "Judges should be umpires rather than players."
<u>Rose v. Superior Court,</u> (Cal. App. 2d Dist. 200) cite as 92
Cal. Reptr. 2d 313, 318.)

This Court should issue an Order to Show Cause on the habeas petition and order that it be returnable in the Superior Court (shown in EXHIBIT "J" attached) and, although the trial judge is capable of hearing this matter, it is possible the apperarance of impartiality may have been compromised. In the interests of justice this Court should order that the proceedings be heard by a different trial judge. (Code Civ. Proc., Z170,sub. (c).

//
//
//

32.

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS


In the matter of the Life )
Term Parole Consideration )     CDC Number   C-94377
Hearing of: )
 )
ROBERT BERTOLDO )
_____)


CHUCKAWALLA VALLEY STATE PRISON

BLYTHE, CALIFORNIA

AUGUST 29, 2006

2:00 P.M.

PANEL PRESENT:

Mr. Edward C. Williams, Presiding Commissioner
Mr. Bruce Mitchell, Deputy Commissioner

OTHERS PRESENT:

Mr. Robert Bertoldo, Inmate
Ms. Rosemary Mbelu, Attorney for Inmate
Ms. Alexis Delagarza, Deputy District Attorney
Ms. Kathy Arrella, Next of Kin
Mr. Carlos Ruiz, Observer
Mr. Felist Rocha, Victim's Escort
Mr. Eric Penney, Parole Representative
Mr. Rizchie, Correctional Officer

**INMATE COPY**

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No        See Review of Hearing
_____ Yes       Transcript Memorandum


**Stacy Wegner, Vine, McKinnon & Hall**



ii

## INDEX

|  | Page |
|---|---|
| Proceedings | 1 |
| Case Factors | 10 |
| Pre-Commitment Factors | 11 |
| Post-Commitment Factors | 25 |
| Parole Plans | 17 |
| Closing Statements | 46 |
| Recess | 53 |
| Decision | 54 |
| Adjournment | 58 |
| Transcriber Certification | 59 |

--oOo--

1

## P R O C E E D I N G S

1    **DEPUTY COMMISSIONER MITCHELL:**  Okay.  We're on

2

3    record.

4    **PRESIDING COMMISSIONER WILLIAMS:**  Okay.  This is a

5    subsequent parole consideration hearing for Robert

6    Bertoldo, CDC number C-94377.  Today's date is August the

7    29th, 2006.  The time is approximately 2:00 p.m.  We're

8    at Chuckawalla Valley State Prison.  The inmate was

9    received on October 22nd, 1984, from Los Angeles County

10   for the crime of murder in the second degree, case number

11   A-527117 to serve 15 years to life plus four-year

12   enhancement for a total term of 19 years to life with a

13   minimum eligible parole date of July the 7th, 1995.  Mr.

14   Bertoldo, we're going to identify each person in the

15   room.  I'm going to start.  We're going to go to my

16   right.  We're going to say our first name, say our last

17   name, spell our last name, and when it get to you, if you

18   would include your CDC number, I would appreciate it.

19   I'm Edward C. Williams, W-I-L-L-I-A-M-S, Commissioner.

20   **DEPUTY COMMISSIONER MITCHELL:**  I'm Bruce Mitchell,

21   M-I-T-C-H-E-L-L, Deputy Commissioner.

22   **MS. ARRELLA:**  Kathy Arrella, A-R-R-E-L-L-A.  I'm the

23   victim's daughter.

24   **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  Alexis

25   Delagarza, D-E-L-A-G-A-R-Z-A, Deputy District Attorney,

26   Los Angeles County.

27   **MR. RUIZ:**  Carlos Ruiz, R-U-I-Z.  I'm support for

2

1    Kathy.

2        **MR. ROCHA:**  Felist (phonetic) Rocha, R-O-C-H-A, and

3    I'm a victim's escort.

4        **ATTORNEY MBELU:**  Rosemary Mbelu, M-B-E-L-U, attorney

5    for Mr. Bertoldo.

6        **INMATE BERTOLDO:**  Robert Bertoldo, B-E-R-T-O-L-D-O,

7    C-94377.

8        **MR. PENNEY:**  Eric Penney, P-E-N-N-E-Y, assistant

9    classification of parole representative assisting the

10   Board.

11       **PRESIDING COMMISSIONER WILLIAMS:**  Okay.

12       **CORRECTIONAL OFFICER RIZCHIE:**  (Inaudible) Rizchie,

13   R-I-Z-C-H-I-E --

14       **PRESIDING COMMISSIONER WILLIAMS:**  That's all right.

15       **CORRECTIONAL OFFICER RIZCHIE:**  -- correctional

16   officer.

17       **PRESIDING COMMISSIONER WILLIAMS:**  All right.

18   Additionally, there's a correctional officer in the room

19   who will not be participating in the hearing.  Read that

20   document there, if you would, sir.

21       **INMATE BERTOLDO:**

22       The American's with Disabilities Act, ADA, is

23       a law to help people with disabilities.

24       Disabilities are problems that make it harder

25       for some people to see, hear, breathe, talk,

26       walk, learn, think, work, or take care of

27       themselves than it is for others.  Nobody can

3

1 be kept out of public places or activities

2 because of a disability. If you have a

3 disability, you have the right to ask for help

4 to get ready for your BPT hearing, get to a

5 hearing -- get to the hearing, talk, read

6 forms and papers and understand the hearing

7 process. BPT will look at what you ask for to

8 make sure that you have a disability that is

9 covered by the ADA and that you have asked for

10 the right kind of help. If you do not get

11 help, or if you don't think you got the kind

12 of help you need, ask for a BPT 1074 Grievance

13 Form. You can also get help to fill it out.

14 **PRESIDING COMMISSIONER WILLIAMS:** Okay. You read

15 that well, even though you wear glasses. You didn't have

16 any trouble seeing it?

17 **INMATE BERTOLDO:** No, sir.

18 **PRESIDING COMMISSIONER WILLIAMS:** Okay. And you

19 hear me okay?

20 **INMATE BERTOLDO:** Yes, I do.

21 **PRESIDING COMMISSIONER WILLIAMS:** And you have no

22 problem getting here today, any physical imparities that

23 limit you?

24 **INMATE BERTOLDO:** No, sir.

25 **PRESIDING COMMISSIONER WILLIAMS:** And on February

26 the 15th of this year you signed what's called a 1073

27 Form indicating that you didn't need -- you have no

4

1   disability and needed no help in attending this hearing.

2   Is that correct?

3       **INMATE BERTOLDO:**  Well, as you can see, I've got the

4   Parkinson's, but that's the only thing.

5       **PRESIDING COMMISSIONER WILLIAMS:**  Parkinson's.

6       **INMATE BERTOLDO:**  It mostly bothers other people to

7   see it rather than me, but that's only --

8       **PRESIDING COMMISSIONER WILLIAMS:**  But it doesn't

9   have anything to do with your mental faculties --

10      **INMATE BERTOLDO:**  Well, I --

11      **PRESIDING COMMISSIONER WILLIAMS:**   -- understanding -

12  -

13      **INMATE BERTOLDO:**  I --

14      **PRESIDING COMMISSIONER WILLIAMS:**  Just a minute.

15      **INMATE BERTOLDO:**  I'm sorry.

16      **PRESIDING COMMISSIONER WILLIAMS:**  Understanding

17  things and getting around and assisting your counsel

18  here?

19      **INMATE BERTOLDO:**  No, but memory sometimes lapses.

20      **PRESIDING COMMISSIONER WILLIAMS:**  Okay.

21      **INMATE BERTOLDO:**  Dementia comes with it.

22      **PRESIDING COMMISSIONER WILLIAMS:**  Okay.  That's

23  fine.  If you have something that you can't remember

24  because of this illness, you just let us know.

25      **INMATE BERTOLDO:**  Okay.

26      **PRESIDING COMMISSIONER WILLIAMS:**  And if you feel

27  like you can't go on at any time, I don't know how that

5

1    affects your stamina or if anything, but if you have any

2    difficulty you let us know, okay?

3        **INMATE BERTOLDO:**  Okay.

4        **PRESIDING COMMISSIONER WILLIAMS:**  And we'll work it

5    out one way or the other.

6        **INMATE BERTOLDO:**  All right.

7        **PRESIDING COMMISSIONER WILLIAMS:**  Any additional ADA

8    issues we should be talking about, Counsel?

9        **ATTORNEY MBELU:**  No, sir.

10       **PRESIDING COMMISSIONER WILLIAMS:**  Okay.  This

11   hearing is being conducted pursuant to the Penal Code and

12   the rules and regulations of the Board of Parole Hearings

13   governing parole consideration hearings for life inmates.

14   The purpose of today's hearing, Mr. Bertoldo is to once

15   again consider your suitability for parole.  We've had

16   the opportunity to review your Central File.  You'll be

17   given an opportunity to correct or clarify the record.

18   We're going to consider your progress since your

19   commitment, your counselor's reports, your mental health

20   evaluations.  We're going to focus on your progress since

21   your last hearing, and any change in your parole plans

22   should be brought to our attention today.  We're going to

23   reach a decision today and inform you what that decision

24   is.  If you are granted a date, then the terms, or the

25   length of your confinement is going to be explained to

26   you.  Before we recess for deliberations, the Deputy

27   District Attorney, your attorney, and you will be given

6

1    an opportunity to make a final statement regarding parole

2    suitability.  Your statement will be limited to why you

3    feel you're suitable for parole.  We'll then go recess,

4    deliberate, and call you back when we have a decision and

5    let you know what that decision is.  The California Code

6    of Regulations states that regardless of time served, a

7    life inmate shall be found unsuitable for and denied

8    parole, if in the judgment of this Panel the inmate would

9    pose an unreasonable risk of danger to society if

10   released from prison.  Do you understand that, sir?

11        **INMATE BERTOLDO:**  Yes, sir.

12        **PRESIDING COMMISSIONER WILLIAMS:**  You have certain

13   rights at this hearing.  I'll ask your counsel, have

14   those rights been met to this point?

15        **ATTORNEY MBELU:**  Yes, they have.

16        **PRESIDING COMMISSIONER WILLIAMS:**  Additionally, you

17   have a right to be heard by an impartial Panel.  Do you

18   have any objection to the two Panel members seated across

19   the table from you?

20        **ATTORNEY MBELU:**  No, I don't.

21        **PRESIDING COMMISSIONER WILLIAMS:**  Okay.  You're

22   going receive a copy of your written tentative decision

23   today.  That decision becomes affective within 120 days.

24   A copy of the decision and a copy of the transcript of

25   this hearing is going to be sent to you.  You have the

26   right to appeal that decision.  Your counsel can assist

27   with you that should you choose to do that.  You're not

7

1    required to admit to or discuss the offense.  However,

2    this Panel does accept as true the findings of the Court.

3    Do you understand that, sir?

4         INMATE BERTOLDO:  Yes, sir.

5         PRESIDING COMMISSIONER WILLIAMS:  We can't overrule

6    what a court or a jury said.  We don't have that kind of

7    power.  We're here just to talk about your suitability

8    for parole.  Is there any confidential information to be

9    used?

10        DEPUTY COMMISSIONER MITCHELL:  Possibly.

11        PRESIDING COMMISSIONER WILLIAMS:  Okay.  I've passed

12   a copy of the hearing checklist to your counsel who has

13   passed it to the Deputy District Attorney and both have

14   those forms.  That's a copy of the lists of reports that

15   we've referred to so we make sure that everybody has

16   access to the same forms.  Do you have additional

17   documents to be submitted today?

18        ATTORNEY MBELU:  No, I don't, (inaudible) file that

19   (inaudible) show the Panel.

20        PRESIDING COMMISSIONER WILLIAMS:  Certainly.

21        ATTORNEY MBELU:  I think we have all the things from

22   Central File.

23        PRESIDING COMMISSIONER WILLIAMS:  Are there any

24   preliminary objections?

25        ATTORNEY MBELU:  No, other than that he will not be

26   speaking on the commitment offense.

27        PRESIDING COMMISSIONER WILLIAMS:  Okay.  So you'll

8

1   be speaking, but not about the crime.  Is that correct?

2   **INMATE BERTOLDO:**  I don't have any problem with

3   that.  Many times before I've spoke on the crime, and

4   those questions have been asked and answered, and if

5   there's anything new --

6   **PRESIDING COMMISSIONER WILLIAMS:**  Yeah.

7   **INMATE BERTOLDO:**  -- to bring to light to the Panel

8   so that it can reach a decision, I don't mind talking

9   about that.  I understand the family is here, and it's

10  been 25 years and it's rough -- I know it's rough for the

11  family.

12  **PRESIDING COMMISSIONER WILLIAMS:**  Okay.

13  **INMATE BERTOLDO:**  (Inaudible).

14  **PRESIDING COMMISSIONER WILLIAMS:**  Okay.  We're going

15  to respect that decision of yours and we're not going to

16  talk about the crime.  We're going to talk about it.

17  You're not going to.

18  **INMATE BERTOLDO:**  Right.

19  **PRESIDING COMMISSIONER WILLIAMS:**  The only thing I

20  would caution you about is don't talk about any aspect of

21  the crime because sometimes you say I have remorse, and

22  then I may say what do you have remorse for, and then

23  you'll be talking about the crime.  So don't talk about

24  any aspect of the crime, and I'll make sure nobody else

25  does also.  Okay?

26  **INMATE BERTOLDO:**  If I may add to that?

27  **PRESIDING COMMISSIONER WILLIAMS:**  Sure.

9

1        **INMATE BERTOLDO:**  I don't mind talking about the

2   crime.  If there's any questions you need to ask about it

3   that are not -- that are the questions from other

4   hearings, I don't mind answering those.

5        **PRESIDING COMMISSIONER WILLIAMS:**  But see what

6   happened at previous hearings happened at previous

7   hearings.  This is a new hearing, so what happened back

8   lord knows when has really no impact on this hearing.

9   This is a separate parole suitability hearing, so I would

10  suggest that you -- if you have any hesitation at all, do

11  not discuss the crime.

12       **INMATE BERTOLDO:**  Okay.

13       **PRESIDING COMMISSIONER WILLIAMS:**  That seems to be

14  the direction that you're going, and I don't want to

15  violate any right that you have taken advantage of.

16  Okay?

17       **INMATE BERTOLDO:**  Okay.

18       **PRESIDING COMMISSIONER WILLIAMS:**  As to other things

19  other than the crime, could you raise your right hand,

20  the best way you can?  I know it's difficult.  Do you

21  solemnly swear or affirm that the testimony you are about

22  to give at this hearing will be the truth, the whole

23  truth, and nothing but the truth?

24       **INMATE BERTOLDO:**  Yes, sir.

25       **PRESIDING COMMISSIONER WILLIAMS:**  Okay.  I'm going

26  to read a summary of the crime found in the board report

27  prepared for this hearing dated June of 2006, and it's

10

1    kind of a summary of the probation officer's report and

2    other documents, and you've heard it before, and you know

3    why you're here.

4        **INMATE BERTOLDO:**  Yes, sir.

5        **PRESIDING COMMISSIONER WILLIAMS:**  So I'm not going

6    to go through that an awful lot.

7            On April the 13th, 1981, between the hours of

8            10:30 a.m. and 2:30 p.m. the victim John

9            Simmerly (phonetic) was murdered in his

10           residence on Hiwacotta Terrace (phonetic) in

11           Hacienda Heights.  Subsequent autopsy reveal

12           that had the victim had been shot in the face

13           with a 22-caliber pistol and had been stabbed

14           approximately 16 times.  That afternoon Dale

15           Rogers, the victim's son-in-law, discovered

16           the body of the victim.  At the time the

17           victim was found with no wallet, and his watch

18           and necklace, which he had been wearing

19           earlier that day, were missing.  On April

20           15th, 1981, Mr. Bertoldo was stopped for a

21           routine traffic violation.  At that time he

22           was searched by the officer and was found to

23           be in possession of a 22-caliber pistol.  It

24           was determined that this particular weapon had

25           been taken at the time of the murder of Mr.

26           John Simmerly and was considered to be the

27           murder weapon.  Subsequent investigation

11

1     revealed that Mr. Bertoldo had pawned Mr.

2     Simmerly's necklace at a local pawn shot.

3     Furthermore, the investigating officers

4     conducted a search of Mr. Bertoldo's

5     girlfriend's apartment and found Mr.

6     Simmerly's rifle, safe and a quilt bearing

7     bloodstains.

8     Okay.  Additionally -- well, as far as a criminal

9     record is concerned, in 1976 you went to state prison for

10    robbery.  Is that correct?

11    **INMATE BERTOLDO:**  Yes, sir.

12    **PRESIDING COMMISSIONER WILLIAMS:**  Sentenced to six

13    months to 20 years.  How long did you serve of that

14    sentence?

15    **INMATE BERTOLDO:**  Approximately 18 months.

16    **PRESIDING COMMISSIONER WILLIAMS:**  18 months?

17    **INMATE BERTOLDO:**  I believe.

18    **PRESIDING COMMISSIONER WILLIAMS:**  As a juvenile in

19    1964 you were arrested for a switchblade knife when you

20    were 13 years old.  Where did you -- where were you

21    raised?

22    **INMATE BERTOLDO:**  In Los Angeles.

23    **PRESIDING COMMISSIONER WILLIAMS:**  Where?

24    **INMATE BERTOLDO:**  In Highland Park.

25    **PRESIDING COMMISSIONER WILLIAMS:**  Okay.  Also '64

26    inhaling glue, and you were 14 years old then.  As an

27    adult in '69, minor in possession of alcohol.  You were

12

1   18 years old.  You were fined and spent four days in

2   jail.  In '69, additionally, drunk driving, and you were

3   fined and spent 25 days in jail.  That was suspended.

4   And also '69, possession of a device for arson, taking a

5   vehicle without the owner's consent.  What was the device

6   for arson?

7       INMATE BERTOLDO:  I believe there was a gas or

8   something that was in the gas.

9       PRESIDING COMMISSIONER WILLIAMS:  Gas?

10      INMATE BERTOLDO:  Can of gas.

11      PRESIDING COMMISSIONER WILLIAMS:  Okay.

12      INMATE BERTOLDO:  Or a bottle of gas.

13      PRESIDING COMMISSIONER WILLIAMS:  Molotov cocktail?

14      INMATE BERTOLDO:  Yeah.

15      PRESIDING COMMISSIONER WILLIAMS:  Were you still in

16  Highland Park?

17      INMATE BERTOLDO:  No, sir.

18      PRESIDING COMMISSIONER WILLIAMS:  You belong to any

19  gang --

20      INMATE BERTOLDO:  No, sir.

21      PRESIDING COMMISSIONER WILLIAMS:  -- or militant

22  organization?

23      INMATE BERTOLDO:  No.

24      PRESIDING COMMISSIONER WILLIAMS:  What were you

25  doing with a Molotov cocktail?

26      INMATE BERTOLDO:  It wasn't my car.  It was in

27  somebody else's car.

13

1    **PRESIDING COMMISSIONER WILLIAMS:**    I see.  You ever

2    been a gang member?

3      **INMATE BERTOLDO:**  No, sir.

4    **PRESIDING COMMISSIONER WILLIAMS:**   In Highland Park?

5      **INMATE BERTOLDO:**  No.

6    **PRESIDING COMMISSIONER WILLIAMS:**   Grand theft auto

7    in '69, three years probation and fined; '70, robbery,

8    probation and a fine; revoked your probation in '76,

9    sentenced to state prison.  That's when you went to

10    prison for the robbery, or is that an additional?

11      **INMATE BERTOLDO:**  No, that was for the robbery.

12    **PRESIDING COMMISSIONER WILLIAMS:**   Okay.  So

13    apparently you were given a fine and probation initially

14    for the robbery, violated your probation, and you then

15    you were sent to prison, correct?

16      **INMATE BERTOLDO:**  I think so.

17    **PRESIDING COMMISSIONER WILLIAMS:**   You think so?

18      **INMATE BERTOLDO:**  Yes.

19    **PRESIDING COMMISSIONER WILLIAMS:**   Okay.  Then in '71

20    you were late for returning to a work furlough program.

21    Again, '71, minor in possession of alcohol, got more

22    probation.  Battery on a police officer.  What happened

23    then, '72?

24      **INMATE BERTOLDO:**  I don't remember.

25    **PRESIDING COMMISSIONER WILLIAMS:**   Okay.  Don't

26    remember.  Possession of marijuana in '72.  Possession of

27    controlled substance in '75.  Do you recall that?

14

1    **INMATE BERTOLDO:**  No.

2    **PRESIDING COMMISSIONER WILLIAMS:**  Okay.  Burglary in

3    '78.  Know anything about that?

4    **INMATE BERTOLDO:**  A burglary?

5    **PRESIDING COMMISSIONER WILLIAMS:**  Yeah.

6    **INMATE BERTOLDO:**  I think I went to prison for that,

7    yes.

8    **PRESIDING COMMISSIONER WILLIAMS:**  Okay.  How long

9    did you go to prison for it?

10   **INMATE BERTOLDO:**  About 16 months.

11   **PRESIDING COMMISSIONER WILLIAMS:**  16 months.  So you

12   had been to prison twice prior to this occasion.  Is that

13   correct?

14   **INMATE BERTOLDO:**  Yes.

15   **PRESIDING COMMISSIONER WILLIAMS:**  Then in '78, under

16   the influence of a controlled substance.  Grand theft

17   auto the next year, '79.  And then forgery in '79, two

18   years in state prison.  Is that an additional one?

19   **INMATE BERTOLDO:**  I've had two commitments.

20   **PRESIDING COMMISSIONER WILLIAMS:**  Okay.  So the

21   other one, the burglary, you didn't go to prison for?  I

22   would suspect that you went for this forgery?

23   **INMATE BERTOLDO:**  Right.

24   **PRESIDING COMMISSIONER WILLIAMS:**  And for the other

25   robbery?

26   **INMATE BERTOLDO:**  Yeah.

27   **PRESIDING COMMISSIONER WILLIAMS:**  Correct?

15

1      **INMATE BERTOLDO:** Yes.

2      **PRESIDING COMMISSIONER WILLIAMS:** Okay. Two prior

3  commitments. You were born in Visalia?

4      **INMATE BERTOLDO:** Yes, sir.

5      **PRESIDING COMMISSIONER WILLIAMS:** Youngest of five

6  kids. Moved to Los Angeles with your mother and the

7  other kids?

8      **INMATE BERTOLDO:** Uh-huh.

9      **PRESIDING COMMISSIONER WILLIAMS:** And went through

10  the 11th grade. How come you left in the 11th grade?

11      **INMATE BERTOLDO:** I just was making wrong decisions.

12      **PRESIDING COMMISSIONER WILLIAMS:** Yeah.

13      **INMATE BERTOLDO:** Didn't like authority.

14      **PRESIDING COMMISSIONER WILLIAMS:** Out on the

15  streets?

16      **INMATE BERTOLDO:** Yes, sir.

17      **PRESIDING COMMISSIONER WILLIAMS:** Running loose?

18      **INMATE BERTOLDO:** Yep.

19      **PRESIDING COMMISSIONER WILLIAMS:** Okay. Into

20  alcohol and drugs?

21      **INMATE BERTOLDO:** Yes, sir.

22      **PRESIDING COMMISSIONER WILLIAMS:** And -- okay. What

23  kind of job did you have?

24      **INMATE BERTOLDO:** Mostly it was patio installation.

25      **PRESIDING COMMISSIONER WILLIAMS:** Okay. Aluminum

26  siding and patio stuff?

27      **INMATE BERTOLDO:** Yes.

16

1        PRESIDING COMMISSIONER WILLIAMS:  Okay.  You

2    married?

3        INMATE BERTOLDO:  Yes, I am.

4        PRESIDING COMMISSIONER WILLIAMS:  When did you get

5    married?

6        INMATE BERTOLDO:  I believe it was November 19th of

7    '91.

8        PRESIDING COMMISSIONER WILLIAMS:  While in prison?

9        INMATE BERTOLDO:  Yes, sir.

10        PRESIDING COMMISSIONER WILLIAMS:  Someone you met

11    while you were in prison or someone from the --

12        INMATE BERTOLDO:  No, we've known each other since

13    we were about 15 years old.

14        PRESIDING COMMISSIONER WILLIAMS:  Okay.  And you

15    maintain a relationship with that lady?

16        INMATE BERTOLDO:  Yes.

17        PRESIDING COMMISSIONER WILLIAMS:  Carol Lee Marangi.

18        INMATE BERTOLDO:  Yes.

19        PRESIDING COMMISSIONER WILLIAMS:  M-A-R-A-N --

20        INMATE BERTOLDO:  Marangi.

21        PRESIDING COMMISSIONER WILLIAMS:  G-I.  Okay.  And

22    your wife visits often?

23        INMATE BERTOLDO:  Not often.  It's -- she's taken

24    sick and -- so that's, you know.

25        PRESIDING COMMISSIONER WILLIAMS:  Sure.  Okay.

26        INMATE BERTOLDO:  She comes up approximately every

27    third month.

17

1        **PRESIDING COMMISSIONER WILLIAMS:**  Is she from the

2    San Diego area?

3        **INMATE BERTOLDO:**  From Los Angeles.

4        **PRESIDING COMMISSIONER WILLIAMS:**  Because you guys

5    got married at Donovan, correct?

6        **INMATE BERTOLDO:**  Yes.

7        **PRESIDING COMMISSIONER WILLIAMS:**  All right.  Tell

8    me about your parole plans.  What would you do if you

9    were out of here?

10       **INMATE BERTOLDO:**  I would be living at home with my

11   wife.  I've started some of my art work that is, that

12   should be in that file that I --

13       **PRESIDING COMMISSIONER WILLIAMS:**  You an artist?

14       **INMATE BERTOLDO:**  Yes, sir.  What I do is I write

15   the hieroglyphs, and they're trying to get a private

16   gallery web site on the internet.  I was getting letters

17   from a friend of mine that owns a boxing ring company,

18   but it's very hard for me to do.  I have got three

19   debilitating diseases, Hep C, degeneration of the lower

20   lumbar and Parkinson's.

21       **PRESIDING COMMISSIONER WILLIAMS:**  Yeah.

22       **INMATE BERTOLDO:**  So sometimes when my back gives

23   out -- I got a medical file with me, I'll be out

24   sometimes for a month.

25       **PRESIDING COMMISSIONER WILLIAMS:**  Okay.

26       **INMATE BERTOLDO:**  In terms of the back, but that is

27   what I do now, and we're trying to get a business going.

18

1      **PRESIDING COMMISSIONER WILLIAMS:** Okay. And these -

2  - you draw it and they're quite colorful.

3      **INMATE BERTOLDO:** Yes.

4      **PRESIDING COMMISSIONER WILLIAMS:** And you're

5  planning on selling those on the internet or what?

6      **INMATE BERTOLDO:** That, and we're targeting

7  restaurants, business, and stuff.

8      **PRESIDING COMMISSIONER WILLIAMS:** Decorations for

9  businesses and --

10      **INMATE BERTOLDO:** Yes.

11      **PRESIDING COMMISSIONER WILLIAMS:** -- that kind of

12  stuff?

13      **INMATE BERTOLDO:** Right.

14      **PRESIDING COMMISSIONER WILLIAMS:** Okay. How long

15  have you been doing that?

16      **INMATE BERTOLDO:** For approximately 10, 15 years

17  now.

18      **PRESIDING COMMISSIONER WILLIAMS:** Okay. Yeah. And

19  they're --

20      **INMATE BERTOLDO:** There's a -- right before the

21  picture there's -- one of the staff here bought some of

22  the paintings from me.

23      **PRESIDING COMMISSIONER WILLIAMS:** They did?

24      **INMATE BERTOLDO:** And I put the amount on there. We

25  sell them up front here. There's a hub store they have

26  at front.

27      **PRESIDING COMMISSIONER WILLIAMS:** Sure.

19

1     **INMATE BERTOLDO:**  And I wanted to show the Board

2  that they can sell.

3     **PRESIDING COMMISSIONER WILLIAMS:**  Okay.

4     **INMATE BERTOLDO:**  They do.  I've gotten more

5  customers from just that one sell.

6     **PRESIDING COMMISSIONER WILLIAMS:**  Okay.  Well, I

7  don't question that.  They look pretty good to me.  I

8  imagine somebody would buy them.

9     **INMATE BERTOLDO:**  Yeah.  And that's what we're --

10  what I'm counting on as a job right now.

11     **PRESIDING COMMISSIONER WILLIAMS:**  Okay.  I have here

12  a petition.  You know these folks?

13     **INMATE BERTOLDO:**  Some I do and some I don't.

14     **PRESIDING COMMISSIONER WILLIAMS:**  How were they

15  gathered?

16     **INMATE BERTOLDO:**  Through family and friends.

17     **PRESIDING COMMISSIONER WILLIAMS:**  Okay.

18     **INMATE BERTOLDO:**  But most of the people on there I

19  did meet.

20     **PRESIDING COMMISSIONER WILLIAMS:**  Somebody didn't

21  stand out in the supermarket and get these people --

22     **INMATE BERTOLDO:**  No, they spoke with their friends.

23     **PRESIDING COMMISSIONER WILLIAMS:**  Okay.

24     **INMATE BERTOLDO:**  And they got signatures.

25     **PRESIDING COMMISSIONER WILLIAMS:**  And they know of

26  you or they know you personally?

27     **INMATE BERTOLDO:**  Right.  But I add to that, to the

20

1   petition is a two-page brief on it, and then I also put

2   my (inaudible) and things like that.

3       **PRESIDING COMMISSIONER WILLIAMS:**  Okay.  All right.

4   So there's -- how many signatures are here?  Some pages

5   have one person, some pages three.

6       **INMATE BERTOLDO:**  Well, I think there was 55 --

7       **PRESIDING COMMISSIONER WILLIAMS:**  All right.

8       **INMATE BERTOLDO:**  -- in 2004 for that hearing, and I

9   think there's 43 on this hearing.

10      **PRESIDING COMMISSIONER WILLIAMS:**  Okay.

11      **INMATE BERTOLDO:**  For 2006.

12      **PRESIDING COMMISSIONER WILLIAMS:**  Same people?

13      **INMATE BERTOLDO:**  Some are same, some are not.

14      **PRESIDING COMMISSIONER WILLIAMS:**  Okay.  And they

15   are from various places in California.  I see Oceanside,

16   Bakersfield, various places.  Okay.  Glendale, one from

17   Arizona?

18      **INMATE BERTOLDO:**  Uh-huh.  That's my sister.

19      **PRESIDING COMMISSIONER WILLIAMS:**  Okay.  Eleanor

20   Silva (phonetic)?

21      **INMATE BERTOLDO:**  That's a friend of the family.

22      **PRESIDING COMMISSIONER WILLIAMS:**  Known her a long

23   time?

24      **INMATE BERTOLDO:**  Since I was about 16.

25      **PRESIDING COMMISSIONER WILLIAMS:**  Okay.  She

26   supports your release on parole.

27      **INMATE BERTOLDO:**  Yes, sir.

21

1      **PRESIDING COMMISSIONER WILLIAMS:**  She's aware of the

2  program that you've been involved in.

3      **INMATE BERTOLDO:**  Yes.  I try to let everyone know

4  that signs the petition what I'm doing.

5      **PRESIDING COMMISSIONER WILLIAMS:**  Yeah.  All right.

6  And she lives in La Puente?

7      **INMATE BERTOLDO:**  Yes.

8      **PRESIDING COMMISSIONER WILLIAMS:**  Josephine

9  Christian?

10      **INMATE BERTOLDO:**  That's my mom.

11      **PRESIDING COMMISSIONER WILLIAMS:**  Your mother.  And

12  where does she live?

13      **INMATE BERTOLDO:**  In (inaudible).

14      **PRESIDING COMMISSIONER WILLIAMS:**  Okay.  She says

15  you've been in for a long time.

16      **INMATE BERTOLDO:**  25 years.

17      **PRESIDING COMMISSIONER WILLIAMS:**  Yeah.  Your

18  direction is inclined toward virtual principals.  Your

19  mother an elderly lady now?

20      **INMATE BERTOLDO:**  She's approximately 84, 85.

21      **PRESIDING COMMISSIONER WILLIAMS:**  Okay.  So it's an

22  assumption that somebody else wrote this letter?

23      **INMATE BERTOLDO:**  Yes.

24      **PRESIDING COMMISSIONER WILLIAMS:**  Okay.  Said she

25  will support you if you were released to some extent?

26      **INMATE BERTOLDO:**  Yes.

27      **PRESIDING COMMISSIONER WILLIAMS:**  Probably to any

22

1  extent she can.

2      INMATE BERTOLDO:  She's a Christian.

3      PRESIDING COMMISSIONER WILLIAMS:  Yeah.

4      INMATE BERTOLDO:  So I'm sure we'll go church

5  together.

6      PRESIDING COMMISSIONER WILLIAMS:  Okay.  This is an

7  eight year-old child.  Who is it?

8      INMATE BERTOLDO:  That is not mine.  That doesn't

9  belong in there.  That was a mistake.

10      PRESIDING COMMISSIONER WILLIAMS:  The child supports

11  your release.

12      INMATE BERTOLDO:  Not me, probably.

13      PRESIDING COMMISSIONER WILLIAMS:  Okay.  All right.

14  Do you have any firm offers of a job?

15      INMATE BERTOLDO:  Just what you see there.  No, sir,

16  I could of done that.

17      PRESIDING COMMISSIONER WILLIAMS:  Yeah.

18      INMATE BERTOLDO:  I could of gotten some letterheads

19  from friends that I know I could work for them.  When my

20  back goes out, it goes out.

21      PRESIDING COMMISSIONER WILLIAMS:  Yeah.

22      INMATE BERTOLDO:  And I can't do anything, not even

23  for myself.  Sometimes I can't get out of the bunk, out

24  of bed.  So it would of been --

25      PRESIDING COMMISSIONER WILLIAMS:  Okay.  Well, you

26  certainly have a promising vocation, I guess we can call

27  it that.  okay.

23

1       **INMATE BERTOLDO:**  I like it.  I enjoy it.

2       **PRESIDING COMMISSIONER WILLIAMS:**  Pardon me?

3       **INMATE BERTOLDO:**  I enjoy it.

4       **PRESIDING COMMISSIONER WILLIAMS:**  All right.  And

5   you have a lot of these folks here.  Where would you live

6   with your wife?

7       **INMATE BERTOLDO:**  In Los Angeles.

8       **PRESIDING COMMISSIONER WILLIAMS:**  Okay.  Does she

9   write a letter here?

10      **INMATE BERTOLDO:**  There's one in here, yes.

11      **PRESIDING COMMISSIONER WILLIAMS:**  I didn't run

12  across it.

13      **INMATE BERTOLDO:**  It should be right behind my

14  mom's.

15      **PRESIDING COMMISSIONER WILLIAMS:**  Okay.  Nope.

16      **INMATE BERTOLDO:**  That's it right there.

17      **PRESIDING COMMISSIONER WILLIAMS:**  Pardon me?

18      **INMATE BERTOLDO:**  That was it where your thumb is.

19      **PRESIDING COMMISSIONER WILLIAMS:**  This one?

20      **INMATE BERTOLDO:**  Yeah.

21      **PRESIDING COMMISSIONER WILLIAMS:**  That's your mom's.

22      **INMATE BERTOLDO:**  Yes.

23      **PRESIDING COMMISSIONER WILLIAMS:**  This is your

24  mother's letter.

25      **INMATE BERTOLDO:**  Chelsea Christian.

26      **PRESIDING COMMISSIONER WILLIAMS:**  I understand it,

27  but your wife's letter?

24

1       INMATE BERTOLDO:  Oh, if it's not in there, maybe it

2  didn't each here in time.  It will be in that file right

3  there.

4       PRESIDING COMMISSIONER WILLIAMS:  All right.

5. Because I don't want to overlook that.

6       INMATE BERTOLDO:  Okay.

7       PRESIDING COMMISSIONER WILLIAMS:  Okay.  I got it

8  right here.  Carol?

9       INMATE BERTOLDO:  Yes.

10      PRESIDING COMMISSIONER WILLIAMS:  She says you will

11  be welcomed home by all of them, living with me, or her.

12  Access to all there is at the home, transportation.

13  She's looking into advertising your artistic work.  Okay.

14  So she offers a home and help and whatever she can.  I

15  don't have any doubt about that.  Ben Vivian (phonetic),

16  the Chaplain.  Tell me that one.

17      INMATE BERTOLDO:  He's one of the chaplains here

18  that comes once a week to give services here, and I'm

19  there to support them and help them out there and attend

20  the services.

21      PRESIDING COMMISSIONER WILLIAMS:  Okay.  He supports

22  your release.  Says that he believes that you would be

23  successful and fit back into society.  Okay.  You

24  obviously have a place to go to?

25      INMATE BERTOLDO:  Yes, sir.

26      PRESIDING COMMISSIONER WILLIAMS:  You have prospects

27  in a very good career that fits within your physical

25

1    limitations.  What else?  Anything else we should be

2    discussing about parole plans?

3        INMATE BERTOLDO:  Other than there's a Calvary

4    Chapel in there that they're willing to accept me into

5    their church there.  There's some community letters that

6    are in there also from the community.  Some of the

7    programs that are there are willing to help get me to

8    school, help me with the -- I don't know how to run a

9    computer.

10        PRESIDING COMMISSIONER WILLIAMS:  Yeah.

11        INMATE BERTOLDO:  So they would be willing to help

12    me out with that.

13        PRESIDING COMMISSIONER WILLIAMS:  Okay.

14        INMATE BERTOLDO:  There's a community service there

15    that would help with that.

16        PRESIDING COMMISSIONER WILLIAMS:  Okay.  Seems to me

17    that your parole plans are pretty appropriate.  You agree

18    with that?

19        INMATE BERTOLDO:  Yes, sir.

20        PRESIDING COMMISSIONER WILLIAMS:  Okay.  Then we'll

21    go to post-conviction factors.

22        DEPUTY COMMISSIONER MITCHELL:  Thank you.  For this

23    portion of the hearing, sir, I reviewed your Central

24    File, post-conviction progress reports, the last updated

25    May 9th, 2006, by Correctional Counselor J. Olearnick,

26    O-L-E-A-R-N-I-C-K, life prisoner evaluation report

27    prepared for June 2006 calendar, it's by the same

26

1    correctional counselor, and a psychological evaluation

2    prepared by Dr. Lane L. Mura, M-U-R-A.  She's a Ph.D.,

3    psychologist.  It's dated November 9th, 2004.  This

4    appears to be your fifth subsequent parole consideration

5    hearing?

6        INMATE BERTOLDO:  Yes, sir.

7        DEPUTY COMMISSIONER MITCHELL:  Last hearing occurred

8    on June 8th, 2005, and that was a stipulated hearing

9    which you agreed to a one-year stipulation to acquire

10   more self-help programs.  Is that correct?

11       INMATE BERTOLDO:  Yes.

12       DEPUTY COMMISSIONER MITCHELL:  So you didn't

13   actually appear before a Panel unless you had one of many

14   hearings, which we do now, which are about 10 minutes

15   long, and we just discuss what we want you to do and you

16   explain your reason for asking for stipulation.  You were

17   asked to remain disciplinary free, which you have done.

18   You were asked to participate in self-help, and you've

19   done that.  You were asked to earn positive chronos, and

20   you've done that.  So I'm satisfied with what the Board

21   asked of you last time this you did comply with those

22   requests.  You have a current classification score, an

23   actual score of zero.  You have a mandatory minimum score

24   of 19 to keep you in a level two facility.  You

25   understand how that works?

26       INMATE BERTOLDO:  Yes, sir.

27       DEPUTY COMMISSIONER MITCHELL:  And you have

27

1   maintained Medium-A custody since your last hearing,

2   which was your lowest custody rating you can have until

3   you get a date by the Board.  You have confidential

4   enemies, non-confidential enemies, and there's no gang

5   affiliation.  Work assignments, what's your current

6   assignment, are you assigned at all?

7        **INMATE BERTOLDO:**  They just had massive transfer

8   from one yard to the other, so I'm without a job right

9   now, but prior to that I was a tutor for the Bridging

10  program.

11       **DEPUTY COMMISSIONER MITCHELL:**  Well, I know you've

12  been a Teacher's Aid, you've been in Vocational Drafting,

13  Vocational Optical.  Is that correct?

14       **INMATE BERTOLDO:**  I --

15       **DEPUTY COMMISSIONER MITCHELL:**  Optician?

16       **INMATE BERTOLDO:**  Yes, I gave --

17       **DEPUTY COMMISSIONER MITCHELL:**  You're licensed --

18       **INMATE BERTOLDO:**  Yes.

19       **DEPUTY COMMISSIONER MITCHELL:**  Okay.  Now, can you

20  do that in the community with your disability?

21       **INMATE BERTOLDO:**  With the Parkinson's, you know,

22  it's really odd.  I can do my paintings and it doesn't

23  bother me, but if I use a salt shaker, once it gets

24  going, it's hard to stop it, so I probably can.  I

25  wouldn't want to work around machines, and there are

26  machines in optical, making the lenses.

27       **DEPUTY COMMISSIONER MITCHELL:**  Okay.  And I saw

28

1    Vocational Computer.  Did you complete any programming in

2    Vocational Computer?

3         INMATE BERTOLDO:  No, I was transferred from --

4         DEPUTY COMMISSIONER MITCHELL:  What I've seen,

5    you've completed your Opticians Training and Drafting,

6    correct?

7         INMATE BERTOLDO:  Right.

8         DEPUTY COMMISSIONER MITCHELL:  Okay.  And I imagine

9    Drafting is going to be tough too?

10        INMATE BERTOLDO:  Well, there's drawing in that, but

11   there's no machines.

12        DEPUTY COMMISSIONER MITCHELL:  Okay.  So you think

13   you might be able to control it?

14        INMATE BERTOLDO:  Yes, sir.

15        DEPUTY COMMISSIONER MITCHELL:  Okay.  Very good.

16   Vocational Silk-screening, you tried that for a while.

17   Vocational Sewing Machine Repair, Arts and Corrections,

18   Porter's Clerk, but the only programs you were able to

19   complete was the Optician Program and Drafting.  Is that

20   correct?

21        INMATE BERTOLDO:  Yes, sir.

22        DEPUTY COMMISSIONER MITCHELL:  Okay.  There's no

23   indication of a mental health disorder.  You're not

24   receiving psychotropic medication.  No treatment as far

25   as the CCCMS/EOP crisis bed or Department of Mental

26   Health.  You do have an Axis II diagnosis of antisocial

27   personality disorder.  You have a GAF score of 70.

29

1    That's the global assessment of functioning.  That's a

2    little bit on the lower side.  Do you know what the GAF

3    score means, sir?

4         INMATE BERTOLDO:  No, sir.

5         DEPUTY COMMISSIONER MITCHELL:  Essentially, it

6    pertains to how you're functioning within the community,

7    which you live out here.  I see scores to a maximum of

8    100.  Usually I see them in their 80s when you're doing

9    real well.  Do you stay by yourself quite a bit?

10        INMATE BERTOLDO:  No, sir.  I'm very active in the

11   Christian community.

12        DEPUTY COMMISSIONER MITCHELL:  I'm kind of curious.

13   Maybe if you do ever see a psychologist again you might

14   ask them how they came up with the 70 score.  That's

15   usually what it relates to.

16        INMATE BERTOLDO:  May I say something about that

17   psych eval?

18        DEPUTY COMMISSIONER MITCHELL:  Your attorney came in

19   and told us that you were interested in trying to get

20   some issues resolved with the psych report.  Is that one

21   of them?

22        INMATE BERTOLDO:  Yes.  There was a -- an evaluation

23   that she came to from two mistakes in her report.

24        DEPUTY COMMISSIONER MITCHELL:  What I'm going to

25   have you do is you can provide the information at kind of

26   the conclusion where your statement is.  What I will do

27   is refer to that report, and it's a negative report as

30

1    you probably know?

2        INMATE BERTOLDO:  Yeah.

3        DEPUTY COMMISSIONER MITCHELL:  And it may be based

4    on erroneous information on conclusions.  And it may be a

5    reason that you, if you do not get a date today, that a

6    new psych report should be prepared so we can get a fresh

7    view from that point of view, and that's something I'd

8    expect your attorney to be request, but it's something

9    pretty automatic for the Board with the negative reports.

10   Let me go ahead and finish, and then I want to hear from

11   you.

12       INMATE BERTOLDO:  Okay.

13       DEPUTY COMMISSIONER MITCHELL:  You have a grade

14   point level that's recorded of 8.9.  You got your GED in

15   1987, and there's some comment here that you took some

16   college courses.  Is that prior to prison or during

17   prison?

18       INMATE BERTOLDO:  No, this was last year.  I took

19   personal financing course, an ethics course and a

20   psychology course.

21       DEPUTY COMMISSIONER MITCHELL:  What college was

22   this?

23       INMATE BERTOLDO:  Coastline College.

24       DEPUTY COMMISSIONER MITCHELL:  All right.  You have

25   documents to that effect?

26       INMATE BERTOLDO:  They should be in that file.

27       DEPUTY COMMISSIONER MITCHELL:  Okay.  Because I

31

1    looked in the Central File and I didn't see that.

2         **INMATE BERTOLDO:** Right. Some of the that paperwork

3    got here a little late.

4         **DEPUTY COMMISSIONER MITCHELL:** Okay.

5         **INMATE BERTOLDO:** So I was advised by my counselor

6    that I could carry it in.

7         **DEPUTY COMMISSIONER MITCHELL:** Yes, you can. What

8    we would suggest you do -- did you do an Olson review

9    before the hearing?

10        **INMATE BERTOLDO:** Yes, I did.

11        **DEPUTY COMMISSIONER MITCHELL:** Okay. If you notice

12   documents missing, if you do another Olson review, don't

13   give away your documents, but ask your counselor to make

14   copies of them and get them incorporated into your file.

15   That way if you ever have another hearing with the Board

16   then we would have a copy before the hearing, so would

17   the District Attorney's office, your attorney would have

18   a copy of it. It's good to have it up front if you can

19   do that. Okay?

20        **INMATE BERTOLDO:** Okay.

21        **DEPUTY COMMISSIONER MITCHELL:** All right. Let's

22   continue here. The CC-I noted some self-help programming

23   you've been involved in. Talks about -- this was 2005,

24   September 5th, December 30th, actually, going back to

25   2004, September 3rd, October 4th, and January 3rd, '05,

26   that your participated in the Narcotics Anonymous program

27   at this facility here. Another March 24th, '05, received

32

1   a CDC 128(b) informational chrono and a certificate for

2   completion of a 20-hour program of Friends Outside

3   Creative Conflict Resolution/Anger Management workshop.

4   Chronos dated August 27th, '05, and October 10th, '06,

5   for Alcoholics Anonymous participation.  January 8th,

6   2004, a project, we called it Breakfast with Santa.  What

7   was that really about?

8       **INMATE BERTOLDO:**  Make toys for kids.  I help out

9   every year with that when I can.

10      **DEPUTY COMMISSIONER MITCHELL:**  All right.  And also

11   that you received a letter from the Children's Hunger

12   Relief Fund for come complementing you for your generous

13   contribution.  What did you do for them?

14      **INMATE BERTOLDO:**  I was the chairman for the inmate

15   group there, and we had voted on helping if people at the

16   Tsunami.

17      **DEPUTY COMMISSIONER MITCHELL:**  Okay.

18      **INMATE BERTOLDO:**  That took place and we gathered, I

19   think it was, little over $500.

20      **DEPUTY COMMISSIONER MITCHELL:**  I want to acknowledge

21   also that in the report under employment it notes here

22   that you have job aluminum patio installation and

23   flooring.  Is that something you learned within the

24   prison?

25      **INMATE BERTOLDO:**  No, sir.

26      **DEPUTY COMMISSIONER MITCHELL:**  Okay.  That's prior

27   to coming here?

33

1          **INMATE BERTOLDO:**  Yes.

2          **DEPUTY COMMISSIONER MITCHELL:**  All right.  And

3     looking at the psychologist's report, they also note

4     about your optician's license.  And going on into the

5     disciplinaries, you have not received any disciplinaries

6     since the last hearing.  You have a total of ten serious

7     rule violation received in total.  The last one is dated

8     April 10th, 2000, for refusing to submit to a urinalysis.

9     Also, you is have a total of ten counseling chronos, CDC

10    128(a)s, the last one dated January 7th, 1987, for

11    performance.  That sound all right to you?

12         **INMATE BERTOLDO:**  Yes.

13         **DEPUTY COMMISSIONER MITCHELL:**  Those disciplinaries

14    historically dealt with refusing to submit to the

15    urinalysis, possession of morphine, positive UA test,

16    possession of inmate manufactured hypodermic syringe,

17    non-expendable property, positive urinalysis, stimulants

18    and sedatives, force and violence, fistfight, threatening

19    officer, assault on staff, so you were pretty rough back

20    in the days of '85 to 2000.  I believe it in the last

21    transcript from the Board it was noted that something

22    dramatic changed in about 2000 changed with you.  What

23    was that?

24         **INMATE BERTOLDO:**  I was touched by the Lord and came

25    to the Lord.  I gave my life over to Jesus Christ, and

26    I've been there ever since.  There was a lot of drugs in

27    any life and that's where I was at.

34

1     **DEPUTY COMMISSIONER MITCHELL:**  Did you learn the 12

2    steps?

3     **INMATE BERTOLDO:**  No.

4     **DEPUTY COMMISSIONER MITCHELL:**  And why not?

5     **INMATE BERTOLDO:**  I didn't memorize them.

6     **DEPUTY COMMISSIONER MITCHELL:**  Do you have a

7    favorite step that you do remember?

8     **INMATE BERTOLDO:**  I go by the (inaudible).  There's

9    a program that we're doing through the church now here,

10   and it's kind of -- I need a moment.

11    **DEPUTY COMMISSIONER MITCHELL:**  I notice in here that

12   there's a number of documents that you have here

13   pertaining your self-help regarding church involvement,

14   so let me just refer to those.

15    **INMATE BERTOLDO:**  Please.

16    **DEPUTY COMMISSIONER MITCHELL:**  This is from Set Free

17   Ministries, and I'm looking at a couple of dozen of those

18   certificates.  The most recent one is 9/17/04, the spirit

19   filled Christian, spirit filled Christian, your life in

20   Christ, Gospel John, serving others, developing your

21   faith, growing as a Christian, talking with Christ, doing

22   time with Jesus, lessons for Christian living, another

23   one like that, basic Christian discipline, lessons an

24   assurance, the good news, and it continues, so there's

25   many of these documents.  Is that what you're talking

26   about?

27    **INMATE BERTOLDO:**  No, sir.  There's a program that

35

1    we wrote to in June of 2005, myself and two of the other

2    Christians brothers that are in the --

3        DEPUTY COMMISSIONER MITCHELL:  Is it the Criminon

4    program?

5        INMATE BERTOLDO:  It's the Most Excellent Way.

6        DEPUTY COMMISSIONER MITCHELL:  Okay.

7        INMATE BERTOLDO:  And through them and the chaplain

8    here Glenn Wright (phonetic), which is the director of

9    that ministry and pastor we started one of those groups

10   here.  It was successful for a year until we moved off

11   the yard.  We're trying to get it over on the next yard,

12   which I'm on, which is B yard.

13       DEPUTY COMMISSIONER MITCHELL:  Okay.  I noted there

14   was two documents pertaining the Most Excellent Way,

15   which is abbreviated as TMEW, and the first one you

16   completed was Christian solution to chemical

17   dependency --

18       INMATE BERTOLDO:  Right.

19       DEPUTY COMMISSIONER MITCHELL:  -- program.  Is that

20   correct?

21       INMATE BERTOLDO:  Right.

22       DEPUTY COMMISSIONER MITCHELL:  And there's another

23   one received on April 10th, 2006.  Those are laudatory

24   chronos as they're identified, as well as one for August

25   3rd, 2006, as a tutor, and August 1st, 2006, Breaking

26   Barriers.  Does that sound right to you, sir?

27       INMATE BERTOLDO:  Yes.

36

1      **DEPUTY COMMISSIONER MITCHELL:**  Okay.  There's

2      another certificate -- it's actually not laudatory

3      chronos, certificates.  You received one on August 1st,

4      2006, for life skills.  You have one June 5th, 2006, SAC.

5      What is that?  Let me go back and look at that time

6      actual chrono or certificate.  I got this one here in

7      front of me at this point, and this is Potter's House the

8      Most Excellent Way and that's June 1st, 2006.

9      **INMATE BERTOLDO:**  Yes.

10     **DEPUTY COMMISSIONER MITCHELL:**  The Way to Happiness,

11     January 5th, 2006.  That's under Criminon.  We have

12     special education project you got a certificate for,

13     December 2005.  That's Breakfast for Santa we talked

14     about, and the last one again is that Potter's House

15     chapel, and that's dated July 12th, 2000 -- actually,

16     there's one more 2005 and a second one.  Okay.  I still

17     don't know what that one is I'm looking at here, at least

18     from my notes here I can't read that.  In reviewing the

19     correctional counselor's report it appears supportive of

20     release in my opinion.  You probably know that your --

21     the correctional counselors can no longer project how

22     they think you'll make it in the community.  They don't

23     have that crystal ball they can say anymore.  They can

24     only say if you release plans, and on the assessment

25     section the counselor states that your future plans seem

26     to be well thought out and realistic.  You have continued

27     support from your wife and the ministry.  You have

37

1    satisfactory residence plans and you completed many

2    trades in order to find employment.  Your current plans

3    to open your own business selling prints will be

4    obtainable with continued support, which he seems to

5    have.  You could benefit from making back-up residency

6    and employment plans just in case the current plans do

7    not materialize.  So this is a positive report.  I'm not

8    quite so positive with the psychologist, and you know

9    that.

10          **INMATE BERTOLDO**:  Uh-huh.

11          **DEPUTY COMMISSIONER MITCHELL**:  So let me read what

12    the psychologist noted down, and then if you want to

13    comment on that you're welcome to, or you can hold off to

14    your conclusion.  Overall risk assessment measures

15    suggest that the inmate poses a moderate likelihood of

16    becoming involved in a violent offense if released to the

17    free community.  There is the caveat that such an

18    assessment is least partially based on the likelihood of

19    continued abstinence from any substance abuse.  That's

20    the part -- positive part of it.  Based on the above

21    information, you would benefit from further exposure to

22    substance abuse programming, whether within his religious

23    group or within the 12 step programs.  So I have some

24    concern with regard to the conclusion the psychologist.

25    Prior to that there was a number of documents that the

26    psychologist referred to going back to a psychologist or

27    psychiatrist in 1986 with continued assessment that you

38

1    have an antisocial personality.  You saw those documents,

2    one, two, three, four, five, six, seven, eight different

3    referrals or reports.  What is the issue you have the

4    report?  Did you try to request an interview with the

5    psychologist to address the concerns that you had?

6        INMATE BERTOLDO:  I did and I did speak to one.  I

7    wrote to Mr. Penney and received some -- his answer,

8    which was that I needed to go through the medical

9    department, which I knew that, but I wrote to him anyhow.

10        DEPUTY COMMISSIONER MITCHELL:  Tell me did you write

11    to the psychologist or the medical department?

12        INMATE BERTOLDO:  Yes, sir.

13        DEPUTY COMMISSIONER MITCHELL:  And what was the

14    final result?

15        INMATE BERTOLDO:  That it had to be ordered by the

16    Board.

17        DEPUTY COMMISSIONER MITCHELL:  A new report has to

18    be ordered by the Board.

19        INMATE BERTOLDO:  Yes, sir.

20        DEPUTY COMMISSIONER MITCHELL:  That's true.  What I

21    was asking about is a way to talk with the psychologist

22    who wrote the report that you don't agree with.  Did you

23    try that after it first came out?

24        INMATE BERTOLDO:  By the time that I did -- it

25    reached me that psychologist had left.  This was

26    approximately two years ago, and the institution needed

27    help to play catch up.

39

1    **DEPUTY COMMISSIONER MITCHELL:** Okay.

2    **INMATE BERTOLDO:** With the psych reports, and I was

3    part of it.

4    **DEPUTY COMMISSIONER MITCHELL:** All right.

5    **INMATE BERTOLDO:** So she had left pretty quick.

6    **DEPUTY COMMISSIONER MITCHELL:** So it's my

7    understanding from your attorney that you are interested

8    in a postponement, something that you could get a new

9    psychological --

10    **INMATE BERTOLDO:** Right.

11    **DEPUTY COMMISSIONER MITCHELL:** -- report before a

12    decision. We didn't agree that at this point for a

13    postponement. We thought we should have the hearing.

14    Part of it is because we do the family here.

15    **INMATE BERTOLDO:** Right.

16    **DEPUTY COMMISSIONER MITCHELL:** The next of kin

17    victims, and we wanted them to have a chance to say what

18    they'd like to at the hearing, but that is an issue that

19    probably needs to be addressed if there is another

20    hearing with a new report, and I'm sure that we'll have

21    one made for you.

22    **INMATE BERTOLDO:** May I say something?

23    **DEPUTY COMMISSIONER MITCHELL:** Yes, you may.

24    **INMATE BERTOLDO:** On the risk factor that you read,

25    and that was exactly what my intention was to stop that

26    because the two mistakes that she made on my parole plans

27    and my resentment of authority led to that assessment.

40

1     **DEPUTY COMMISSIONER MITCHELL:** Okay. All right.

2     Very good.

3     **MR. PENNEY:** I need to switch to side two, please.

4     **DEPUTY COMMISSIONER MITCHELL:** Yes.

5                    **(Off the Record)**

6     **MR. PENNEY:** Okay. We're continuing to record on

7     side two.

8     **DEPUTY COMMISSIONER MITCHELL:** Just as I close, I'll

9     just mention that, and this may of been addressed

10    already, but according to file documents, your history of

11    substance abuse includes heroin, cocaine, marijuana,

12    methamphetamine, alcohol, sniffing glue and barbiturates,

13    correct?

14    **INMATE BERTOLDO:** Yes.

15    **DEPUTY COMMISSIONER MITCHELL:** With that kind of a

16    history you need to be fully involved in a self-help

17    program such as AA or NA, or if those were offensive

18    programs because they're Christian based programs, then

19    find a different program. I strongly suggest that you

20    learn the 12 steps. They are very important, and I

21    believe those things will keep you sober in the future.

22    **INMATE BERTOLDO:** I've stayed sober since 2000,

23    September of 2000.

24    **DEPUTY COMMISSIONER MITCHELL:** I understand. It's

25    different when you get in the community and you're under

26    pressure, so I want you to think about that. When you

27    come into another hearing you bring in some reference

41

1    information pertaining to what programs out there you can

2    get involved in, the addresses of the AA, NA meetings,

3    things that show that you've prepared yourself, but at

4    this point I want to go ahead and ask counsel anything

5    further you want to direct in post-conviction

6    information?

7         **ATTORNEY MBELU:**  Well, we have some --

8         **INMATE BERTOLDO:**  I have letters already from U-turn

9    Program, Victory Outreach Program, the director of the

10   Most Excellent Way who has offered me a place to stay and

11   a place where I can teach --

12        **DEPUTY COMMISSIONER MITCHELL:**  Did you bring those

13   up to the Chairman, those letters?

14        **INMATE BERTOLDO:**  They're in that file that I gave

15   you.

16        **DEPUTY COMMISSIONER MITCHELL:**  Okay.  That are

17   offering more residency plans?

18        **INMATE BERTOLDO:**  Yes, sir.

19        **DEPUTY COMMISSIONER MITCHELL:**  When he asked you if

20   there's anything else, that's what he was asking about is

21   there more residency plans that would be of value for us

22   to be put on record that we know.  Can you get down to it

23   and show us which one it is?

24        **INMATE BERTOLDO:**  Yes, sir.

25        **DEPUTY COMMISSIONER MITCHELL:**  And did you make a

26   packet, an extra one that the District Attorney's office

27   could look at?

42

1        **INMATE BERTOLDO:**  Yes.

2        **DEPUTY COMMISSIONER MITCHELL:**  Okay.

3        **PRESIDING COMMISSIONER WILLIAMS:**  Which letter are

4    you referring to Mr. Bertoldo?

5        **INMATE BERTOLDO:**  There was one by Mr. Glenn Wright.

6    He's one of the pastors.

7        **PRESIDING COMMISSIONER WILLIAMS:**  Okay.  I have

8    that.

9        **INMATE BERTOLDO:**  From San Diego.

10        **PRESIDING COMMISSIONER WILLIAMS:**  Yes.

11        **INMATE BERTOLDO:**  And by that one there should be

12    one from the U-turn Program.

13        **PRESIDING COMMISSIONER WILLIAMS:**  All right.

14        **INMATE BERTOLDO:**  U-turn for Christ.  And another

15    one that is in, I believe, Riverside.  There's another

16    one from Oxnard from the Victory Outreach Christian

17    Ministry there that runs a home also, and that's ran by,

18    I believe, a Frank Garcia, which is the director of that

19    home.  He sent a letter also.

20        **PRESIDING COMMISSIONER WILLIAMS:**  Okay.  He talked

21    to the -- or a Veteran's representative wrote you a

22    letter?

23        **INMATE BERTOLDO:**  Right.  They also wrote --

24        **PRESIDING COMMISSIONER WILLIAMS:**  They offer support

25    services?

26        **INMATE BERTOLDO:**  Right.  There's a few places that

27    I've written to that have sent me letters.

43

1      **PRESIDING COMMISSIONER WILLIAMS:**  Okay.  These are

2    letters that you solicited asking for the services that

3    they normally offer in the course of their business.

4    Okay.  These are letters in response to letters that you

5    had sent, and they in general describe what they're

6    services are?

7      **INMATE BERTOLDO:**  One of them was the Department of

8    Employment, but there's other letters that are addressed

9    to me.  One of them is one of the ministry that comes

10   here, the Victory Outreach.

11     **PRESIDING COMMISSIONER WILLIAMS:**  Uh-huh.

12     **INMATE BERTOLDO:**  And they have told me that they

13   have a home there, a rehab home.

14     **PRESIDING COMMISSIONER WILLIAMS:**  Yeah.

15     **INMATE BERTOLDO:**  That would help out with that, the

16   reentry back into society.

17     **PRESIDING COMMISSIONER WILLIAMS:**  Yeah, but you're

18   not going to that one.  You're going to the home of your

19   wife, correct?

20     **INMATE BERTOLDO:**  Yes, but if there was any

21   conditions for that, I would have those ready.

22     **PRESIDING COMMISSIONER WILLIAMS:**  Okay.  But again,

23   the ones that are here are ones that you have sent

24   letters to and that they have returned outlining their

25   services?

26     **INMATE BERTOLDO:**  Yes.

27     **PRESIDING COMMISSIONER WILLIAMS:**  Okay.

44

1        **INMATE BERTOLDO:**  And their willingness to help me.

2        **PRESIDING COMMISSIONER WILLIAMS:**  Okay.

3        **DEPUTY COMMISSIONER MITCHELL:**  Are you satisfied,

4  Counsel, that we've covered this section?

5        **ATTORNEY MBELU:**  Yes, sir.

6        **DEPUTY COMMISSIONER MITCHELL:**  Thank you.  Chairman?

7        **PRESIDING COMMISSIONER WILLIAMS:**  Do you have any

8  questions?

9        **DEPUTY COMMISSIONER MITCHELL:**  No.

10        **PRESIDING COMMISSIONER WILLIAMS:**  Questions, Ms.

11  Delagarza?

12        **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  Yes.  The first

13  question I would ask of the inmate is was he in the

14  military?

15        **PRESIDING COMMISSIONER WILLIAMS:**  Were you in the

16  military, sir?

17        **INMATE BERTOLDO:**  No, sir.

18        **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  Well, he

19  provided all these letters from New Directions, which

20  clearly indicates it is for Veterans who have been

21  honorably discharged.  Is he aware that he's not even

22  eligible for these programs?

23        **INMATE BERTOLDO:**  There's a letter, a supplemental

24  letter with that that states that if I'm not a Veteran

25  and I get into the SAP program or the SAP program here in

26  the institution, which the institution does provide a SAP

27  program, they'll be willing to help me out.

45

1      **PRESIDING COMMISSIONER WILLIAMS:**  Are you involved

2  in that program?

3      **INMATE BERTOLDO:**  No, sir.

4      **PRESIDING COMMISSIONER WILLIAMS:**  Anything further?

5      **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  I have no other

6  questions.

7      **PRESIDING COMMISSIONER WILLIAMS:**  Questions,

8  Counsel?

9      **ATTORNEY MBELU:**  Do you plan on going into that

10  program?

11      **INMATE BERTOLDO:**  No, ma'am.  The reason that I got

12  these was the psychological, or the psych that I spoke

13  with asked me about that, and she advised me that I get

14  that kind of stuff in case the Board wanted to stipulate

15  that as part of parole plans that I would have that

16  ready.  And when I wrote to the people, I advised them of

17  that, that I will be -- if I was to be paroled, if they

18  would be able to afford that help for me.

19      **ATTORNEY MBELU:**  Okay.  Do you have another program

20  that is not sanctioned around Veterans?

21      **INMATE BERTOLDO:**  Yes, the U-turn Program, the

22  Victory Outreach Program, and the Most Excellent Way

23  Program.

24      **ATTORNEY MBELU:**  Okay.  So you don't have to be a

25  Veteran to qualify for those things?

26      **INMATE BERTOLDO:**  Right.

27      **ATTORNEY MBELU:**  Okay.

46

1    **PRESIDING COMMISSIONER WILLIAMS:**  Anything further?

2    **ATTORNEY MBELU:**  No.

3    **PRESIDING COMMISSIONER WILLIAMS:**  Closing, Ms.

4    Delagarza?

5    **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  Thank you.  The

6    District Attorney's office of Los Angeles County opposes

7    the granting of parole date for this inmate.  This inmate

8    has a long history of criminalities, including two prior

9    CDC commitments.  With respect to the life crime itself,

10   he showed an incredible amount of callousness toward the

11   life of the victim.  The victim was stabbed many times, I

12   think it was 17 times he was stabbed.  And after stabbing

13   this -- the victim this many times, the inmate shot Mr.

14   Smith -- Simmerly, excuse me, so he showed a great degree

15   of violence toward the victim.  The inmate has never

16   accepted full responsibility.  Recently -- well, for many

17   years he denied involvement in the crime, and then

18   recently he's concocted this story about the victim.  And

19   with respect to the story, he makes the victim appear as

20   the aggressor, and again he shows very little sensitively

21   or insight into his crime indicating that the victim was

22   the aggressor, the victim was involved in drugs, the

23   victim was under the influence of alcohol and assaulted

24   him and he was only defending himself.  However, that is

25   totally not supported by the evidence in this case,

26   either with respect to the victim's involvement with

27   drugs or with respect to the victim assaulting him.  What

47

1    is of interest is that shortly after the crime the inmate

2    is seen having taken a picture of himself with the

3    victim's guns, so it was just shortly after this

4    particular incident that the inmate is basically

5    strutting around showing his booty of the weapons that

6    were stolen from the victim.  In terms of the

7    psychological report, one of the things that was of

8    interest is that -- if I could have a moment.  And I'm

9    refer to go page 14.  It says during the evaluation the

10   inmate presented almost like a poster boy for

11   psychopathy.  Historically, and in some cases currently,

12   he exhibited multiple signs of psychopathy, including

13   grandiosity, a high need for stimulation, pathological

14   lying, manipulativeness, lack of remorse, guilt, shallow

15   affect, callousness, a parasitic lifestyle, poor

16   behavioral controls, promiscuity, early behavior

17   problems, lack of realistic long term plans, impulsivity,

18   irresponsibility, inability to act responsibility for his

19   own actions, juvenile delinquency, revocation of

20   conditional release.  Although he seems to be developing

21   some maturity and insight at the present time, it is

22   still unclear whether this is for show or genuine.  He

23   seems to have flashbulb insight.  It operates for moments

24   at a time and rapidly dissipates completely.  He has

25   displayed some evidence of self-help orientation,

26   including past involvement in AA and NA, completion of

27   several self-help groups, and present devotion to

48

1    religious activity.  However, it is unclear just how

2    these forces have affected him, in that his parole plans

3    still appear to be vague and fail to address key issues,

4    including substance abuse relapse prevention.  With

5    respect to the inmate's comments, he has a lot that he's

6    presented to the Board; however, if you look through some

7    of the people that are written on his behalf, basically

8    they've signed a petition.  It's unclear how many of

9    these people actually even know the inmate.  With respect

10   to the parole plans, he submits a program that he clearly

11   knows he's not eligible for, and then when questioned

12   about that he says well, if you belong to this other

13   program you can still go into this program, but he's not

14   even bothered to get involved in the program that would

15   be necessary to possibly make him eligible for this

16   parole -- this home -- this listed facility that he's

17   indicating that he can go into.  So we have an individual

18   who is incredibly narcissistic and has a history of

19   serious violence.  As I indicated, there is nowhere where

20   it indicates that the inmate has fully accepted

21   responsibility for the crime or has shown real remorse.

22   You go into the report where he makes a statement, and

23   you go through it -- it's a rambling statement that never

24   addresses exactly the life crime or the responsibility

25   that the inmate takes for that particular crime.  Until

26   we can be sure that the inmate has the insight into his

27   criminality and has addressed his substance abuse

49

1    problems, we cannot be sure that he does not continue to

2    pose a threat to society.  The psychiatric report is not

3    supportive, and clearly addresses those issues with

4    respect to factors that make him not suitable for parole

5    and a continuing risk.  For those reasons, the District

6    Attorney's office opposes the granting of a parole date

7    for this inmate.  Thank you.

8    **PRESIDING COMMISSIONER WILLIAMS:**  Thank you.

9    Closing, Counsel?

10    **ATTORNEY MBELU:**  Thank you, Mr. Chairman.  I think

11    we have come to the conclusion and agree that Mr.

12    Bertoldo definitely needs a new psych report.  This

13    argument and inferences has been made on the psych report

14    (inaudible) at this point.  Mr. Bertoldo has served time

15    for his crime or the crime he committed.  He has shown

16    remorse.  He admitted -- he accepted that he committed

17    the crime.  He is not denying that he did not commit the

18    crime.  He said that he did commit the crime.  He's shown

19    remorse, and right now the Board should concentrate on

20    what the issue is before the Panel is he suitable for

21    parole.  Look at his parole plans, I think they're very

22    viable parole plans.  He stipulated a few years ago

23    because he wanted to go work on his parole plans and get

24    other straight, and he did that.  He came back

25    (inaudible) but it's not that it's just that of all

26    aspects.  There's some things he has done to better

27    himself.  He has worked hard here in prison.  He's a born

50

1    again Christian like he said.  He probably does not know

2    the 12 steps of AA or NA, but he has learned some steps

3    through being a Christian, and he knows what it is or

4    what it is all about committing the crime that he

5    (inaudible).  So now I'm just asking the Panel to find

6    him suitable.  If not, give him a minimal return date and

7    please, on doing that, get him a new psych report before

8    his next hearing.

9        **PRESIDING COMMISSIONER WILLIAMS:**  Okay.  You're

10   satisfied with what your counsel has said, or do you have

11   anything to add?

12       **INMATE BERTOLDO:**  I can't remember -- in 2002 I sent

13   the letter to the victim, an apologetic letter.  It was

14   hard to write that letter.  I don't know if the victim's

15   daughter or John Davidson if they ever got that letter or

16   not.  I had known John Davidson for quite a while, and

17   had done things with him.  We had gone fishing one time

18   and we drank together.  What happened there that day it's

19   been a long time ago.  It was -- I like John Simmerly.  I

20   didn't dislike John Simmerly.  I never did that.  It was

21   something that happened there that day.

22       **PRESIDING COMMISSIONER WILLIAMS:**  Let me remind

23   you --

24       **INMATE BERTOLDO:**  I'm trying to explain --

25       **PRESIDING COMMISSIONER WILLIAMS:**  Let me remind you

26   that you exercised your right not to speak about the

27   crime.

51

1    **INMATE BERTOLDO:** Okay. I've dealt with that, and I

2    sent the letter to his family in 2002. I've done what I

3    can. I know, and I really know this in my heart, the

4    Lord has forgiven me. And that doesn't do anything for

5    the family, but I know what has become of me after that,

6    after knowing that.

7    **DEPUTY COMMISSIONER MITCHELL:** Let me ask you a

8    question, sir, at this time we're asking you to tell us

9    why you're suitable for release.

10    **INMATE BERTOLDO:** I understand.

11    **DEPUTY COMMISSIONER MITCHELL:** I'd like you to

12    concentrate on that.

13    **INMATE BERTOLDO:** I just wanted to say something on

14    the part of the my remorse towards the family.

15    **DEPUTY COMMISSIONER MITCHELL:** You did.

16    **INMATE BERTOLDO:** My suitability, I've been

17    incarcerated for 25 years. I'm not the same man that I

18    was 10 years ago, 15 years ago, 25 years ago. I've

19    realized a lot of things now through everything that I've

20    gone through, through my drug use, through my criminal

21    life. I've learned from that, believe it or not, I have.

22    When I came to the Lord a lot of things came into light

23    for me, as far as people are concerned, consideration to

24    two people --

25    **DEPUTY COMMISSIONER MITCHELL:** I think we're going a

26    little bit off topic again. What I would like you to do

27    is focus on why we should give you a date. That's what

52

1    it's about.  Now, you told us you're changed.  That

2    you're now a Christian.  You're not the same man as 10,

3    20 years ago.  Why do you think you are suitable for

4    release beyond that?

5        **INMATE BERTOLDO:**  Well, I've done 25 years on a 15-

6    to-life crime.  I'm ready to go home.  I have plans for

7    release, and I worked hard at it.

8        **PRESIDING COMMISSIONER WILLIAMS:**  Okay.  Thank you.

9    Do you have a statement to make, ma'am?

10       **DEPUTY COMMISSIONER MITCHELL:**  May I ask you, is

11   that a written statement that you wanted to read?

12       **MS. ARRELLA:**  No, no, no.

13       **DEPUTY COMMISSIONER MITCHELL:**  Okay.  I was just

14   wondering.

15       **MS. ARRELLA:**  Okay.  I was just -- well, actually, I

16   would like to make a statement.  Because of this crime

17   that was committed, you know, a lot of people have kind

18   of paid the price for it.  My kids do not have a

19   grandfather.  I don't have a father.  People around me

20   have parents to kind of lean on, you know, and, you know,

21   I don't, so it's very -- it's very difficult.  It has

22   been a long time.  I wanted to say I'm glad that he going

23   through all these programs and that he has come to the

24   Lord, and that's very important because the Word can

25   change you.  And, you know, people that commit crimes, I

26   mean that's just a price that we have to pay when -- what

27   am I saying?  There's always a price to pay for

53

1    everything that you do, and I believe that this was very
2    serious what was done, very, very serious.  And the
3    reason why I came to this hearing today and actually felt
4    a little bit different about this hearing is just because
5    I want to know where he's at because one day he may get
6    out.  But hearing him talk about his plans after he gets
7    out it's really upsetting that he took my father's life
8    and my father, you know, he took his life in cold blood,
9    and yet he wants to be released so that he can, you know,
10    do all these things that he has planned, and it's kind of
11    confusing for me.  I don't know what else to say.  There
12    are family members that would have liked to have come.
13    My father only had one living brother, you know, and this
14    pretty much killed him when this occurred.  And yes, it
15    was a long time ago, but still it's, you know, it's just
16    still hard.

17        **PRESIDING COMMISSIONER WILLIAMS:**  Okay.  Thank you,
18    very much.

19        **MS. ARRELLA:**  You're welcome.  I don't know even if
20    you understood what I just said.

21        **PRESIDING COMMISSIONER WILLIAMS:**  Sure, I did.  And
22    we'll be in recess.  We'll call you back when we have a
23    decision.

24        **MS. ARRELLA:**  Okay.

25                        **R E C E S S**

26                        --oOo--

27

54

1    **CALIFORNIA BOARD OF PAROLE HEARINGS**

2    **D E C I S I O N**

3    **MR. PENNEY:** Okay. We're back on record, sir.

4    **PRESIDING COMMISSIONER WILLIAMS:** Okay. Those previously

5    in the room have returned. It's approximately 3:30 p.m.

6    Mr. Bertoldo, the Panel reviewed all information received

7    from the public and relied on the following circumstances

8    in concluding that you're not suitable for parole and

9    would pose an unreasonable risk of danger to society or a

10    threat to public safety if released from prison. The

11    reasons are, the obvious one is the crime. The offense

12    is carried out in a manner which demonstrates an

13    exceptionally callous disregard for human suffering.

14    Motive for the crime was inexplicable in relation to the

15    offense, and the murder of the victim did not deter the

16    inmate from later committing additional crimes, in that

17    he was -- had an opiates in his system in state prison.

18    Conclusions are drawn from the statement of fact, wherein

19    the inmate stabbed the victim 17 times and shot the

20    victim in the face causing his death. The murder was

21    committed during a robbery. The inmate was later

22    arrested while in possession of the victim's property

23    after he had pawned many items. The inmate had a record

24    of violence and assaultive behavior, in that he was

25    convicted of robbery, an escalating pattern of criminal

26    conduct, including extensive drug abuse, two

27    **ROBERT BERTOLDO C-94377 DECISION PAGE 1 8/29/06**

55

1    prior prison sentences, he failed previous grants of

2    probation and parole, failed to profit from society's

3    previous attempts to correct his criminality.  Such

4    attempts include juvenile probation, adult probation,

5    county jail, prior prison terms and parole.  He's been

6    sentenced to state prison for robbery and forgery in the

7    past in addition to the commitment offense.  He's

8    programmed to a limited manner while incarcerated, not

9    sufficiently participated in beneficial self-help

10   programs.  He has ten serious 115s, three of them in the

11   year 2000, which were very serious involving drugs.

12   Psychological evaluation dated October the 20th, 2004, by

13   Dr. Mura is unfavorable, in that under Axis I the doctor

14   diagnosis alcohol, opiate, cocaine, hallucinogenic, and

15   inhalant dependence in remission.  Axis II, personality

16   disorder, antisocial personality disorder not otherwise

17   specified, narcissistic and avoidance and paranoid

18   features.  The doctor judges the risk of the inmate is in

19   the moderate to moderately high range, especially if he

20   returns to substance abuse.  The inmate appears to have

21   appropriate parole plans.  The Panel took into

22   consideration the appearance of the Deputy District

23   Attorney of Los Angeles County and the victim's next of

24   kin who appeared in opposition to parole.  The Panel

25   makes the following findings:  The prisoner needs

26   continued programming in order to face, discuss,

27   **ROBERT BERTOLDO C-94377 DECISION PAGE 2 8/29/06**

56

1    understand, and cope with stress in a nondestructive

2    manner.  Until more progress is made, the prisoner

3    continues to be unpredictable and a threat to others.

4    The prisoner's gains are very recent, and he must

5    demonstrate an ability to maintain those gains over an

6    extended period of time.  Nevertheless, the inmate is to

7    be commended for being disciplinary free for six years,

8    obtaining certificates in vocational Optician and

9    Drafting, some minor participation in AA and NA,

10   participation in the Breaking Barriers program and your

11   religious programs.  However, these positive aspects of

12   your behavior danger not outweigh the factors of

13   unsuitability.  Parole is denied for a period of three

14   years.  In a separate decision, the Hearing Panel finds

15   that the prisoner has been convicted of murder, and it's

16   not reasonable to expect that parole would be granted at

17   a hearing during the next three years, in that the inmate

18   stabbed the victim 17 times and shot the victim in the

19   face, causing his death.  The murder was committed during

20   a robbery.  The inmate was later arrested while in

21   possession of the victim's property after he had pawned

22   many of the items.  The offense was carried out in a

23   manner which demonstrates an exceptionally callous

24   disregard for human suffering.  The motive for the crime

25   was inexplicable in relation to the offense, and the

26   murder of the victim did not deter the prisoner from

27   **ROBERT BERTOLDO C-94377 DECISION PAGE 3 8/29/06**

57

1   later committing additional violations, in that you had

2   opiates in his system while in a state prison.   Is

3   psychiatric evaluation by Dr. Mura dated October the

4   20th, 2004, indicates a need for a longer period of

5   observation and evaluation, in that the doctor states

6   that under Axis I inmate suffers alcohol, opiate,

7   cocaine, hallucinogenic, and inhalant dependence, which

8   is in remission.   Under Axis II, personality disorder,

9   antisocial personality disorder not otherwise specified

10   with narcissistic avoidance and paranoid features.   The

11   doctor judges the inmate's risk of dangerousness as

12   moderate to moderately high, most especially if he

13   returns to substance abuse.   Therefore, a longer period

14   of observation and evaluation of the inmate is required

15   before the Board should consider suitability -- should

16   find that the inmate is suitable for parole.   The Panel

17   recommends that the inmate remain disciplinary free, that

18   if available, you upgrade educationally, as the two

19   vocation that he has attained may not be suitable given

20   his physical condition at this point, and when available

21   participate in self-help and therapy programs.   That

22   concludes the reading of the decision.   It's 3:35.   Do

23   you have anything further to add?

24   //

25   //

26   //

27   **ROBERT BERTOLDO C-94377 DECISION PAGE 4 8/29/06**

58

1         **DEPUTY COMMISSIONER MITCHELL:**  Good luck to you,

2    sir.

3         **INMATE BERTOLDO:**  Thank you, sir.

4         **PRESIDING COMMISSIONER WILLIAMS:**  Okay.  That's all.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    **PAROLE DENIED THREE YEARS**

24    **THIS DECISION WILL BE FINAL ON:**_____ DEC 2 7 2006 _____

25    **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26    **DATE, THE DECISION IS MODIFIED.**

27    **ROBERT BERTOLDO C-94377 DECISION PAGE 5 8/29/06**

59

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, STACY WEGNER, a duly designated
transcriber, VINE, MCKINNON & HALL, do hereby
declare and certify under penalty of perjury that
I have transcribed tape(s) which total one in
number and cover a total of pages numbered 1 - 58,
and which recording was duly recorded at
CHUCKAWALLA VALLEY STATE PRISON, at BLYTHE,
CALIFORNIA, in the matter of the SUBSEQUENT PAROLE
CONSIDERATION HEARING of ROBERT BERTOLDO, CDC No.
C-94377, on AUGUST 29, 2006, and that the
foregoing pages constitute a true, complete, and
accurate transcription of the aforementioned
tape(s) to the best of my ability.

I hereby certify that I am a disinterested
party in the above-mentioned matter and have no
interest in the outcome of the hearing.

Dated November 24, 2006, at Sacramento
County, California.

_____
STACY WEGNER
Transcriber
**VINE, MCKINNON & HALL**

**DEPT. East B**

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

Date: **Sept. 25, 1984**

HONORABLE: **Eric E. Younger**              JUDGE        **S. Rock**                                    , Deputy Clerk

**D. McKindley**              Deputy Sheriff        **P. Satkin**                                    , Reporter

                                                                    (Parties and counsel checked if present)

| A527117 | | **R. Philibosian** | , DISTRICT ATTY. | BY |
|---|---|---|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA | Counsel for Plaintiff | **J. Prudhomme** | | DEPUTY |
| VS  *6110197* | Counsel for Defendant | | , PUBLIC DEFENDER | BY |
| 01  **Bertoldo, Robert** | | **B. Plotkin** | | DEPUTY |

NATURE OF PROCEEDINGS  PROBATION AND SENTENCE                    (Boxes checked if order applicable)

PROBATION DENIED. SENTENCE AS INDICATED BELOW.

Whereas the said defendant having.....**been**...................duly...**found**......................
guilty in this court of the crime of **MURDER as charged in Count 1 of the Superior Court Information\***.

**\*The Court orders the jury verdict of Guilty of Murder in the 1st degree reduced to Guilty of Murder in the 2nd degree; the jury finding on the special circ. alleg. of robbery as true is ordered stricken; the jury finding of the use alleg. pur. sec. 12022(b)PC remains; the jury finding of the the use alleg.** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

It is Therefore Ordered, adjudged and Decreed that the said defendant be punished by imprisonment in the
..........☐ County Jail of the County of Los Angeles for the term of.................................................

☒ State Prison for the term prescribed by law **15 years to LIFE plus 1 year as to the 12022(b)PC alleg. Ct. 1**

☒ Defendant is given credit for **1260** days in custody.

It is further Ordered that the defendant be remanded into the custody of the Sheriff of the County of Los Angeles.
    ☒ to be by him delivered into the custody of the Director of Corrections at the California State Institution
. . for......**men**...........................at......**Chino**.................................

ENTERED

**September 25, 198**

**John J. Corcoran,**
COUNTY CLERK
AND CLERK OF THE
SUPERIOR COURT

☐ Remaining count(s) dismissed in interests of justice.
☐ Bail exonerated.

2    76J 803A - (REV.7-78)        **JUDGMENT**
C109

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life )
Term Parole Consideration )   CDC Number C-94377
Hearing of: )
                   ) 
ROBERTO BERTOLDO )
                   )

# COPY

## INMATE

CHUCKAWALLA VALLEY STATE PRISON

BLYTHE, CALIFORNIA

NOVEMBER 20, 2002

8:45 A.M.


PANEL PRESENT:

AL ANGELE, Presiding Commissioner
HERBERT MAY, Deputy Commissioner


OTHERS PRESENT:

ROBERTO BERTOLDO, Inmate
KEITH STANTON, Attorney for Inmate
DAVID DAHLE, Deputy District Attorney
ANDREA TERRY, Acting Assistant C & PR


CORRECTIONS TO THE DECISION HAVE BEEN MADE

✓    No
____ Yes        See Errata Sheet


**Patricia Johnson**      **Capitol Electronic Reporting**



ii

## INDEX

|                          | Page |
|--------------------------|------|
| Proceedings .............................................. | 1 |
| Case Factors ............................................. | 7 |
| Pre-Commitment Factors ................................ | 18 |
| Post-Commitment Factors ............................... | 29 |
| Parole Plans ........................................... | 35 |
| Closing Statements ..................................... | 40 |
| Recess ................................................. | 51 |
| Decision ............................................... | 52 |
| Adjournment ............................................ | 59 |
| Transcriber Certification ............................. | 60 |

--o0o--

1

1    **P R O C E E D I N G S**

2    **PRESIDING COMMISSIONER ANGELE:**  This is

3    going to be a Subsequent Parole Consideration

4    Hearing for Roberto Bertoldo, CDC number C,

5    Charles, 94377.  Today's date November 20th, 2002.

6    The time is approximately 8:45 a.m.  We're located

7    at Chuckawalla Valley State Prison.  Inmate was

8    received October 22nd, 1984 from Los Angeles

9    County, murder second degree with use of a deadly

10   weapon, case number A, Adam, 527117, count number

11   one, 187 of the Penal Code, 12022(b), boy, of the

12   Penal Code, receiving a term of 19 years to life

13   with a minimum eligible parole date of July the

14   7th, 1995.  Additional count of grand theft person,

15   that's 487.2 of the Penal Code, same county, same

16   case number, count two.  Mr. Bertoldo, this

17   hearing's going to be tape-recorded, and for the

18   purpose of voice identification, each of us will

19   state our first name and last name, spelling our

20   last name.  When it comes to your turn, after you

21   spell your last name give us your CDC number.  I'm

22   going to go to my left.  My name is Al Angele,

23   A-N-G-E-L-E, Commissioner, Board of Prison Terms.

24   **ATTORNEY STANTON:**  Dave.

25   **DEPUTY DISTRICT ATTORNEY DAHLE:**  Oh, I'm

26   sorry.  David Dahle, Deputy District Attorney,

27   D-A-H-L-E.

2

1       **ATTORNEY STANTON:**  Keith Stanton,

2   S-T-A-N-T-O-N, attorney.

3       **INMATE BERTOLDO:**  Roberto Bertoldo, inmate,

4   B-E-R-T-O-L-D-O.

5       **ATTORNEY STANTON:**  CDC number.

6       **INMATE BERTOLDO:**  C-94377.

7       **ACTING ASSISTANT C & PR TERRY:**  Acting

8   Assistant C & PR at Chuckawalla Valley State

9   Prison Andrea Terry, T, as in Tom, E-R-R-Y.

10      **DEPUTY COMMISSIONER MAY:**  Herbert May,

11   M-A-Y, Deputy Commissioner, Board of Prison Terms.

12      **PRESIDING COMMISSIONER ANGELE:**  Let the

13   record reflect that there's also a correctional

14   officer in the room for security purposes who will

15   not be participating in this hearing.  This

16   hearing is being conducted pursuant to Penal Code

17   Sections 3041 and 3042 and the rules and

18   regulations of the Board of Prison Terms governing

19   parole consideration hearings for life prisoners.

20   The purpose of today's hearing is to once again

21   consider your suitability for parole.  In doing

22   so, we're going to consider the crime you were

23   committed for, your prior criminal and social

24   history, and your behavior and your programming

25   since your commitment.  We've had the opportunity

26   to review your Central File and the prior

27   transcripts.  You will have the opportunity to

3

1    correct or clarify the record.  We're going to

2    consider your progress since your last hearing,

3    any new psychiatric reports, and any other

4    information which may have a bearing on your

5    suitability for parole.  We'll reach a decision

6    today and inform you whether or not we find you

7    suitable for parole and the reasons for our

8    decision.  If you're found suitable for parole,

9    the length of your confinement will be explained

10   to you.  Before we recess for deliberations, the

11   District Attorney, your attorney, and yourself

12   will have the opportunity to make a final

13   statement regarding parole suitability.  Once that

14   is done, we will recess, clear the room and

15   deliberate.  When we have completed our

16   deliberations, we will resume the hearing and

17   announce our decision.  The California Code of

18   Regulations state a life prisoner, regardless of

19   time served, shall be found unsuitable for and

20   denied parole if in the opinion of this Panel

21   release would pose an unreasonable risk of danger

22   to society.  You have certain rights,

23   Mr. Bertoldo.  Those rights include a timely

24   notice of this hearing, a right to review your

25   Central File, and a right to present relevant

26   documents.  Have those rights been met so far,

27   Mr. Stanton?

4

1          **ATTORNEY STANTON:**  We're satisfied as to

2     those rights, Mr. Chairman, thank you.

3          **PRESIDING COMMISSIONER ANGELE:**  An

4     additional right you have is to be heard by an

5     impartial Panel.  Any objections to either member

6     of this Panel?

7          **INMATE BERTOLDO:**  No, Sir.

8          **PRESIDING COMMISSIONER ANGELE:**  The record

9     reflects that you signed BPT Form 1073 on July the

10    23rd, 2002, which is the Reasonable Accommodation

11    Notice and Request in accordance with the

12    provisions of the Americans with Disabilities Act

13    indicating that you do have a disability as

14    defined under the ADA.  You have a problem

15    walking?

16         **INMATE BERTOLDO:**  I've got a brace on my

17    lower right leg.

18         **PRESIDING COMMISSIONER ANGELE:**  Okay.  Have

19    you been -- Have all accommodations been offered

20    you today?

21         **INMATE BERTOLDO:**  Yes, Sir.

22         **PRESIDING COMMISSIONER ANGELE:**  All right.

23    And you have -- Is it -- Does it give you much

24    pain at all?

25         **INMATE BERTOLDO:**  In cold weather some.

26         **PRESIDING COMMISSIONER ANGELE:**  Cold

27    weather.  Are you okay today?

5

1          **INMATE BERTOLDO:**  Yes, Sir.

2          **PRESIDING COMMISSIONER ANGELE:**  Okay.  This,

3    by the way, was signed on July 23rd, a few months

4    ago.  Is the information still current and

5    correct?

6          **INMATE BERTOLDO:**  Yes, it is.

7          **PRESIDING COMMISSIONER ANGELE:**  And you need

8    no further accommodation?

9          **INMATE BERTOLDO:**  No, Sir.

10          **PRESIDING COMMISSIONER ANGELE:**  All right.

11    Counsel?

12          **ATTORNEY STANTON:**  I'm satisfied that his

13    ADA rights have been met.  We're not requesting

14    any further accommodation, thank you.

15          **PRESIDING COMMISSIONER ANGELE:**  All right,

16    thank you.  You will receive a copy of the written

17    tentative decision today.  The decision becomes

18    final within 120 days.  You'll then receive a copy

19    of the decision and a copy of the transcript, and

20    you'll have 90 days from the effective date to

21    appeal if you so desire.  You're not required to

22    discuss your offense with us.  You're not required

23    to admit your offense.  However, this Panel does

24    accept as true the findings of the court.  Do you

25    understand what that means?

26          **INMATE BERTOLDO:**  Yes, Sir.

27          **PRESIDING COMMISSIONER ANGELE:**  Any

6

1    confidential material to be used today,

2    Commissioner May?

3        **DEPUTY COMMISSIONER MAY:**  There's none,

4    thank you.

5        **PRESIDING COMMISSIONER ANGELE:**  I've passed

6    the hearing checklist marked Exhibit One both to

7    your attorney and to the District Attorney to

8    ensure that we're all operating off the same set

9    of documents.  Mr. Dahle, do you have those

10    documents?

11        **DEPUTY DISTRICT ATTORNEY DAHLE:**  I have all

12    the documents that are shown on your checklist.

13        **PRESIDING COMMISSIONER ANGELE:**  Thank you.

14    Mr. Stanton, do you have all those documents?

15        **ATTORNEY STANTON:**  We have those as well,

16    Mr. Chairman.

17        **PRESIDING COMMISSIONER ANGELE:**  Any

18    additional documents to be submitted?

19        **ATTORNEY STANTON:**  Thank you.  Just going

20    through them.  This is a -- This document is an

21    inmate request.  Basically it's a letter of

22    remorse that Mr. Bertoldo tried to get to the

23    victim.  These are institutional adjustment

24    chronos for Mr. May's review in case he hasn't

25    seen them.  And these all pertain to parole plans

26    and job offers, letters of support.  Actually,

27    it's a petition which has been signed.  It's

7

1    perfectly self-explanatory, and we'll submit those

2    as well.  Thank you.

3         **PRESIDING COMMISSIONER ANGELE:**  Inmate be

4    speaking with us today?

5         **ATTORNEY STANTON:**  Mr. Bertoldo has spoken

6    on the crime before.  Nothing's changed.  His

7    version in the Board report is accurate.  He

8    admits the crime and is remorseful for it, but has

9    elected to exercise the right not to discuss the

10   commitment factors themselves, but he will address

11   other areas with the Panel.

12        **PRESIDING COMMISSIONER ANGELE:**  All right.

13   We'll still need to swear you in, Mr. Bertoldo, so

14   raise your right hand, please.  Do you solemnly

15   swear or affirm that the testimony you give at

16   today's hearing will be the truth, the whole

17   truth, and nothing but the truth?

18        **INMATE BERTOLDO:**  Yes, Sir.

19        **PRESIDING COMMISSIONER ANGELE:**  Thank you.

20   I then will be reading into the record the

21   Statement of Facts.  I'm going to take this from

22   the October 2002 Board report, page one.

23        **ATTORNEY STANTON:**  No objection.

24        **PRESIDING COMMISSIONER ANGELE:**

25        "April 13th, 1981 between the hours

26        of 10:30 a.m. and 2:30 p.m., the

27        victim, John Simerly --"

8

1       S-I-M-E-R-L-Y -- "was murdered in his

2       residence at 2056 Avocado Terrace in

3       Hacienda Heights.  A subsequent

4       autopsy revealed that the victim had

5       been shot in the face with a .22

6       caliber pistol and had been stabbed

7       approximately 16 times.  That

8       afternoon, Dale Rogers, the victim's

9       son-in-law, discovered the victim's

10      body.  At the time the victim was

11      found there was no wallet on his

12      person and his watch and necklace,

13      which he had been wearing earlier

14      during the day, were missing.  On

15      April 15th, 1981, Mr. Bertoldo was

16      stopped for a routine traffic

17      violation.  At that time, he was

18      searched by the officer, who found a

19      .22 caliber pistol.  It was

20      consequently discovered that the

21      particular weapon had been taken at

22      the time of the murder of Mr. John

23      Simerly and was considered to be the

24      murder weapon.  A subsequent

25      investigation revealed that

26      Mr. Bertoldo had pawned Mr. Simerly's

27      necklace at a pawnshop.  The

9

| | |
|---|---|
| 1 | investigating officers concluded --" |
| 2 | or excuse me -- "conducted a search |
| 3 | of Mr. Bertoldo's girlfriend's |
| 4 | apartment and found Mr. Simerly's |
| 5 | rifle, safe, along with its contents, |
| 6 | and a quilt bearing blood stains." |
| 7 | The inmate's version in this report indicates |
| 8 | that: |
| 9 | "At his last two Board hearings he |
| 10 | was asked by the Board of Prison |
| 11 | Terms to describe in full detail what |
| 12 | happened and the controlling facts of |
| 13 | the case.  Nothing had changed from |
| 14 | these facts, which are documented in |
| 15 | the transcripts of the last two Board |
| 16 | hearings.  For approximately 20 years |
| 17 | now, the inmate has come to grips |
| 18 | with a lot of the questions that were |
| 19 | put to him by the BPT Panel members. |
| 20 | He realizes that he -- that he could |
| 21 | not answer some of the questions or |
| 22 | would not answer them by saying:  "I |
| 23 | could not remember.  I don't have all |
| 24 | of the answers, but I know that the |
| 25 | reason I could not answer was because |
| 26 | of the guilt and shame of the crime. |
| 27 | I continue to carry that guilt and |

10

1    shame.  As hard as it is, I better

2    understand the severity of the crime.

3    I've never heard any consideration as

4    to the fact that all the weapons used

5    in the crime resulting were his

6    weapons and the fact that I never

7    went to his home with a weapon or

8    intentions of using any weapons.'"

9  That does conclude the reading of the Statement of

10 Facts along with the inmate's version.  The last

11 portion of that obviously was something that I was

12 going to ask you, but apparently you're not going

13 to talk about the crime so I can't.  That was a

14 question I had for you.  All right, we're going to

15 go into your prior criminality.

16        INMATE BERTOLDO:  I don't mind talking about

17 the case.

18        PRESIDING COMMISSIONER ANGELE:  Okay.

19        INMATE BERTOLDO:  There's -- If it's going

20 to help the hearing, I don't mind.

21        PRESIDING COMMISSIONER ANGELE:  I'll tell

22 you what, I've got maybe three questions I want to

23 ask you.  You don't have to answer any of them,

24 and if you don't want to answer just say so.

25        INMATE BERTOLDO:  I understand.

26        PRESIDING COMMISSIONER ANGELE:  The first

27 question, did you know the victim?

11

1          **INMATE BERTOLDO:**  Yes, I did.

2          **PRESIDING COMMISSIONER ANGELE:**  Okay.

3   Second question is why did you go to his

4   residence?

5          **INMATE BERTOLDO:**  There was -- I had done a

6   job for him --

7          **PRESIDING COMMISSIONER ANGELE:**  Okay.

8          **INMATE BERTOLDO:**  -- and he had owed me

9   approximately 350 dollars to 400 dollars.  I

10  called him prior to going there.  He said to come

11  on over.  I got there.  We had had some crooked

12  business dealings before, too.  He used to buy or

13  sell drugs.  I used to be the middleman for that.

14         **PRESIDING COMMISSIONER ANGELE:**  Okay.

15         **INMATE BERTOLDO:**  Upon arriving there, I

16  asked him for the money that he owed me, but the

17  discussion turned into why some money had gotten

18  away from him as far as losing a deal.  I was the

19  middleman for a deal that he was going to -- that

20  was going to go down between him and some other

21  people.  I let the people get away because I just

22  didn't have interest in it for whatever reason.

23  We started arguing at that time.

24         **PRESIDING COMMISSIONER ANGELE:**  Hang a

25  second.  You said you let the people get away.  Am

26  I going to assume that you fronted some dope --

27         **INMATE BERTOLDO:**  No.

12

1        **PRESIDING COMMISSIONER ANGELE:**  -- and

2    didn't get the money?

3        **INMATE BERTOLDO:**  No, no.  What he used to

4    do is he used to buy the dope or else -- and what

5    I would do is I'd find the people that were either

6    selling it --

7        **PRESIDING COMMISSIONER ANGELE:**  Okay.

8        **INMATE BERTOLDO:**  -- or buying it.

9        **PRESIDING COMMISSIONER ANGELE:**  Okay.

10        **INMATE BERTOLDO:**  Okay.  In this case, the

11    people were going to be buying it.  They were

12    going to be buying some cocaine from him.

13        **PRESIDING COMMISSIONER ANGELE:**  And what

14    happened?

15        **INMATE BERTOLDO:**  I didn't stay in touch

16    with them.

17        **PRESIDING COMMISSIONER ANGELE:**  Oh, you lost

18    the deal?

19        **INMATE BERTOLDO:**  Right.

20        **PRESIDING COMMISSIONER ANGELE:**  Okay.

21        **INMATE BERTOLDO:**  And I -- because I was

22    supposed to bring these people to him.

23        **PRESIDING COMMISSIONER ANGELE:**  But nobody

24    got ripped off.

25        **INMATE BERTOLDO:**  I introduced them --

26        **PRESIDING COMMISSIONER ANGELE:**  He maybe

27    lost the opportunity to make some money?

13

1      **INMATE BERTOLDO:**  Right.  That's where the

2  argument started.

3      **PRESIDING COMMISSIONER ANGELE:**  So you got

4  into an argument with him and one thing led to

5  another.

6      **INMATE BERTOLDO:**  Yes, Sir.

7      **PRESIDING COMMISSIONER ANGELE:**  And as a

8  result, you would up shooting him and stabbing

9  him?

10      **INMATE BERTOLDO:**  Well, we started

11  fighting --

12      **PRESIDING COMMISSIONER ANGELE:**  Okay.

13      **INMATE BERTOLDO:**  -- in the house, and

14  that's when the knife turned up.  I'm sure that

15  the knife came from the top of the counter.  As if

16  this was the counter, this would be the front room

17  over here.  We were fighting over the top, all

18  over couches and stuff.  We ended up on the floor.

19  When we came up from the floor, he had a knife.

20  That's when I grabbed his arm.  We started

21  scuffling for the knife.  I ended up with the

22  knife and the fight kept going and I started

23  stabbing him.  As I stabbed him, he would come

24  towards me sometimes too.  He's a big man.  And

25  I'm not trying to justify anything.

26      **PRESIDING COMMISSIONER ANGELE:**  I

27  understand.  I understand.  Okay.

14

1        **INMATE BERTOLDO:**  He was known to have

2    weapons on him all the time.  His belt buckles

3    used to turn into weapons.  He always carried a

4    .9 mm on his person or a .380 in his Porsche.

5        **PRESIDING COMMISSIONER ANGELE:**  Did you --

6    Did you anticipate a problem when you went over

7    there?

8        **INMATE BERTOLDO:**  No, but I knew the

9    character.  He used to read like these magazines

10   on self-defense or, what do they call them,

11   mercenaries.

12       **PRESIDING COMMISSIONER ANGELE:**  Uh-hmm.

13       **INMATE BERTOLDO:**  So he was in -- I knew

14   that he was into that.

15       **PRESIDING COMMISSIONER ANGELE:**  But you went

16   there expecting to be paid for what he owed you?

17       **INMATE BERTOLDO:**  Right.

18       **PRESIDING COMMISSIONER ANGELE:**  And then

19   things just got worse from there?

20       **INMATE BERTOLDO:**  Right.  It turned from

21   that subject into the subject of the dope.  That's

22   what happened.

23       **PRESIDING COMMISSIONER ANGELE:**  And I'm --

24   this is an assumption on my part.  Tell me if I'm

25   wrong or not.  Did he indicate to you that the

26   money that he owed you he was going to keep

27   because that was the money he would have made

15

1    during the dope deal?

2              INMATE BERTOLDO:  No.

3              PRESIDING COMMISSIONER ANGELE:  No, okay.

4    That never happened?

5              INMATE BERTOLDO:  It was strictly on losing

6    the people and then the cussing and the pushing --

7              PRESIDING COMMISSIONER ANGELE:  Okay.

8              INMATE BERTOLDO:  -- and it just got real

9    heated.

10             PRESIDING COMMISSIONER ANGELE:  Well, did

11   the .25 come from?  Wasn't it a .25 automatic that

12   was used?

13             INMATE BERTOLDO:  It was a .22.

14             PRESIDING COMMISSIONER ANGELE:  A .22, okay.

15             INMATE BERTOLDO:  From his desk.

16             PRESIDING COMMISSIONER ANGELE:  Was it in

17   it, on it?

18             INMATE BERTOLDO:  It was on it.

19             PRESIDING COMMISSIONER ANGELE:  And who --

20             INMATE BERTOLDO:  He had -- He had showed me

21   the gun prior to because it was a brand new gun

22   that he had bought.

23             PRESIDING COMMISSIONER ANGELE:  That day,

24   prior to?

25             INMATE BERTOLDO:  Yeah.

26             PRESIDING COMMISSIONER ANGELE:  Prior to,

27   okay.

16

1          **INMATE BERTOLDO:**  Yeah.

2          **PRESIDING COMMISSIONER ANGELE:**  And was it

3   on top of his desk?

4          **INMATE BERTOLDO:**  If I remember, it was on

5   top of the desk.

6          **PRESIDING COMMISSIONER ANGELE:**  Okay.

7          **INMATE BERTOLDO:**  He had pulled it from --

8   It's been 21 years.

9          **PRESIDING COMMISSIONER ANGELE:**  I

10  understand.

11         **INMATE BERTOLDO:**  He had pulled it from a

12  drawer in the desk when he showed it to me.

13         **PRESIDING COMMISSIONER ANGELE:**  And who was

14  the first one who grabbed the gun?

15         **INMATE BERTOLDO:**  I was.

16         **PRESIDING COMMISSIONER ANGELE:**  This was

17  after he was down?

18         **INMATE BERTOLDO:**  Yes, Sir.

19         **PRESIDING COMMISSIONER ANGELE:**  And this is

20  kind of like a coup de grâce?

21         **INMATE BERTOLDO:**  What?

22         **PRESIDING COMMISSIONER ANGELE:**  A final

23  shot?  I mean he was down --

24         **INMATE BERTOLDO:**  Yes, as I was --

25         **PRESIDING COMMISSIONER ANGELE:**  --

26  obviously.

27         **INMATE BERTOLDO:**  As I was leaving, I was

17

1    grabbing things.  And I started -- As I was

2    leaving, there was the wallet.  The chain was on

3    the floor.  I picked that up.  I started -- I'm

4    running around the house.  I run to the back where

5    his bedroom was.  There was a sliding glass door

6    there.  As I started to run out, I had heard

7    something.  I came back to the living room.  When

8    I was on my way back into the living room, when I

9    turned in the bedroom to go back into the living

10   room, right next to the doorway there was a closet

11   there, a sliding door.  The door was open and

12   there was a safe there that I had seen as I was

13   going through.  I went back into the living room

14   and he was laying on the floor, and what I had

15   heard was him.  He was saying something.  And he

16   had said something to me.  I walked into his

17   office, grabbed the gun and I shot him.

18          **PRESIDING COMMISSIONER ANGELE:** Where did

19   you shoot him?

20          **INMATE BERTOLDO:** In the head.

21          **PRESIDING COMMISSIONER ANGELE:** What was in

22   the safe?

23          **INMATE BERTOLDO:** I never opened it.

24          **PRESIDING COMMISSIONER ANGELE:** You never

25   got it opened?

26          **INMATE BERTOLDO:** No, Sir.

27          **PRESIDING COMMISSIONER ANGELE:** Okay.  All

18

1    right, thank you.  We'll go into your prior

2    criminality.  As a juvenile, you had an arrest for

3    carrying a switchblade knife.  You were counseled

4    and released.  Also had an arrest for inhaling

5    glue, 14 years old.  They gave you six months

6    probation.  As an adult, minor in possession of

7    alcohol in 1969.  You were given four days jail

8    suspended.  1969, misdemeanor drunk driving.  Paid

9    a fine and jail sentence of 25 days was suspended.

10   And in '69, possession of material and device for

11   arson and taking a vehicle without the owner's

12   consent.  You were released.  What was that all

13   about?  Do you recall that?

14           INMATE BERTOLDO:  Oh, there was -- My

15   parents had went on vacation and I was with some

16   fellows.  We had got into an argument with some

17   people.  We went over to my parents' house and

18   while we were there a couple of the guys had made

19   gas cocktails.

20           PRESIDING COMMISSIONER ANGELE:  Molotov

21   cocktails?

22           INMATE BERTOLDO:  Yes, Sir.

23           PRESIDING COMMISSIONER ANGELE:  Okay.  And

24   they had them in the car.  So we went outside and

25   we were drinking in front of my parents' house,

26   and a patrol car came by and started checking us

27   and seeing that we're minors, that we were

19

1    drinking.  So as he started to search the cars, he

2    found the Molotov cocktails.

3         **PRESIDING COMMISSIONER ANGELE:**  Okay.  In

4    any case, you were released.  I don't know what

5    that really means, but apparently -- Did they take

6    any action against you?

7         **INMATE BERTOLDO:**  Excuse me, Sir?

8         **PRESIDING COMMISSIONER ANGELE:**  Did they

9    take any action against you in that case, the

10   police?

11        **INMATE BERTOLDO:**  On which one was that?

12   Oh, oh, on the Molotov cocktails?

13        **PRESIDING COMMISSIONER ANGELE:**  Yeah, this

14   says released, so I don't know --

15        **INMATE BERTOLDO:**  Right.

16        **PRESIDING COMMISSIONER ANGELE:**  -- what

17   they're talking about.

18        **INMATE BERTOLDO:**  Right.

19        **PRESIDING COMMISSIONER ANGELE:**  Okay.  Next

20   you had a grand theft auto in 1969.  You were

21   fined and put on three years probation.  You had a

22   robbery in 1970.  You were fined, three years

23   probation.  Probation was revoked and you were

24   sent to state prison for the term prescribed by

25   law.  Where did you go?

26        **INMATE BERTOLDO:**  I think I went to

27   Susanville that time.

20

1          **PRESIDING COMMISSIONER ANGELE:**  Okay.  High

2     Desert?

3          **INMATE BERTOLDO:**  Yes, Sir.

4          **PRESIDING COMMISSIONER ANGELE:**  Okay.  How

5     much time did you serve?

6          **INMATE BERTOLDO:**  Sixteen months, I believe.

7          **PRESIDING COMMISSIONER ANGELE:**  In 1971, you

8     went to (Indiscernible) Work Furlough Center.

9     This doesn't make any sense here.  You were put on

10    probation in 1970, and then you had some problems

11    between '70 and '76 when your probation was

12    revoked.  That included a minor in possession.

13    You wound up going to the (Indiscernible) Work

14    Center.  You had a battery on a peace officer in

15    1972 with no disposition shown.  You had a

16    possession of marijuana with no disposition shown.

17    Then you had a possession of a controlled

18    substance.  You were 24 at the time.  That was in

19    1975.  It says no prosecution was -- I mean I

20    should say it says prosecution was rejected.  I'm

21    going to assume that's what revoked your

22    probation --

23          **INMATE BERTOLDO:**  Yes.

24          **PRESIDING COMMISSIONER ANGELE:**  -- and then

25    you wound up going to prison and that's why no

26    charges were filed.  Then you had a -- you got out

27    of prison.  You had a burglary and you were sent

21

1    back to prison for two more years.  Where did you

2    go the second time?

3         INMATE BERTOLDO:  I believe that was at

4    Chino West.

5         PRESIDING COMMISSIONER ANGELE:  CIM?

6         INMATE BERTOLDO:  No, at West I was on the

7    permanent work crew there.

8         PRESIDING COMMISSIONER ANGELE:  Okay.

9         INMATE BERTOLDO:  They had a small facility

10   there for the guys that worked there.

11        PRESIDING COMMISSIONER ANGELE:  Now, the --

12   you also have that forgery charge, and they took

13   the forgery charge and they combined it with the

14   burglary and that's why you went to prison the

15   second -- the second time.  In 1978, under the

16   influence of a controlled substance.  Well, how

17   much time did you serve the second time?  It

18   wasn't very long.

19        INMATE BERTOLDO:  No, it wasn't.  I think it

20   was 18 months.

21        PRESIDING COMMISSIONER ANGELE:  Uh-hmm.

22        INMATE BERTOLDO:  Yeah, the dates --

23        PRESIDING COMMISSIONER ANGELE:  Well, it

24   says 4/21/78 burglary, and then 11/1/78 the under

25   the influence of a controlled substance where you

26   spent five days county jail.  It doesn't make much

27   sense unless they have the dates wrong.  What were

22

1    you under the influence of, do you recall that?

2    If you have the report, it's number 13 there.

3         INMATE BERTOLDO:  I don't remember that too

4    much.  I think that could have been a time we went

5    fishing up at Hansen Dam in San Fernando Valley in

6    Los Angeles County.  And they had patrols there on

7    horses and they had seen one of the guys that I

8    was with smoking some weed and they --

9         PRESIDING COMMISSIONER ANGELE:  Was it a

10    bass lake?  Was it the bass lakes?

11         INMATE BERTOLDO:  Yes.

12         PRESIDING COMMISSIONER ANGELE:  Then you had

13    a grand theft auto in 1979.  No disposition shown

14    there.

15         INMATE BERTOLDO:  That was a rental that I

16    didn't take back in time and it was straightened

17    out.

18         PRESIDING COMMISSIONER ANGELE:  All right.

19    You were born on December the 10th, 1950?

20         INMATE BERTOLDO:  Yes, Sir.

21         PRESIDING COMMISSIONER ANGELE:  The youngest

22    of five children in Visalia.

23         INMATE BERTOLDO:  Yes.

24         PRESIDING COMMISSIONER ANGELE:  Indicates

25    your father was an alcoholic.  Your parents

26    separated when you were an infant.  Your mother

27    moved to her parents' home in Los Angeles, taking

23

1    you children with her.  You were essentially

2    raised in the home of your maternal grandparents

3    until you reached school age.  Completed school

4    through the eleventh grade, quitting after your

5    mother remarried.  You didn't get along with your

6    stepfather apparently.

7         INMATE BERTOLDO:  I've had a problem with

8    authority growing up.

9         PRESIDING COMMISSIONER ANGELE:  Well, you

10   didn't have any authority that was in the house

11   until your stepfather?

12        INMATE BERTOLDO:  My brothers used to

13   discipline me --

14        PRESIDING COMMISSIONER ANGELE:  Okay.

15        INMATE BERTOLDO:  -- my older brothers when

16   I was young, but I see now that I just -- I didn't

17   have any.  I didn't grow up with a father, so I

18   just couldn't take discipline.  I did -- I wasn't

19   shown how to.  My mom was either working or not at

20   the house trying to take care of us.  And now I --

21   Looking back now I could see that.  I took a class

22   that -- here through the chapel that made me see

23   that.

24        PRESIDING COMMISSIONER ANGELE:  Which one

25   was that?

26        INMATE BERTOLDO:  It's one of the

27   instructors, vocational instructors, has an eight-

24

1    week class that he's got going.  It's a biblical

2    class.  And he had some good things to say about

3    accepting the Lord.  And that's what He is; He's

4    our Father in heaven, so that's why He was never

5    in my life.  I never had a father to discipline me

6    and I realize that, that growing up I just --

7    discipline wasn't in my life and I rejected it.

8         PRESIDING COMMISSIONER ANGELE:  You were not

9    married prior to the commitment offense, but you

10   had a pretty long relationship with a Carolee

11   Marangi?

12        INMATE BERTOLDO:  Yes, Sir.

13        PRESIDING COMMISSIONER ANGELE:  And

14   apparently you married her in 1992?

15        INMATE BERTOLDO:  Yes.

16        PRESIDING COMMISSIONER ANGELE:  But you --

17   the last visit was in December '99; is that

18   correct?  Have you seen her since?

19        INMATE BERTOLDO:  Yes, this past weekend.

20        PRESIDING COMMISSIONER ANGELE:  So things

21   are starting to work out again?

22        INMATE BERTOLDO:  There was never anything

23   wrong.  She takes care of -- Her mother's in a

24   wheelchair and she takes care of her at the house,

25   so it's hard for her to get around.

26        PRESIDING COMMISSIONER ANGELE:  You've never

27   served in the military; is that correct?

25

1    **INMATE BERTOLDO:**  Right.

2    **PRESIDING COMMISSIONER ANGELE:**  Do you have

3 any children of your own?

4    **INMATE BERTOLDO:**  When I was 16 years old --

5 I can't say I fathered -- a girl was pregnant by

6 me and --

7    **PRESIDING COMMISSIONER ANGELE:**  As a result

8 you had Lisa.

9    **INMATE BERTOLDO:**  -- I never owned up to the

10 responsibility.

11    **PRESIDING COMMISSIONER ANGELE:**  Is it your

12 daughter Lisa?

13    **INMATE BERTOLDO:**  Yes.

14    **PRESIDING COMMISSIONER ANGELE:**  All right.

15 But I mean for sure?

16    **INMATE BERTOLDO:**  Yes.

17    **PRESIDING COMMISSIONER ANGELE:**  Okay.  You

18 do acknowledge it?

19    **INMATE BERTOLDO:**  Yes.

20    **PRESIDING COMMISSIONER ANGELE:**  All right.

21 Do you stay in contact with her at all?

22    **INMATE BERTOLDO:**  After she graduated, she

23 got married to one of the guys there and moved

24 away.  I think they went to Michigan.

25    **PRESIDING COMMISSIONER ANGELE:**  Your pattern

26 of drug and alcohol abuse began about the age of

27 13 with alcohol.  Nineteen, you considered

26

1    yourself an alcoholic.  Age of 25 you began using
2    heroin and described yourself as a lifelong
3    maintenance user without becoming severely
4    addicted.  Were you skin-popping or mainlining?
5              **INMATE BERTOLDO:**  I was mainlining.
6              **PRESIDING COMMISSIONER ANGELE:**  Mainlining.
7    How much were you using a day?
8              **INMATE BERTOLDO:**  Enough to get strung out
9    on.
10             **PRESIDING COMMISSIONER ANGELE:**  Okay.
11             **INMATE BERTOLDO:**  Even in my incarceration
12   within these 21 years I've been using.
13             **PRESIDING COMMISSIONER ANGELE:**  Uh-hmm.
14             **INMATE BERTOLDO:**  I had a problem even
15   coming -- when I got to this institution with
16   heroin and ducking and dodging every time the
17   question would come up from somebody like you that
18   was in authority about it.  In September of 2000,
19   the middle of September of 2000, something
20   happened to me spiritually and since that time
21   I've been away from all of that.  But it's been in
22   my life for quite a long time and it was, it was
23   just a nosedive.
24             **PRESIDING COMMISSIONER ANGELE:**  Well, this
25   indicates that you were doing barbiturates and
26   stimulants, cocaine, LSD, amphetamines.  Is that
27   true, tried everything?

27

1          **INMATE BERTOLDO:**  Yes.

2          **PRESIDING COMMISSIONER ANGELE:**  Okay.  This

3     is back in '80.  You were probably doing reds?

4          **INMATE BERTOLDO:**  Yes.

5          **PRESIDING COMMISSIONER ANGELE:**  Mini

6     bennies?

7          **INMATE BERTOLDO:**  Yes.

8          **PRESIDING COMMISSIONER ANGELE:**  LSD, what

9     form of LSD had you been using?

10          **INMATE BERTOLDO:**  Windowpane.

11          **PRESIDING COMMISSIONER ANGELE:**  That was

12     available, windowpane?

13          **INMATE BERTOLDO:**  Barrels.

14          **PRESIDING COMMISSIONER ANGELE:**  Sugar cubes,

15     anything?

16          **INMATE BERTOLDO:**  No, I stopped using LSD

17     about -- No, I hadn't -- I didn't stop using LSD

18     because I remember taking it in San Quentin.  I've

19     never really liked looked back into what the whole

20     thing was with the drug thing.  I know that when I

21     -- when I would see it in the building, in my dorm

22     building, prior to me coming to the Lord, I could

23     not stand still.  If I seen in a cube that there

24     was guys going in and out of there and that they

25     were using drugs in there, it would stay in my

26     mind until I went over there and tried to get

27     something even if it was what they call a

28

1  cotton --

2        **PRESIDING COMMISSIONER ANGELE:**  Yeah, yeah.

3        **INMATE BERTOLDO:**  -- what's the residue in a

4  cotton after they use it.  And it would just -- it

5  would eat me up.  I just -- I would obsess over it

6  and I didn't understand those things.  I do know

7  the obsession.  I recognize that now.

8        **PRESIDING COMMISSIONER ANGELE:**  Had you

9  gotten to the point where cotton would satisfy

10  your jones?

11        **INMATE BERTOLDO:**  It was more of a mental

12  thing.

13        **PRESIDING COMMISSIONER ANGELE:**  Okay.

14        **INMATE BERTOLDO:**  And that's why I say that

15  now -- I can say that now that it was more of a

16  mental thing, because now I see it all day long

17  and it doesn't bother me.  I don't obsess.  I can

18  -- I can pray about it.  I can go to the chapel

19  about it.  I can do other things about it.  I'm

20  learning to do that, and I'll probably be doing

21  that until the day I die, but it's a better place.

22        **PRESIDING COMMISSIONER ANGELE:**  So in 2000

23  you took that big step?

24        **INMATE BERTOLDO:**  Yes.  I don't think I took

25  it.  It was odd the way it happened.  I don't

26  remember me going out of the dorm to the chapel.

27  One of the guys was there.  I looked.  Things were

29

1    happening, personal things were happening in my

2    life too.  I owed the yard money.  I owed

3    everybody money.  I was getting people in trouble.

4    I was getting myself in trouble.  And I was in the

5    chapel.  One of the guys asked me if I was sick.

6    I said yes.  And he said you want us to pray for

7    you and I said yeah.  And I turned around to walk

8    out, but he grabbed me and took me up to the front

9    of the chapel.  And that's when the guys, you

10   know, came around me and they started praying for

11   me and stuff, and I started crying.  And the next

12   day I went over and talked to the chaplain.

13        **PRESIDING COMMISSIONER ANGELE:**  A new

14   beginning?

15        **INMATE BERTOLDO:**  Yeah.

16        **PRESIDING COMMISSIONER ANGELE:**  All right.

17   That's not a bad place to be, I guess, in here.

18   All right, we'll go to post-conviction factors now

19   please, Commissioner May.

20        **DEPUTY COMMISSIONER MAY:**  Thank you,

21   Mr. Chairman.  On October the 17th, 2000, inmate

22   wished to have a stipulation of two years because

23   he wanted more discipline-free time before

24   appearing before the Board.  Since that date, he

25   has been disciplinary-free.  But prior to that,

26   his last Board hearing was June the 1st, 1995 and

27   he had three 115s since that date and they were on

30

1    January the 13th, 2000 for possession of inmate-

2    manufactured hypodermic syringe, January the 27th,

3    2000 for possession of morphine, positive

4    urinalysis test, and on April the 10th, 2000 for

5    refusal to submit urinalysis.  There were a total

6    of 10 115s since being incarcerated, and also he

7    had 10 128s.  The last 128 was in 1997 for

8    performance.  He's had a number of job

9    assignments.  He completed the vocational eyewear

10   program and passed his ABO state licensing and

11   that was in 1997; is that correct?

12          **INMATE BERTOLDO:**  Yes, Sir.

13          **DEPUTY COMMISSIONER MAY:**  And then you were

14   assigned to vocational computers in 1998.  Later,

15   you were assigned MAC president and

16   (indiscernible) clerk?

17          **INMATE BERTOLDO:**  Yes, Sir.

18          **DEPUTY COMMISSIONER MAY:**  And then you also

19   had a job as a dental porter and a graphic arts

20   student.  You were involved with Set Free

21   Ministries, and you completed the Born to Win

22   through correspondence.  You also -- I note that

23   you had many certificates.  You received a

24   certificate of completion of 12 NA meetings; that

25   was from November of 2000 to February 2001.  And

26   also 10 Narcotics Anonymous meetings; that was

27   dated January the 2nd, 2001.  There was also 10 NA

31

1    meetings; that was April the 4th, 2001.  You

2    received a certificate of achievement --

3         **ACTING ASSISTANT C & PR TERRY:**  Stop for a

4    moment, please.  (Inaudible).

5         **DEPUTY COMMISSIONER MAY:**  Thank you.  April

6    the 8th, 2001, there's a certificate of achievement

7    and recognition for the requirements and

8    participation in a seminar of Christian

9    Discipleship.  July the 17th, 2001, the staff

10   sponsor:  "Bertoldo's a current member in good

11   standing of the CDS NA group with 11 meetings and

12   also serving as -- in the members of the executive

13   body."  He attended 12 Alcoholics Anonymous

14   meetings.  There's also a chrono March the 30th,

15   2002 as a member of the NA group, and July the 9th,

16   2002 attending 12 NA meetings.  He's received

17   three certificates:  May the 9th, 2001, One-to-One

18   Discipleship; September the 2nd, 2001, his

19   baptismal certificate; June the 5th, 2002, Breaking

20   Barriers.  There's a laudatory chrono from B.

21   Porter, associate warden, commending him for his

22   service as a facilitator in Breaking Barriers in

23   the video program.  He has a number of other

24   awards.  He received an acknowledgement as a

25   fellow in the National Academy of Opticians, the

26   Order of Ophthalmic Lenses on November the 27th,

27   2000, Basic Optical Principals, November 27th,

32

1    2000, Basic Bible Study on March the 28th, 2001,

2    and certified optician 1996 and it was renewed --

3    which expires on December the 31st, 2002. There

4    were some laudatory chronos given today and this

5    was one by Pittman, Eight Facility Clothing Room.

6    He said: "It's a privilege to supervise him. He

7    has shown considerable character and steady

8    attention towards his duties." There's one dated

9    August the 22nd, 2002 and this was by Lozoya,

10   L-O-Z-O-Y-A, that: "He's always willing to help

11   others." There's Rosa Perez dated September the

12   19th, 2002: "He's held executive position in the

13   Narcotics Anonymous and he's present at every

14   meeting and he has a good attitude." And there's

15   one for September the 28th signed by R. Perez. It

16   shows positive attitude, interested in the self-

17   help organization. Also another one by Perez and

18   this was dated July the 31st, 2002 and that's also

19   for Narcotics Anonymous. Was there anything that

20   I omitted?

21        INMATE BERTOLDO: On the -- My optician's

22   license is actually expired on 2003. I think

23   there was a typo there.

24        DEPUTY COMMISSIONER MAY: I think so.

25        INMATE BERTOLDO: Yes, Sir.

26        DEPUTY COMMISSIONER MAY: So you have

27   another year then?

33

1          **INMATE BERTOLDO:**  Yes.

2          **DEPUTY COMMISSIONER MAY:**  Okay.  Otherwise

3    has everything been covered then?

4          **INMATE BERTOLDO:**  Yes, Sir.

5          **DEPUTY COMMISSIONER MAY:**  Thank you.  The

6    summary by the counselor, and that's F. Gonzales:

7               "Bertoldo has attempted to take

8               advantage and incorporate the BPT

9               recommendations into his daily life

10              activities.  He appeared to have

11              matured since his last BPT hearing.

12              This writer notes that Bertoldo was

13              assigned to vocational programs and

14              removed due to a reason noted in the

15              work records section of this BPT

16              report.  This writer recommends that

17              Bertoldo participate in and complete

18              vocational programs that are

19              available to him.  During this period

20              of time, and after careful review of

21              the Central File, this writer

22              believes that Bertoldo would pose a

23              moderate degree to threat to the

24              public if released from prison."

25    The psychiatric report by Dr. Freitas, Axis I:

26    Poly-Substance Dependence, Heroin,

27    Methamphetamine.  Axis II:  Anti-Social

34

1    Personality Disorder.  Axis III, Physical Disorder

2    or Conditions:  Hepatitis C, Chronic Back Pain,

3    Nerve Damage to the Right Leg.  Axis IV, Psycho-

4    Social Stressors:  Minimal.  Axis V:  GAF is 74.

5    The doctor concludes that:

6              "This evaluator would note that

7              criminal-mindedness and criminal

8              intent were the primary elements of

9              this offense, and that circumstantial

10             and psychological factors were

11             secondary.  The inmate offers a

12             limited explanation for his

13             involvement in this offense, except

14             to note how escalating circumstances

15             resulted in a conflict and that this

16             death was the result of criminal

17             lifestyle choices."

18   Further states that:

19             "Based on this evaluation process,

20             this inmate appears to have a

21             personality disorder in the moderate

22             to severe range.  He would receive

23             some benefit from a continuing

24             participation in the self-help

25             process.  He described himself as

26             addicted to alcohol and heavy

27             maintenance user of heroin most of

35

1          his adult life.  Substance abuse also

2          appears to have played a role in this

3          inmate's participation in the

4          committing offense, but more on the

5          level of involvement in a drug

6          criminal lifestyle."

7    As far as future plans, you plan to live with your

8    wife in Los Angeles, California, and we do have

9    some letters.  As far as notices, 3042 notices, we

10   do have the representative from the Los Angeles

11   District Attorney's office here to speak for the

12   People of Los Angeles County.  There is a letter

13   from the Los Angeles Sheriff's Department signed

14   by Frank Merriman, captain, Homicide Bureau.  He

15   states:

16         "Thirty-two-year-old Jimmy Bertoldo

17         was acquainted with victim John

18         Simerly's son-in-law, who helped

19         arrange a loan from Simerly so

20         Bertoldo could purchase a mobile

21         home.  Jimmy Bertoldo subsequently

22         defaulted on the loan and lost the

23         home when John Simerly foreclosed.

24         On April the 13th, 1981, inmate

25         Bertoldo, Jimmy's younger brother,

26         told his girlfriend not to come home

27         after work until 7:00 p.m.  Between

36

1     the hours of 2:00 p.m. and 3:00 p.m.

2     on that date, victim Simerly was

3     confronted in his own home and

4     murdered.  He was stabbed 16 times,

5     his face was slashed, his mouth and

6     ears.  He was shot in the left cheek

7     with a .22 caliber pistol.  Jewelry,

8     cash, several firearms, and a safe

9     and victim Simerly's car were stolen

10    from the property.  When Bertoldo's

11    girlfriend arrived home early, she

12    found Jimmy and inmate Bertoldo

13    inside the apartment with the guns

14    and stolen property.  She (inaudible)

15    Jimmy and inmate Bertoldo inside her

16    apartment with the guns and stolen

17    property.  She later stated that she

18    was afraid due to inmate Bertoldo's

19    violent temper and did not report the

20    apparent crime.  Inmate Bertoldo was

21    arrested two days later in possession

22    of the stolen .22 caliber pistol,

23    which proved to be the murder weapon.

24    A subsequent search of his

25    girlfriend's apartment produced most

26    of the stolen property such as a

27    knife used to stab Simerly and a

37

1       bloodstained quilt used to carry the

2       stolen property from Simerly's house.

3       Also found were several photographs

4       of inmate Bertoldo posing with the

5       stolen guns in his girlfriend's

6       apartment.  Inmate Bertoldo married

7       this girlfriend prior to his

8       preliminary hearing and she refused

9       to testify against him.  Jimmy

10      Bertoldo claimed he had no prior

11      knowledge of the murder, but

12      responded to the call from his

13      brother to help unload stolen

14      property from Simerly's car.  Despite

15      Jimmy Bertoldo's apparent hostility

16      towards John Simerly, there was not

17      sufficient evidence to charge him

18      with -- in the murder.  Inmate

19      Bertoldo was convicted of first

20      degree murder with special

21      circumstances.  Due to the

22      circumstantial nature of the

23      evidence, the judge reduced the

24      conviction to second degree.  It is

25      the opinion of the department that

26      parole of inmate Bertoldo is

27      inappropriate and should be denied."

38

1   As far as support letters, there were -- there's a

2   letter from John Christian.  This is a friend of

3   yours for 20 years who wrote in support.  There's

4   a letter from your wife, and you've known each

5   other for over 30 years and she's certainly in

6   support.  She says: "I'm an ex-aerospace worker.

7   My mother and I live together in a three bedroom

8   house in Los Angeles."  And certainly they have

9   room and want to welcome you home.  There's a

10  support letter from your sister-in-law, and that's

11  Sandy Bird, is it?

12          INMATE BERTOLDO:  Yes, Sir.

13          DEPUTY COMMISSIONER MAY:  And there's a

14  letter from Darlene.  That's your mother-in-law,

15  Darlene --

16          INMATE BERTOLDO:  Marangi.

17          DEPUTY COMMISSIONER MAY:  M-A-R-A-N-G-I?

18          INMATE BERTOLDO:  Yes, Sir.

19          DEPUTY COMMISSIONER MAY:  And she certainly

20  is in support.  Then today we've received a

21  petition from 35 people with their names and

22  addresses and this was of support, their total

23  support for you for release from the institution.

24  We also have a job offer from Master Built Boxing

25  Ring and this is signed by John Flores:  "I'm the

26  owner and sole proprietor of Master Built Boxing.

27  I have a position available for Robert in my place

39

1   of business." Did I cover all the letters?

2   **INMATE BERTOLDO:** Yes, Sir.

3   **DEPUTY COMMISSIONER MAY:** Is there anything

4   else I omitted, Counsel?

5   **ATTORNEY STANTON:** No.

6   **DEPUTY COMMISSIONER MAY:** Then I'll return

7   it to the Chair.

8   **PRESIDING COMMISSIONER ANGELE:** Thank you.

9   I don't have any questions. Commissioner May?

10   **DEPUTY COMMISSIONER MAY:** I have none, thank

11   you.

12   **PRESIDING COMMISSIONER ANGELE:** Any

13   questions, Mr. Dahle?

14   **DEPUTY DISTRICT ATTORNEY DAHLE:** No, thank

15   you.

16   **PRESIDING COMMISSIONER ANGELE:** Questions of

17   your client, Mr. Stanton?

18   **ATTORNEY STANTON:** I just want to ask

19   Mr. Bertoldo if he is satisfied that everything's

20   been put on record before we get into concluding

21   -- closing statements?

22   **INMATE BERTOLDO:** Yes.

23   **ATTORNEY STANTON:** You okay with it?

24   **INMATE BERTOLDO:** Yes, sir.

25   **ATTORNEY STANTON:** I think it's been covered

26   too, thank you.

27   **PRESIDING COMMISSIONER ANGELE:** Mr. Dahle,

40

1  closing please.

2      **DEPUTY DISTRICT ATTORNEY DAHLE:**  Thank you.

3  I do not believe that Mr. Bertoldo is suitable for

4  release from the Department of Corrections on

5  parole.  We believe he still poses an unreasonable

6  risk to the citizens of the County of Los Angeles

7  and the State of California.  Mr. Bertoldo is a

8  52-year-old inmate who has a fairly extensive

9  record going back to 1964, a pattern of escalating

10  criminality and drug use and abuse which

11  culminated in a particularly vicious attack by

12  Mr. Bertoldo on the victim in this particular

13  case, inflicting more than a dozen stabbing

14  wounds, cutting wounds, on the victim; in fact, 16

15  according to the records.  And then by all

16  statements, finishing him off when he made a

17  statement by executing him with a single round

18  from a .22 with a gunshot to the head.  This all

19  was preceded by apparent ransacking and taking of

20  property in the house, property that he was found

21  with afterwards.  In terms of second degree

22  murders, I think it is a markedly vicious crime.

23  He has, as has been indicated, a significant

24  history of drug abuse dating back again to 1964,

25  starting off with glue sniffing, and covers a wide

26  range of different substances.  And as

27  Mr. Bertoldo has indicated, that abuse continued

41

1  for a period of approximately 18 plus years in

2  prison where he continued to use heroin.

3  Particularly unusual, when fairly large number of

4  substance abusers tend to stop using as they

5  approach their forties, Mr. Bertoldo was still

6  using as of age 50.  To his credit, he has

7  recognized and stayed clean since September of

8  2000, but in review of the amount of time that he

9  has been involved in substance abuse, that's still

10  a wait-and-see period of time.  Certainly with

11  respect to the evaluation of the psychologist,

12  Dr. Freitas, as well, it is a significant concern

13  to his suitability and ability to succeed on

14  parole in the future.  We have a period here of

15  approximately two years and two months of reported

16  sobriety in comparison with the life span in which

17  he has been abusing drugs.  I think he needs to

18  put a lot more space between his drug abuse and

19  drug use in prison to demonstrate that if he goes

20  back out onto the street he is not going to fall

21  back into that pattern.  That's the pattern that

22  led him to commit a murder, take another man's

23  life.  It prompted him to engage in the thefts,

24  which, I think, were part and parcel to sustain or

25  continue his drug habit.  The psychiatric report

26  that's before this Panel, that was before the

27  Panels previously, cannot be described as

42

1    supportive of parole.  It indicates that he

2    suffers from a personality disorder that is

3    moderate to severe, and in conjunction with his

4    history of drug abuse, requires additional self-

5    help and therapy.  I believe that a new clinical

6    assessment would be appropriate to determine

7    whether or not that condition still exists.  I

8    would recommend that the Panel deny parole because

9    of those unanswered questions, and he needs a

10   further period of observation to see if he can

11   maintain his sobriety.  It does appear --

12           [Thereupon, the tape was turned over.]

13           **ACTING ASSISTING C & PR TERRY:**  Okay, you

14   may resume.

15           **DEPUTY DISTRICT ATTORNEY DAHLE:**  It does

16   appear Mr. Bertoldo has turned the corner.  He

17   certainly has made some significant changes since

18   I last saw him in 1993 at his initial parole

19   hearing.  But it remains to be seen whether or not

20   he can maintain the gains that he has recently

21   demonstrated.  Thank you.

22           **PRESIDING COMMISSIONER ANGELE:**  Mr. Stanton,

23   closing please.

24           **ATTORNEY STANTON:**  Thank you, Mr. Chairman.

25   Well, we would agree we'd like to get another

26   psych report if Mr. Bertoldo is not found or

27   deemed suitable at this hearing.  One thing I

43

1    would ask the Panel to keep in mind, this wasn't

2    actually considered to be an execution.  That's

3    why the judge reduced it down.  This was in the

4    heat of passion.  He was obviously in a violent

5    struggle.  It was done at time when Mr. Bertoldo

6    was truly involved in substances to a very

7    significant degree.  I don't know how intoxicated

8    he might have been at that particular time, but I

9    think his overall state of being at that time, his

10   overall judgment was certainly clouded with the

11   things he was involved in, the lifestyle he was

12   leading.  This was a single victim, a single

13   incident.  It wasn't a premeditated act.  He did

14   have an argument with the victim.  He didn't go

15   there armed.  The weapons were the victim's.  He

16   has tried to make amends.  He has written a letter

17   that he would like to send to the victim.  He is

18   clearly troubled by this.  I think he is sincerely

19   and honestly remorseful.  He's taken

20   responsibility for it.  I think he's gained

21   insight into this and the seriousness of it and

22   the magnitude on the lives that it has -- lives

23   that have been affected by this.  You know, if you

24   look over his history, it's a significant criminal

25   history.  Nobody's trying to argue differently.

26   But I was just looking at the prior again, and

27   really there's only two acts in here that involved

44

1    any violence.  One was a robbery and the other was

2    battery on a peace officer.  He doesn't really

3    have a nature of an assaultive behavior.  He never

4    had assaultive behavior as a juvenile or the kind

5    of person who was out there doing a lot of

6    violence.  It just seemed like someone who, at

7    least in my opinion, became very involved in some

8    serious -- with some serious substances.  Heroin

9    is a very powerful drug, as we all know.  And

10   Mr. Dahle is right.  When he came to prison,

11   unfortunately he didn't clean up his act right

12   away.  It took a long time.  But I think most

13   importantly is that he has turned that corner that

14   was alluded to and I think he's sincere about

15   that.  If you look at his social history, I know,

16   obviously, he was addicted to heroin.  I can't

17   it's a perfect social history.  But the statute

18   speaks to relationships, and if you look over his

19   relationships, he's got a long-term relationship,

20   somebody who can maintain these kinds of

21   relationships.  I didn't actually see a history of

22   (inaudible) the wrong people and unstable

23   relations.  He's with his wife or his girlfriend

24   long term, very long, 30 something years.  He

25   worked.  And, again, he does have a record, but it

26   wasn't mostly for assaultive behavior.  His

27   juvenile record was very minor.  I think there

45

1    were only a couple of contacts there and not for

2    violence.  Obviously, he's a lot older and a lot

3    wiser now.  It may have taken him a while to see

4    the light, but I think Mr. Bertoldo has certainly

5    seen it and is pursuing it.  And I support that

6    with the fact that he has obtained a GED and has

7    taken college classes.  He's brought his

8    classification score down to zero.  He's at his

9    lowest custody level now.  He's been in drafting,

10   silk screening.  He's a licensed optician.  One

11   thing I just found out from interviewing him right

12   before the hearing, we didn't talk about it here,

13   but, you know, he upgraded this vocation with

14   money that he, himself, earned by selling his

15   artwork.  And he's been the chairman of AA --

16   excuse me, NA now, a facilitator for Breaking

17   Barriers.  I believe, as Commissioner May pointed

18   out, he was a MAC president and he's a MAC rep.

19   He's been in Born to Win, taken correspondence

20   courses, Crim-Anon.  Before that he's had Breaking

21   Barriers, Alternatives to Violence both Basic and

22   Advanced, has been a facilitator of that.

23   According to my notes, has been in Amer-I-Can,

24   Morals and Values, church groups, Arts in

25   Corrections.  Again, he's earned money with his

26   artwork.  His work record is outstanding.  He's

27   been in Bible Study, Set Free Ministries.  There's

46

1    several laudatory chronos.  He's maintained

2    positive relations.  He actually had a request.  I

3    told him I didn't think the Panel would do it, but

4    he would like it for you to call his building

5    officer because this is the man who apparently has

6    the most contact with Mr. Bertoldo and

7    unfortunately couldn't get a chrono off or a

8    letter, but did indicate that if the Panel wanted

9    to call him that he would be willing to talk to

10   the Panel to indicate Mr. Bertoldo's behavior --

11   positive behavior I should say.  The psychological

12   report was done at a time when Mr. Bertoldo was

13   still having some problems and I ask the Panel to

14   please bear that in mind.  He -- The doctors do

15   indicate that he's remorseful, don't get me wrong.

16   Under the high risk factors, it says that -- one

17   thing I did want to talk about was it says that

18   the victim was extremely vulnerable and that there

19   was no immediate threat to Mr. Bertoldo.  The

20   doctor said the latter based on the victim being

21   killed by the gunshots.  I just want to make sure,

22   you know, that's a little bit misleading because

23   the victim was not actually someone who was a

24   particularly vulnerable victim in the beginning as

25   we would normally see.  This was someone who he

26   was in a violent struggle with.  And that he had

27   limited awareness regarding his involvement in the

47

1   offense.  I don't think that is, at this time,

2   still applicable based on the -- on what we've

3   seen here today and the gains that Mr. Bertoldo

4   has made.  Also, he doesn't have any major mental

5   disorders.  Even according to this, there's no

6   treatment recommendations were indicated.  And the

7   prior reports do indicate that he demonstrated

8   remorse.  And finally, I think in the area of

9   parole plans that Mr. Bertoldo has adequate plans.

10  He has a place to live and he has a place to work

11  and he's got marketable skills.  He has support

12  out there, and he certainly has a proven work

13  record.  I don't see any major problems in that

14  area.  Finally, Mr. Bertoldo's been down, I guess

15  incarcerated approximately 21 years if you include

16  the county time.  He's -- He did have some

17  problems, and I know the problems with the

18  psychological report.  I do a lot of parole

19  hearings, as the Panel knows.  And I urge you to

20  find him suitable, but I also realize the

21  shortcomings of the packet.  I discussed those

22  with Mr. Bertoldo.  And if he's not deemed

23  suitable, the one thing I would really ask the

24  Panel to reflect on is I think he's making a

25  sincere effort to turn his life around.  And I'm

26  hoping that the Panel will credit him with that

27  and take that into consideration.  I think that

48

```
 1    Mr. Bertoldo at this point in his life and with
 2    what he's doing in trying to overcome his
 3    substance abuse problems and the gains that he's
 4    made needs encouragement.  The last time he came
 5    to Board he got a five-year denial.  Then he came
 6    and he took the two-year stip because he knew that
 7    he had made mistakes.  That was my suggestion that
 8    he take a stip at that point, and we agreed on
 9    that because of the recency of the disciplinaries.
10    And I know the Panel can deny anywhere from one to
11    five years, but if he's not deemed suitable then
12    we're hoping that he will be back in a minimal
13    time to show him that when you do the right things
14    and make these kind of efforts and do turn your
15    life around that they mean something, they count
16    for something.  And I guess that's the bottom line
17    of what I'm saying is that I encourage you to find
18    him suitable.  I don't think that he's going to be
19    a danger at this point, but as the DA pointed out,
20    at least by what we usually see, these gains are
21    not the most long term ones we've seen and I can't
22    argue in good faith otherwise.  But I would say
23    that I think he has made significant progress and
24    turned himself around and made a real commitment
25    to doing the right thing, to being a constructive
26    member of society, someone that you can count on
27    to go out there and do what he says he's going to
```

49

1    do, not get involved with substances but rather

2    continue his participation in substance abuse

3    programming throughout his life, which he

4    indicated he would do, and credit him with that

5    and hopefully bring him back either perhaps in

6    minimal time or a very reasonable short time.  I

7    know you can deny him three, four, or five years,

8    but we're hoping that his efforts will count for

9    something today and he'll be -- if he's not deemed

10   suitable, which is, of course, our request, but if

11   he's not deemed suitable, to be brought back in a

12   minimal amount of time.  I submit with those

13   comments.  And we would also -- If he isn't deemed

14   suitable, I would agree and request another

15   psychological report be done.  Thank you,

16   submitted.

17          **PRESIDING COMMISSIONER ANGELE:**  Thank you.

18   Mr. Bertoldo, now it's your turn to make a

19   statement to this Panel regarding your parole

20   suitability, unless you'd like to end this hearing

21   with what your attorney's said on your behalf.

22          **INMATE BERTOLDO:**  Excuse me, Sir?

23          **PRESIDING COMMISSIONER ANGELE:**  Unless you'd

24   like to end this on what your attorney's said on

25   your behalf.

26          **INMATE BERTOLDO:**  I -- Can I make a comment?

27          **PRESIDING COMMISSIONER ANGELE:**  Certainly.

50

1          **INMATE BERTOLDO:**  I agree with the District

2     Attorney that the vehicle that got me to the man's

3     house was drugs.  I look back in my life and I see

4     a lot of that in it.  I realize the vehicle.  As

5     my attorney said also, we always like to think of

6     ourselves as the nice guy and this and that, and I

7     hope that I've done some nice things in my

8     lifetime, too.  I could look back and see some.

9     But if you ask me, yes, I want to go home.  It's

10    been 21 years.  I've thought about a lot of things

11    in between that time.  I've gotten loaded a lot of

12    times, too.  If I'm ready to go home, if I

13    continue doing what I've been doing since

14    September of 2000, I know I'm ready to go home.

15    That's what I can say.

16          **PRESIDING COMMISSIONER ANGELE:**  All right.

17          **INMATE BERTOLDO:**  I feel good with myself

18    since then.

19          **PRESIDING COMMISSIONER ANGELE:**  One last

20    question I want to ask you.  Did you catch the

21    Hepatitis C off of needles?

22          **INMATE BERTOLDO:**  I believe so.

23          **PRESIDING COMMISSIONER ANGELE:**  Okay.

24          **INMATE BERTOLDO:**  In prison.

25          **PRESIDING COMMISSIONER ANGELE:**  Yeah.

26          **ATTORNEY STANTON:**  I'm sorry, I didn't

27    understand that.  If you could tell me, I'm sorry.

51

1          **PRESIDING COMMISSIONER ANGELE:**  Oh, he has

2     Hepatitis C and I asked him if he got it off the

3     needles.

4          **ATTORNEY STANTON:**  Oh, thank you.

5          **PRESIDING COMMISSIONER ANGELE:**  All right,

6     we're going to recess for deliberations please.

7          **ATTORNEY STANTON:**  Thank you, Sir.

8                         **R E C E S S**

9                          --oOo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

52

1          **CALIFORNIA BOARD OF PRISON TERMS**

2                  **D E C I S I O N**

3          **PRESIDING COMMISSIONER ANGELE:**   This is in

4     the matter of Roberto Bertoldo.   Mr. Bertoldo, the

5     Panel has reviewed all information received from

6     the public and relied on the following

7     circumstances in concluding that you are not yet

8     suitable for parole and would pose an unreasonable

9     risk of danger to society or a threat to public

10    safety if released from prison.   The offense was

11    carried out in an exceptionally cruel, callous,

12    violent, brutal manner.   The offense was carried

13    out in a dispassionate manner such as an execution

14    style murder, although I realize and for the

15    record indicate that your conviction was for

16    murder in the second degree.   The victim was

17    abused.   He had been stabbed 16 times and then

18    shot in the head after he had been stabbed and was

19    on the ground.   The offense was carried out in a

20    manner which demonstrates an exceptionally callous

21    disregard for human suffering and life.   The

22    motive for the crime was inexplicable or very

23    trivial in relation to the offense.   These

24    conclusions are drawn from the Statement of Facts

25    wherein the inmate, on or about the 13th day of

26    April 1981, did stab and shoot Mr. John Simerly,

27    **ROBERTO BERTOLDO   C-94377   DECISION PAGE 1   11/20/02**

EX. 3

53

1    S-I-M-E-R-L-Y, age 49.  This occurred after the

2    inmate had gone to Mr. Simerly's residence in

3    order to get some money that Mr. Simerly had owed

4    him.  They got involved in a discussion that

5    escalated to an argument that escalated to

6    violence.  A knife was drawn.  They were wrestling

7    for the knife.  Mr. Simerly was then stabbed 16

8    times.  And then the inmate did remove a number of

9    items of property from the residence and wound up

10    shooting the victim in the head one last time,

11    causing his death.  The inmate did have an

12    escalating pattern of criminal conduct.  He's

13    failed to profit from society's previous attempts

14    to correct his criminality which include juvenile

15    probation, adult probation, county jail, two prior

16    prison terms and parole.  He has a prior

17    criminality which includes convictions for grand

18    theft auto, robbery, forgery, battery, burglary,

19    and under the influence of a controlled substance.

20    The inmate, during his incarceration, has received

21    10 128(a) counseling chronos or counseling --

22    counseling chronos, the last one being in 1997 for

23    performance.  He has received 10 115 disciplinary

24    reports.  His last face-to-face Board hearing was

25    on June 1st of 1995 where he received a five-year

26    denial.  In October of 2000, he stipulated for two

27    **ROBERTO BERTOLDO   C-94377   DECISION PAGE 2   11/20/02**

*Ex. B*

54

1    years because of his 115s.  So since that '95

2    period, he received -- he has received three 115s,

3    all in 2000:  April 10th, 2000, refusal to submit

4    to a urinalysis; January 27th, 2000, possession of

5    morphine or positive urinalysis test; and January

6    the 13th, 2000, possession of manufactured

7    hypodermic syringe.  The psychological evaluation,

8    which is dated 12/28, 2000 by Dr. Gary Freitas,

9    F-R-E-I-T-A-S, is not supportive of parole in that

10   the doctor states that:

11        "The inmate offers a limited

12        explanation of his involvement in the

13        offense except to note how escalating

14        circumstances resulted in the

15        conflict and that the death was a

16        result of criminal lifestyle choices

17        made by both the inmate and the

18        victim.  Based on this evaluation

19        process, this inmate appears to have

20        a personality disorder in the

21        moderate to severe range.  He would

22        receive some benefit from continuing

23        to participate in the self-help

24        process."

25   Also, he indicates under clinical assessment under

26   Axis I:  Poly-Substance Dependence, which is

27   **ROBERTO BERTOLDO   C-94377   DECISION PAGE 3   11/20/02**

55

1    Heroin and Methamphetamines.  And also Axis II:

2    Anti-Social Personality Disorder.  The inmate does

3    have realistic parole plans, a job, a place to

4    live.  The Hearing Panel notes that responses to

5    3042 notices indicate opposition to a finding of

6    parole suitability.  Specifically, the District

7    Attorney of Los Angeles County, who had a

8    representative here at this hearing to voice their

9    opposition to parole suitability, and the Los

10   Angeles County Sheriff's Department, who submitted

11   a letter in opposition.  The Panel makes the

12   following findings:  That the inmate needs

13   additional time in order to fully understand and

14   deal with the causation factors that led to the

15   commitment of the life crime.  Until progress is

16   made, the prisoner continues to be unpredictable

17   and a threat to others.  Therapy in a controlled

18   setting is needed.  The prisoner's gains are

19   recent.  He must demonstrate an ability to

20   maintain gains over an extended period of time.

21   In view of the inmate's criminal history,

22   substance abuse, and continued negative behavior,

23   there is no indication that the prisoner would

24   behave differently if paroled.  Nevertheless, he

25   should be commended for obtaining his GED while in

26   custody, for getting some college courses under

27   **ROBERTO BERTOLDO   C-94377   DECISION PAGE 4   11/20/02**

56

1    his belt also, for completing vocational optical

2    and being a certified optician, for being involved

3    in AA/NA, for taking the Born to Win course,

4    Breaking Barriers, Arts in Corrections,

5    Amer-I-Can, Christian Discipleship course, and

6    being MAC president.  However, these positive

7    aspects of his behavior do not outweigh the

8    factors of unsuitability.  In a separate decision,

9    the Hearing Panel finds that it is not reasonable

10    to expect that the inmate will be granted parole

11    at a hearing during the following two years.  The

12    prisoner committed the offense in an exceptionally

13    cruel, callous, violent, brutal manner.

14    Specifically, on or about the 13th day of April

15    1981, did cause the death of one John Simerly,

16    S-I-M-E-R-L-Y, age 49, by stabbing him 16 times

17    and shooting him in the head with a .22 caliber

18    weapon.  The inmate had gone to the victim's home

19    to obtain some money that the victim had owed him.

20    They got into a discussion, which escalated to a

21    physical confrontation, at which time a knife was

22    drawn.  There was a fight over the knife.  The

23    victim was then stabbed 16 times.  The inmate then

24    removed property from the residence, and prior to

25    leaving retrieved a .22 caliber gun and did shoot

26    the victim the head, causing his death.  The

27    **ROBERTO BERTOLDO    C-94377    DECISION PAGE 5    11/20/02**

57

1    victim was abused, obviously, shot in the head

2    after he was down, being stabbed 16 times.  The

3    offense was carried out in a manner which

4    demonstrates an exceptionally callous disregard

5    for human suffering and life, and the motive for

6    the crime was inexplicable or very trivial in

7    relation to the offense.  The prisoner does have a

8    prior history of violent behavior in that he has

9    arrests and convictions for robbery and battery.

10    The prisoner has an extensive history of

11    criminality, excuse me, and misconduct which

12    includes convictions for grand theft auto, armed

13    robbery, forgery, battery, burglary, and under the

14    influence of a controlled substance.

15    Additionally, he has served two prior prison

16    terms.  In addition, his discipline includes 10

17    115s during his incarceration.  The last three

18    were in the year 2000, April 2000, refusal to

19    submit to a urinalysis test; January 2000,

20    possession of morphine or positive UA test; and

21    January of 2000, possession of manufactured

22    hypodermic syringe indicating that the inmate did,

23    in fact, commit three serious violations during a

24    recent period.  And, once again, those were three

25    115s in the year 2000.  The recent psychological

26    evaluation dated 12/28/00 by Dr. Gary Freitas,

27    **ROBERTO BERTOLDO   C-94377   DECISION PAGE 6   11/20/02**

58

1    F-R-E-I-T-A-S, indicates a need for a longer

2    period of observation, evaluation, and treatment.

3    The prisoner has not completed the necessary

4    programming which is essential to his adjustment.

5    He needs additional time in order to gain such

6    programming.  That is self-help and therapy

7    programming, which was also recommended by the

8    psychologist.  In addition, the correctional

9    counselor's report dated October 2002 by initial

10   F. Gonzales indicates a threat to the community as

11   moderate.  Therefore, a longer period of

12   observation and evaluation of the prisoner is

13   required before the Board should find the prisoner

14   suitable for parole.  And before I read the

15   recommendations, I also want to indicate,

16   Mr. Bertoldo, that apparently in the year 2000

17   something happened to you and you have since that

18   time been disciplinary-free.  It's positive, but

19   it has not been a long enough time.  Understand

20   that.

21        **INMATE BERTOLDO:**  I do.

22        **PRESIDING COMMISSIONER ANGELE:**  But we do

23   commend you for that, and hopefully you'll stay on

24   that road.  I know what it must be like to, I

25   guess to say to try to get smack back while you're

26   in prison, and if you dumped that in 2000 also

27   **ROBERTO BERTOLDO   C-94377   DECISION PAGE 7   11/20/02**

59

1    you've come a long way.  The Panel makes the

2    following recommendations:  That the inmate become

3    and remain disciplinary-free, if available,

4    participate in self-help and therapy program, and

5    cooperate with clinicians in the completion of a

6    clinical evaluation.  We'll be asking for a new

7    one prior to your next hearing.  Hopefully, some

8    of those matters will be cleared up by then and

9    another year behind this stuff for you.  Looking

10    at the whole record, you've changed.  You're a

11    different individual from what happened prior to

12    2000 or prior to April of 2000 anyway.

13            **INMATE BERTOLDO:**  I feel like a different

14    individual.

15            **PRESIDING COMMISSIONER ANGELE:**  It shows.

16    It shows.  It just hasn't been -- You haven't

17    gotten away long enough from that area.  And I do

18    wish you good luck.  Any comments, Commissioner

19    May?

20            **DEPUTY COMMISSIONER MAY:**  I concur.

21            **PRESIDING COMMISSIONER ANGELE:**  That does

22    conclude this hearing.  The time is approximately

23    10:15 a.m.

24                    --o0o--

25    **PAROLE DENIED TWO YEARS**

26    **EFFECTIVE DATE OF THIS DECISION**_____ DEC 2 4 2002 _____

27    **ROBERTO BERTOLDO  C-94377  DECISION PAGE 8  11/20/02**

60

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, PATRICIA M. JOHNSON, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 59, and which recording was duly recorded at CHUCKAWALLA VALLEY STATE PRISON, at BLYTHE, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of ROBERTO BERTOLDO, CDC No. C-94377, on NOVEMBER 20, 2002, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated December 12, 2002, at Sacramento County, California.

_____
Patricia M. Johnson
Transcriber
**CAPITOL ELECTRONIC REPORTING**

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )    CDC Number C-94377
)
ROBERT BERTOLDO )
_____ )



RICHARD J. DONOVAN CORRECTIONAL FACILITY

AT ROCK MOUNTAIN

SAN DIEGO, CALIFORNIA

JUNE 1, 1995

1:35 P.M.


PANEL PRESENT:

Mr. Tom Giaquinto, Presiding Commissioner
Ms. Carol Bentley, Commissioner
Mr. Manuel Guaderrama, Commissioner


OTHERS PRESENT:

Mr. Robert Bertoldo, Inmate
Mr. Richard Jallins, Attorney for Inmate
Ms. Tina Hansen, Deputy District Attorney
Ms. Katherine Rogers, Family Member
Mr. Arreola, Family Member
Correctional Officer


CORRECTIONS TO THE DECISION HAVE BEEN MADE
     ✗     No
_____    Yes        See Errata Sheet


Iris Abernathy, Transcriber

PETERS SHORTHAND REPORTING CORPORATION



ii

INDEX

|  | PAGE |
|---|---|
| Proceedings . . . . . . . . . . . . . . . . | 1 |
| Statement of Facts . . . . . . . . . . . . | 4 |
| Post-Conviction Factors . . . . . . . . . . | 15 |
| Parole Plans . . . . . . . . . . . . . . . | 27 |
| Closing Statements . . . . . . . . . . . . | 49 |
| Recess . . . . . . . . . . . . . . . . . . | 57 |
| Decision . . . . . . . . . . . . . . . . . | 58 |
| Adjournment . . . . . . . . . . . . . . . . | 61 |
| Transcriber Certificate . . . . . . . . . . | 62 |

--oOo--

1

1      P R O C E E D I N G S

2          PRESIDING COMMISSIONER GIAQUINTO:  This is a

3      subsequent parole consideration hearing for Robert

4      Bertoldo, CDC number C-94377.  Today's date is June

5      1st, '95.  The time is 1:35 P.M.  We're located at

6      RJD.  The prisoner was received on 10/22/84 from the

7      County of Los Angeles for the offense of murder in the

8      second degree with the use of a deadly weapon and

9      grand theft from a person, case number A-527117,

10     counts one and two, 187 P.C., 12022B P.C. and 487 P.C,

11     having received a term of 19 years to life, with a

12     minimum eligible parole date of 9/9/94.  At this time

13     what we're going to do is make voice identification.

14     I know you've done this before.  I'm going to go from

15     myself, and we're going to go to my right, and when it

16     comes to you state your full name, spell your last

17     name and your CDC number.  My name is Tom Giaquinto,

18     G-i-a-q-u-i-n-t-o, Commissioner, Board of Prison

19     Terms.

20         COMMISSIONER BENTLEY:  Carol Bentley, B-e-n-t-

21     l-e-y, Commissioner, Board of Prison Terms.

22         MS. ROGERS:  Katherine Rogers, I'm the victim's

23     daughter, R-o-g-e-r-s.

24         MR. ARREOLA:  (Inaudible).

25         PRESIDING COMMISSIONER GIAQUINTO:  Spell your

26     name, please.

27         MR. ARREOLA:  A-r-r-e-o-l-a.

2

1          PRESIDING COMMISSIONER GIAQUINTO:   And you're

2     here as a support person for the --

3          MR. ARREOLA:   Next of kin.

4          PRESIDING COMMISSIONER GIAQUINTO:   -- next-of-

5     kin?   Okay.

6          DEPUTY DISTRICT ATTORNEY HANSEN:   Tina Hansen,

7     deputy district attorney representing the Los Angeles

8     County District Attorney's Office.

9          ATTORNEY JALLINS:   Richard Jallins, J-a-l-l-i-

10    n-s, state-appointed counsel for the prisoner.

11         INMATE BERTOLDO:   Robert Bertoldo, B-e-r-t-o-l-

12    d-o.

13         COMMISSIONER GUADERRAMA:   M. Guaderrama, G-u-a-

14    d-e-r-r-a-m-a, Commissioner, Board of Prison Terms.

15         PRESIDING COMMISSIONER GIAQUINTO:   Okay, the

16    purpose of today's hearing is to again consider your

17    suitability for parole.   In arriving at a decision, we

18    will consider the commitment offense, your prior

19    criminality, and your adjustment since you've been

20    incarcerated.   We have reviewed your central file and

21    other pertinent documents that we will be utilizing to

22    conduct today's hearing.   And during the proceedings

23    you or your attorney will be given an opportunity to

24    make clarifications or corrections to the record.   The

25    law and the Board of Prison Terms rules state you are

26    to be denied a parole date if your release would pose

27    an unreasonable risk of danger to others.   Now there

3

1    are certain rights that you are afforded, and I'll ask

2    counsel if the prisoner's rights have been met.

3            ATTORNEY JALLINS:  He has one objection to

4    make, place on the record.  He objects to the fact

5    that he has not been notified previous to today that

6    there would be next-of-kin of the victim.

7            PRESIDING COMMISSIONER GIAQUINTO:  Okay, the

8    objection is overruled.  You will receive a copy of

9    the tentative written decision today.  That decision

10   will be effective 90 days after review.  A transcript

11   of the hearing will be sent to you.  You have 90 days

12   to appeal from the effective date of the decision.

13   You're not required to discuss this matter with the

14   Panel.  You're not required to admit the offense.

15   However, the Panel does accept as true the court

16   findings.  Is there any confidential information we're

17   going to use today?

18           COMMISSIONER GUADERRAMA:  No, there's none.

19           PRESIDING COMMISSIONER GIAQUINTO:  Is the

20   prisoner going to speak to the Panel today?

21           ATTORNEY JALLINS:  Yes.

22           PRESIDING COMMISSIONER GIAQUINTO:  I will pass

23   to your attorney and to the deputy district attorney a

24   hearing checklist so we can make sure we're working

25   from the same set of documents.

26           DEPUTY DISTRICT ATTORNEY HANSEN:  I have the

27   same documents.

4

1        **ATTORNEY JALLINS:**  I have all the documents.  I

2   also submitted a memorandum on behalf of the prisoner.

3        **PRESIDING COMMISSIONER GIAQUINTO:**  Okay.  Raise

4   your right hand, be sworn.  Do you swear or affirm

5   that in the cause now pending you will tell the truth,

6   the whole truth, and nothing but the truth, so help

7   you, God?

8        **INMATE BERTOLDO:**  Yes.

9        **PRESIDING COMMISSIONER GIAQUINTO:**  This offense

10  occurred on April 13, 1981 and you murdered another

11  individual.  You stabbed him numerous times, is that

12  correct?

13       **INMATE BERTOLDO:**  Yeah.

14       **PRESIDING COMMISSIONER GIAQUINTO:**  You shot him

15  with a gun?

16       **INMATE BERTOLDO:**  Yeah.

17       **PRESIDING COMMISSIONER GIAQUINTO:**  And then you

18  robbed, you stole some of his property, is that

19  correct?

20       **INMATE BERTOLDO:**  Yeah.

21       **PRESIDING COMMISSIONER GIAQUINTO:**  And

22  ultimately the police had stopped you at some point in

23  time later on.  As a result of that, they recovered

24  some of the victim's stolen property, is that right?

25       **INMATE BERTOLDO:**  Yes.

26       **PRESIDING COMMISSIONER GIAQUINTO:**  Why did you

27  kill him?

5

1          INMATE BERTOLDO:  I was defending myself.  We

2    were fighting.  I didn't go there with any of those

3    intentions.  Everything that was used there, every

4    weapon that was used there that day, were his weapons.

5    I didn't go there with any weapons.  The fight broke

6    out.  That's what happened.

7          PRESIDING COMMISSIONER GIAQUINTO:  Well --

8          INMATE BERTOLDO:  The knife was his.  The gun

9    was his.

10          PRESIDING COMMISSIONER GIAQUINTO:  How did the

11    fight start?

12          INMATE BERTOLDO:  There was an argument there.

13          PRESIDING COMMISSIONER GIAQUINTO:  About what?

14          INMATE BERTOLDO:  About drugs.

15          PRESIDING COMMISSIONER GIAQUINTO:  Okay, how

16    did the physical altercation start?  Was it a physical

17    altercation, or a verbal argument or what?

18          INMATE BERTOLDO:  It started verbally.

19          PRESIDING COMMISSIONER GIAQUINTO:  And what

20    happened?

21          INMATE BERTOLDO:  And just got heated.  Just

22    started getting higher and higher.

23          PRESIDING COMMISSIONER GIAQUINTO:  Okay.

24          INMATE BERTOLDO:  And he started pushing me,

25    and I started swinging, and he started swinging.

26          PRESIDING COMMISSIONER GIAQUINTO:  Okay.  How

27    did you get the knife?

6

1          INMATE BERTOLDO:  I can't remember exactly.  It
2    could have been it happened when we went from his --
3    There was an office that he had.  And we went
4    scuffling from there wrestling with each other,
5    punching each other, into the living room.  And there
6    was an area there.  I don't know if it was the kitchen
7    or what it was separating the two.  It was a counter
8    of some sort.  And it could have come from there,
9    because that's when he turned up is when we got into
10   the living room.
11         PRESIDING COMMISSIONER GIAQUINTO:  You don't
12   remember where the knife came from?
13         INMATE BERTOLDO:  No.
14         PRESIDING COMMISSIONER GIAQUINTO:  Did you stab
15   him first?
16         INMATE BERTOLDO:  We were wrestling on the
17   floor with the knife, and that's when I took the knife
18   from him.
19         PRESIDING COMMISSIONER GIAQUINTO:  So he had
20   the knife?
21         INMATE BERTOLDO:  Yes.
22         PRESIDING COMMISSIONER GIAQUINTO:  And you took
23   the knife from him and what happened next?
24         INMATE BERTOLDO:  And we rolled around on the
25   floor for a little while, and when I got up, we both
26   got --  I got up and then he got up and started like
27   coming towards me, and I started stabbing him.

7

1          PRESIDING COMMISSIONER GIAQUINTO:  You stabbed

2    him 16 times?

3          INMATE BERTOLDO:  I don't know how many times.

4          PRESIDING COMMISSIONER GIAQUINTO:  Yeah, at

5    least 16 times.  Why so many times?  Doesn't sound

6    like self-defense, does it?

7          INMATE BERTOLDO:  There was a lot happening.  I

8    don't know if you've ever been in a situation like

9    that.  And there's somebody on you.  There's somebody

10   coming at you.

11         PRESIDING COMMISSIONER GIAQUINTO:  And you just

12   kept stabbing him?

13         INMATE BERTOLDO:  Yes.

14         PRESIDING COMMISSIONER GIAQUINTO:  And the

15   reason you kept stabbing him is because the fight was

16   still going on, right?

17         INMATE BERTOLDO:  Yeah.

18         PRESIDING COMMISSIONER GIAQUINTO:  So then he

19   falls down on the floor?

20         INMATE BERTOLDO:  Yeah.

21         PRESIDING COMMISSIONER GIAQUINTO:  Then you

22   went and got a gun?

23         INMATE BERTOLDO:  No.

24         PRESIDING COMMISSIONER GIAQUINTO:  When did the

25   gun come into play?

26         INMATE BERTOLDO:  I had ran, I think towards

27   the bedroom or towards that office that he had there.

8

1    And I think the gun was on his desk or in the drawer.

2         PRESIDING COMMISSIONER GIAQUINTO:  Well you've

3    told us in the past where the gun was.  You mean you

4    don't remember today?

5         INMATE BERTOLDO:  It was in the desk.

6         PRESIDING COMMISSIONER GIAQUINTO:  And so you

7    went and got the gun?

8         INMATE BERTOLDO:  Yeah.

9         PRESIDING COMMISSIONER GIAQUINTO:  Then you

10   went back to the victim and you shot him?

11        INMATE BERTOLDO:  No.  I started to re-lock the

12   door.

13        PRESIDING COMMISSIONER GIAQUINTO:  I beg your

14   pardon?

15        INMATE BERTOLDO:  I started to re-lock the back

16   door.

17        PRESIDING COMMISSIONER GIAQUINTO:  Yeah, and?

18        INMATE BERTOLDO:  And that's when I heard

19   something.  And it was him.  That's when I went back

20   in and shot.

21        PRESIDING COMMISSIONER GIAQUINTO:  But he

22   didn't pose a threat to you at that time, did he?

23        INMATE BERTOLDO:  Probably not.

24        PRESIDING COMMISSIONER GIAQUINTO:  Was it

25   possible that he would have lived had you not shot

26   him?

27        INMATE BERTOLDO:  Very possible.

9

1        PRESIDING COMMISSIONER GIAQUINTO:  So basically

2   you said you were defending yourself, and then you

3   decided to just execute him?  After you killed this

4   man, you rummaged through his house and stole a lot of

5   his property, right?

6        INMATE BERTOLDO:  Yes.

7        PRESIDING COMMISSIONER GIAQUINTO:  Why?

8        INMATE BERTOLDO:  There was too many things

9   going through my mind.

10       PRESIDING COMMISSIONER GIAQUINTO:  Well, you

11  know, you paint the picture of somebody that is

12  defending himself, and you feel like your life is

13  threatened in some manner, and so you have to defend

14  yourself and that's why you stabbed this guy 16 times.

15  But then you were executing him.  You were so

16  concerned about your own safety that you not only

17  execute him, but then you rummage through his house

18  and you stole his property?

19       INMATE BERTOLDO:  I wasn't rummaging through

20  his house.

21       PRESIDING COMMISSIONER GIAQUINTO:  Don't talk

22  at the same time I'm talking, mostly because the

23  transcriber can't get both of us at the same time.

24       INMATE BERTOLDO:  All right.

25       PRESIDING COMMISSIONER GIAQUINTO:  So how did

26  you come to steal all his property, then?

27       INMATE BERTOLDO:  As I started to go out the

10

1      door, when I came back, there were some rifles in a

2      closet and I took those. When I went back to the

3      front room, there was a, a wallet was on the floor,

4      and my (inaudible) was on the floor. I picked those

5      up and put them in my pocket. And I took the rifles

6      and the safe.

7              PRESIDING COMMISSIONER GIAQUINTO: You know, it

8      doesn't sound real good. It sounds like you weren't

9      very concerned about the fact that you'd just killed a

10     man. And this was somebody known to you. (Inaudible)

11     thing, you go steal his property. It's pretty

12     ruthless considering the fact the you go back and you

13     shoot him and execute him when he might have lived.

14     There were a lot of stab wounds around his face, huh?

15     Why did you stab him in the face?

16             INMATE BERTOLDO: He was coming at me. I just

17     kept swinging. I don't know -- I didn't stop and

18     think of every stab wound. I didn't do that, and

19     that's what you're asking me to describe here. I

20     didn't do that. What happened, every --

21             PRESIDING COMMISSIONER GIAQUINTO: Why are you

22     getting so defensive? This is not supposed to be

23     easy, you know. A man is dead --

24             INMATE BERTOLDO: I know that. I know it's

25     not. There's people here that, you know --

26             PRESIDING COMMISSIONER GIAQUINTO: -- and you

27     killed him. Wait a minute. You killed this man. You

11

1    killed him savagely.  And then you stole his property.

2    You're in prison.  And a decision has to be made

3    whether you're ready to go on parole.  So somebody has

4    to ask the hard questions, don't they?  It would be

5    real easy for us to say "Did you kill somebody?"  You

6    come in here and say "Yeah, I'm really sorry about it.

7    Can I leave?"  It's not that easy, is it?

8              INMATE BERTOLDO:  No, it's not.

9              PRESIDING COMMISSIONER GIAQUINTO:  We're going

10    to ask the hard questions.  And you get upset when

11    you're asked those hard questions, you always do.  I

12    remember your last time.  You got upset.  You get very

13    defensive.

14              INMATE BERTOLDO:  They hurt.

15              PRESIDING COMMISSIONER GIAQUINTO:  Well, --

16              INMATE BERTOLDO:  They hurt a lot of me.

17              PRESIDING COMMISSIONER GIAQUINTO:  Hurting is

18    one thing, and being defensive to the point that

19    you're taking it, because you almost feel justified.

20    This guy attacked you.  You don't even know where the

21    knife came from, and you were able to overpower him.

22    You had virtually no marks on your body, no

23    indications that you had been punched yet.  A little

24    scratch on your nose, and you had a scratch on your

25    stomach as I recall.  Is that right?

26              INMATE BERTOLDO:  I think so.

27              PRESIDING COMMISSIONER GIAQUINTO:  Was he a

12

1    small man?

2         INMATE BERTOLDO:  No.

3         PRESIDING COMMISSIONER GIAQUINTO:  And then you

4    went and you pawned some of the property, and some of

5    the property you kept?

6         INMATE BERTOLDO:  Yes.

7         PRESIDING COMMISSIONER GIAQUINTO:  How do you

8    feel about this now?

9         INMATE BERTOLDO:  There's a lot of, there's a

10    lot of feelings.  There's a lot of them.

11         PRESIDING COMMISSIONER GIAQUINTO:  Okay, did --

12         INMATE BERTOLDO:  I wish it would have never

13    happened, but --

14         PRESIDING COMMISSIONER GIAQUINTO:  Can you

15    describe those feelings?

16         INMATE BERTOLDO:  There's a lot of shame.

17    There's a lot of guilt.  There's a lot of ghosts.

18    There's a lot of --  There's different feelings.

19    There's a feeling when I wake up in the morning and

20    I've dreamt about things like this that's happened.

21    And that will stay with me throughout the day.  Those

22    are different feelings.  There's a lot of emotion.

23    There's a lot of feelings that go with this.  I don't

24    think that I could just describe.

25         PRESIDING COMMISSIONER GIAQUINTO:  Well, you've

26    been down now about 14 years?

27         INMATE BERTOLDO:  Yes.

13

1          PRESIDING COMMISSIONER GIAQUINTO:  About eleven

2     of that in state prison and the rest of the time you

3     were in county jail?

4          INMATE BERTOLDO:  Since '81.

5          PRESIDING COMMISSIONER GIAQUINTO:  And have you

6     ever said --  You've been asked this question before

7     in prior years, the same one I just asked you.  And

8     you still can't articulate any real thoughts on this

9     terrible tragedy, except to say that it's difficult to

10    talk about.

11         INMATE BERTOLDO:  Well, it is.  I mean, there's

12    a lot of lives that been changed on this.  There's all

13    behind one incident.  All behind me killing Mr.

14    Simerly (phonetic).  On my side of the family, on his

15    side of the family.  And those, they go through my

16    head.  I could be watching a program, I could be

17    reading a book, I could, and something will make me

18    think about that.  And within myself, I feel bad.

19    It's not a bad to where, "Hey, I'm a bad guy".  It's a

20    deeper thought than that to me when it happens.  I've

21    had people pass away within the past year, and I can

22    relate.  Those are the things that I'm going through.

23    Those are the emotions, the feelings that I have.  And

24    I can't do anything about it.  I can't, as he said, I

25    went back and I killed the man.  He could have lived.

26    I can't do anything about that.  I want to, but I know

27    I can't.  That can't be done.  Those are the emotions.

14

1  Those are some of the feelings that I have.  It's very

2  frustrating within myself.  It's very frustrating to

3  see that the victim's family.  That's hard.

4        PRESIDING COMMISSIONER GIAQUINTO:  The stabbing

5  of the victim, do you feel that was justified?

6        INMATE BERTOLDO:  No.

7        PRESIDING COMMISSIONER GIAQUINTO:  But you did

8  feel that you were acting in self-defense?

9        INMATE BERTOLDO:  I should have run out of

10  there.

11        PRESIDING COMMISSIONER GIAQUINTO:  And you feel

12  like the only reason he was stabbed 16 times is you

13  were defending yourself, right?  That's what you said.

14        INMATE BERTOLDO:  It happened so fast.

15        PRESIDING COMMISSIONER GIAQUINTO:  And the

16  shooting, do you feel that that was, for what reason?

17        INMATE BERTOLDO:  I don't know.  If I could

18  tell you, I would tell you.  There was a lot of

19  emotion.  There was fear.

20        PRESIDING COMMISSIONER GIAQUINTO:  Fear of

21  what?

22        INMATE BERTOLDO:  If he came, if he lived, I'd

23  be in jail.  And these are the things that I --

24        PRESIDING COMMISSIONER GIAQUINTO:  You were

25  actually thinking about going to jail at the time this

26  thing was going down?

27        INMATE BERTOLDO:  I can't tell you yes, that

15

1   that's exactly what was going through my mind at the

2   time.  I know this, I know that I was scared.  What I

3   was afraid of, I don't know.  I've never sat there and

4   really talked to anyone about it.  I know I had fear.

5       PRESIDING COMMISSIONER GIAQUINTO:  Well, I'll

6   tell you.  The reason that we ask you all these

7   questions and you've been told this before is we're

8   trying to measure what depth of insight and true

9   remorse that you have or if you're still mitigating it

10  all.  And so consequently that's why I ask these

11  questions.  And what you're relating to me is a story

12  of a partial self-defense and then just a rational

13  thinking based upon fear is why you executed him.  And

14  no real explanation as to why you stole all this

15  property after, which usually takes some clear

16  thinking, doesn't it?  I'm not going to go into your

17  prior criminal record, which is extensive, and your

18  social factors, but I am going to use them in any

19  decision we make today.  And we'll go to post-

20  conviction factors.

21      COMMISSIONER GUADERRAMA:  Okay, your

22  classification score at the present time is 34 points.

23  And since you've been in the institution, you've

24  picked up 7 115s.  And I believe the last time I

25  recommended that you be disciplinary-free.  And since

26  that time, you've picked up two more.  Is that right?

27  On 4/10/95, the recent one, that's for having non-

16

1    expendable property?

2              INMATE BERTOLDO:  Twenty T-shirts.

3              COMMISSIONER GUADERRAMA:  And why did that

4    happen?

5              INMATE BERTOLDO:  Well, in the 14 years, they

6    accumulated in my cell.  We're allowed 10 and I had

7    over the limit.

8              COMMISSIONER GUADERRAMA:  How many did you

9    have?

10             INMATE BERTOLDO:  Approximately 17 to 19.

11             COMMISSIONER GUADERRAMA:  Why did you have

12   that?  You know what the rules are, don't you?

13             INMATE BERTOLDO:  Yes.

14             COMMISSIONER GUADERRAMA:  So why did you

15   deliberately break the rules?

16             INMATE BERTOLDO:  It wasn't done deliberately.

17   As I said, there were 18, and I didn't get rid of

18   them.

19             COMMISSIONER GUADERRAMA:  Okay, and then on

20   5/31/94, about a year ago, you had a positive UA.

21             INMATE BERTOLDO:  Yes.

22             COMMISSIONER GUADERRAMA:  And how did that

23   happen?

24             INMATE BERTOLDO:  I don't know.  We're going to

25   take it into the courts.  I'm waiting for a letter

26   from Gina Barry (phonetic) in Sacramento to defend me

27   on that, take it into the court.

17

1          COMMISSIONER GUADERRAMA:  So were you using?

2          INMATE BERTOLDO:  No.

3          COMMISSIONER GUADERRAMA:  Do you have any idea

4    how that got into your system?

5          INMATE BERTOLDO:  No, I don't.

6          COMMISSIONER GUADERRAMA:  Was it cocaine?

7          INMATE BERTOLDO:  Yes, it was positive for

8    coke.

9          COMMISSIONER GUADERRAMA:  Had you been on a

10   family visit?

11         INMATE BERTOLDO:  Yes.

12         COMMISSIONER GUADERRAMA:  And this was on your

13   exit, that you tested?

14         INMATE BERTOLDO:  Re-entry, coming back in.

15         COMMISSIONER GUADERRAMA:  Coming back in?

16         INMATE BERTOLDO:  They don't test you going

17   out.  They test you coming back in.  And I had written

18   a letter.  The specimen was taken on the 12th, I

19   think.  The tests were run on the 18th and the

20   institution was notified on the 31st of May, '94.  And

21   the first of June, I wrote a letter to the warden here

22   and asked him for a secondary test and that my family

23   would pay for the secondary test.  The form of the

24   secondary test would have been your blood test or a

25   follicle test, and that would have taken me back to

26   the point in question.  On June 2nd, I wrote another

27   formal letter to the associate warden of the

18

1    institution, asking for the secondary test, and it was

2    never granted.

3          COMMISSIONER GUADERRAMA:  Okay.  What we got

4    here is a finding of guilty.  You were found guilty on

5    that, and that's what we're going to go by.  Your 115s

6    have been pretty serious.  You had one on 4/13/85 for

7    assault on staff.  You threw a cup of unknown liquid

8    on one of the officers.  And you had another one on

9    2/17/88 for threatening an officer.  On 3/1/88, you

10    were involved in a fistfight.  On 5/8/89, force and

11    violence.  7/24/89, stimulants and sedatives.  And

12    that leads up to your last two.  Are you a violent

13    person?

14          INMATE BERTOLDO:  I'm trying to control that.

15    I'm a facilitator in Hands of Peace (phonetic) which

16    is an alternatives to violence program.

17          COMMISSIONER GUADERRAMA:  Well, it's only been

18    recently that you've shown any evidence that you're

19    mellowing at all.  You've had some pretty bad 115s.

20    And threatening is the next thing to violence.  Why

21    would you do something like that?

22          INMATE BERTOLDO:  Because I hadn't learned to

23    control my temper probably at that time.

24          COMMISSIONER GUADERRAMA:  Have you now?

25          INMATE BERTOLDO:  I'm trying.  And I'm getting

26    (inaudible).

27          COMMISSIONER GUADERRAMA:  Okay, and you appear

19

1    pretty excitable.  I was watching you, or listening to
2    your responses to Mr. Giaquinto's questions.  You seem
3    to have a hard time containing yourself.  Is that an
4    accurate observation of you?  Not at all?
5          INMATE BERTOLDO:  It's --
6          COMMISSIONER GUADERRAMA:  Okay, I think I
7    mentioned your classification score is 34 points.  To
8    your credit, you finished Alternatives to Violence on
9    8/6/93 and Breaking Barriers on 7/30/93.  You do have
10   a Vocational Optical certificate, is that right?
11         INMATE BERTOLDO:  No.  I'm still in the
12   program.
13         COMMISSIONER GUADERRAMA:  You completed
14   Vocational Drafting on 10/1/91.  I'm right there,
15   right?
16         INMATE BERTOLDO:  Yes.
17         COMMISSIONER GUADERRAMA:  Okay, and you are in
18   the Vocational Optical program?
19         INMATE BERTOLDO:  Right.
20         COMMISSIONER GUADERRAMA:  And how much longer
21   do you have to go before you finish it?
22         INMATE BERTOLDO:  They take the test once a
23   year, and in November they'll be testing.
24         COMMISSIONER GUADERRAMA:  Are you prepared to
25   take it?
26         INMATE BERTOLDO:  I'm on the list to take it.
27         COMMISSIONER GUADERRAMA:  All right.  Think

20

1    you'll pass?

2         INMATE BERTOLDO:  I hope so.

3         COMMISSIONER GUADERRAMA:  Good.  You did

4    complete your GED on 7/27/87?

5         INMATE BERTOLDO:  Yes.

6         COMMISSIONER GUADERRAMA:  And okay, well, I'll

7    give you an opportunity.  What else have you done in

8    the last couple of years?

9         INMATE BERTOLDO:  Just continued on the

10   Alternatives to Violence program and started a new

11   program called Kairos (phonetic), which is --

12        COMMISSIONER GUADERRAMA:  Tell us what Kairos

13   is about.

14        INMATE BERTOLDO:  It's a religious group.  A

15   Bible study program.

16        COMMISSIONER GUADERRAMA:  Are you religious?

17        INMATE BERTOLDO:  I have gotten back into it,

18   yes.

19        COMMISSIONER GUADERRAMA:  You go to services?

20        INMATE BERTOLDO:  Yeah.

21        COMMISSIONER GUADERRAMA:  How often?

22        INMATE BERTOLDO:  Every week.

23        COMMISSIONER GUADERRAMA:  Sundays?

24        INMATE BERTOLDO:  Yes.

25        COMMISSIONER GUADERRAMA:  Are you a Catholic?

26        INMATE BERTOLDO:  No, a Christian.

27        COMMISSIONER GUADERRAMA:  Christian?   And what

21

1    do you do in your spare time?

2         INMATE BERTOLDO:  I hobby.  I'm in the hobby

3    program.

4         COMMISSIONER GUADERRAMA:  I'm looking for

5    something that would indicate that you're in AA or NA.

6    I don't see it.

7         INMATE BERTOLDO:  I haven't been attending

8    the --

9         COMMISSIONER GUADERRAMA:  Why not?

10        INMATE BERTOLDO:  I just haven't gone.  For a

11   while they had stopped them, and continued them again.

12   And they have them, what, once every other week, I

13   think.  Twice a month.

14        COMMISSIONER GUADERRAMA:  Is there a valid

15   point here?

16        INMATE BERTOLDO:  It's not that it's not

17   important to me, it's --  I've had a busy schedule at

18   night.  But that program is going to stop the coming

19   year, which gives me a little more time at night to

20   attend the other meeting.

21        COMMISSIONER GUADERRAMA:  Okay.  Did you have a

22   problem with substance?

23        INMATE BERTOLDO:  Excuse me?

24        COMMISSIONER GUADERRAMA:  Did you have a

25   problem with substance abuse?

26        INMATE BERTOLDO:  Did I have one?

27        COMMISSIONER GUADERRAMA:  Yes.

22

1          INMATE BERTOLDO:  With alcohol, yes.

2          COMMISSIONER GUADERRAMA:  With alcohol?  Okay.

3     And when is the last time you attended AA?

4          INMATE BERTOLDO:  About two or three months

5     ago.

6          COMMISSIONER GUADERRAMA:  Two?  I didn't see a

7     chrono.

8          INMATE BERTOLDO:  They give them to you every,

9     I think quarterly.

10         COMMISSIONER GUADERRAMA:  I've checked every

11    one, every one up to '91, and I haven't seen one yet.

12         INMATE BERTOLDO:  A chrono?

13         COMMISSIONER GUADERRAMA:  Yeah.

14         INMATE BERTOLDO:  They give them to you

15    quarterly, if you attend on a regular basis.

16         COMMISSIONER GUADERRAMA:  Uh-huh.  Well, we've

17    talked to people this week that have come up with a

18    lot of chronos.  So how many times did you go in the

19    past year?

20         INMATE BERTOLDO:  I'd say about three or four

21    times.

22         COMMISSIONER GUADERRAMA:  Three or four times?

23    I don't think they would give you a chrono for three

24    or four times out of the year, would they?

25         INMATE BERTOLDO:  No.

26         COMMISSIONER GUADERRAMA:  What did you get out

27    of the programming?

23

1         INMATE BERTOLDO:  The AA?

2         COMMISSIONER GUADERRAMA:  Yeah.  What did you

3   get out of them?

4         INMATE BERTOLDO:  I wasn't there long enough

5   to.  I'd just seen what was going on there and it was

6   very --  The one that they had here was very

7   religiously geared, and that's why I started the

8   Kairos program.

9         COMMISSIONER GUADERRAMA:  Okay.  Back in '87

10  now, in Tehachapi, I still don't see any chronos.  Is

11  that the extent of it?

12        INMATE BERTOLDO:  Yes.

13        COMMISSIONER GUADERRAMA:  Okay.  None of the

14  substance abuse programming?

15        INMATE BERTOLDO:  No.  I don't think the

16  (inaudible) accepts lifers in their program.

17        COMMISSIONER GUADERRAMA:  Well, there's a lot

18  of programs.  It just doesn't seem to be important to

19  you, I don't think.  Okay.  No point in asking you

20  about the steps.  You probably don't know the steps,

21  do you?

22        INMATE BERTOLDO:  No.

23        COMMISSIONER GUADERRAMA:  All right.  Anything

24  else you want to talk about as far as your

25  programming?

26        INMATE BERTOLDO:  No.

27        COMMISSIONER GUADERRAMA:  I'm going to cover

24

1  your psych report.  This is a report and it's prepared

2  by Dr. John (phonetic) Saunders, S-a-u-n-d-e-r-s,

3  staff psychiatrist.  How much time did you spend with

4  him?

5        INMATE BERTOLDO:  Approximately an hour.

6        COMMISSIONER GUADERRAMA:  Okay.  This is a

7  several page report.  I'm not going to read it all,

8  but I have read it.  And it says that "Around the time

9  of the arrest and conviction, Mr. Bertoldo denied

10  involvement.  At a BPT psychiatric review with Dr.

11  Tavoularis in 1991 it was reported that Mr. Bertoldo

12  did not wish to discuss the instant offense in any

13  detail and became tearful when he was asked to.  His

14  August 1993 BPT psychological report with Dr. Menuti,

15  Mr. Bertoldo reported that he had been involved in

16  drug dealing with the victim for some time, and that

17  he was attempting to collect a drug debt when the

18  victim pulled a knife.  Mr. Bertoldo gained control of

19  it, then stabbed and shot the victim with a .32

20  caliber pistol he found in the victim's desk."  Under

21  commitment offense, it says "In his interview of

22  3/6/95, Mr. Bertoldo asked if he had to talk about the

23  commitment offense.  He said he didn't like thinking

24  or talking about it, yet he would like to start

25  getting over it.  He said he would prefer it if I read

26  Dr. Menuti's report or the last Parole Board

27  transcript because they were the same thing.  Things

25

```
 1    haven't changed.  He asked why I had asked since it
 2    was morbid, there was blood all over and that it was
 3    painful for him, but not for the Board or this
 4    evaluator."  Then he goes and talks about prior
 5    offenses, your disciplinaries, mental health
 6    treatment, educational activities.  Under self-help
 7    activities, it says "Mr. Bertoldo reports that he has
 8    not become involved in Alcoholics Anonymous or
 9    Narcotics Anonymous on a regular basis.  He says he
10    has gone a few times and that there is nothing keeping
11    him from it.  Neglect, pure neglect.  He acknowledged
12    that the Board recommended him to go to anonymous
13    groups two years ago."  Under responsibility he says
14    "Mr. Bertoldo admits committing the instant offense.
15    Beyond that, he had very little to say about it."
16    Under self-awareness, he says "Mr. Bertoldo
17    demonstrates some awareness of his own emotions and
18    those of others."  Under remorse, "Mr. Bertoldo
19    demonstrates remorse for the commitment offense by
20    reporting how difficult it is for him to talk about
21    it.  And he also mentions the effect on a daughter of
22    the victim, who he says was present at his last Board
23    meeting."  Under conclusions he said "Mr. Bertoldo has
24    improved somewhat in his ability to conform to social
25    norms with respect to lawful behavior.  He
26    demonstrates some failure to plan ahead and some
27    rationalization of having hurt others.  These are
```

26

1   anti-social personality traits.  Mr. Bertoldo has a

2   history of substance abuse that was more-or-less

3   directly related to the commitment offense.  He has

4   made only the most indirective efforts to decrease his

5   risk of relapse.  Mr. Bertoldo does not seem to have

6   any major non-substance-abuse mental illness.  He

7   clearly has some discomfort with his circumstances,

8   but almost as clearly there is little discomfort with

9   his own belief.  In such a situation, insight, or

10   psychotherapy is probably useless and possibly

11   counterproductive."  Under recommendation, he says "I

12   recommend that Mr. Bertoldo be allowed to pursue self-

13   help activities at his own pace.  Insight-oriented

14   psychotherapy is not indicated and is perhaps

15   contraindicated.  Re-evaluation may eventually be

16   helpful."  That's the report.  You have any comments

17   on what I've just read?

18        INMATE BERTOLDO:  No.

19        COMMISSIONER GUADERRAMA:  I think he came to

20   the same conclusions I have about your problem with

21   substance abuse, that you haven't done anything about

22   it.  It's a major problem in your life, and sadly

23   you've just ignored the advice of previous Boards, and

24   even psychiatrists.  That's your decision.

25        INMATE BERTOLDO:  I've not ignored it.  I've

26   known that I've had to go.  But as I told you, that at

27   times there was --  I didn't have the time for it.  I

27

1    had other programs that I had committed to.

2          COMMISSIONER GUADERRAMA:  Those are decisions

3    you make.  Nobody can make you go to AA or NA.  And

4    what you put ahead of it is your decision.  I have

5    nothing else.

6          PRESIDING COMMISSIONER GIAQUINTO:  Ms. Bentley?

7          COMMISSIONER BENTLEY:  Uh-huh.  All right.  It

8    says in the Board report that your plans are to parole

9    and live with your wife in Los Angeles.  Is that still

10   correct?

11         INMATE BERTOLDO:  Yeah.

12         COMMISSIONER BENTLEY:  How did you meet your

13   wife?

14         INMATE BERTOLDO:  In school when we were kids.

15         COMMISSIONER BENTLEY:  In where?

16         INMATE BERTOLDO:  In school.

17         COMMISSIONER BENTLEY:  So you've known her a

18   long time?

19         INMATE BERTOLDO:  Yes.

20         COMMISSIONER BENTLEY:  But you got married

21   while you're in prison, right?

22         INMATE BERTOLDO:  Yeah.

23         COMMISSIONER BENTLEY:  Okay.  And what does she

24   do?

25         INMATE BERTOLDO:  She takes care of my mother-

26   in-law.

27         COMMISSIONER BENTLEY:  Okay.  Does she have

28

1    children?

2         INMATE BERTOLDO:  No.

3         COMMISSIONER BENTLEY:  Okay.  And what type of

4    work are you going to do?

5         INMATE BERTOLDO:  Well, I plan on the technical

6    eyewear I'm doing now, in the drafting classes that

7    I've been taking.  I've also done patio installation

8    before.

9         COMMISSIONER BENTLEY:  It says in this --  This

10   is going back to the previous Board report, but it

11   says that you didn't have any hope getting employment

12   as a certified draftsman because of your age.

13        INMATE BERTOLDO:  Yeah.

14        COMMISSIONER BENTLEY:  Why is that?

15        INMATE BERTOLDO:  As I was looking through the

16   want ads and stuff, this year, mostly the age group

17   they want are young people.  (Inaudible) chance for

18   advancement in drafting are always going up and do

19   engineering.

20        COMMISSIONER BENTLEY:  And so it says in the

21   ads that young people only can apply?

22        INMATE BERTOLDO:  No, it didn't say that.

23        COMMISSIONER BENTLEY:  Well, I don't understand

24   what --

25        INMATE BERTOLDO:  They would prefer you --

26        COMMISSIONER BENTLEY:  But see, that's

27   discrimination.  They can't do that.  Okay, but you've

29

1    gotten --  You're not licensed yet, but you're

2    scheduled to take that test, right?

3              INMATE BERTOLDO:  For optician?

4              COMMISSIONER BENTLEY:  Yeah.

5              INMATE BERTOLDO:  Yes.

6              COMMISSIONER BENTLEY:  Okay, all right.  So

7    that's the kind of work you'd do.  What other kinds of

8    support are you going to need out there?

9              INMATE BERTOLDO:  My wife's a homeowner.

10             COMMISSIONER BENTLEY:  Huh?

11             INMATE BERTOLDO:  She's a homeowner, so I have

12   a place to go to.

13             COMMISSIONER BENTLEY:  Okay, and how does she

14   support herself?

15             INMATE BERTOLDO:  I think she's, well, she is

16   back with (inaudible) attain.

17             COMMISSIONER BENTLEY:  Okay.  All right, and

18   what else would you need?  Anything else?

19             INMATE BERTOLDO:  Well, a job.

20             COMMISSIONER BENTLEY:  Okay, all right, we've

21   talked about what you'd seek in the way of employment.

22   But how would you stay away from drugs and alcohol?

23             INMATE BERTOLDO:  I'd just try to stay away

24   from them.  I've stayed away from them all this time.

25             COMMISSIONER BENTLEY:  You mean while you're in

26   prison?

27             INMATE BERTOLDO:  Yes.

30

1        **COMMISSIONER BENTLEY:** But it's real different

2   on the outside. You work in the --

3        **INMATE BERTOLDO:** It's not so much different on

4   the outside. There's a lot of drugs in prison.

5        **COMMISSIONER BENTLEY:** Well, sure, but you

6   don't have somebody looking over your shoulder on the

7   outside, either.

8        **INMATE BERTOLDO:** Yeah.

9        **COMMISSIONER BENTLEY:** You know, if your

10  friends, good friends say "Let's go out and have a few

11  beers." Are you going to join them?

12       **INMATE BERTOLDO:** That's why I'm taking the

13  programs that I'm taking now.

14       **COMMISSIONER BENTLEY:** What programs are those?

15       **INMATE BERTOLDO:** Self-help groups.

16       **COMMISSIONER BENTLEY:** Yeah, but you're not in

17  the self-help group that you really need to help out

18  with the alcohol, right?

19       **INMATE BERTOLDO:** True.

20       **COMMISSIONER BENTLEY:** We didn't get any

21  letters from anybody. Did you ask people, did you ask

22  your wife to write?

23       **INMATE BERTOLDO:** No, I didn't.

24       **COMMISSIONER BENTLEY:** Why not?

25       **INMATE BERTOLDO:** I don't know. I didn't.

26       **COMMISSIONER BENTLEY:** Okay. Did she write

27  last time?

31

1          INMATE BERTOLDO:  No.

2          COMMISSIONER BENTLEY:  Did she know you're

3     coming up for a parole hearing?

4          INMATE BERTOLDO:  Yeah, I told them.

5          COMMISSIONER BENTLEY:  Okay, why don't you want

6     her to write a letter?  We have no way of knowing if

7     she even exists, right?

8          INMATE BERTOLDO:  Yeah.

9          COMMISSIONER BENTLEY:  If the marriage is still

10    intact, if she's still going to --

11         INMATE BERTOLDO:  Yes, it is.

12         COMMISSIONER BENTLEY:  Yeah, but we don't know

13    that.  That's why we need a letter.  Didn't they talk

14    to you about this at your last hearing?

15         INMATE BERTOLDO:  They may have.

16         COMMISSIONER BENTLEY:  Okay.  All right,

17    because we didn't get any letters.  Do you have any

18    savings?

19         INMATE BERTOLDO:  No.

20         COMMISSIONER BENTLEY:  Okay.  Anything else you

21    want to share with us about your parole plans?

22         INMATE BERTOLDO:  No.

23         COMMISSIONER BENTLEY:  All right.  We sent out

24    3042 notices.  Those go out to agencies that would

25    have an interest in this hearing today, and to people.

26    And we did get a letter back from Captain Daniel Burke

27    (phonetic) of the Homicide Bureau of the County of Los

32

1    Angeles Sheriff's Department.  And it goes along to

2    describe the crime that you committed, the murder of

3    the victim.  And it says because of your long-standing

4    criminal and violent nature, and your total disregard

5    for human life and the lives of victims and society,

6    it is the opinion of this department that you would

7    present a significant threat to the community should

8    you be released.  And they recommend that parole be

9    denied.  So with that, I'll return to the Chair.

10        PRESIDING COMMISSIONER GIAQUINTO:  Okay, Mr.

11   Bertoldo, you said that you were hiring Gina Barry to

12   represent you in this cocaine thing?

13        INMATE BERTOLDO:  I've written her a letter.

14        PRESIDING COMMISSIONER GIAQUINTO:  And you're

15   going to hire her, I assume, yourself, right?

16        INMATE BERTOLDO:  I don't know about hiring,

17   because I don't have any money.  I'm hoping that

18   they'll take the case.  Either them or the prison law

19   office.

20        PRESIDING COMMISSIONER GIAQUINTO:  Okay.  You

21   do have a substance abuse problem, right?

22        INMATE BERTOLDO:  Alcoholism, yes.

23        PRESIDING COMMISSIONER GIAQUINTO:  Nothing, no

24   drug problem?

25        INMATE BERTOLDO:  No.

26        PRESIDING COMMISSIONER GIAQUINTO:  You don't

27   consider yourself a substance abuser?

33

1          INMATE BERTOLDO:  Substance, I guess.  I've

2     never really gotten into it.  I know that I used to

3     drink a lot, a lot.

4          PRESIDING COMMISSIONER GIAQUINTO:  But you

5     never misused drugs?

6          INMATE BERTOLDO:  Any use of illegal drugs is a

7     misuse.  I know that.

8          PRESIDING COMMISSIONER GIAQUINTO:  Well, did

9     you use a lot of drugs, or hardly no drugs, or what?

10          INMATE BERTOLDO:  Yes, I used to use drugs out

11     there, but not as much as I would use alcohol.

12          PRESIDING COMMISSIONER GIAQUINTO:  Just maybe a

13     normal amount or just drugs?

14          INMATE BERTOLDO:  I don't know what a normal

15     amount is.

16          PRESIDING COMMISSIONER GIAQUINTO:  Well, I

17     don't know --

18          INMATE BERTOLDO:  Substance abuse, yes, I do

19     have a problem with it.

20          PRESIDING COMMISSIONER GIAQUINTO:  Yeah,

21     because when Mr. Guaderrama was talking to you, you

22     make it sound like you never had a real drug problem.

23     This murder is behind drugs, right?  According to you?

24          INMATE BERTOLDO:  Yes, it is.

25          PRESIDING COMMISSIONER GIAQUINTO:  And you used

26     amphetamines, barbiturates, marijuana, reds, cocaine,

27     heroin, LSD, hallucinogens, right?

34

1          INMATE BERTOLDO:  Yeah.

2          PRESIDING COMMISSIONER GIAQUINTO:  You used up

3     to two spoons a day of heroin?   When you went into

4     the probation officer, you had 20 fresh tracks in your

5     arm.

6          INMATE BERTOLDO:  That report --  What report

7     is that?

8          PRESIDING COMMISSIONER GIAQUINTO:  The

9     probation report.

10         INMATE BERTOLDO:  I'm a bit surprised --

11         PRESIDING COMMISSIONER GIAQUINTO:  I'll read it

12    to you.  You state here, you admit that you smoke

13    marijuana, and you denied that --  You say you used

14    heroin.  This might be on the other offense, on the

15    theft, but regardless of which one.  Well, let's see.

16    You had a hearing on June '79 on this murder right?

17         INMATE BERTOLDO:  No.

18         PRESIDING COMMISSIONER GIAQUINTO:  When was

19    the --  When was this murder?  This murder was --

20         INMATE BERTOLDO:  Oh, I'm sorry, '79.

21         PRESIDING COMMISSIONER GIAQUINTO:  Yeah, when

22    was this?  This must have been like a year before, you

23    had gone to a probation officer, is that right?  Yeah,

24    for burglary and for forgery.  This is like a year

25    before.  And when they were talking to you then, you

26    told them you used heroin, and that you hadn't been

27    addicted and you stated that you only had used it

35

1    about 12 times, and that you had consumed a lot of

2    alcohol. He says here "The defendant's current

3    statement of substance abuse is in marked contrast to

4    the statement which he made to probation department

5    narcotic evaluator Dawn Hartley (phonetic). At that

6    time, the defendant admitted using heroin at a rate of

7    two spoons a day for the previous three years",

8    meaning at that time. "He was dealing heroin at the

9    rate of five to seven ounces a week, and confessed

10   that he had over 50 LSD trips, that he had tried every

11   other form of hallucinogen, amphetamines and

12   barbiturates." And at that time they found

13   approximately 18, I'm sorry, six puncture wounds 18 to

14   21 days old. You had prior arrests for alcohol-

15   related offenses, and you had, as I recall, prior

16   arrests for under the influence of a controlled

17   substance was one. And then you had one for

18   possession of marijuana. And then the instant offense

19   revolved around narcotics, at least according to what

20   you tell us. You don't think you've got a problem?

21   You're an addict?

22        **INMATE BERTOLDO:** I've never been a drug

23   addict. I was always an alcoholic.

24        **PRESIDING COMMISSIONER GIAQUINTO:** Well, what

25   would you call that? You're shooting heroin. Whether

26   it was two spoons a day, or a little bit. You walked

27   in the place with fresh tracks. You think that's

36

1    normal?

2          INMATE BERTOLDO:  I've explained that at the

3    last Board hearing.  That at that time, and I think it

4    was in '76, when that woman took that report, or '77,

5    I was trying to get into CRC.  And if you could tell

6    them and show them marks --  You get a pin and you

7    stick it in your arm, put a couple of needle pricks in

8    your arm, you get sent to CRC.  That was the game,

9    then.

10          PRESIDING COMMISSIONER GIAQUINTO:  So you just

11    made that up?  You stuck your arm --

12          INMATE BERTOLDO:  To get to CRC.

13          PRESIDING COMMISSIONER GIAQUINTO:  -- but you

14    weren't really a heroin user?

15          INMATE BERTOLDO:  No.

16          PRESIDING COMMISSIONER GIAQUINTO:  But on two

17    separate occasions, and one time you tell them you're

18    a heroin user.  And a year or two later you talk to a

19    different P.O. and you tell him you're a heroin user.

20    And you get arrested for being under the influence of

21    illegal substances and marijuana, and things.  And you

22    don't think you have a drug problem?

23          INMATE BERTOLDO:  I have a drug problem.

24          PRESIDING COMMISSIONER GIAQUINTO:  Okay, so now

25    you put these marks on your arm, because you're making

26    it up.  Did you lie about using LSD?

27          INMATE BERTOLDO:  The LSD trips, yeah.  I

37

1    didn't use LSD until after that.

2           PRESIDING COMMISSIONER GIAQUINTO:   Did you lie

3    about the cocaine use?

4           INMATE BERTOLDO:   I may have used cocaine prior

5    to that.

6           PRESIDING COMMISSIONER GIAQUINTO:   How about

7    the use of amphetamines and barbiturates?  Did you lie

8    about that?

9           INMATE BERTOLDO:   I had taken reds before when

10   I was younger.

11          PRESIDING COMMISSIONER GIAQUINTO:   Mr.

12   Guaderrama, do you have any questions?

13          COMMISSIONER GUADERRAMA:   I have a couple.  You

14   did a robbery, right?  Relating to a laundromat?

15          INMATE BERTOLDO:   Yes.

16          COMMISSIONER GUADERRAMA:   And you were

17   convicted of it?

18          INMATE BERTOLDO:   Yes.

19          COMMISSIONER GUADERRAMA:   And you held her up

20   with a screwdriver?

21          INMATE BERTOLDO:   Yes, she walked in to a

22   laundromat when I was in the laundromat trying to get

23   one of the change things in the laundromat open.

24          COMMISSIONER GUADERRAMA:   Did you hold her up?

25          INMATE BERTOLDO:   I told her to --  I pointed

26   the screwdriver at her and I told her to give me her

27   money.  She said "Get out of here, or I'll call the

38

1    cops."  I took off.

2         COMMISSIONER GUADERRAMA:  She said that you

3    walked, that she was in the laundromat.  That you

4    approached the victim, held out a screwdriver and said

5    "Give me your money, ma'am."  She didn't have any

6    money.  And then you were apprehended outside the

7    laundromat.  But you denied that you were involved in

8    that crime, right?  You claimed you were innocent?  As

9    a matter of fact, you said "absolutely innocent".

10   That's in the probation officer's report.  Well, were

11   you under the influence of drugs at the time of the

12   life offense?

13        INMATE BERTOLDO:  No.

14        COMMISSIONER GUADERRAMA:  You weren't?  You

15   were perfectly sober that day?

16        INMATE BERTOLDO:  I was drinking.

17        COMMISSIONER GUADERRAMA:  Okay.  And during

18   that time were you selling heroin or drugs?

19        INMATE BERTOLDO:  No.

20        COMMISSIONER GUADERRAMA:  No?

21        INMATE BERTOLDO:  No.

22        COMMISSIONER GUADERRAMA:  How were you

23   maintaining your lifestyle?

24        INMATE BERTOLDO:  I was -- Odd jobs.  I would

25   work for Simerly sometimes or a guy that was

26   contracting or a friend of Simerly's who was a

27   contractor up in Oxnard.

39

1      COMMISSIONER GUADERRAMA:  Okay, so how does
2    this man happen to owe you this drug debt?

3      INMATE BERTOLDO:  He didn't owe me for a drug
4    debt.  He owed me for a job that I had done for him.
5    I think it was either the Bakersfield job or the San
6    Diego job.

7      COMMISSIONER GUADERRAMA:  Did you ever say that
8    he owed you a drug debt?

9      INMATE BERTOLDO:  He had owed me at times.

10      COMMISSIONER GUADERRAMA:  For drugs?

11      INMATE BERTOLDO:  Well, what it was, it was
12    like a commission.  I would introduce him to people
13    that would buy or sell, and --

14      COMMISSIONER GUADERRAMA:  What kind of drugs
15    was he buying?

16      INMATE BERTOLDO:  Cocaine.

17      COMMISSIONER GUADERRAMA:  Cocaine?  And why
18    would he do business with you?

19      INMATE BERTOLDO:  Me or someone else.

20      COMMISSIONER GUADERRAMA:  Well, you're a hype,
21    you're a drunk, you're out in --  You're on the outs.

22      INMATE BERTOLDO:  I wasn't a hype.  I used a
23    few times.  I wasn't strung out.  I was (inaudible), I
24    was arrested.  I didn't go through no --  I was not
25    strung out.

26      COMMISSIONER GUADERRAMA:  You weren't strung
27    out?

40

1        INMATE BERTOLDO:  No.

2        COMMISSIONER GUADERRAMA:  Then why did you go

3    to his house on that day?

4        INMATE BERTOLDO:  I called him up and told him

5    to give me the money that he had owed me, he owed

6    me --

7        COMMISSIONER GUADERRAMA:  And what did he say

8    when you called him up?

9        INMATE BERTOLDO:  He said "Come on by".

10       COMMISSIONER GUADERRAMA:  "Come on by"?  And

11   did he have his money in the hand to pay you when you

12   got there?

13       INMATE BERTOLDO:  No.

14       COMMISSIONER GUADERRAMA:  So why was there an

15   argument?  Why would he tell you to come over?

16       INMATE BERTOLDO:  That's what he wanted me

17   there for.  He wanted me to get this deal done for

18   him.

19       COMMISSIONER GUADERRAMA:  How did you get into

20   the house?

21       INMATE BERTOLDO:  He was anxious about it.

22       COMMISSIONER GUADERRAMA:  How did you get into

23   the house?

24       INMATE BERTOLDO:  He opened the door and

25   invited me in.

26       COMMISSIONER GUADERRAMA:  Okay.  And how old

27   was he?

41

1          INMATE BERTOLDO:  Gee, I don't know.  I don't

2    know.

3          COMMISSIONER GUADERRAMA:  Big man?

4          INMATE BERTOLDO:  Yeah.

5          COMMISSIONER GUADERRAMA:  But a lot older than

6    you, right?

7          INMATE BERTOLDO:  Yeah, I'd say maybe mid-40s.

8    I don't know how old he was.

9          COMMISSIONER GUADERRAMA:  Pretty good shape?

10         INMATE BERTOLDO:  Yeah.

11         COMMISSIONER GUADERRAMA:  You knew he carried

12   large amounts of cash, right?

13         INMATE BERTOLDO:  No.  I knew he carried a lot

14   of weapons.

15         COMMISSIONER GUADERRAMA:  Uh-huh.  And you

16   didn't go there armed, even knowing that he carried

17   weapons?

18         INMATE BERTOLDO:  That's right.

19         COMMISSIONER GUADERRAMA:  Were you working for

20   your brother during that period of time?

21         INMATE BERTOLDO:  No.

22         COMMISSIONER GUADERRAMA:  Wasn't your brother

23   doing the jobs for him?

24         INMATE BERTOLDO:  Sometimes, yeah, he would.

25         COMMISSIONER GUADERRAMA:  And did he ever hire

26   you independent of your brother?

27         INMATE BERTOLDO:  Twice.

42

1       **COMMISSIONER GUADERRAMA:** Twice? And what kind

2  of work were you doing for him?

3       **INMATE BERTOLDO:** Flooring.

4       **COMMISSIONER GUADERRAMA:** Flooring? Were you

5  on parole at the time?

6       **INMATE BERTOLDO:** I had just discharged, I

7  think, a month prior to the incident.

8       **COMMISSIONER GUADERRAMA:** And how long had you

9  been out of prison?

10       **INMATE BERTOLDO:** Approximately a year.

11       **COMMISSIONER GUADERRAMA:** Okay. You know, I'm

12  kind of hung up on this same problem Mr. Giaquinto

13  had, you know, where you kill a man in panic and your

14  fear for your life, yet you take his gold watch. Did

15  you take it off his arm?

16       **INMATE BERTOLDO:** No, it was on the floor.

17       **COMMISSIONER GUADERRAMA:** It was on the floor?

18  And how about the safe?

19       **INMATE BERTOLDO:** The safe was in the closet.

20       **COMMISSIONER GUADERRAMA:** How big a safe was

21  it?

22       **INMATE BERTOLDO:** It was big enough to where I

23  needed a dolly to roll it out.

24       **COMMISSIONER GUADERRAMA:** Okay, that takes some

25  time, doesn't it? I mean it's not you were able to

26  pick up this safe and carry it out to your car. I

27  mean it takes real planning and thinking to get that

43

1    safe out.  I mean it doesn't sound like a man who is

2    panicked would take that much time to get a dolly and

3    load the safe up and take it with him.  That's a lot

4    of work.  What did you do with the safe?

5         INMATE BERTOLDO:  I put it in the back of the

6    truck and drove off.

7         COMMISSIONER GUADERRAMA:  Did you ever open it?

8         INMATE BERTOLDO:  No.

9         COMMISSIONER GUADERRAMA:  You didn't?  And the

10   guns --  How many guns did you take?

11        INMATE BERTOLDO:  I don't remember.  I just

12   grabbed them.

13        COMMISSIONER GUADERRAMA:  You told Dr. Menuti

14   that you were involved in drug dealing with the victim

15   for some time.

16        INMATE BERTOLDO:  Yes.

17        COMMISSIONER GUADERRAMA:  How long had you been

18   dealing drugs with him?

19        INMATE BERTOLDO:  It could have been for that

20   whole year.

21        COMMISSIONER GUADERRAMA:  You know what

22   concerns me more than anything?  Number one, I don't

23   believe you.  And two is that this man, you kill this

24   man, and then just run his name into the ground.

25   That's a terrible thing to do.  It just doesn't seem

26   to me that you have any conscience at all.  That's all

27   I have.  I'll turn it back to the Chair.

44

1          PRESIDING COMMISSIONER GIAQUINTO:  Were you a

2     heroin addict?

3          INMATE BERTOLDO:  No.  I had used heroin.

4          PRESIDING COMMISSIONER GIAQUINTO:  I just

5     wanted to hear you say it again, I guess.  You know, I

6     was going back through this 1970 arrest, when you were

7     arrested for the robbery that Mr. Guaderrama was just

8     talking about.  And at that time when they wrote up

9     the report, probation and all that, they talked about

10    the robbery and they went on and on.  And then finally

11    they get to the point here where they talk about you,

12    "And by his own admission, has been dealing in heroin

13    and feeding his own addiction."  And "He has paid only

14    $15 on this $375 fine.  He has shown poor cooperation

15    with his former probation officer as evidenced by his

16    desertion of probation, and his lack of frankness in

17    disclosing his arrest and his narcotic addiction.  The

18    court has for its consideration this 25-year-old

19    disabled addict, who has literally made a mockery of

20    probation.  Judging from his past record, he is full

21    of promises to reform when facing a state prison

22    sentencing, but quickly reverts to his true form when

23    released on probation.  He fails to contact his

24    probation officer, continues to engage in the illegal

25    use of narcotics.  Over the past year, has incurred a

26    number of arrests", et cetera, et cetera.  "And has

27    finally acknowledged his heroin addiction, verbalizing

45

1    that he wishes to cure his habit and walk the straight

2    and narrow." And this thing goes on and on. In here,

3    it talks about that two spoons a day.

4          INMATE BERTOLDO: What year was that?

5          PRESIDING COMMISSIONER GIAQUINTO: That was

6    from the 1970 arrest for robbery. All right, Ms.

7    Bentley, do you have any questions?

8          COMMISSIONER BENTLEY: Why did you take the

9    quilt?

10          INMATE BERTOLDO: I think I put the rifles in

11    that.

12          COMMISSIONER BENTLEY: And how did you know

13    that there was a safe?

14          INMATE BERTOLDO: When I went out the back

15    door, and I came back in, when I heard his voice and

16    came back in, when I turned around, there was -- This

17    closet door was open, and that's when I see the safe.

18          COMMISSIONER BENTLEY: Okay, that's all the

19    questions I have.

20          PRESIDING COMMISSIONER GIAQUINTO: Okay, do you

21    need any --

22          COMMISSIONER GUADERRAMA: (Inaudible.)

23          PRESIDING COMMISSIONER GIAQUINTO: Ms. Hansen,

24    do you have any questions?

25          DEPUTY DISTRICT ATTORNEY HANSEN: Yes. The

26    1993 psych report refers to a statement by the inmate

27    that at some point while in prison, he was a middleman

46

1    in drug distribution.  Is that correct?

2         PRESIDING COMMISSIONER GIAQUINTO:  You

3    understand the question?

4         INMATE BERTOLDO:  In prison?  No, I don't.

5         PRESIDING COMMISSIONER GIAQUINTO:  Okay.  Any

6    other questions?

7         DEPUTY DISTRICT ATTORNEY HANSEN:  The probation

8    report shows that, or talks about, page five, that the

9    inmate's brother lived in a house that was foreclosed

10   on by the victim.  Is that correct?

11        PRESIDING COMMISSIONER GIAQUINTO:  Is that

12   correct?

13        INMATE BERTOLDO:  I'm sorry, I didn't hear.  He

14   was showing me something on the (inaudible).

15        PRESIDING COMMISSIONER GIAQUINTO:  Okay, you

16   want to ask the question again?

17        DEPUTY DISTRICT ATTORNEY HANSEN:  Sure.  The

18   probation report regarding the life crime indicates

19   that the inmate's brother lived in a house that was

20   foreclosed on by the victim.  Is that correct?

21        INMATE BERTOLDO:  I don't know.  I don't know

22   what those two people had going.  I had just gotten

23   out.  I had heard something about that through

24   paperwork, but never discussed anything like that with

25   my brother or with John, anything else.

26        PRESIDING COMMISSIONER GIAQUINTO:  Anything

27   else?

47

1       **DEPUTY DISTRICT ATTORNEY HANSEN:**  Yeah, one

2  other question, and then I want to go back to the

3  first question.  You talked, or the Board talked about

4  these 16 stab wounds, but one of them was a slash that

5  went from, basically ear to chin and exposed the

6  jawbone.  Does the inmate --  I mean, didn't he see

7  that?  Didn't he know how seriously he had injured his

8  victim at that time?

9       **PRESIDING COMMISSIONER GIAQUINTO:**  Do you

10  understand that question?

11       **INMATE BERTOLDO:**  Yes, I do.  No, I remember

12  looking at him, or at his clothing.  And a lot of

13  blood.  There was a lot of blood everywhere.

14       **PRESIDING COMMISSIONER GIAQUINTO:**  Okay,

15  anything else?

16       **DEPUTY DISTRICT ATTORNEY HANSEN:**  Would it be

17  possible for the inmate to look at page one of the

18  1993 psych report written by Dr. Menuti and see if the

19  statements are correct.  It says that he was

20  associating with a bad crowd.  He was involved as a

21  middleman in some drug distribution at CCI.

22       **PRESIDING COMMISSIONER GIAQUINTO:**  I think he

23  already answered that, didn't he?

24       **DEPUTY DISTRICT ATTORNEY HANSEN:**  He said he

25  didn't know.  I thought --

26       **PRESIDING COMMISSIONER GIAQUINTO:**  Is that true

27  or not?

48

1          INMATE BERTOLDO:  I don't remember that.

2     That's in my brief?

3          PRESIDING COMMISSIONER GIAQUINTO:  Why would

4     Dr. Menuti have something like that in his report?

5     Where do you think he got that from?

6          INMATE BERTOLDO:  I wasn't a middleman.  I just

7     got involved with the wrong people.  I was using drugs

8     at the time.  At that time, I used about three or four

9     times.  I did some speed.

10          PRESIDING COMMISSIONER GIAQUINTO:  Do you have

11     anything else?

12          DEPUTY DISTRICT ATTORNEY HANSEN:  No, thank

13     you.

14          PRESIDING COMMISSIONER GIAQUINTO:  Did the

15     court order you to pay restitution in this case?

16          INMATE BERTOLDO:  I can't remember.

17          PRESIDING COMMISSIONER GIAQUINTO:  Because I

18     still have the figure of $10,000 restitution in there.

19     I don't know if the court actually ordered that or

20     not.  Mr. Jallins, do you have any questions?

21          ATTORNEY JALLINS:  Robert, in any of the

22     questions that the Board has asked, do you want to go

23     back over something, re-address a question, modify or

24     amend an answer?

25          INMATE BERTOLDO:  No.

26          ATTORNEY JALLINS:  Okay, all right, thank you.

27          PRESIDING COMMISSIONER GIAQUINTO:  Closing, Ms.

49

1    Hansen?

2        **DEPUTY DISTRICT ATTORNEY HANSEN:** Thank you.

3    This is an extremely violent, brutal offense. The

4    facts are that where the victim was stabbed 16 times

5    including one slash that went from mouth to ear

6    exposing his jawbone, so we're talking about a lot of

7    anger and violence that was demonstrated and

8    perpetrated on this victim. Also he was shot with his

9    own gun. Then, without any concern for this

10   individual that he's just killed, the inmate ransacks

11   his house and takes his property, takes his rifles,

12   takes the gun, takes his wallet, takes jewelry, takes

13   the safe and even uses a dolly to get out of the

14   house, takes his quilt. The fact that he has no

15   remorse is apparent because the next day he pawns some

16   of the property. And the next day, when stopped by

17   the police still has the gun that he's used to kill

18   the victim with. He has no remorse and no concern

19   over what he had done. This inmate wants to put the

20   blame on everybody else. He wants to put the blame on

21   the victim. And I think we've heard a lot of self-

22   serving statements about the drug debt or the money

23   owed or the self-defense when in reality, everything

24   about this inmate's history is indicative and

25   consistent with him killing this man for money because

26   of his drug habit. He has prison commitments for

27   attempted robbery, for burglary, for forgery. And as

50

1    I know this Board knows, property and theft offenses

2    often go hand-in-hand with drug offenses.  We have a

3    1976 report from a drug evaluation probation officer

4    where this inmate, even now he says "Well, I just

5    wanted to go to CRC", but it talks about using all

6    kinds of narcotics, had multiple track marks.  He's

7    got a 1989 CDC for stimulants and sedatives, a recent

8    CDC 115 for being under the influence.  These are all

9    consistent with a drug abuser.  He talks about well,

10    he used while in prison and he was involved with the

11    wrong people in the drug-distribution ring.  All of

12    these show that this man has been and continues to be

13    somebody who abuses drugs, and that's why he got

14    involved in this offense, not because of any other

15    belief that he wants the Board to now take.  Also,

16    he's assaultive.  His behavior in prison shows that.

17    He has multiple CDCs which are of assaultive types,

18    which are entirely consistent with him cold-bloodedly

19    murdering this victim.  His 1993 psych interview talks

20    extensively about his need to go to AA and NA.  The

21    Board last, at his last hearing told him he needed to

22    go to NA and AA.  The Board also told him, quote, that

23    if he got another disciplinary action, he would be at

24    ground zero, and that's where he should be right now

25    is at ground zero again.  He has no respect for this

26    Board, as he had no respect for the victim.  He has

27    not upgraded his vocational work.  His counselor

51

1    report shows that he poses a moderate degree of harm.

2    His psych report shows that he still exhibits anti-

3    social behavior. He still has no insight and no

4    willingness to get any insight into why he committed

5    this crime. The 1991 psych report said he was only

6    just beginning to deal with his feelings, and that's

7    ten years after the incident took place. He wouldn't

8    discuss the incident in 1993. 1995, as the Board

9    noticed today, he gets defensive when talking about

10   it. He still wants to minimize that. He still wants

11   to minimize the substance abuse. This case is just a

12   terrible tragedy for the family that has to sit

13   through this and relive this. And there's just

14   nothing positive to say about this inmate, nothing.

15   And the people are asking that you deny parole, and

16   you deny it for a multiple-year denial because he has

17   thrown the Board's recommendations back in their face.

18   He has had no respect for them, for you. He has not

19   done anything to better himself, to get ready to get

20   out of prison, and he doesn't deserve the chance now

21   and he shouldn't get another chance for several years.

22   Thank you.

23           PRESIDING COMMISSIONER GIAQUINTO:  Mr. Jallins?

24           ATTORNEY JALLINS:  There are several factors of

25   suitability in favor of Mr. Bertoldo.  Most

26   importantly, at least the prior, his prior history, he

27   seems to have had a fairly stable social history.  He

52

```
 1    worked for construction.  He was a Boy Scout.  A
 2    couple of his juvenile offenses, his most serious one,
 3    was for possession of a Boy Scout knife and he was a
 4    Boy Scout.  His reports do indicate, though, a great
 5    deal of remorse over the crime.  His psychiatric
 6    evaluation this year indicated that the crime is
 7    painful for him, and of course it is.  I don't think
 8    you could expect anybody to sit here and talk about
 9    what happened and not feel hurt and pain and it will
10    be difficult for them.  And I think though, that in
11    showing that, I don't think it should be utilized that
12    he hasn't been able to deal with the offense as much
13    as it's just very painful and difficult.  And
14    something, he obviously because of the pain he's
15    feeling, he's going to have to deal with for the rest
16    of his life.  His last Board report indicated that he
17    felt remorse for the crime.  In terms of the
18    circumstances behind the offense, I don't know if
19    we'll ever know what really happened.  Obviously,
20    there was some sort of relationship between him and
21    Mr. Simerly, that there was some sort of difficulty in
22    that relationship.  They had some sort of difficult
23    history.  Something was going on that resulted in some
24    sort of a struggle and the offense.  I don't think
25    he's minimizing the offense.  I don't think when he
26    tells you it's self-defense that he doesn't mean that
27    he was justified in what he did.  I think he's only
```

53

1    trying to tell you what was the motivation behind this

2    offense, why did it happen and why did it occur.  I

3    don't think he went in there and went into that home

4    with the thought that he was going to kill Mr.

5    Simerly.  One thought that the robbery and all of that

6    was an afterthought.  What happened between the two,

7    we will never know, but again, I think that he does

8    take responsibility for the offense, and I think he

9    feels a great deal of pain and sorrow for it.  In

10   terms of his criminal history, he did do a prior term.

11   Although I think for his credit, due to his credit,

12   and it's a rare thing these days for someone to come

13   off a robbery conviction and do enough clean time on

14   parole where he is discharged.  I see enough

15   revocation cases every week to know that that's a very

16   difficult thing to go two or three or four months

17   without being able to commit another offense, another

18   parole violation.  In fact, he was able to go a year

19   after that.  At least he was making somewhat of an

20   effort to try to clean up his life.  In terms of his

21   parole plans, they're realistic.  They're in Los

22   Angeles.  He has a wife that he's known a number of

23   years and he hopes to use his skills in optical when

24   he's released.  He also has other family members that

25   are in support.  In terms of a disciplinary history,

26   prior to the '94 115, he had gone five years

27   disciplinary-free.  I suppose I could incorporate by

54

1    reference the remarks about the positive UA test from

2    the last hearing.  We know that the testing process

3    isn't always, you know, isn't always a clean one.

4    It's not always 100 percent valid.  I can't believe

5    someone who's going into a family unit visit would put

6    themselves at risk like that and I think it should be

7    noted that he is fighting that.  He feels very

8    strongly about that.  It should be said, however, that

9    the one about the T-shirts is simply what I call a

10   pack-rat for having too many, too much stuff.

11   Actually, in the real world, I don't think that you'll

12   be punished for having too many T-shirts unless you

13   obtain those T-shirts illegally.  Nonetheless, I don't

14   think it represents any violence or any assaultive

15   behavior, and I think it's been a number of years

16   since he has had a 115 that shows any assaultive or

17   violent behavior.  In terms of his other things, it

18   should be noted that he's upgraded educationally by

19   getting his GED, by doing Vocational Drafting, he's

20   upgraded vocationally.  He's been involved in

21   Vocational Eyewear, hopes to get his certification

22   here by the end of the year.  And as I noted earlier

23   today, I note that the Vocational Eyewear program is a

24   highly technical one, one that is marketable, one that

25   is in demand out in the public, and one that the Board

26   has a great deal of respect for.  His work reports

27   have been, when he's had other jobs, he's been above-

55

```
1    average.  And he's done a number of self-help programs
2    which indicate Alternatives to Violence, Breaking
3    Barriers, as a facilitator (inaudible) values and
4    Kairos, and he was welcomed into (inaudible) counsel
5    which notes that he has participated a great deal in
6    self-help.  In terms of the last psychiatric report,
7    it indicated that he has improved somewhat his ability
8    to conform to social norms with respect to social
9    behavior.  In other words, he's beginning to
10   understand how to handle himself here in the
11   institution, so he can better handle himself outside,
12   excuse me, in the public.  I think having said that
13   there are factors of suitability in his favor.  I
14   think when you take a look at his overall record, all-
15   in-all, if you're prone to deny parole, I don't know
16   if it demands as many as it may seem on the surface,
17   based on the fact that I think if you look overall at
18   his institutional behavior, he has made somewhat, some
19   strides and improvements.  And with that I'll submit
20   those factors of suitability.
21        PRESIDING COMMISSIONER GIAQUINTO:  Anything you
22   want to add to what your attorney said on your behalf?
23        INMATE BERTOLDO:  No.
24        PRESIDING COMMISSIONER GIAQUINTO:  Ms. Rogers,
25   did you want to make any comments relative to
26   suitability?
27        MS. ROGERS:  Yes, I would.
```

56

1        PRESIDING COMMISSIONER GIAQUINTO:   Okay.

2        MS. ROGERS:   Mr. Bertoldo on April 13th went

3    into my father's home and brutally killed him.   I

4    spoke with the paramedics that were called out to the

5    house, and they just said that he was over-killed,

6    that it was apparent that someone had attacked him,

7    you know, and just over-killed him.   On that day my

8    son was supposed to be left with my father and, thank

9    God, he decided not to stay that day.   He was only two

10   and one-half years old.   And I've always wondered

11   that, you know, what would have happened to him if he

12   would have been left there, you know, what he would

13   have had to have witnessed or we're even talking about

14   two people being dead instead of one.   One thing that

15   I'd like to say is that there wasn't any mention about

16   pictures that Mr. Bertoldo and his previous wife to

17   this wife had taken of themselves posing with the

18   weapons.   To me that shows that they were --   He was

19   very proud of what he had done.   And that removing

20   someone's jewelry after you've murder somebody is

21   pretty disgusting.   And he --   I felt that my children

22   have been cheated of their grandfather, that I've been

23   cheated of having him around, his friends, everybody

24   that cared and loved him because this man took it upon

25   himself to commit a crime that I feel that he should

26   not ever be let out for.   I saw coroner's pictures

27   accidentally.   And when I went to the funeral home

57

1    prior to him being buried, I saw injuries that I won't
2    forget and my ex-husband will have to live with
3    finding him and seeing him laying there in blood, and
4    that's something that's going to be in his mind for
5    the rest of his life.  And I went into that house that
6    evening after they removed his body.  I went in
7    probably maybe 15, 20 minutes later and I witnessed
8    the blood.  And there was no way that my father did
9    anything, any of this was caused by him.  It was
10   apparent that he had been attacked.  And my neighbor
11   had told me that she had heard him yelling "Get out of
12   here.  Get out of my house.  Get out of here."  And
13   then she heard what at first she thought was a dog
14   being hurt.  And later said that it more sounded like
15   a human cry.  And I was also told that the first
16   injury probably, the slashing of the face which could
17   have been from behind, and that his jugular vein was
18   cut.  And normally when that happens, you're spurting
19   blood so quickly that you're going to go down.
20   There's no way to struggle.  There's no way to
21   struggle.  There's no way to put up a fight.  So
22   therefore, I feel that Mr. Bertoldo should be in here
23   as long you guys can keep him in here.
24        PRESIDING COMMISSIONER GIAQUINTO:  Okay, thank
25   you very much.  We'll be in recess.  The time is 2:36,
26   and we'll call you back when we reach a decision.
27                      R E C E S S

58

1        CALIFORNIA BOARD OF PRISON TERMS

2                D E C I S I O N

3        **PRESIDING COMMISSIONER GIAQUINTO:**  Okay we are

4    on record.  The time is 2:51.  Mr. Bertoldo, we did

5    deny your parole.  The Panel reviewed all the

6    information received from the public and relied on the

7    following circumstances in concluding that the

8    prisoner is not suitable for parole and would pose an

9    unreasonable risk of danger to society and a threat to

10   public safety if released from prison.  The offense

11   was carried out in an especially cruel and callous

12   manner with a disregard for the life and suffering of

13   another, and in a dispassionate and calculated manner.

14   These conclusions are drawn from the statement of

15   facts wherein the prisoner killed another human being

16   with the use of a knife and a gun.  He stabbed a

17   victim or slashed him and cut him approximately 16

18   times and then delivered the coup de grace by shooting

19   him.  He then removed property from the victim's house

20   and pawned some of that property.  He still had the

21   property in his possession several days later, some

22   other property.  The prisoner had an escalating

23   pattern of criminal conduct which included arrests for

24   possession of a switchblade knife, inhaling glue when

25   he was 14 years old, possession of alcohol 18 years

26   old, drunk driving, possession of material and device

27   **ROBERT BERTOLDO   C-94377.   DECISION PAGE 1   6/1/95**

FX C.

59

1   for arson and taking a vehicle without the owner's

2   consent, grand theft auto, robbery.  He was sentenced

3   to prison, and his probation was revoked on June 18

4   '76.  That's when he went back to prison for the

5   robbery offense.  He had minor in possession of

6   alcohol, battery on police officers, disturbing the

7   peace, possession of marijuana, possession of

8   controlled substances, burglary, forgery, under the

9   influence, grand theft, and this murder.  He's been in

10   prison, as I've indicated.  He's been on parole

11   before, county jail.  He's been fined by the court and

12   ordered to pay restitution on at least one prior case.

13   And the prisoner has failed to demonstrate evidence of

14   positive change.  His misconduct while incarcerated

15   includes several 115s, including one on 5/31/94 for

16   positive urinalysis, tested positive for cocaine.  He

17   has not sufficiently participated in beneficial self-

18   help and therapy programming.  I'm not going to read

19   the psychiatric report into the record.  However, the

20   3/27/95 report that Mr. Guaderrama referred to and

21   read into the record extensively is not totally

22   supportive of release.  The district attorney's office

23   has voiced opposition to the granting of a parole

24   date.  The Panel makes the following findings.  That

25   therapy in a controlled setting is needed, but

26   motivation and amenability are questionable.  This is

27   **ROBERT BERTOLDO    C-94377.    DECISION PAGE 2    6/1/95**

60

1    a five-year denial.  The Panel finds that it's not

2    reasonable to expect that parole will be granted at a

3    hearing during the next five years for the following

4    reasons.  The prisoner committed the offense in an

5    especially cruel and callous manner, specifically he

6    killed another human being first by stabbing and

7    slashing the victim and then shooting the victim.  As

8    a result, a longer period of observation and

9    evaluation is required before the Board should set a

10   parole date.  The previously-referred-to disciplinary

11   issues indicate that the prisoner needs a longer time

12   of observation and evaluation before the Board should

13   set a parole date.  The psychiatric report, as I

14   indicated, indicates a need for a longer period of

15   observation and evaluation or treatment, and the

16   programming which is essential to his adjustment.  The

17   Panel recommends that the prisoner become

18   disciplinary-free, and continue to upgrade

19   vocationally and educationally and participate in

20   available self-help and therapy programming.  That

21   ends the reading of this.  Any statement, Mr.

22   Guaderrama?

23        COMMISSIONER GUADERRAMA:  I don't have any

24   comments.

25        PRESIDING COMMISSIONER GIAQUINTO:  Ms. Bentley?

26        COMMISSIONER BENTLEY:  I don't have anything.

27   ROBERT BERTOLDO    C-94377.    DECISION PAGE 3   6/1/95

61

1            **PRESIDING COMMISSIONER GIAQUINTO:**   That ends

2      this hearing, and the time is 2:55.

3                          --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25      **PAROLE DENIED FIVE YEARS**

26      **EFFECTIVE DATE OF THIS DECISION**_____ SEP 2 7 1995_____

27      **ROBERT BERTOLDO    C-94377.    DECISION PAGE 4    6/1/95**

62

```
 1                    CERTIFICATE AND
 2                DECLARATION OF TRANSCRIBER
 3
 4          I, Iris Abernathy, a duly designated
 5   transcriber, PETERS SHORTHAND REPORTING CORPORATION,
 6   do hereby declare and certify under penalty of perjury
 7   that I have transcribed tape(s) which total one in
 8   number and cover a total of pages numbered 1 - 61, and
 9   which recording was duly recorded at RICHARD J.
10   DONOVAN CORRECTIONAL FACILITY AT ROCK MOUNTAIN - SAN
11   DIEGO, CALIFORNIA, in the matter of the SUBSEQUENT
12   PAROLE CONSIDERATION HEARING OF ROBERT BERTOLDO, CDC
13   No. C-94377 on June 1, 1995, and that the foregoing
14   pages constitute a true, complete, and accurate
15   transcription of the aforementioned tape(s) to the
16   best of my ability.
17          I hereby certify that I am a disinterested
18   party in the above-mentioned matter and have no
19   interest in the outcome of the hearing.
20          Dated September 7, 1995 at Sacramento,
21   California.
22
23          _____
24                    Iris Abernathy,
25                    Transcriber
26
27
```

INITIAL PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the Matter of the Life          )
Term Parole Consideration          )
Hearing of:                        )     CDC Number C-94377
                                   )
ROBERT BERTOLDO                     )
———————————————————————————        )



RICHARD J. DONOVAN CORRECTIONAL FACILITY

SAN DIEGO, CALIFORNIA

AUGUST 17, 1993

INMATE COPY

PANEL PRESENT:

Mr. Manny Guaderrama, Presiding Commissioner
Mr. Tom Giaquinto, Commissioner
Mr. Cleo Brown, Deputy Commissioner


OTHERS PRESENT:

Mr. Robert Bertoldo, Inmate
Mr. Richard Jallins, Attorney
Mr. David Dahle, Los Angeles County D. A.'s Office
Ms. Kathy Rogers, Daughter of Victim
Mr. Dale Rogers, Son-in-Law of Victim
Mr. Frank W. Michelle, Victim Services Coordinator
Ms. Patty Celaya, Facility III Program Secretary
Ms. M. Logan, Correctional Officer


CORRECTIONS TO THE DECISION HAVE BEEN MADE
        ————      No
        ————      Yes    See Errata Sheet


Tamara Kizirian, Transcriber          Legal Typing Services



ii

## <u>INDEX</u>

|                                  | PAGE |
| -------------------------------- | ---- |
| Proceedings...................................... | 1  |
| Case Factors..................................... | 6  |
| Pre-Commitment Factors........................... | 22 |
| Post-Commitment Factors.......................... | 27 |
| Parole Plans..................................... | 39 |
| Closing Statements............................... | 54 |
| Recess .......................................... | 65 |
| Decision ........................................ | 66 |
| Adjournment...................................... | 71 |
| Transcriber Certification........................ | 72 |

--o0o--

1

```
1               P R O C E E D I N G S

2          PRESIDING COMMISSIONER GUADERRAMA:   Okay.   This

3     is an Initial Parole Consideration Hearing for Robert

4     Bertoldo, B-e-r-t-o-l-d-o, CDC No. C-94377.   Date of

5     hearing is August 18th, 1993.   The time is approximately

6     9:00 a. m.  We're located at the Richard J. Donovan

7     Correctional Facility, San Diego County.   The legal

8     status:  The prisoner was received on October 22nd, 1984

9     out of Los Angeles County.   The offense is murder second

10    degree with use of deadly weapon and grand theft.   Case

11    No. A-527117.   That's Counts I and II.   Penal Code

12    Section violated is 187 P. C. and 12022.(b) P. C. and

13    also 487 P. C.   The term is 19 years to life.   The

14    minimum eligible parole date was April 12th, 1994.

15              This hearing is tape recorded.   In order

16    that we get an accurate transcription of the

17    proceedings, I'll ask for voice identification.   I'll

18    ask that everyone in the room give first and last names,

19    spell last name, tell what your function is here today.

20    And when we get around to the prisoner, I'd like you to

21    add your CDC number.   I'm going to start and we'll go to

22    my left.   I'm Manny Guaderrama, G-u-a-d-e-r-r-a-m-a,

23    Commissioner, Board of Prison Terms.

24          COMMISSIONER GIAQUINTO:   Tom Giaquinto,

25    G-i-a-q-u-i-n-t-o, Commissioner, Board of Prison Terms.

26          DEPUTY COMMISSIONER BROWN:   Cleo Brown,

27    B-r-o-w-n, Deputy Commissioner, Board of Prison Terms.
```

2

1        PRESIDING COMMISSIONER GUADERRAMA:   Go ahead.

2        INMATE BERTOLDO:  Robert Bertoldo.  The last

3  name, B-e-r-t-o-l-d-o, and my C-number is C-14377.

4        ATTORNEY JALLINS:   Richard Jallins,

5  J-a-l-l-i-n-s, State appointed counsel for the prisoner.

6        ASSISTANT DISTRICT ATTORNEY DAHLE:   David Dahle,

7  D-a-h-l-e, Deputy District Attorney from Los Angeles

8  County.

9        MS. ROGERS:  Kathy Rogers, R-o-g-e-r-s, victim's

10  daughter.

11        MR. MICHELLE:   Hello.  My name is Frank W.

12  Michelle, M-i-c-h-e-l-l-e. I'm the Assistant CNPR

13  (phonetic) and the Victim's Services Coordinator at RJD.

14        MR. ROGERS:   Dale Rogers, R-o-g-e-r-s.  I'm the

15  victim's son-in-law.

16        MS. CELAYA:   Patty Celaya, C-e-l-a-y-a, Facility

17  III Program Secretary.

18        CORRECTIONAL OFFICER LOGAN:   M. Logan,

19  L-o-g-a-n, Correctional Officer.

20        PRESIDING COMMISSIONER GUADERRAMA:   Okay.  The

21  purpose of today's hearing is again to consider your

22  suitability or to consider your suitability for parole.

23  In arriving at a decision, we'll consider the commitment

24  offense, your prior criminal and social history, as well

25  as your behavior and overall programming since your

26  commitment.  We've reviewed your records and files and

27  you'll have an opportunity to make corrections and

3

1  clarifications as we go.  The way this hearing will be

2  conducted today, I -- being this is your Initial

3  Hearing, I will be discussing with you the life offense,

4  your prior criminal and social history.  And then we

5  will go to Mr. Brown, at my far left, who will discuss

6  post-conviction factors and that's your adjustment in

7  the institution.  And being that again, that this --

8  this is your Initial, he's going to be discussing your

9  progress since the time you walked into the institution.

10        Then we'll go to Mr. Giaquinto, at my

11  immediate left, and he'll discuss with you your parole

12  plans.  Following that, I'll poll the panel and see if

13  they have any questions.  Then I'll also ask Mr. Dahle,

14  representing Los Angeles District Attorney's Office, if

15  he has any questions.  If he does, he'll direct those

16  questions to the Chair.  Now, the role of the District

17  Attorney today is to represent the people of Los Angeles

18  County.  We're not retrying the case.  Again, he's here

19  to represent the people and if he has any questions

20  he'll direct them to the Chair, and if you want to

21  respond to those questions, you'll respond back to me.

22  No direct cross-examination is permitted.

23        Okay.  You came in here today convicted of

24  all the charges that you've been convicted of and that's

25  not going to change at all.  Our charge today is to

26  determine whether or not -- whether or not you're

27  suitable for parole.  Following the District Attorney,

4

1     then your attorney, Mr. Jallins, will have an

2     opportunity to ask you questions directly.  Following

3     the questioning phase, then we'll go back to the

4     District Attorney and ask him to comment on your

5     suitability for parole.  Then Mr. Jallins will have an

6     opportunity to make a statement.  Then if you wish to

7     have -- make a statement following your attorney, you

8     may do so.  We have next of kin here today and we have

9     two spokespersons, the victim's daughter and the

10    victim's son-in-law, and they'll both be making

11    statements here today.  They'll be the last ones to --

12    to speak.  Okay.  I'll ask Mr. Jallins whether or not

13    he's satisfied that your rights have been met up until

14    now?

15          ATTORNEY JALLINS:    Yes.

16          PRESIDING COMMISSIONER GUADERRAMA:    Okay.  Do

17    you have any objections to any of the panel members you

18    see before you?

19          INMATE BERTOLDO:    No.  I don't.

20          PRESIDING COMMISSIONER GUADERRAMA:    Okay.  You

21    will receive a copy of the tentative written decision

22    today.  The decision becomes effective in 60 days.  A

23    transcript will automatically be sent to you and you

24    have the right to appeal within 90 days if you're

25    dissatisfied with the results of today's hearing.  Now,

26    today you're not required to discuss the life offense

27    with the panel.  You're not required to admit your

5

1    guilt. But the panel does accept as true the findings

2    of the Court. Again, you came in here convicted of

3    murder; you're going to leave here today convicted of

4    murder. That's not going to change at all. I just want

5    to caution you since this is your -- your Initial

6    Hearing and what you say here today is going to go with

7    you for a long time, if you don't get a parole date

8    today. And the transcript will record everything that's

9    said. So I advise you very strongly to be very truthful

10   and if you don't want to answer the questions, you're

11   better off not answering the questions than to tell a

12   lie here today. Is that clear?

13        INMATE BERTOLDO:   Yes.

14        PRESIDING COMMISSIONER GUADERRAMA:   Okay.  I

15   have a documents list here.  I'd like Mr. Dahle and Mr.

16   Jallins to take a look at and make sure that everyone

17   has the same documents.

18        ASSISTANT DISTRICT ATTORNEY DAHLE:   Yes.  I have

19   these same documents.

20        ATTORNEY JALLINS:   I have the same documents and

21   also would note for the record, I have provided the

22   Board with a memorandum.

23        PRESIDING COMMISSIONER GUADERRAMA:   Okay.  Thank

24   you.  I there any preliminary objections, Mr. Jallins?

25        ATTORNEY JALLINS:   No.

26        PRESIDING COMMISSIONER GUADERRAMA:   Is your

27   client going to be responding to questions today?

6

1          ATTORNEY JALLINS:     Yes.  He is.

2          PRESIDING COMMISSIONER GUADERRAMA:     Would you

3    raise your right hand and I'll swear you in.   Do you

4    solemnly swear or affirm that the testimony you give

5    before this panel will be the truth, the whole truth,

6    and nothing but the truth?

7          INMATE BERTOLDO:     Yes.

8          PRESIDING COMMISSIONER GUADERRAMA:     Okay.  Thank

9    you.  What I'm going to do is I'm going to read into the

10   record the statement of facts and those facts are coming

11   from the Board report, which did a pretty good job of

12   putting all the information from the probation officer's

13   report and also the -- the -- the Appeals Court, putting

14   them together and -- and did a fairly good job

15   summarizing them.

16          Okay.  The facts.  "On April 13th, 1981,

17   between the hours of 10:30 a. m. and 2:30 p. m., the

18   victim, John Simmarly (phonetic) was murdered in his

19   residence, located at 2056 Avocado Terrace, Hacienda

20   Heights.  The subsequent autopsy revealed that the

21   victim had been shot in the face with a .22 caliber

22   pistol and had been stabbed approximately 16 times.

23   That afternoon, Dale Rogers, the victim's son-in-law,

24   discovered the victim's body.  At the time the victim

25   was found, there was no wallet on his person and his

26   watch and necklace, which he had been wearing earlier

27   during the day, were missing.  On April 15th, 1981, Mr.

7

1    Bertoldo was stopped for a routine traffic violation.

2    At that time he was searched by the officer who found a

3    .22 caliber pistol.  It was consequently discovered that

4    this particular weapon had been taken at the time of the

5    murder of Mr. John Simmarly and was considered to be the

6    murder weapon.  The subsequent investigation revealed

7    that Mr. Bertoldo had pawned Mr. Simmarly's necklace at

8    a pawn shop.  The investigating officers conducted a

9    search of Mr. Bertoldo's girlfriends apartment and found

10   Mr. Simmarly's rifles, safe, along with it's contents,

11   and a quilt bearing blood stains." Okay.  Mr. Bertoldo,

12   those are the facts as we know them.  Is that an

13   accurate reflection or description of what happened?

14            INMATE BERTOLDO:  Yes.

15            PRESIDING COMMISSIONER GUADERRAMA:  Okay.  Give

16   us a little detail on -- on how this occurred, what your

17   relationship was to Mr. Simmarly.  Did you plan this?

18            INMATE BERTOLDO:  No.  I didn't know Mr.

19   Simmarly that well.  We had did some drug deals, some

20   cocaine deals before where I had introduced him to

21   people that were either buying or selling and he would

22   either buy or sell.  I had worked for him a couple of

23   times and -- but I had never, I'd say, gone out with him

24   as far as his social activities were concerned.  On the

25   day that this happened, yes, I was there.  And I went

26   there -- I called before I went there.  He told me to

27   come by.  He had owed me some money, $350 on a job that

8

1    I'd done for him.  When I got there we started talking

2    about it and I screwed up a deal that he was supposed to

3    make some money on.  It was a cocaine deal.  An argument

4    started from there and that's when everything happened.

5         PRESIDING COMMISSIONER GUADERRAMA:    How did you

6    screw up the deal?

7         INMATE BERTOLDO:    Excuse me?

8         PRESIDING COMMISSIONER GUADERRAMA:    How did you

9    screw up this cocaine deal?

10        INMATE BERTOLDO:    I let the people get away.  I

11   didn't keep in contact with the people that were

12   supposed make the buy.  At this point, he was going to

13   be selling and I let the people get away.  I didn't keep

14   in contact with them.

15        PRESIDING COMMISSIONER GUADERRAMA:    How is it

16   that he owed you $350?

17        INMATE BERTOLDO:    It was on a job that I had

18   done for him.

19        PRESIDING COMMISSIONER GUADERRAMA:    What kind of

20   job?

21        INMATE BERTOLDO:    Flooring job.

22        PRESIDING COMMISSIONER GUADERRAMA:    Flooring.

23   Had long had you known Mr. Simmarly?

24        INMATE BERTOLDO:    I knew Mr. Simmarly through my

25   brother and another contractor.  And I was on a job in

26   Bakersfield and Mr. Simmarly -- Simmarly had stopped by

27   at that time, and that's when I -- he asked me if I

9

1    could do another job for him.  And I went with another

2    contractor on that job.

3            PRESIDING COMMISSIONER GUADERRAMA:    So how long

4    had you know him?

5            INMATE BERTOLDO:    Prior to the incident, I'd say

6    about approximately -- approximately a year.

7            PRESIDING COMMISSIONER GUADERRAMA:    A year?

8            INMATE BERTOLDO:    Yes.

9            PRESIDING COMMISSIONER GUADERRAMA:    Okay.  And

10   how is it that you hit it off with Mr. Simmarly or able

11   to deal in -- in cocaine and other drugs?

12           INMATE BERTOLDO:    When we're at the job site, we

13   were talking and we had a few beers and got a little

14   loose talking with each other in the conversation, and

15   drugs came up.

16           PRESIDING COMMISSIONER GUADERRAMA:    And how did

17   that come up?

18           INMATE BERTOLDO:    Well, he had known that I'd

19   been arrested prior to knowing him and I had told him

20   that, you know, I had messed around with drugs.  And

21   that's when he came out and asked me if I had any

22   connections.  I told him I did and from there it

23   started.  It started with some -- some pot, at first and

24   then from there it went into cocaine.

25           PRESIDING COMMISSIONER GUADERRAMA:    What did you

26   do?  You sold him pot?

27           INMATE BERTOLDO:    Yes.

10

1          PRESIDING COMMISSIONER GUADERRAMA:    And you sold

2    him cocaine?

3          INMATE BERTOLDO:    No.   I -- that I -- he wanted

4    to buy some, so I introduced him to people that were

5    selling.

6          PRESIDING COMMISSIONER GUADERRAMA:    And how much

7    would he buy?

8          INMATE BERTOLDO:    At first, he would buy ounces.

9    After that, he started making money.

10          PRESIDING COMMISSIONER GUADERRAMA:    Okay.   How

11    many times had you been to his home?

12          INMATE BERTOLDO:    Once, prior to that time.

13    Most of the time he would either see me at a job site or

14    I'd just call and we -- normally, we'd meet like at a

15    restaurant.   There was one place over in, I think it was

16    Covina.   It's right off the freeway.   There's a mall

17    there and sometimes we'd meet there.

18          PRESIDING COMMISSIONER GUADERRAMA:    And your

19    purpose for being at his house on the day of the murder?

20          INMATE BERTOLDO:    I called him up so I could go

21    by there and pick up my -- the money that he owed me.

22          PRESIDING COMMISSIONER GUADERRAMA:    Did he tell

23    you to come by?

24          INMATE BERTOLDO:    Yes.

25          PRESIDING COMMISSIONER GUADERRAMA:    Okay.   And

26    did you take a gun with you?

27          INMATE BERTOLDO:    No.

11

1          PRESIDING COMMISSIONER GUADERRAMA:    Okay.

2          INMATE BERTOLDO:    When I went there, there was

3     no intentions of hurting Mr. Simmarly.  The argument got

4     pretty heated.  We started fighting.  I don't know where

5     the knife came from.  When I went there, I didn't have

6     no weapons.  And as I said, I didn't go there with any

7     intentions of hurting him, none at all.  I did know Mr.

8     Simmarly to be one to carry guns.  Normally, anytime

9     that I did see him, he had a weapon on him.

10          PRESIDING COMMISSIONER GUADERRAMA:    Okay.

11    What -- what started the fight?

12          INMATE BERTOLDO:    He started getting on me about

13    letting people get away from me.

14          PRESIDING COMMISSIONER GUADERRAMA:    All right.

15          INMATE BERTOLDO:    And when he started with that,

16    I started telling him that he can just give me my money,

17    I'd take off.  And he kept pushing me, as far as getting

18    the people back.  He said he had invested his money into

19    cocaine.  He had the cocaine and needed to get rid of

20    it.  That's the problem -- that's where all the problems

21    started.  As we started arguing back and forth, I told

22    him, "Well, yeah.  Maybe I can get ahold of the people.

23    Give me my money.  I need money.  I'm broke.  I don't

24    have one penny.  I need my money."  He says, "You get

25    ahold of the people and I'll start thinking about paying

26    you."  When -- when he told me about that, we started

27    arguing, cussing at each other.  And started pushing me

12

1    and I socked him.  That's when we started fighting in

2    the front room.  It started in the his office and led

3    into the front room and that's where the scuffle

4    started.  Fell over the couch, started running around

5    and that's when a knife was involved.

6         PRESIDING COMMISSIONER GUADERRAMA:   Where did

7    the knife come from?

8         INMATE BERTOLDO:   I don't know.  I don't know

9    whether it came from the sink top -- top of the sink or

10   the counter.  When we fell over the couch and were

11   scuffling, that's when I seen the knife come up.

12        PRESIDING COMMISSIONER GUADERRAMA:   What do you

13   mean, "seen it come up?"  How did it come up?

14        INMATE BERTOLDO:   It came up this way.

15        PRESIDING COMMISSIONER GUADERRAMA:   Did -- did

16   Mr. Simmarly have it?

17        INMATE BERTOLDO:   Yes.

18        PRESIDING COMMISSIONER GUADERRAMA:   All right.

19        INMATE BERTOLDO:   And we started -- I grabbed

20   his arm.  I threw my whole body on -- I grabbed his arm

21   and I threw my whole body onto it.  And as I'm

22   concentrating on the knife, we're falling back over on

23   the floor and we're right against the corner of the --

24   there's like a tabletop that separates the front room

25   from the kitchen, and we're right in that corner.  And I

26   grabbed the knife and I think I swung a few times when I

27   was on the floor with the knife, and I got up.  When I

13

1     got up to start to run, Mr. Simmarly kept attacking me.

2          PRESIDING COMMISSIONER GUADERRAMA:   Who had the

3     knife then?

4          INMATE BERTOLDO:   I did.  I don't think he

5     attacked me, per say, I think he was trying to get the

6     knife from me.

7          PRESIDING COMMISSIONER GUADERRAMA:   So what did

8     you do with the knife?

9          INMATE BERTOLDO:   I kept thrusting it this way

10     as he was coming towards me.  And it was -- I was in a

11     situation -- I was scared, very scared.  Things were

12     happening so fast.  I would say that this whole thing

13     that I'm describing right now, happened within maybe

14     seconds, minutes.  It happened very, very fast.

15          PRESIDING COMMISSIONER GUADERRAMA:   How long was

16     the blade of the knife?

17          INMATE BERTOLDO:   Excuse me?

18          PRESIDING COMMISSIONER GUADERRAMA:   How long was

19     the blade of the knife?

20          INMATE BERTOLDO:   It was a large knife.

21          PRESIDING COMMISSIONER GUADERRAMA:   A kitchen

22     knife?  A butcher knife?

23          INMATE BERTOLDO:   I can't remember exactly.  I

24     think it was a kitchen knife, some type of a kitchen

25     knife.

26          PRESIDING COMMISSIONER GUADERRAMA:   Usually the

27     blades are about eight --

14

1        INMATE BERTOLDO:    It was --

2        PRESIDING COMMISSIONER GUADERRAMA:    --nine

3    inches long.

4        INMATE BERTOLDO:    It was a large knife.

5        PRESIDING COMMISSIONER GUADERRAMA:    Uh-hum.    How

6    many times did you thrust it into him?

7        INMATE BERTOLDO:    I can't remember.

8        PRESIDING COMMISSIONER GUADERRAMA:    According to

9    the record, it's 16 times.

10        INMATE BERTOLDO:    I went -- because this -- the

11    question about how many times has arisen about what I

12    spoke with counselors, psychiatrists.    So I went through

13    the complete autopsy report and it never states how many

14    times the man was stabbed or cut.    I know that

15    throughout the report, the number 16 came up.    Yet, what

16    happened, I think, in my opinion, was it was the 16th

17    day that they took the autopsy report.    And in a lot of

18    the pages where it says stabbed --

19        PRESIDING COMMISSIONER GUADERRAMA:    Did you stab

20    him several times?

21        INMATE BERTOLDO:    Yes.

22        PRESIDING COMMISSIONER GUADERRAMA:    Okay.

23        INMATE BERTOLDO:    Yes.

24        PRESIDING COMMISSIONER GUADERRAMA:    How many

25    times do you think you stabbed him?

26        INMATE BERTOLDO:    A lot.

27        PRESIDING COMMISSIONER GUADERRAMA:    Okay.    So

15

1    the number is really not important.

2         INMATE BERTOLDO:   I understand that.

3         PRESIDING COMMISSIONER GUADERRAMA:   Yeah.

4         INMATE BERTOLDO:   I know that, yes, I kept

5    thrusting as he kept coming towards me.

6         PRESIDING COMMISSIONER GUADERRAMA:   Okay.

7         INMATE BERTOLDO:   But as I said, I don't think

8    he came towards me -- I think he was trying to grab the

9    knife, because he kept coming this way, not this way.

10   He kept coming like this.  He kept advancing towards me

11   and the only thing I could think of was just thrusting

12   the knife.

13        PRESIDING COMMISSIONER GUADERRAMA:   And so what

14   happened after you stabbed him?

15        INMATE BERTOLDO:   I ran -- I dropped the knife

16   and I think I ran towards the -- back to the office.  I

17   ran back towards the office, I looked out the window.

18   At this point, things started coming in a little bit

19   more clear.  I was still scared.  Things were still

20   happening fast.  I could hear my heart beat.  The first

21   thing I thought of was, if anyone was there or saw this.

22   That's what I was thinking -- afraid of at that time.

23   When I turned around from the window, I don't even know

24   if there was a window there or not, I -- when I was

25   behind the desk I turned to run out.  The bottom, I

26   think, of the desk or somewhere, there was a drawer open

27   and there was a gun there.  I grabbed the gun and I

16

1  proceeded to run out the bedroom. I think there's a

2  sliding glass door there. And I heard him say

3  something. And I walked towards him and he looked ugly.

4  I don't mean -- I mean the scene looked ugly. And he

5  said something. I -- it was a mumble and I shot him.

6      PRESIDING COMMISSIONER GUADERRAMA:    Why did you

7  shoot him?

8      INMATE BERTOLDO:    I -- I don't want to say I

9  don't know. I shot him because I was afraid that he

10  would live and that I'd be right where I'm at now, and

11  that's the truth.

12      PRESIDING COMMISSIONER GUADERRAMA:    Okay. After

13  that -- after you shot him, what did you do?

14      INMATE BERTOLDO:    I ran back into the bedroom

15  and as I was in the bedroom I started to run out the --

16  the sliding glass doors there. And I turned around,

17  bend around and there was a -- there was some rifles

18  there on the safe. And I grabbed those. I put them in

19  the car and I left.

20      PRESIDING COMMISSIONER GUADERRAMA:    You also

21  took his necklace?

22      INMATE BERTOLDO:    Yes.

23      PRESIDING COMMISSIONER GUADERRAMA:    Did you take

24  that off his person?

25      INMATE BERTOLDO:    I think that was on the floor,

26  but I really don't even remember that.

27      PRESIDING COMMISSIONER GUADERRAMA:    But --

17

1    INMATE BERTOLDO:    I don't remember taking the

2    jewelry.

3    PRESIDING COMMISSIONER GUADERRAMA:    What about

4    his wallet?

5    INMATE BERTOLDO:    I think that was on the floor,

6    too.    I honestly don't remember that.

7    PRESIDING COMMISSIONER GUADERRAMA:    You took it

8    though; didn't you?

9    INMATE BERTOLDO:    Yes.    I did.

10    PRESIDING COMMISSIONER GUADERRAMA:    Okay.    Did

11    you take anything else?

12    INMATE BERTOLDO:    I don't remember.    At that

13    point -- after I shot, things started to speed up again.

14    The motions, everything that I was going through started

15    to speed up.    My heart, I could like feel my heart, I

16    guess that was what it was.    I don't know.    But things

17    started to speed up then.

18    PRESIDING COMMISSIONER GUADERRAMA:    You said he

19    had cocaine.    Did you take his cocaine?

20    INMATE BERTOLDO:    I don't know where.    He said

21    he had it.    I don't know if he did.

22    PRESIDING COMMISSIONER GUADERRAMA:    Was it

23    ever --

24    INMATE BERTOLDO:    I never --

25    PRESIDING COMMISSIONER GUADERRAMA:    Was it ever

26    recovered?

27    INMATE BERTOLDO:    I don't know.

18

1      PRESIDING COMMISSIONER GUADERRAMA:    Okay.    It

2   sounds like, you know -- why did you rob him after

3   you're -- you're panicked.   You say you were panicking.

4   Why did take the time to rob him after all this

5   happened?

6      INMATE BERTOLDO:    I don't know.   I've only this

7   year, have I started to come and think about any of

8   that.   I was -- I had myself convinced for a long time

9   that I was totally innocent of this.   I mean, in the

10  back of my mind I know what happened.   I'm -- I'm not

11  illiterate or anything.   I -- I was fooling myself.   And

12  only lately have I started thinking about all of this

13  and -- and everything that it's caused.

14     PRESIDING COMMISSIONER GUADERRAMA:    You -- you

15  didn't take responsibility for this crime for a long

16  time.

17     INMATE BERTOLDO:    True.

18     PRESIDING COMMISSIONER GUADERRAMA:    As a matter

19  of fact, you appealed and --

20     INMATE BERTOLDO:    Yes.

21     PRESIDING COMMISSIONER GUADERRAMA:    In spite of

22  all the -- all the evidence.   You know -- you know what

23  it sounds like to me, that you went over there to rob

24  him.   There was this fight and then you killed him to

25  cover -- to cover your tracks.

26     INMATE BERTOLDO:    That's your thought on it.

27     PRESIDING COMMISSIONER GUADERRAMA:    Yes.

19

1          INMATE BERTOLDO:    No.

2          PRESIDING COMMISSIONER GUADERRAMA:    Yes.

3          INMATE BERTOLDO:    No.  I did not.  I did not

4     enter -- if I was not here today, then it would be Dave

5     Simmarly sitting here talking to you.  I am positive of

6     that.  I know that.  I did not go there with any

7     intentions of hurting him or killing him.  I did not.

8     Every weapon that was used there that day, was Dave

9     Simmarly's.  I did not go there with any intentions of

10    harming Dave Simmarly.

11         PRESIDING COMMISSIONER GUADERRAMA:    Okay.

12         INMATE BERTOLDO:    But that I know is the truth.

13         PRESIDING COMMISSIONER GUADERRAMA:    All right.

14    Your -- your brother had some kind of working

15    relationship with Mr. Simmarly, also.

16         INMATE BERTOLDO:    Yes.

17         PRESIDING COMMISSIONER GUADERRAMA:    What was his

18    involvement in this crime?

19         INMATE BERTOLDO:    None.

20         PRESIDING COMMISSIONER GUADERRAMA:    None at all?

21         INMATE BERTOLDO:    None.

22         PRESIDING COMMISSIONER GUADERRAMA:    He helped

23    you get rid of the -- at least transport some of the --

24    the --

25         INMATE BERTOLDO:    No.

26         PRESIDING COMMISSIONER GUADERRAMA:    -- loot; did

27    he not?

20

1          INMATE BERTOLDO:    Later on that day he gave me a

2    ride, yes.

3          PRESIDING COMMISSIONER GUADERRAMA:    Okay.  Had

4    you been drinking or using any narcotics that day?

5          INMATE BERTOLDO:    I had been drinking.

6          PRESIDING COMMISSIONER GUADERRAMA:    What had you

7    been drinking?

8          INMATE BERTOLDO:    Some whiskey.

9          PRESIDING COMMISSIONER GUADERRAMA:    Okay.  What

10    about cocaine or marijuana?

11          INMATE BERTOLDO:    No.

12          PRESIDING COMMISSIONER GUADERRAMA:    None at all?

13          INMATE BERTOLDO:    No.

14          PRESIDING COMMISSIONER GUADERRAMA:    So what --

15    what do -- what do you think caused you to act that way,

16    to do what you did?

17          INMATE BERTOLDO:    I don't know.

18          PRESIDING COMMISSIONER GUADERRAMA:    You've been

19    in prison a long time.

20          INMATE BERTOLDO:    Yes.

21          PRESIDING COMMISSIONER GUADERRAMA:    You had a

22    pretty bad record before this.  As a matter of fact,

23    you'd been in prison two times, on two prior occasions.

24    Is that right?

25          INMATE BERTOLDO:    Yes.

26          PRESIDING COMMISSIONER GUADERRAMA:    It says

27    here, according to the probation officer's report, that

21

1    you admitted that you smoked marijuana from the age of

2    16 until about a year before you were picked up on this

3    life offense. It says you used Reds once at the age of

4    19. You used cocaine once at the age of 24. It says you

5    used heroin from August 1975 until the year before you

6    were picked up on this offense. You deny that you were

7    ever addicted. It said you used it a total of 12 times.

8    You said you limited your alcohol consumption to six

9    beers on the weekend. And it says here that -- that

10   your current statement of substance abuse is in marked

11   contrast to the statements which you made to the

12   probation department narcotic evaluator, Don Harvey

13   (phonetic), on June 7th, 1976.

14            At that time, you admitted using heroin

15   over the past year at the rate of two spoons a day. You

16   further admitted that for the three previous years, you

17   were dealing in heroin at the rate of five to seven

18   ounces a week. You confessed that you had a -- had had

19   over 50 LSD trips and that you had tried ever other form

20   of hallucinogens, amphetamines, and barbituates. The

21   examiner found tracks on you and a total of six puncture

22   wounds, which appeared to be approximately 18 to 21 days

23   old. So it sounds like you were a pretty strung out.

24   Would -- would this -- is that an accurate assessment?

25            INMATE BERTOLDO:   I think so. I was trying to

26   get into CRC at the time.

27            PRESIDING COMMISSIONER GUADERRAMA:   At the time

22

1    this -- this offense occurred?

2         INMATE BERTOLDO:    No, no, no.  I think in '76.

3    I can't remember that far back exactly what was

4    happening.

5         PRESIDING COMMISSIONER GUADERRAMA:    How did you

6    whip your heroin habit?

7         INMATE BERTOLDO:    I had more an alcohol habit

8    than I did a heroin habit.

9         PRESIDING COMMISSIONER GUADERRAMA:    But

10   according to your previous statements, you had been

11   using it for -- for a long time.

12        INMATE BERTOLDO:    In '76?

13        PRESIDING COMMISSIONER GUADERRAMA:    Uh-hum.

14        INMATE BERTOLDO:    Yeah.  I -- that's what I'm

15   saying.  I was trying to get into CRC at the time and

16   made statements that would be -- that would make it

17   easier for me to get into CRC.

18        PRESIDING COMMISSIONER GUADERRAMA:    We're going

19   to go into your background as far as arrests.  Your

20   juvenile, at least according to our record here, you

21   were arrested twice on 7/13/64 for carrying a

22   switchblade knife.  You were 13-year's-old at the time.

23   You were counseled and released.  On 12/23/64 you were

24   arrested of suspicion of inhaling glue.  You were

25   14-year's-old.  You got six months probation.

26             Your adult record, on 4/2/69 you were a

27   minor in possession of alcohol.  You were 18-year's-old.

23

1    You got a $48 fine and four days in jail, suspended.  On

2    5/11/69 you were arrested for misdemeanor drunk driving.

3    You got a $200 fine, 25 days in jail.  That was

4    suspended.  On 9/1/69 you were in possession of material

5    device for arson and taking a vehicle without owner's

6    consent.  You were released.  Apparently, you -- do you

7    remember that one, whether -- what -- what the

8    disposition was?

9         INMATE BERTOLDO:   No.  I don't.

10        PRESIDING COMMISSIONER GUADERRAMA:   On 9/19/69

11   you were arrested for grand theft auto, $100 -- $150

12   fine, three years probation.  On 4/28/70, you were

13   19-year's-old; you were arrested for robbery.  You got a

14   $300 fine and three years probation.  The probation was

15   revoked on 6/18/76 and you were sentenced to State

16   prison for the term prescribed by law.  So how much time

17   did you spend in prison on that one?

18        INMATE BERTOLDO:   I can't remember.  I think it

19   was 16 or 18 months.

20        PRESIDING COMMISSIONER GUADERRAMA:   Where did

21   you spend your time?

22        INMATE BERTOLDO:   In California.

23        PRESIDING COMMISSIONER GUADERRAMA:   Which

24   prison?

25        INMATE BERTOLDO:   In Susanville.

26        PRESIDING COMMISSIONER GUADERRAMA:   On 1/28/71,

27   it says you were late returning to Biscaylou's

24

1      (phonetic) -- Biscaylou's --

2              INMATE BERTOLDO:    Biscaylou.

3              PRESIDING COMMISSIONER GUADERRAMA:    -- Work

4      Furlow.

5              INMATE BERTOLDO:    Biscaylou.

6              PRESIDING COMMISSIONER GUADERRAMA:    Biscaylou

7      Work Furlow Center.  And no disposition shown.  On

8      11/11/71 you were a minor in possession of alcohol, one

9      year probation and one day in county jail, suspended.

10     On 1/9/72 you were arrested for battery on a police

11     officer and disturbing the peace.  And you were

12     21-year's-old then and no dispostion here.  Do you

13     recall what happened on that one?

14             INMATE BERTOLDO:    No.  Battery on a police

15     officer?

16             PRESIDING COMMISSIONER GUADERRAMA:    Yes.

17             INMATE BERTOLDO:    No.  I don't remember that.

18             PRESIDING COMMISSIONER GUADERRAMA:    Apparently,

19     it seems to me I read the probation officer's report and

20     you had some kind of beef with your brother.  Did you

21     get in a fight with your brother?

22             INMATE BERTOLDO:    (Inaudible response.)

23             PRESIDING COMMISSIONER GUADERRAMA:    And the

24     police were called?

25             INMATE BERTOLDO:    Yeah.  That was -- but I don't

26     remember battery on a police officer.

27             PRESIDING COMMISSIONER GUADERRAMA:    Okay.  On

25

1    1/16/72 you were arrested for possession of marijuana.

2    On 5/30/75, possession of controlled substance.   You

3    were 24-year's-old then and that was a prosecution

4    reject.   On 4/21/78 you were arrested for burglary.   You

5    were 27-year's-old then and sentenced to two years State

6    prison, consecutive with the forgery charge of 4/12/78.

7    How much time did you spend on that one?

8            INMATE BERTOLDO:   Approximately the same --

9    about the same time.

10           PRESIDING COMMISSIONER GUADERRAMA:   Sixteen, 18

11   months?

12           INMATE BERTOLDO:   I think so.

13           PRESIDING COMMISSIONER GUADERRAMA:   Then on

14   4/12/78 you were arrested for forgery and that's a --

15   okay, that -- that ties into the other one.   On 11/1/78

16   you were arrested for under the influence of controlled

17   substance.   You got five days in county jail.   Then on

18   3/3/79, grand theft auto, 28-year's-old, no disposition

19   shown.   And that brings us up the -- the life offense.

20   It appears that you were on parole.   Is that right?

21   When you were involved --

22           INMATE BERTOLDO:   No.

23           PRESIDING COMMISSIONER GUADERRAMA:   -- in the

24   life offense.

25           INMATE BERTOLDO:   No.

26           PRESIDING COMMISSIONER GUADERRAMA:   That -- you

27   were not on parole?

26

1          INMATE BERTOLDO:    No.   I was not.

2          PRESIDING COMMISSIONER GUADERRAMA:    How long had

3   you been out of prison when you got involved in the life

4   offense?

5          INMATE BERTOLDO:    I was discharged a month prior

6   to the incident.

7          PRESIDING COMMISSIONER GUADERRAMA:    Okay.  So,

8   you know, from reading all this, it appears that you've

9   gotten all kinds of breaks, lots and lots of breaks.

10  Probably, if the system -- the justice system had done

11  it's job, you would have been in prison for something

12  and you wouldn't have gotten involved in the life

13  offense.  You belonged in prison.

14          Personal factors:  You were born in

15  Visalia, California, the youngest of five children.

16  Your father was an alcoholic and your parents separated

17  when you were an infant.  Your mother moved to your

18  parent's house in Los Angeles, taking her children with

19  her.  You were essentially raised in the home of your

20  maternal grandparents until you reached school age.  You

21  completed school through the 11th grade, quitting after

22  your mother remarried.  You resented the discipline your

23  father -- your stepfather brought into the home.  You

24  maintained sporadic employment with several contractors,

25  laying floors, installing aluminum siding and patios.

26  It says although you were never married prior to the

27  current commitment to CDC, you maintained a continual

27

1     relationship with Carol Lee Merangi (phonetic).

2          INMATE BERTOLDO:   Yes.

3          PRESIDING COMMISSIONER GUADERRAMA:   On November

4     19th, 1992, you married Carol, at RJD Correctional

5     Facilty.  Okay.  What we're going to do, we're going to

6     move on the other facets of this hearing.  I'm sure

7     they'll be other questions concerning the life offense

8     throughout the hearing.  So we're going to move to Mr.

9     Brown at this point and he'll talk about your

10     post-conviction factors.

11          DEPUTY COMMISSIONER BROWN:   Okay.  You were

12     received in prison October 22nd, 1984, at the Reception

13     Center at CIM.  You went out to court as a witness,

14     November '94 (sic), returned December 11th, '84 -- oh,

15     '84.  December 24th, '84 you were transferred the

16     Training Facility in Soledad.  And April 26th, 1985, it

17     shows you were transferred to San Quentin.  April 28th,

18     1986, you were transferred to Tehachapi, Unit 4-A.

19     November 10th, 1987, transferred to Tehachapi Unit 4-B.

20     And then December 19th, 1991, to Richard J. Donovan.  Is

21     that the extent of your travels?

22          INMATE BERTOLDO:   Yes.

23          DEPUTY COMMISSIONER BROWN:   I noticed five

24     disciplinary write-ups in your chrono -- in your file.

25     The latest one is -- is 1979.  They are serious

26     write-ups.  April 15th, 1985, you had a write-up for

27     assault on staff -- April 13th, '85 write-up.  And you

28

1    were assaulted in 1987?

2         INMATE BERTOLDO:    Yes.

3         DEPUTY COMMISSIONER BROWN:    And what was that

4    about?

5         INMATE BERTOLDO:    I don't know if that was the

6    Tehachapi incident or not.

7         DEPUTY COMMISSIONER BROWN:    How many times have

8    you been assaulted?

9         INMATE BERTOLDO:    I think there was two

10   stabbings.

11        DEPUTY COMMISSIONER BROWN:    Okay.    Tell me about

12   both of them.

13        INMATE BERTOLDO:    One was on the weight pile

14   (phonetic).    And -- oh, there was only one stabbing.

15   That was on the weight pile.    And one was a fight.

16        DEPUTY COMMISSIONER BROWN:    Why were you

17   stabbed?

18        INMATE BERTOLDO:    There was politics on the yard

19   between north and south.

20        DEPUTY COMMISSIONER BROWN:    Politics?

21        INMATE BERTOLDO:    Yeah.

22        DEPUTY COMMISSIONER BROWN:    What does that mean?

23        INMATE BERTOLDO:    Uhmm --

24        DEPUTY COMMISSIONER BROWN:    Somebody ran for

25   president or something?

26        INMATE BERTOLDO:    Well --

27        DEPUTY COMMISSIONER BROWN:    You have to help us

1    out.  We don't know -- we don't know what goes on out

2    there.

3         INMATE BERTOLDO:    Okay.

4         DEPUTY COMMISSIONER BROWN:    You talk all that

5    yard talk, you have to explain it.

6         INMATE BERTOLDO:    There's -- sometimes there's

7    trouble between the Northern -- Northern California

8    Hispanics and the Southern California Hispanics.  And

9    depending where you're from -- raised from -- at, one

10   doesn't like the other.  And I happened to be on the

11   weight pile at the time that the Northern Hispanics were

12   on the yard, and was stabbed.

13        DEPUTY COMMISSIONER BROWN:    And you're

14   considered a Southern Hispanic?

15        INMATE BERTOLDO:    Yes.

16        DEPUTY COMMISSIONER BROWN:    Weren't you supposed

17   to be a dropout from the M.F.?

18        INMATE BERTOLDO:    No.

19        DEPUTY COMMISSIONER BROWN:    Then you had one for

20   threatening staff, February of '88.

21        INMATE BERTOLDO:    Yes.

22        DEPUTY COMMISSIONER BROWN:    You may comment

23   anytime you wish.  If there are no comments I'll keep

24   moving.  And then you had a fist fight, March of '88.

25        INMATE BERTOLDO:    Yes.

26        DEPUTY COMMISSIONER BROWN:    Force and violence,

27   May of '89.

30

1          INMATE BERTOLDO:    (Inaudible response.)

2          DEPUTY COMMISSIONER BROWN:    You and another guy

3    were fighting again.    And then stimulants and sedatives.

4    You used amphetamines and methamphetamines.

5          INMATE BERTOLDO:    Yes.

6          DEPUTY COMMISSIONER BROWN:    Both?

7          INMATE BERTOLDO:    It was -- I guess it was a

8    methamphetamine.

9          DEPUTY COMMISSIONER BROWN:    You had three

10   chronos that are negative for disrespect to staff,

11   participation in disruptive behavior, and out of bounds.

12   So, you didn't get many write-ups, but they were all

13   serious.    So, '92 is your last negative chrono, April?

14         INMATE BERTOLDO:    That was the 128 chrono, yes.

15         DEPUTY COMMISSIONER BROWN:    Okay.    Negative;

16   right?

17         INMATE BERTOLDO:    Yes.

18         DEPUTY COMMISSIONER BROWN:    Okay.    The way you

19   were correcting me, I thought I made a mistake and it

20   was positive.

21         INMATE BERTOLDO:    No.    I -- it -- it wasn't

22   meant as a correction.

23         DEPUTY COMMISSIONER BROWN:    Oh, okay.    You

24   successfully completed the drafting program.    I saw a

25   chrono for that.    And you're presently involved in

26   vocational optical technology?

27         INMATE BERTOLDO:    Yes.

1      DEPUTY COMMISSIONER BROWN:   When will you
2  complete that?
3      INMATE BERTOLDO:   Next year they'll be having
4  the -- the ABFD (phonetic) test for -- for the ABL and
5  I'll be --
6      DEPUTY COMMISSIONER BROWN:   For the what?
7      INMATE BERTOLDO:   It's the -- the American Board
8  of Opticians.
9      DEPUTY COMMISSIONER BROWN:   Okay.
10     INMATE BERTOLDO:   And it's the national
11  certification.  They'll be taking the test next year and
12  I'm scheduled for it.
13     DEPUTY COMMISSIONER BROWN:   Very good.  And you
14  passed your GED in 1987?
15     INMATE BERTOLDO:   Yes.
16     DEPUTY COMMISSIONER BROWN:   Now, it shows that
17  you were involved in college classes, but I didn't see
18  where you completed anything.
19     INMATE BERTOLDO:   That's true.  They
20  discontinued the program up at Tehachapi.
21     DEPUTY COMMISSIONER BROWN:   So you didn't
22  complete any classes?
23     INMATE BERTOLDO:   Right.
24     DEPUTY COMMISSIONER BROWN:   You participated in
25  several self-help groups, Breaking Barriers.  And it
26  says you're not a facilitator for that.
27     INMATE BERTOLDO:   Yes.

32

1          DEPUTY COMMISSIONER BROWN:    What -- what -- help

2    me out with that.  What's a facilitator?

3          INMATE BERTOLDO:    Well, I help teach the class.

4    Basically, it's a -- it's goal setting, completing goals

5    and how to cope with -- while you're setting goals, if

6    you don't accomplish them; how to start setting other

7    goals.

8          DEPUTY COMMISSIONER BROWN:    Uh-hum.  And you

9    finished a course called, Amer-I-Can?

10         INMATE BERTOLDO:    Yes.

11         DEPUTY COMMISSIONER BROWN:    Did I -- did I

12    pronounce that right?

13         INMATE BERTOLDO:    Yes.

14         DEPUTY COMMISSIONER BROWN:    What does that do?

15         INMATE BERTOLDO:    That's on self-development,

16    you know.  It's a program put out through Jim Brown

17    (phonetic).  And basically, it's how to start dealing

18    with yourself and some of the mistakes that you've made

19    in your life.

20         DEPUTY COMMISSIONER BROWN:    And you were in

21    Violence Control?

22         INMATE BERTOLDO:    Alternatives to Violence.

23    That's another program that helps you deal with violent

24    situations in -- in your life, and how to deal with them

25    and how to face them.

26         DEPUTY COMMISSIONER BROWN:    Okay.  Give me a

27    little bit more.

33

1          INMATE BERTOLDO:    Their -- their basics are --
2    what they -- they have something that's called,
3    transforming power and what that is is that anytime you
4    come into a violent situation or there's violent
5    potential to happen, they teach you how to quell that
6    violence down.    How to turn it over into a win-win
7    situation with people and so that you can get away from
8    violence.
9          DEPUTY COMMISSIONER BROWN:    And you're a
10   facilitator in that also?
11         INMATE BERTOLDO:    Yes.
12         DEPUTY COMMISSIONER BROWN:    Now, I noticed that
13   you have not been involved in AA or NA.
14         INMATE BERTOLDO:    No.  I haven't.
15         DEPUTY COMMISSIONER BROWN:    Any reason why not?
16         INMATE BERTOLDO:    No.  There isn't any reason.
17   I started the program back in '87 or '88, I think, in
18   Tehachapi.  And I don't think when I started the
19   program -- I think -- I just don't think I was ready
20   to -- to participate in the program.
21         DEPUTY COMMISSIONER BROWN:    What about other
22   self-help groups that are conducted by therapists?
23         INMATE BERTOLDO:    Excuse me?
24         DEPUTY COMMISSIONER BROWN:    What about self-help
25   groups that are conducted by therapists or therapy
26   groups rather than self-help groups?
27         INMATE BERTOLDO:    I --

34

1             DEPUTY COMMISSIONER BROWN:   Have you gotten

2  involved in any of those?

3             INMATE BERTOLDO:   No.  I haven't had that

4  opportunity yet.

5             DEPUTY COMMISSIONER BROWN:   Are they not

6  available?

7             INMATE BERTOLDO:   Other than the programs that

8  I've taken now, those are the only ones that were

9  available to me.

10            DEPUTY COMMISSIONER BROWN:   Is there anything

11  else about your in-prison behavior that the panel needs

12  to know about?

13            INMATE BERTOLDO:   No.  I don't think so.

14            DEPUTY COMMISSIONER BROWN:   There are a number

15  of psychological and psychiatric evaluations that have

16  been prepared over the years.

17            ATTORNEY JALLINS:   Can I -- can I just note for

18  the record, he also -- I think he has Morals and Values,

19  and I think he MAC, Men's Advisory Council, Chairman --

20  Vice-Chairman now -- Men's Advisory Council,

21  Vice-Chairman now.

22            DEPUTY COMMISSIONER BROWN:   What was the first

23  thing that you said?

24            ATTORNEY JALLINS:   Morals and Values.

25            DEPUTY COMMISSIONER BROWN:   Is that through the

26  chaplin?

27            INMATE BERTOLDO:   Yes.  It's through the Rabbi.

35

1            DEPUTY COMMISSIONER BROWN:    What -- what does

2   that do?

3            INMATE BERTOLDO:    He's just started the program

4   out, but basically it was -- my understanding of it

5   was -- before I took this class I used to think that

6   each individual person carried his own morals and

7   values, basically they do.   But I think my problem

8   before I started this class was that I thought I had my

9   own set of morals and values and standards.   And I think

10   that's -- that was my problem.

11           DEPUTY COMMISSIONER BROWN:    How long have you

12   been in that class?

13           INMATE BERTOLDO:    I completed it approximately

14   three weeks ago.

15           DEPUTY COMMISSIONER BROWN:    And who conducts it?

16           INMATE BERTOLDO:    The Rabbi.   I --

17           DEPUTY COMMISSIONER BROWN:    How often?   I saw

18   the chrono, but I --

19           INMATE BERTOLDO:    I think it's -- it's a

20   nine-week course and as soon as one's over with, he

21   waits about two weeks and he starts the next one.

22           DEPUTY COMMISSIONER BROWN:    Is there anything

23   else?

24           INMATE BERTOLDO:    No.

25           DEPUTY COMMISSIONER BROWN:    Okay.   The first

26   report is dated May the 19th, 1986, by Charles B.

27   Willis, W-i-l-l-i-s, and he gives a summary that says,

1    "We have here a man who reveals no sign of psychosis or

2    organic brain syndrome.  He diagnostically can be seen

3    as an antisocial personality.  He is responsible for his

4    actions.  Prognosis seems guarded since he has had a

5    long history of antisocial acting out since 1969."

6              The next report I'm going to read portions

7    of is by F. A. Matychowiak, M-a-t-y-c-h-o-w-i-a-k, M.

8    D., Psychiatric Consultant.  And he says the impression

9    he gets is "Personality disorder, antisocial type.

10   Diagnosed psychopathology is part of his present

11   offense.  During observation in the institution, he

12   seems to me to be just now beginning to show evidence of

13   some significant change.  Conditions of parole would

14   need to include quite close supervision of associates

15   and activities.  For maintenance of regular work of

16   substance would help (inaudible) system and would

17   (inaudible) the need to impress others.

18   Recommendations, basically, that he (inaudible) trade

19   and subsequent to that, be considered for stress

20   assessment, unit evaluation concerning improvement in

21   his ability to handle (inaudible)."

22             A. M. Charlens is the next one, date of

23   8/27/88 is up at the top for those that are following.

24   And again, the diagnosis:  "Antisocial personality.

25   Conclusion:  The criminal history of this inmate is

26   directly related to the above diagnosis.  There is

27   little to suggest that he would conform without external

37

1    controls." And he spells the name, C-h-a-r-l-e-n-s,

2    PhD.

3            The next one I'll look at is dated October

4    the 15th, 1991. That is prepared by Marjorie

5    Tavouleris, T-a-v-o-u-l-e-r-i-s, M. D., Senior

6    Psychiatrist. "Diagnosis: Poly drug abuse by history.

7    Antisocial personality disorder. Recurring

8    osteporitis -- poresis (phonetic) of the right leg."

9    Did you have surgery on your leg or something?

10         INMATE BERTOLDO:   I've got a prosthesis on my

11    right leg.

12         DEPUTY COMMISSIONER BROWN:   "Diagnosis and

13    recommended treatment:  It is difficult to assess

14    whether the self-professed introspection of the last

15    years have held a definitive change in the antisocial

16    character pathology in this man. He has had a serious

17    drug problem and even if motivated to remain drug free,

18    he has never learned how to do so. Close observation

19    over the next year or so may give evidence to whether or

20    not he is maturing or whether his verbalized

21    self-criticisms are for, quote, "show," end quote. If

22    genuine, he should be encouraged to involve himself in

23    psychotherapeutic efforts, including self-help groups.

24    At the moment, he as has been offended by superficial

25    issues in AA that has very little, if any, to do with

26    the 12-step program. I would assess his impulse control

27    to be average for this inmate population. His

1    propensity for violence has probably dropped to at least

2    average for this inmate population." And she's talking

3    about Tehachapi, 4-B, that has some bad fellows in it.

4    Right?

5         INMATE BERTOLDO:    Yes.

6         DEPUTY COMMISSIONER BROWN:    The final one is

7    dated July the 8th, 1993 and that is prepared by S. A.

8    Mennuti, PhD, spelled, M-e-n-n-u-t-i, Clinical

9    Psychologist. "Diagnosis:  Mixed substance abuse

10   disorder, alcohol, methamphetamines. Antisocial

11   personality." And the conclusion:  "The diagnosed

12   psychopathology, while not directly related to the

13   commitment offense, strongly predisposed him to commit

14   it.

15             "During observation in the institution, the

16   inmate has begun to make psychological changes. While

17   these are in the right direction, they are relatively

18   recent and must be maintained over a longer period of

19   time. Additionally, while they are a good beginnings,

20   significant other changes must occur. This has also

21   been discussed at length with the inmate. In a less

22   controlled setting such as return to the community, the

23   inmate's ability to hold his present gains is good if he

24   is able to refrain from using drugs or alcohol." And

25   then she makes some suggestions for you to get into

26   various programs. Do you have any comments on your

27   psychiatric evaluations or psychological evaluations?

39

1          INMATE BERTOLDO:   No.  I don't.

2          DEPUTY COMMISSIONER BROWN:   Then I'll return it

3    to the Chair.

4          PRESIDING COMMISSIONER GUADERRAMA:   Mr.

5    Giaquinto will now discuss parole plans with you.

6          COMMISSIONER GIAQUINTO:   Mr. Bertola

7    (phonetic) -- Bertoldo, if you're granted a date, you

8    intend to go to L. A. and live with your wife?

9          INMATE BERTOLDO:   Yes.

10          COMMISSIONER GIAQUINTO:   How long have you been

11    married?

12          INMATE BERTOLDO:   For approximately a year now.

13          COMMISSIONER GIAQUINTO:   Where did you meet your

14    wife?

15          INMATE BERTOLDO:   In school.

16          COMMISSIONER GIAQUINTO:   Does she work?

17          INMATE BERTOLDO:   No.  Right at the time --

18    she's -- there was some chemical involvement over at

19    Lockheed and which has disabled her for -- for a

20    period -- period of time.

21          COMMISSIONER GIAQUINTO:   How does she live?

22          INMATE BERTOLDO:   I think there's -- she's

23    getting unemployment at the time.

24          COMMISSIONER GIAQUINTO:   Does she --

25          INMATE BERTOLDO:   And she --

26          COMMISSIONER GIAQUINTO:   -- have a home?

27          INMATE BERTOLDO:   Yes.  And lives with her

40

1    mother.  Her mother lives with her.  They live together.

2              COMMISSIONER GIAQUINTO:   Do you have any

3    prospects for work or what you're going to do?  I know

4    you've done some drafting, but you don't -- according to

5    the reports, you don't anticipate being able to get a

6    job in the drafting field.

7              INMATE BERTOLDO:   No.  I -- I can -- I still

8    keep up my drafting communications with the vocational

9    colleges that's out there.  At the time I made that

10   statement, I didn't think I'd ever be getting out and I

11   may not.  And --

12             COMMISSIONER GIAQUINTO:   At the time you made

13   what statement?

14             INMATE BERTOLDO:   That statement about the

15   drafting --

16             COMMISSIONER GIAQUINTO:   About --

17             INMATE BERTOLDO:    Getting -- not getting a job

18   in drafting.

19             COMMISSIONER GIAQUINTO:   That was in July?

20             INMATE BERTOLDO:   Yes.

21             COMMISSIONER GIAQUINTO:   What was that, three

22   weeks ago?

23             INMATE BERTOLDO:   Oh, no.  Was that when I made

24   that statement?

25             COMMISSIONER GIAQUINTO:   July 15th, '93 report.

26   It's the Board report.  It says that you're a certified

27   draftsman, but you hold little hope as securing

41

1    employment in that field, because of your age.

2    INMATE BERTOLDO:    I -- I just didn't feel that

3    any company would hire a paroled murderer who's

4    50-year's-old, looking for a drafting job.    I -- at the

5    time, that's what went through my mind.

6    COMMISSIONER GIAQUINTO:    So you have no

7    prospects, in terms of employment, on the outside;

8    right?    And you have no promises of employment or is

9    there any letters?    Is there anything that I'm not aware

10   of, regarding employment or --

11   INMATE BERTOLDO:    No, no.

12   COMMISSIONER GIAQUINTO:    -- perspective

13   interviews for employment?    It says that you want to

14   attend barber college following a release?

15   INMATE BERTOLDO:    Those are my intentions.

16   COMMISSIONER GIAQUINTO:    And you're also going

17   to vocational optical technician program; right?

18   INMATE BERTOLDO:    Yes.

19   COMMISSIONER GIAQUINTO:    Here at RJD?

20   INMATE BERTOLDO:    Yes.

21   COMMISSIONER GIAQUINTO:    So you really don't

22   have any vocational that you're really going to pursue

23   then.

24   INMATE BERTOLDO:    The optical, I -- I am

25   pursuing.

26   COMMISSIONER GIAQUINTO:    What about being a

27   barber?

1    INMATE BERTOLDO:   Well, if I go out, that's my

2    intentions.  I did want to become a barber, but I will

3    need other vocations with the job market that's out

4    there right now.  I know that I just can't go out there

5    and get in one -- into one field.  If I have more

6    vocations than I have more -- more opportunity to go out

7    there.

8    COMMISSIONER GIAQUINTO:   Okay.  The appropriate

9    3042 notices went out and that would be notices to

10   interested parties, regarding this hearing.  And of

11   course, the District Attorney's Office is represented

12   here today.  Mr. Dahle will speak on their behalf at

13   some point in time.  There is a response in here from

14   the Office of the Sheriff for the County of Los Angeles

15   and it's from Sherman Blott (phonetic), the Sheriff, by

16   Don Brooks (phonetic), the Captain of Homicide Division.

17   And in response to this particular incident and

18   basically in the letter he summarizes the events and

19   then says:

20           "The day following the murder, the inmate

21   Bertoldo pawned some of the victim's jewelry, which was

22   ultimately -- ultimately recovered.  Two days later,

23   inmate Bertoldo was arrested and had in his possession

24   the murder weapon, which had been stolen from the

25   victim's residence.  Due to inmate Bertoldo's long

26   standing criminal and violent nature, and his total

27   disregard for human life and the laws of decent society,

1    it's the opinon of this department that he would present
2    a significant threat to the community should he be
3    released.  We recommend parole be denied."  And that's
4    the only letter that I'm aware of.  Do you have any
5    other letters in support or anything from your wife
6    or --
7              INMATE BERTOLDO:    No.
8              COMMISSIONER GIAQUINTO:    -- relatives?
9              INMATE BERTOLDO:    No.
10             COMMISSIONER GIAQUINTO:    No letters.  If -- if
11   you get out and you don't have a vocation and you're
12   going to go to barber school, and your wife's not
13   working, and she's disabled, and she's living with her
14   mother; how are you going to make it?
15             INMATE BERTOLDO:    I'll just keep trying to find
16   a job.  That -- that the only thing that's -- that's
17   going to keep me going out there if I -- if I was to get
18   a parole.  I would keep looking for a job.  There's --
19   there's a lot of people that are out of jobs out there.
20   I know that.  And they're doing the same thing.  They're
21   going out everyday and looking for jobs.  And if that's
22   what it took, that's what I would try to do.  I would
23   have to.  There is no option for me.  There's no option
24   of -- that is not an option for me, of coming back to
25   jail.  I realize that.  I know that.
26             COMMISSIONER GIAQUINTO:    Okay.  I'll return it
27   to the Chair.

44

1          PRESIDING COMMISSIONER GUADERRAMA:    How do you

2    feel about the victim?

3          INMATE BERTOLDO:    I don't know if I can -- I

4    don't know if anyone, besides the victim's family, can

5    know how -- how to feel about him there.    I know this,

6    that my feelings as to what happened to the victim, what

7    I caused the victim and what the victim must have gone

8    through at the time that it -- it was happening, it was

9    horrible.    If -- I have been in the situation like that

10   where I had been laying down dying.    So I know how I

11   felt at that time and I can relate that to what that

12   person felt.    I've never, as I said, I only just started

13   thinking about these things and it's -- it's -- it's a

14   hard thing to think about.    I don't want to, but it's --

15   it's there.

16         PRESIDING COMMISSIONER GUADERRAMA:    In light of

17   what you just said about just starting to recognize some

18   of the problems that you caused, do you think you're

19   ready for a parole date?

20         INMATE BERTOLDO:    Yes.    I am ready.

21         PRESIDING COMMISSIONER GUADERRAMA:    Okay.    Mr.

22   Giaquinto, questions?

23         COMMISSIONER GIAQUINTO:    Yeah.    I -- I have some

24   concerns.    And the way I understand this and if the

25   family would please forgive me, the victim was a drug

26   dealer, basically, and that was the crux of the matter;

27   right?

1          INMATE BERTOLDO:    Basically.    I don't know what

2      his whole life was about.    I know that he was a

3      contractor.    He worked hard.    I know that.    But I also

4      know --

5          COMMISSIONER GIAQUINTO:    Just answer my

6      question.    Was he a drug dealer?

7          INMATE BERTOLDO:    Yes.

8          COMMISSIONER GIAQUINTO:    And you were dealing

9      with him?

10         INMATE BERTOLDO:    Yes.

11         COMMISSIONER GIAQUINTO:    So you went over there

12     that day to -- to talk about drugs.

13         INMATE BERTOLDO:    I went over there to pick my

14     money up.    That's what the original phone call was

15     about.

16         COMMISSIONER GIAQUINTO:    Did the issue of drugs

17     or him having been a drug dealer ever come up in the

18     trial?

19         INMATE BERTOLDO:    No.    At the trial, I did not

20     take the witness stand and I did not give my side of it.

21     I was --

22         COMMISSIONER GIAQUINTO:    You didn't tell your

23     attorney about this?    Did he ever try to elicit any

24     testimony relative to the victim being a drug dealer?

25         INMATE BERTOLDO:    I think he was headed towards

26     that way or --

27         COMMISSIONER GIAQUINTO:    In other words, no?

46

1    INMATE BERTOLDO:   No.

2    COMMISSIONER GIAQUINTO:   Just the yes or no will

3    do fine.  Now, you went in there to talk to this victim

4    about drugs and you got into a disagreement with him,

5    and there was a verbal altercation and then it resulted

6    in a physical altercation.

7    INMATE BERTOLDO:   No.  I went there to talk to

8    him about the money that he owed me, then the subject of

9    drugs came up.

10   COMMISSIONER GIAQUINTO:   What did he say to you

11   about the drugs?

12   INMATE BERTOLDO:   He asked me if it was going to

13   go through.

14   COMMISSIONER GIAQUINTO:   And what did you tell

15   him?

16   INMATE BERTOLDO:   I told him I hadn't gotten in

17   touch with the people.

18   COMMISSIONER GIAQUINTO:   And what did he say?

19   INMATE BERTOLDO:   That's when he started getting

20   angry that he had the stuff that was sitting there

21   ready.  He bought it.

22   COMMISSIONER GIAQUINTO:   Well, what did he say?

23   "I'm angry that you didn't --

24   INMATE BERTOLDO:   I don't remember --

25   COMMISSIONER GIAQUINTO:   -- stay in touch with

26   these people."

27   INMATE BERTOLDO:   -- word for word what he said.

47

1    But I know that he was angry.

2            COMMISSIONER GIAQUINTO:    Did he call you a name,

3    say you were stupid for letting --

4            INMATE BERTOLDO:    Not at that time.

5            COMMISSIONER GIAQUINTO:    -- these people go?

6    What did he do?

7            INMATE BERTOLDO:    No.  Not at that time.

8            PRESIDING COMMISSIONER GUADERRAMA:    Well,

9    you're --

10           INMATE BERTOLDO:    That's what --

11           COMMISSIONER GIAQUINTO:    You're --

12           INMATE BERTOLDO:    -- we started talking about.

13           COMMISSIONER GIAQUINTO:    --painting a picture of

14   a man that's extremely angry at you because you didn't

15   put the drug deal together.

16           INMATE BERTOLDO:    Right.  When I walked in there

17   he was not extremely angry at me.

18           COMMISSIONER GIAQUINTO:    No.  At this point in

19   time, he became angry at you?

20           INMATE BERTOLDO:    It's started to -- it started

21   to get heated at that time.

22           COMMISSIONER GIAQUINTO:    Okay.

23           INMATE BERTOLDO:    The conversation first started

24   out --

25           COMMISSIONER GIAQUINTO:    But you don't remember

26   what he said?

27           INMATE BERTOLDO:    He wanted -- he would -- kept

1   pushing the issue of me trying to get in touch with the

2   people and why was I stupid enough to let them go like

3   that.  Did I understand how much money was involved and

4   how much money he had already spent to buy the drugs.

5       COMMISSIONER GIAQUINTO:    Well, it's interesting

6   that today you paint a picture of this victim as a being

7   involved in drugs and it never came out -- it never came

8   out in the trial.  And I don't see it anywhere in any of

9   the transcripts.  I don't see it in your Appellate

10  Decision.  I -- I basically don't see it anywhere.  In

11  fact, what I do see is that you didn't have any money.

12  You were unemployed.  You had use of a vehicle.  You

13  knew the guy was wealthy.  He had employed your brother

14  before.  He had foreclosed on your brother's residence.

15  He was a guy that had a lot of jewelry and a lot of

16  money.  He lived alone in a residence.  He was somewhat

17  secluded.

18           And you were a person that knew him.  You

19  went over there.  That's what I see in the record.  So

20  the picture you're painting today is -- is kind of

21  different.  I guess you, after this altercation went

22  down, which you didn't plan and you didn't intend to

23  hurt him, even though you had gotten into this

24  altercation and stabbed him several times, then went

25  back and shot him, which was basically the cause of

26  death, was the gunshot wound to the head.  You must have

27  felt pretty bad.

1        INMATE BERTOLDO:    Excuse me?

2        COMMISSIONER GIAQUINTO:    Did you feel pretty bad

3  about killing this guy?

4        INMATE BERTOLDO:    I felt scared.

5        COMMISSIONER GIAQUINTO:    You were scared.

6        INMATE BERTOLDO:    Yes.

7        COMMISSIONER GIAQUINTO:    And you didn't intend

8  to go over there and rob him.  That was --

9        INMATE BERTOLDO:    I haven't starting feeling --

10        COMMISSIONER GIAQUINTO:    -- not your intention

11  of going over there.

12        INMATE BERTOLDO:    -- bad about this person until

13  lately.

14        COMMISSIONER GIAQUINTO:    So then after you left

15  there, you felt so bad you went out and you took

16  pictures of yourself with the loot that you took from

17  the house.  Is that correct?

18        INMATE BERTOLDO:    I -- I --

19        COMMISSIONER GIAQUINTO:    Did you take pictures

20  with --

21        INMATE BERTOLDO:    No.  I just said --

22        COMMISSIONER GIAQUINTO:    -- the gun?

23        INMATE BERTOLDO:    -- I didn't feel bad for him.

24  I was in total denial.

25        COMMISSIONER GIAQUINTO:    Wait a minute.  My

26  question was, did you take pictures of yourself with

27  some of the loot that you had taken from the residence?

1      INMATE BERTOLDO:   I think there was a picture

2  where the guns were on the bed or something like that,

3  yes.

4      COMMISSIONER GIAQUINTO:   Well, what the

5  Appellate Court Decision says is that you posed with the

6  guns from the victim's collection and with your

7  girlfriend.  Basically, you didn't go there intending to

8  rob him and you just went there to talk about other

9  things, and this unfortunate thing went down because the

10  victim was a drug dealer.  Then you decided to take his

11  cash, his gold, his watch, his bracelet, his rings, his

12  gun, his rifles, his safe, and his wallet.  Is that

13  about the way it boils down?

14      INMATE BERTOLDO:   Yes.

15      COMMISSIONER GIAQUINTO:   Okay.  I have no

16  further questions.

17      PRESIDING COMMISSIONER GUADERRAMA:   Mr. Brown?

18      DEPUTY COMMISSIONER BROWN:   I have no questions.

19  Thank you.

20      PRESIDING COMMISSIONER GUADERRAMA:   Mr. Dahle,

21  any questions?

22      ASSISTANT DISTRICT ATTORNEY DAHLE:   Yes.  Mr.

23  Bertoldo has told the panel that he just recently began

24  thinking about what he'd been involved in, this year.   I

25  would like the panel to inquire of him if, in fact, he

26  recalls in 1991, telling Doctor Tavouleris in her

27  psychological (inaudible) the same thing?  That he'd

51

1       only recently, in the last year, began thinking about

2       having feelings about this particular killing?

3               PRESIDING COMMISSIONER GUADERRAMA:   Do you

4       recall telling Doctor Tavouleris?

5               INMATE BERTOLDO:   I -- you said that was '91?

6               ASSISTANT DISTRICT ATTORNEY DAHLE:   1991.

7               PRESIDING COMMISSIONER GUADERRAMA:   Okay.

8       Respond to the panel.

9               INMATE BERTOLDO:   Yes.  That's when everything

10      started coming up.  When I started speaking with her we

11      were talking on a one-on-one basis and I think she did

12      this report after we were talking on a one-on-one basis.

13      And --

14              PRESIDING COMMISSIONER GUADERRAMA:   Okay.  What

15      is recent to you?  You mentioned -- you used the word --

16      term "recent" here today, also.

17              INMATE BERTOLDO:   From '91, is when she was the

18      one that started bringing it out about it and I started

19      talking more about it from that point on.

20              ASSISTANT DISTRICT ATTORNEY DAHLE:   I would like

21      to know if Bertoldo made the comment attributed to him

22      by Doctor Mennuti in this July 8th, 1993 psychological

23      report, when he went over to the victim's house to

24      collect a drug debt from the victim.

25              PRESIDING COMMISSIONER GUADERRAMA:   Okay.  Did

26      you tell the doctor that?

27              INMATE BERTOLDO:   I told the doctor that we had

52

1    had drug deals, but the debt was through money that he

2    owed me for a job that I'd done for him, a flooring job.

3        PRESIDING COMMISSIONER GUADERRAMA:    So either

4    the doctor erred in his report -- you're saying that's

5    not true?

6        INMATE BERTOLDO:    No.  That's -- no, that's not

7    true.  I went there to collect $350 from a job that I

8    had done.  But, yes, I -- I remember talking with Mr.

9    Mennuti and telling him all about the drug deals that me

10   and Dave (inaudible).

11       ASSISTANT DISTRICT ATTORNEY DAHLE:    I would like

12   to know if Mr. Bertoldo recalls stabbing Mr. Simmarly in

13   the back area?

14       PRESIDING COMMISSIONER GUADERRAMA:    Do you

15   remember stabbing him in the back?

16       INMATE BERTOLDO:    No.  I don't.  I remember

17   stabbing a lot.

18       PRESIDING COMMISSIONER GUADERRAMA:    Is it

19   possible that you stabbed him in the back?

20       INMATE BERTOLDO:    Sure.

21       PRESIDING COMMISSIONER GUADERRAMA:    And that's

22   not the way you described it today.  Everything was the

23   forward thrusting, moving towards your --

24       INMATE BERTOLDO:    I remember swinging a couple

25   of times when we were wrestling on the floor and that's

26   when I stood up to get up.  When I stood to get up he

27   started -- he got up right after I did and that's when

1    he started going forward towards me.

2            PRESIDING COMMISSIONER GUADERRAMA:    Okay.

3            ASSISTANT DISTRICT ATTORNEY DAHLE:    I have no

4    other questions.

5            PRESIDING COMMISSIONER GUADERRAMA:    Okay.    Mr.

6    Jallins, any questions?

7            ATTORNEY JALLINS:    Robert, there's some

8    suggestion in the sentencing transcript that you -- that

9    your relatives had been calling the victim's families

10   house.  Do you want to address that?

11           INMATE BERTOLDO:    Yes.  At the ending of -- or

12   at sentencing day, Mr. Rogers came into court, stating

13   that his -- how he felt things.  And at the time, I -- I

14   didn't get the gist of it, but I can imagine how he

15   feels.  But he did say something about that people were

16   calling his home and threatening him, something to that

17   effect.  And he was in contact with Mr. Reardon

18   (phonetic) and Mr. Reed (phonetic), who were the

19   investigators --

20           PRESIDING COMMISSIONER GUADERRAMA:    Speak to the

21   panel.

22           INMATE BERTOLDO:    -- detective investigators

23   that were there.  And Mr. Reed -- because I talked with

24   Mr. Reed and Mr. Reardon and they told me that they

25   never had gotten any complaints from the Rogers' family,

26   stating that there was any threats to that house.

27           ATTORNEY JALLINS:    Okay.  And you don't know of

54

1    anything -- nothing was done as far as you know?

2          INMATE BERTOLDO:    No.

3          ATTORNEY JALLINS:    Okay.  In any of the

4    questions that the Board has asked or Mr. Dahle has

5    asked, do you want to respond more fully to or go -- and

6    just the questions.  It's not -- it's not time to make

7    closing statements.  It's just a --

8          INMATE BERTOLDO:    What I wanted to say to this

9    gentlemen was that I was not trying to paint a picture

10    of anyone.  What I was doing was telling the truth and

11    in the autopsy report of Mr. Dave Simmarly, he's -- they

12    had found traces of barbituates, amphetamines, and

13    alcohol in his blood stream.

14          ATTORNEY JALLINS:    Okay.

15          PRESIDING COMMISSIONER GUADERRAMA:    Is that it,

16    Mr. Jallins?

17          ATTORNEY JALLINS:    Yeah.

18          PRESIDING COMMISSIONER GUADERRAMA:    At this

19    point in the hearing we're going to go ask Mr. Dahle,

20    representing the District Attorney's Office, if he'll

21    comment on your suitability.  Mr. Dahle?

22          ASSISTANT DISTRICT ATTORNEY DAHLE:    Thank you.

23    On behalf of the County of Los Angeles, we would ask

24    that this panel deny parole at this time, as we don't

25    believe that Mr. Bertoldo is, in fact, suitable for

26    parole release.  The reasons for that are the nature of

27    the commitment offense itself, which was a homicide.

1    Although fixed by the Court as murder in the second

2    degree, I believe that the statements the panel has

3    heard here today show there was premeditation and

4    deliberation on Mr. Bertoldo's part.  In that he

5    intentionally walked over the victim, having concluded a

6    fight and having stabbed the victim, by his own words,

7    numerous times, with a .22 pistol, having heard him

8    mumble some sounds and shot him.

9           The evidence showed that he shot him in the

10   head and by his own statement, he was fearful of the

11   consequences of what had taken place that day.  He had

12   looked through the house for witnesses.  He was afraid

13   the victim would live and that he would end up, as he

14   said, right where he is today.  This was a killing to

15   eliminate any witnesses.  He did so in cold blood.

16   Whether or not there had been a mitigation, without

17   agreeing that the circumstances as he describes them

18   were true, he intentionally eliminated the victim so

19   that he would not be a position to have him convicted of

20   any criminal offense for the assaultive conduct.

21          His prior record is poor.  He has a history

22   of failing to profit from prior attempts by law

23   enforcement to correct his behavior.  He has a history

24   of drug and alcohol abuse.  His institutional

25   performance is unsatisfactory.  He has at least five

26   serious violations in the forms of CDC-115's, for

27   violence, for threats, for fighting, and for possession

1    of drugs in the correctional facility.    In addition to

2    that, he had other infractions as late as 1992, which

3    involved less serious, but out of bounds, offensive

4    language.    The psychological reports conducted in

5    support of this case are not supportive of his release.

6    They reflect that he has a diagnosis, which was

7    concurred in 1991 and I believe 1993, an antisocial

8    personality disorder.    That he is -- has a mixed

9    substance abuse disorder.

10                And that this situation of antisocial

11    personality disorder was developed first in childhood

12    and carried through adulthood.    There is no real

13    indication that he has addressed the antisocial or the

14    mixed substance abuse disorder.    In fact, the

15    recommendations are for therapy and treatment and as the

16    Doctor Mennuti indicates here, there is a need for long

17    term participation in AA and NA, as that is a part of

18    the problem in this particular case.    The offense

19    itself, by Mr. Bertoldo's own statements, involves his

20    prior consumption of alcohol and his use and abuse of

21    alcohol, heroin, and methamphetamines, and barbituates,

22    apparently.

23                He does not have strong parole plans for

24    his future, if released.    But there's a clear indication

25    from the psychiatric report here that long term study of

26    Mr. Bertoldo is necessary.    Recommending the possibility

27    of having a Category X or Category T program and

1   certainly long term participation and counseling

2   regarding drug and alcohol abuse.  It does not appear

3   that he has come to grips with that situation, nor

4   participated in any extensive, intensive therapy.  The

5   nature of the underlying offense screams out for long

6   term commitment into prison.  Granted, he has a sentence

7   of 19 years to life, but the cold, calculated manner of

8   executing the victim while he was down with numerous

9   stab wounds itself would demand extensive period of time

10  in custody.  We would ask that the panel deny parole at

11  this for the maximum of two years, based upon the

12  commitment offense and the clear indication in the

13  psychiatric reports that Mr. Bertoldo needs long term

14  treatment and care.  And for all these reasons, we

15  believe he would pose an unreasonable risk if the panel

16  was to now grant him a date.  We would ask it denied.

17  Thank you.

18          PRESIDING COMMISSIONER GUADERRAMA:    Thank you,

19  Mr. Dahle.  Mr. Jallins?

20          ATTORNEY JALLINS:    It's important to keep in

21  mind and I -- I remind the Board that he was convicted

22  of second degree murder.  And as try -- in all due

23  respect to the District Attorney's Office, as much as

24  they would like to still try to find him guilty of first

25  degree murder with the special circumstances, that did

26  not happen.  The Judge in this case looked at the

27  evidence and determined that he -- he didn't -- he

58

1    did -- that the robberies and the thefts were committed

2    after the crime and there's no indication that he

3    actually went over for the purpose of robbing.  In fact,

4    the Appellate Court Decision indicates there was no

5    forced entry.  Obviously, part of -- at least in the

6    beginning, he went over there with the thought of

7    meeting with Mr. Simmarly and did not go there with the

8    thought that he was going to commit any offense.  Aside

9    from all that, he had taken responsibility for the

10   crime.

11              Albeit in the last couple of years, but he

12   has taken responsibility for the crime and he

13   essentially agrees with everything that was in the

14   probation officer's report.  I don't think it was his

15   intent to paint the victim in a terrible theme.  I think

16   he's just telling you the truth.  I think he's

17   explaining to you the relationship that he had with Mr.

18   Simmarly, but I don't think he -- he has tried to or has

19   intended to paint Mr. Simmarly in a less than

20   favorable -- favorable light.  I think he takes

21   responsibility for the crime.

22              And whatever Mr. Simmarly was, I think he

23   made it clear that he has -- and the reports indicate

24   that he -- in fact, his last psychological evaluation

25   indicates that he expressed genuine remorse for the

26   effects this has had on the -- on the victim's family.

27   And so I -- I think -- I think he had made it clear to

1    the Board how he feels about the victim.  He did work

2    legitimately.  His background indicates he worked for

3    several contractors, laying floors, installing aluminum

4    siding and patios.  I noted that he was a Boy Scout as

5    a -- as a child, so he made several attempts in his

6    social history to try to function within the bounds

7    of -- of the law.

8              In terms of his institutional adjustment,

9    keep in mind one thing, we -- you know, we look at -- at

10   Mr. Bertoldo as a snapshot in history and the history he

11   comes before you is a very different person than he was

12   nine years ago when he first came to the institution.

13   He has remained disciplinary free for over four years.

14   He has upgraded educationally by getting his GED, which

15   was recommended by the Board.  He has completed on

16   vocational program of vocational drafting and within the

17   next year will complete a second one in optical

18   technician.  So he does have marketable skills that he

19   will talk out in the community.

20             He has had a wide variety of self-help

21   activities, which were noted by the -- by the Board.

22   And his psychological evaluation does indicate that in a

23   less controlled setting the inmate would hold his gains

24   as long as he refrains from drug and alcohol, which can

25   be said about any inmate that leaves the institution.

26   In other words, as long as he stays -- understands that

27   drugs and alcohol, he will -- he will -- he can function

1    well on the outside.  And it was noticed that his

2    violence potential is decreased, and again, we're

3    looking at his reasonable risk to society.  I think a

4    lot can be said for Mr. Bertoldo.  I think this was a

5    terrible offense as any murder or -- is -- is and all

6    the adjectives are appropriate and -- and Mr. Bertoldo

7    will tell you that.

8              But the bottom line is -- is that however

9    hard you may try, keep in perspective what really

10    happened, what the Court decided happened.  It was not a

11    first degree murder.  It was not a premeditated and

12    deliberate murder, because that's not the -- the jury

13    may have found that, but the Judge -- Judge rejected

14    that.  And whatever robberies -- whatever happened

15    occurred after the murder and -- and in terms of his --

16    in terms of his -- in terms of the over -- you know,

17    overall perspective of the murder, keep that in mind.

18    That that was the decision by the Court and decision by

19    the Judge as to how this would be treated.  It doesn't

20    mitigate the offense, but I think that his -- it was

21    suggested in this hearing as his reasons for going over

22    there was to rob and I don't think that was determined

23    by the Judge to be so.  And with that I will submit the

24    case.

25              PRESIDING COMMISSIONER GUADERRAMA:   Okay.  Mr.

26    Bertoldo, would you like to make a statement to the

27    panel?

61

1     INMATE BERTOLDO:    Yes.  There -- I -- I don't --
2   I -- I feel nervous.  I think my -- the biggest feeling
3   on -- on that, being -- feeling nervous, mainly because
4   the victim's family is here.  I've been in front of
5   classification Boards and I know they don't even compete
6   with a Parole Board, but I had asked my attorney if the
7   family was going to be here or not and he didn't know.
8   And I thought they were not going to be here.  Probably,
9   to make myself feel better.  There's a lot of shame,
10   guilt, a lot of emotions that -- that go through me.
11   And I don't think one or all of those emotions can
12   compete with the emotions that that family feels.
13   Someone mentioned that if I would have been arrested for
14   the things that I had gotten away with, maybe that
15   person, Dave Simmarly wouldn't be dead today.  And that
16   didn't happen.  I understood that he had a grandson.
17     PRESIDING COMMISSIONER GUADERRAMA:    Okay.  I'm
18   going to mention that you have an opportunity to make a
19   statement concerning your suitability for parole.  So if
20   you'll confine your remarks to that.
21     INMATE BERTOLDO:    Suitability for parole.  We're
22   all born free and that stays within us.  Yes, I don't
23   want to be locked up.  Yes, I know what I did and I -- I
24   must go with what the parole hearing finds on that.  My
25   suitability for -- for parole.  Whether I was paroled or
26   whether I stay here, the incident will always stay in my
27   mind.  That's -- I think that's all I can say about

1    that.  The incident of that night will always be with

2    me, always.  I don't want to be in jail.  But I did

3    something that I know if someone did to my family I

4    would want that person to stay in jail for the rest of

5    his life.  And -- but I feel and I know with the things

6    that have been happening in life and the decisions that

7    I've been making, that I can make right decision now.

8    And I can make right decision while on parole.  Because

9    this is not an option for me.

10           PRESIDING COMMISSIONER GUADERRAMA:   Okay.  Is

11   that it?

12           INMATE BERTOLDO:   Yes.

13           PRESIDING COMMISSIONER GUADERRAMA:   Okay.  At

14   this point, we're going to hear from Kathy Rogers,

15   the -- the daughter of the victim.  She has a statement

16   that she'd like to make before the panel.

17           MS. ROGERS:   Okay.  I would just like to say

18   that -- that April the 13th, 1981 was one of the worst

19   days of my and my families lives.  Robert Bertoldo went

20   into my father's home and viciously attacked him and

21   murdered him.  That morning, I was supposed to be at his

22   house.  As a matter of fact, my husband was there hours

23   previous to that with my son and my son was almost left

24   with my father.  And what I've always wondered is, what

25   would have happened to my son?  What would have happened

26   if I and my other child would have been there?  I was

27   not even 18-year's-old.  My husband was the one to have

1    to find him.  He has to live with that memory of seeing

2    my father brutally cut up, his face cut from his mouth

3    to his ear, every single day of his life.  I can't even

4    talk to him about it because it's too hurtful for him to

5    talk about it.  The rest of my family, my grandmother,

6    my father's mother, my grandfather, they all suffered.

7    My aunt, my uncle -- if my uncle wouldn't have suffered

8    a stroke a couple of months ago, he probably would have

9    been here today.

10            My father was a very good person.  As a

11   matter of fact, I brought pictures.  And I know probably

12   none of you ever knew what he looked like and I know how

13   the -- you know -- this is a picture that was probably

14   taken maybe six months to a year before my father's life

15   was taken.  And if he wasn't dead right now, he'd be

16   living in Colorado where he planned to retire.  And my

17   grand -- my kids would have a grandfather, because he

18   loved them.  He took my son everywhere he went.  And

19   thank God, that morning my son, for some reason, didn't

20   want to stay with grandpa and went with his daddy to do

21   what they had to do, but was there with my husband when

22   he was found.

23            Thank God, he was too young to remember,

24   you know, what he might have seen.  And as far as I'm

25   concerned, I feel that he should stay in prison for as

26   long as -- as long as possible.  You can't commit a

27   crime like this and expect to be let out into society.

1    Everyone gets angry at people, but they don't go around
2    murdering them.  But the ones that do murder, they need
3    to be locked up and kept away from people.  As we all
4    know, crime is on the increase and not on the decline
5    and I think that we need to start setting examples by --
6    by keeping these people incarcerated.  I can't -- I
7    can't bring him back.  And -- and I just know that he
8    shouldn't be let out.
9         PRESIDING COMMISSIONER GUADERRAMA:   Thank you.
10    Thank you, Ms. Rogers.  Would you exchange seats with
11    your husband.  And Mr. Dale Rogers, at this time, will
12    make a statement.  Thank you.
13         MR. ROGERS:   Well, all -- apparently, my wife
14    said most of it.  I do see my father-in-law's face and,
15    you know, it's real hard for me.  Okay.  The thing that
16    he's done, he murdered my father-in-law.  Okay.  That's
17    true.  But it just didn't stop there.  Today, as today,
18    we're still paying for it.  Because at that time they
19    didn't have certain, you know, they had laws on will and
20    stuff.  Well, my father-in-law got triple -- we got
21    triple taxed because he didn't have a will.  Okay.
22    The -- the -- the IRS came in.  They taxed things on
23    him.  But we're still paying -- we're still paying for
24    that.  We can't get a loan on our own house because of
25    this.  And yes, I -- we did get threatening phone calls
26    saying that when -- if we didn't do certain things or
27    when he got out he was going to kill me, my son and my

1  wife, and anyone else.  Yes, he -- that was said.  I

2  don't know if it was by him or his brother or whoever,

3  but that was told to me.  You know, when the Judge

4  reduced the sentence I went to the Judge, I asked him

5  how can this happen.  And the Judge came to me and says,

6  "I don't have to give a reason.  I just did it."  That's

7  what he told me.  That's what I understood.  You know, I

8  don't have too much say, but, you know, but please don't

9  let him out, for the safety of my family.

10        PRESIDING COMMISSIONER GUADERRAMA:  Okay.  Thank

11  you, Mr. Rogers.

12        MR. ROGERS:  Because I don't believe that this

13  is just one killing, I think this is something that's --

14  he has no remorse.  He doesn't care about his fellowman.

15  Now, I am a Christian now and I have a problem with the

16  church because they told me -- they tell me I should

17  forgive him.  But I tell them, "If you saw my father

18  laying on the ground, how could you forgive something

19  like that?"  I can't.  That's all I have to say.

20        PRESIDING COMMISSIONER GUADERRAMA:  Thank you.

21  Okay.  We're going to be in recess.  The time is 10:25.

22  We'll ask the prisoner to leave first and then we'll

23  call him back when we have a decision.

24

25                    R E C E S S

26

27                    --o0o--

66

1        CALIFORNIA BOARD OF PRISON TERMS

2                    D E C I S I O N

3        PRESIDING COMMISSIONER GUADERRAMA:    The time now

4   is 10:40 a. m. and everyone that was present before the

5   break is back in the room again.   Mr. Bertoldo, we have

6   a unanimous decision.   The panel reviewed all the

7   information received from the public and relied on the

8   following circumstances in concluding that you're not

9   suitable for parole and would pose an unreasonable risk

10  of danger to society and a threat to public safety if

11  released from prison.   The offense was carried out in a

12  manner which exhibits a callous disregard for the life

13  and suffering of another.   The victim was abused,

14  defiled, or mutilated during or after the offense.   The

15  murder of the victim did not deter the prisoner was

16  later committing other criminal offenses, specifically,

17  you robbed the victim of his possessions.

18           These conclusions are drawn from the

19  statement of facts wherein the prisoner went to the home

20  of the victim, following an argument, he stabbed him 16

21  times.   Later, as the victim was struggling and gasping,

22  the prisoner shot him in the face, killing him.   The

23  prisoner then ransacked the victim's home, stealing his

24  property.

25           The previous record.   The prisoner has a

26  record of violence or assaultive behavior, an escalating

27  ROBERT BERTOLDO   C-94377    DECISION PAGE 1      8/17/93

EX. D

1    pattern of criminal conduct and/or violence, a

2    persistent pattern of tumultuous relationships and

3    criminal behavior which commenced at any early age, an

4    unstable social history. He's failed previous grants of

5    probation and cannot be counted upon to avoid

6    criminality. He failed to profit from society's

7    previous attempts to correct his criminality.  These

8    attempts include:  Juvenile probation, county jail, two

9    prior prison terms and parole.  He has an unstable

10   social history and prior criminality, which includes a

11   long history of serious substance abuse.  He dropped out

12   of high school, had sporadic employment, has a long

13   criminal record, including felony -- felony offenses

14   that resulted in two prior prison terms.

15            Your institutional behavior.  The prisoner

16   has programmed in a limited manner while incarcerated.

17   Has not sufficiently participated in beneficial

18   self-help and therapy programming. Failed to

19   demonstrate evidence of positive change.  His misconduct

20   while incarcerated includes five CDC-115's since

21   incarceration.  The last one on 7/24/89 for stimulants

22   and sedatives.

23            The psychological report, the psychiatric

24   factors.  The psychological report dated July 8th, 1993,

25   authored by Doctor Mennuti, is unfavorable.  In that

26   report Doctor Mennuti says, "During observation in the

27   ROBERT BERTOLDO   C-94377     DECISION PAGE 2       8/17/93

1    institution, the inmate has begun to make psychological

2    changes.  While these are in the right direction, they

3    are relatively recent and must be maintained over a

4    longer period of time.  Additionally, while they are a

5    good beginning, significant other change must occur.

6    This has been discussed at length with the inmate."

7         The panel makes the following findings:

8    That the prisoner needs therapy in order to face,

9    discuss, understand, and cope with stress in a

10   non-destructive manner.  Until progress is made, the

11   prisoner continues to be unpredictable and a threat to

12   others.  Therapy in a controlled setting is needed, but

13   motivation and amenability are questionable.  The

14   prisoner's gains are recent and he must demonstrate an

15   ability to maintain gains over an extended period of

16   time.  In view of the prisoner's assaultive history

17   and/or lack of program participation, there's no

18   indication that the prisoner would behave differently if

19   paroled.  Nevertheless, the prisoner should be commended

20   for earning his GED, upgrading vocationally, and being

21   disciplinary free since July 24th of '89.  However,

22   these positive aspects of his behavior do not outweigh

23   the factors of unsuitability.

24         Okay.  Mr. Bertoldo, you're being denied

25   parole for two years.  The hearing panel finds that it's

26   not reasonable to expect that parole would be granted at

27   ROBERT BERTOLDO  C-94377    DECISION PAGE 3    8/17/93

1    a hearing during the following two years.  The specific

2    reasons for this finding are as follows:

3         One.  The prisoner committed the offense,

4    specifically he stabbed the victim 16 times --

5

6                    (End of Tape 1)

7                    (Tape 2)

8

9    PRESIDING COMMISSIONER GUADERRAMA:    Okay.  Going

10   back for the reasons for the two-year denial.  The

11   prisoner committed the offense, specifically, he stabbed

12   the victim 16 times following an argument.  He then shot

13   victim in the face, killing him in an attempt to avoid

14   prosecution.  As a result, a longer period of

15   observation and evaluation is required before the Board

16   should set a parole date.

17        Two.  The prisoner has a prior record of

18   violent behavior in that the prisoner has been convicted

19   of robbery and arrest for battery on a police officer.

20        Three.  A longer period of time is required

21   to evaluate his suitability in view of the prisoner's

22   long history of criminality and misconduct, including a

23   long history of misdemeanor and felony convictions,

24   resulting in county jail time and two prior prison

25   terms.

26        A recent psychological report, dated

27   ROBERT BERTOLDO   C-94377     DECISION PAGE 4       8/17/93

1   7/8/93, authored by Doctor Mennuti, indicates a need for

2   a longer period of observation and evaluation or

3   treatment.

4           And finally, the prisoner has not completed

5   the necessary programming, which is essential to his

6   adjustment and needs additional time to gain such

7   programming.  He has failed to participate in Alcoholics

8   Anonymous or Narcotics Anonymous.  He is encouraged by

9   this panel to learn -- and besides getting involved in

10  those program, to learn and practice the 12 steps.  All

11  panel also feels that he needs therapy to gain

12  additional insight into the life offense and the

13  problems that preceeded his commitment to the State

14  penitentiary.

15          Recommendations to the prisoner:  The panel

16  recommends that the prisoner remain disciplinary free.

17  That he work towards reducing his custody levels so that

18  program opportunities become more available.  That he

19  continue to upgrade vocationally and educationally.

20  That he participate in self-help and therapy

21  programming, specifically again, NA and AA.  That is the

22  formal decision.

23          I'd just like to say, Mr. Bertoldo, you

24  made some progress here today.  The panel still feels

25  that you need additional insight.  In part, your -- your

26  story doesn't make sense.  It's not felt by this panel

27  ROBERT BERTOLDO  C-94377      DECISION PAGE 5      8/17/93

1    that you're totally believable in the -- in your

2    explanation of the -- of what happened.  We're concerned

3    about your not involving yourself in AA and NA, in spite

4    of the tremendous problem that you had with drugs prior

5    to coming to prison and while in prison, by your own

6    admission.  You need self-help.  And the last thing I

7    can recommend for you to do is not pick up any more

8    115's.  Okay.  Because if you come back within the next

9    two years and you have 115's, it's almost like starting

10   from ground zero again.  So avoid that at all costs.

11   Okay.  Any comments by Mr. Giaquinto?

12          COMMISSIONER GIAQUINTO:   No.  Thank you.  No

13   comments.

14          PRESIDING COMMISSIONER GUADERRAMA:   Mr. Brown?

15          DEPUTY COMMISSIONER BROWN:   Good luck to you.

16          PRESIDING COMMISSIONER GUADERRAMA:   Okay.  That

17   concludes the hearing at 10:45.  This is a copy of the

18   decision.  We'll see you in two years and we want to

19   wish you well.

20                        --oOo--

21

22

23

24

25   PAROLE DENIED TWO YEARS

26   EFFECTIVE DATE OF THIS DECISION    JAN 0 3 1994

27   ROBERT BERTOLDO  C-94377    DECISION PAGE 6    8/17/93

72

## CERTIFICATION AND
## DECLARATION OF TRANSCRIBER

I, TAMARA KIZIRIAN, a duly designated transcriber, LEGAL TYPING SERVICES, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 - 71, and which recording was duly recorded at SAN DIEGO, CALIFORNIA, in the matter of the INITIAL PAROLE CONSIDERATION HEARING OF ROBERT BERTOLDO, on AUGUST 17, 1993, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated OCTOBER 14, 1993, at Sonora, California.


TAMARA KIZIRIAN
TRANSCRIBER

BOARD OF PRISON TERMS
LIFE PRISONER HEARING – EXTRAORDINARY ACTION AND DECISION

STATE OF CALIFORNIA
BPT 1001A (Rev. 10/89)

**ACTION TYPE** (select one)
☐ Waiver of Appearance
☐ Request for Postponement
☒ Waiver of Parole Consideration Hearing-Stipulation of Unsuitability

**HEARING TYPE** (select one)
☒ Parole Consideration
☐ Progress
☐ Rescission
Hearing Date **06-08-05**

## WAIVER OF RIGHT TO ATTEND HEARING

I understand that I am scheduled for the Board of Prison Terms hearing indicated above.

☐ I do not wish to attend my Board hearing and do not wish to be represented at the hearing. The hearing will be held in my absence.

☐ I do not personally wish to attend my hearing but I do wish to be represented by counsel at the hearing.

☐ I will employ counsel to represent me at the hearing.

☐ I cannot afford counsel and wish counsel appointed to represent me.

## POSTPONEMENT

I understand that I am scheduled for the Board of Prison Terms hearing indicated above.

☐ I hereby request that the hearing indicated above be Postponed to _____

The reasons for my request for a postponement are stated below.

## WAIVER OF HEARING AND STIPULATION TO UNSUITABILITY

I understand that I am scheduled for the Board of Prison Terms hearing indicated above.

☒ I waive my right to a parole consideration hearing and I waive the right to have an attorney represent me at a hearing in my absence. I find that I am unsuitable for parole based on my reasons given on this form and therefore request that you find me unsuitable.

☒ One-year Denial     ☐ Two-year Denial     ☐ Three-year Denial

PRISONER'S REASON(S) FOR REQUEST:
(For Example: Psychiatric Evaluation Not Supportive, Programming Inadequate, Cat X Incomplete, etc.)

_needs more self-help programs_

| | |
|---|---|
| Signature of Prisoner | Date **06-08-05** |
| Signature of Attorney (if applicable) | Date **06-08-05** |
| Signature and Title of Witness (CDC)  Linda A. Ludwig | Date |

NAME _____ CDC NUMBER _____ INSTITUTION _____ CALENDAR _____ DATE

BOARD OF PRISON TERMS
LIFE PRISONER HEARING – EXTRAORDINARY ACTION AND DECISION

STATE OF CALIFORNIA
BPT 1001A (Rev. 10/89)

| ACTION TYPE (select one) | ☐ Waiver of Appearance | ☐ Request for Postponement | ☒ Waiver of Parole Consideration Hearing- Stipulation of Unsuitability | |
|---|---|---|---|---|
| HEARING TYPE (select one) | ☒ Parole Consideration | ☐ Progress | ☐ Rescission | Hearing Date 10/17/00 |

## WAIVER OF RIGHT TO ATTEND HEARING

I understand that I am scheduled for the Board of Prison Terms hearing indicated above.

☐ I do not wish to attend my Board hearing and do not wish to be represented at the hearing. The hearing will be held in my absence.

☐ I do not personally wish to attend my hearing but I do wish to be represented by counsel at the hearing.

  ☐ I will employ counsel to represent me at the hearing.

  ☐ I cannot afford counsel and wish counsel appointed to represent me.

## POSTPONEMENT

I understand that I am scheduled for the Board of Prison Terms hearing indicated above.

☐ I hereby request that the hearing indicated above be Postponed to _____ .
   The reasons for my request for a postponement are stated below.

## WAIVER OF HEARING AND STIPULATION TO UNSUITABILITY

I understand that I am scheduled for the Board of Prison Terms hearing indicated above.

☒ I waive my right to a parole consideration hearing and I waive the right to have an attorney represent me at a hearing in my absence. I find that I am unsuitable for parole based on my reasons given on this form and therefore request that you find me unsuitable.

  ☐ One-year Denial    ☒ Two-year Denial    ☐ Three-year Denial

PRISONER'S REASON(S) FOR REQUEST:
(For Example: Psychiatric Evaluation Not Supportive, Programming Inadequate, Cat X Incomplete, etc.)

_Want to put in more discipline free time_
_before appearing for parole consideration_

| Signature of Prisoner | Date 10-17-00 |
|---|---|
| Signature of Attorney (if applicable) | Date 10/17/00 |
| Keith Stanton | |
| Signature and Title of Witness (CDC) | Date |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | DATE |
|---|---|---|---|---|
| | | | | 10/17/00 |

BOARD OF PRISON TERMS
LIFE PRISONER HEARING – EXTRAORDINARY ACTION AND DECISION

STATE OF CALIFORNIA
BPT 1001A (Rev. 10/89)

[ ] I certify to the best of my knowledge and information, the foregoing reasons as stated by the prisoner are accurate, and that the prisoner was capable of making a knowledgeable decision regarding his/her hearing.

The following information is submitted for the Board's consideration in making their decision:

_____

_____

_____

| CDPR Signature | Date |
|---|---|
| | |

*FOR BOARD OF PRISON TERMS USE ONLY*

## DECISION / ORDER

### WAIVER OF RIGHT TO ATTEND HEARING

1. [ ] Request is denied.

   [ ] Request is granted. Hearing will be conducted in absence of prisoner.

### POSTPONEMENT

2. [ ] Request is denied.

   [ ] Request is granted. Grant based on a finding of good cause. Place on _____ calendar.

### WAIVER OF HEARING AND STIPULATION TO UNSUITABILITY

3. [ ] Request is denied.

   [X] Request is granted. The Board agrees to enter into the stipulation, on a finding of good cause, offered by the prisoner on the waiver of his/her Life Parole Consideration Hearing and orders a:

   [ ] One-year denial    [X] Two-year denial*    [ ] Three-year denial**

   * The Board must find it unreasonable to expect that the prisoner would be eligible for parole during the second, or second and third year, and the Board must state the reasons for its finding.

   ** In addition to the above (*), the prisoner must have been convicted of more than one offense which involves the taking of a life.

(The basis of the finding of good cause for postponement or multiple-year denial must be stated below.)

   [X] Good cause based on the reasons given by the prisoner.

Other comments (if applicable):

_____

_____

_____

Signature of BPT Commissioners

1. *Sharon Lawin*                                          Date 10/17/00

2. *[signature]*                                            Date 10/17/00

BPT Action Taken At:    [ ] BPT Headquarters    [X] Institution

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | DATE |
|---|---|---|---|---|
| Bertoldo, Robert | C94377 | CVSP | | 10/17/00 |

# MENTAL HEALTH EVALUATION
# FOR THE BOARD OF PRISON TERMS
# NOVEMBER 2004 CALENDAR
## California State Prison - Chuckawalla Valley

## LIFER PROGRAM UNIT

### PSYCHOSOCIAL ASSESSMENT

Copy to
inmate via CCI *dH*
11-30-04

## I.   IDENTIFYING INFORMATION

| | |
|---|---|
| Inmate Name: | Robert Bertoldo |
| CDC Number: | C 94377 |
| DOB (Current Age): | 12/10/50 (53 years old) |
| BPT Calendar Date: | November 2004 |
| Controlling Offense: | Second degree murder (weapon) |
| Date of Offense (Age at Time): | 4/13/81 (30 years old) |
| County of Offense: | Los Angeles |
| Sentence: | Base Term - 15 years to life |
| | Enhancements - 4 years |
| | Total Term - 19 years to life |
| MEPD: | 7/7/95 |
| Date Entered CDC: | 10/22/84 |
| Location of Inmate at Time of Evaluation: | California State Prison Chuckawalla Valley |
| Date Entered CSP-Chuckawalla Valley: | 3/16/98 |
| Classification Score: | 0 (11/24/03) |
| Date of Evaluation: | 10/20/2004 |
| CDC Evaluator: | Elaine L. Mura, Ph.D. |

## II.   SOURCES OF INFORMATION

Mr. Robert Bertoldo, C 94377, was interviewed at California State Prison - Chuckawalla Valley on 10/20/2004. Prior to the interview, his Central File and Unit Health Record were reviewed by the undersigned. The following information is a composite of information from these records and Mr. Bertoldo's statements during the interview. Mr. Bertoldo was informed that the interview was not confidential and that a report with the results of the evaluation would be submitted to the Board of Prison Terms (BPT). The inmate appeared to understand the nature of the evaluation and the possible consequences of the interview to the best of his ability. For reasons not limited to the possibility that an individual being evaluated may have a mental disability or condition which may qualify under the Americans with Disabilities Act, the evaluation was conducted by a licensed psychologist. Also, it is my conclusion that it was not necessary to provide auxiliary aids or assistance to achieve effective communication.



III.    CONTROLLING OFFENSE

The following information was gathered from Mr. Bertoldo's Probation Officer's Reports (POR's) dated 12/8/81 and 7/25/84. On 4/13/81, Mr. Bertoldo murdered the 49-year-old male victim, a wealthy contractor who lived alone, in his residence. Shortly after the murder, the victim's son-in-law discovered the body. An autopsy determined that the victim had been shot in the face with a .22 caliber pistol and was also stabbed approximately 16 times. Police indicated that a number of the victim's possessions were missing, including his wallet, jewelry, a small quantity of money, a small safe and its contents, a bed quilt, several rifles, and a .22 caliber pistol. On 4/16/81, Mr. Bertoldo was stopped for a routine traffic violation. When he was searched, police found a .22 caliber pistol which they subsequently determined was the murder weapon. Further investigation revealed that Mr. Bertoldo pawned the victim's necklace at a pawnshop. When his girlfriend's apartment was searched, many of the victim's possessions were found. At the time, his girlfriend reported that she met Mr. Bertoldo in prison, where she was a clerk, that he moved in with her, and that he had beaten her in the past. When Mr. Bertoldo's brother Jim was interviewed, he indicated that he helped Mr. Bertoldo unload the guns and safe in his girlfriend's apartment but had no idea where they had come from. However, further investigation revealed that Mr. Bertoldo's brother had previously worked for the victim and borrowed money from him to buy a house. When he did not repay the loan, the victim foreclosed on the house and later rented it to his son-in-law. Mr. Bertoldo was arrested on 4/16/81. On 7/10/84, he was found guilty by jury trial.

When he was interviewed for the 1981 POR, Mr. Bertoldo chose not to make any statements until he spoke to his attorney. The author of the 1981 POR concluded the following:

> "Apparently, the victim tried to defend himself and put up a struggle before being brutally stabbed and shot to death. Violence is not foreign to this defendant, who was committed to State prison following a robbery when he threatened the victim with a screwdriver...has a lengthy arrest history that includes two separate prison terms...(and) using drugs."

When he was again interviewed after his conviction in 1984, Mr. Bertoldo said that "the jury convicted the wrong person and made a big mistake." He complained about his legal representation and stated that he planned to appeal.

When asked about the controlling offense, Mr. Bertoldo made the following statement: "That was me and David...I knew him through my brother Jim as a flooring contractor...we started talking...he knew I was in prison...he would finance and buy drugs to sell them...or he did guns too...sometimes I hooked him up with people to buy or sell...he ended up owing me on one of the deals...it was for $300 or $400...I gave him a call, and he told me to come down to talk about it...we had a drink, a beer, and started talking about it...he wanted me to get hold of some people to buy or sell...I said I needed my money...we was

arguing about it and pushing each other and fighting in the house...there was a knife on the kitchen counter...as we was fighting, he got the knife...then we fall over the couch...anyway, I ended up with the knife; and I stabbed him 17 times...as we was fighting, I thrust the knife forward and he fell to the floor...as I ran out, I heard something; so I went back in...then I walked closer to him, and he says I'll get you...I started to go back out when I grabbed a gun and shot him...the safe was in the back...I pulled it out...I put the safe on a dolly and left with some guns...I was arrested two days later...at the time, I'd been drinking a lot of beer and whiskey...that day, I was intoxicated; but I knew what I was doing... would I do it without liquor?...I don't know (teary-eyed)...the situation, the way it came down, it was a fight...was the sentence fair?...I was charged in murder one because of the robbery...after the jury convicted me and I returned for sentencing, the judge dropped it to murder two...my attorney said I was lucky...that I got a good sentence...then I looked at the law...it could have been manslaughter...but it's all right since I became a Christian...what do I think about the victim?...he had a grandson who would be 24 or 26 today (teary-eyed)...it's been 23 years...I cried about it...I done what I can...I've written to the family...I've thought bad about myself...at what point do I change?...what factors caused me to do it?...it was the drug life, but I wasn't a gun-toting druggie...it was my frame of mind...but I'm okay, a nice guy... now I know drugs took me to that place...that life style."

## IV.    BACKGROUND INFORMATION/LIFE HISTORY

Unless otherwise indicated, Mr. Bertoldo served as informant for the bulk of information reported in this section of the report.

Mr. Bertoldo was born in Visalia, California, the youngest of five children. He has three brothers who are eight, seven, and three years older and one sister who is four years older. His second brother, towards whom he felt closest, died in 1996 of cancer. He was unaware of any perinatal complications and denied any specific developmental disabilities (although he was apparently treated in elementary school for pigeon toes and in junior high school for possible reading deficits).

Mr. Bertoldo was raised by his mother after his parents divorced before the first year of his life: "He used to beat her...he was an alcoholic." His father was a ranch cook, while his mother collected welfare for most of the time Mr. Bertoldo was growing up. Although his birth father never visited the children, "We looked for him...that's how I saw him a few times." After the divorce, Mr. Bertoldo, his mother, and his siblings moved to Los Angeles to live with his maternal grandparents. When he was five years old, a stepfather (Danny) entered the home; Danny and his mother separated when Mr. Bertoldo was 13 years old. Shortly thereafter, a second stepfather (Jimmy) entered the home; eventually the couple married and have maintained a stable, long-term relationship to the present time. As a child, Mr. Bertoldo described himself as "friendly...because I was pigeon-toed, I had to go to corrective classes...then I got picked on by the other kids...that was when I was seven and eight...I had some fights with my brothers...once I stole from my mom when I was

nine...I stole from a store once when I was eight too...I was one of a group of guys who started fires with firecrackers when I was 16 or 17... I hung out with other people...I followed my brothers and their friends...I was a follower...once when I was young, I ditched...then I ditched more in junior high...I felt self conscious walking across the floor and reading aloud in class...that's why I started ditching a lot." Mr. Bertoldo denied any history of abuse or gang activities.

When he was 15 or 16 years old, he stated that he left home: "I had a problem with my mom's husband...he wanted us to do chores, and I didn't like it there...I'd sleep at home and leave to stay with friend...I got my first apartment when I was 17." Between ages 17 and 23, he reported that he lived in a hippie commune: "It was like a flophouse...we lived there...two girls were working...we'd deal drugs and sell beer on the beach...we were all free spirited." Thereafter, he served two CDC commitments, intermittently living in the community. At the time of his arrest for the controlling offense, he was living with a girlfriend.

Mr. Bertoldo described his relationship with him mother as he was growing up as "good...she did what she could to raise us...I was close to her when I was real little... when I got older, I took off...I just didn't stay home...now she lives with Jimmy in El Monte...our relationship is the same, good, maybe closer...we talk on the phone once a week and write some letters...she's in her early 80's, so the last time she visited was in '98." He said that his relationship with his birth father was "poor...he's still an alcoholic...he didn't visit after the divorce...I don't know where he is now...the last time I saw him was in '81." He reported that his relationship with Danny, his first stepfather, was "good...he was cool...I liked him...he was a good person...he disciplined us, but for the right thing...he punished us, but not always with spanking... I felt close to him...the last time I saw him I was 13...there was a fight between him and my two brothers, and he left and never came back." He noted that his relationship with Jimmy, his second stepfather, was limited: "I resented authority in the house, so I just left...I got picked up for drinking, and he bailed me out...he said I had to be a man and he would never help me again...he was a man of his word, and he never did again...but I respected what he did for mom...now he lives with my mom, and I see him and talk to him the same as my mom...he just went through heart surgery...I have a lot of respect for that man...our relationship got better...we write, but he's not supportive of me being here in prison...that's why he won't sign any forms for me." He indicated that his relationships with his siblings were "always good...we played with each other and protected each other...sometimes we would fight...now my oldest brother is in Florida with his family...we talk on the phone once a month and write letters...my sister is in Glendale...we write and talk on the phone... my other brother is in Victorville...we seldom have contact...mostly it's through my mom...generally, our relationships got a lot better...I think it's just getting older and appreciating each other more." He stated that he maintains contact with his brother's widow: "She's fighting cancer now...and my older brother too...and I keep in touch with some of my sister's and brother's kids...but not Jimmy's kids...I phone and write to some friends too...I talk to my wife twice a week and we write letters...the last time I saw her

was six months ago."

Educationally, Mr. Bertoldo reported that he received good marks in elementary school: "But in the fourth grade, I was in a corrective class for my pigeon toes...one time, I got in trouble for talking back to the teacher." In junior high school, he reported initially doing well "but then it went downhill...by the eighth grade, I was failing because I was ditching and getting in trouble outside of school." In senior high school, he continued his downward spiral: "I was failing because I just wasn't going to school...I dropped out in the eleventh grade." He completed his GED in prison on 8/5/87. He stated that he took a college course in 1984 "but I didn't complete it." In fact, records noted Ohio University enrollment on 8/10/89. On 11/19/84, he received an AGCT IQ of 93 (average). A TABE was administered on 5/1/87 in which he received the following grade levels:

| | |
|---|---|
| Total academic | 8.9 |
| Reading | 12.9 |
| Math | 6.8 |
| Language | 8.7 |

Mr. Bertoldo reported that his first sexual experience was at the age of nine with a married adult female: "I was her babysitter between nine and 11...we did it many times." He refused to consider this an abusive situation. When interviewed in 1986, he said that his first sexual experience was at age 16. He said that he has had approximately 100 sex partners: "I was very active...I had a problem." He denied any history of soliciting prostitutes, pimping, homosexuality, or aggressive behaviors towards partners. He was successfully treated for a sexually transmitted disease when he was 19 years old. When asked about group sex, he commented, "That was in my hippie days...it was four females and me...I was in my early 20's."

Mr. Bertoldo has been married two times. When he was 31 years old, he married Maria: "We didn't consummate the marriage...it was after my conviction...I never saw her again...the last time was at my sentencing...we got divorced in RJD in '91." He has no current contact with Maria. When he was 42 years old, he married Carol: "We're still married...she was my girlfriend when she was 16...she was pregnant, but I never had any responsibility." As noted earlier, the last time Carol visited with six months ago; she lives in Los Angeles. Mr. Bertoldo has one daughter, Lisa, currently 38 years old. They have no contact. He indicated that he never had a live-in relationship. However, the Institutional Staff Recommendation Summary dated 11/19/89 stated that he had two common-law relationships, one in 1970 with Carol and one in 1977 with Marlene. The same document reported that his marriage to Maria was annulled and that he has no children.

Mr. Bertoldo has never served in the U.S. Military forces.

Mr. Bertoldo indicated that his first seasonal jobs were at age 13 selling flowers for three years and selling fruit for two years. His next job was in his 20's for less than one year in a garment factory: "I guess I left because I just didn't go back." When he was 31 years old, he worked for a month in a machine company. He added that, between ages 16 and 30, he subcontracted patio installation jobs for his brother. From age 16 until his arrest for the controlling case, he also engaged in drug sales, especially heroin and "pills:" "That's how I paid for my apartments...I did it to support myself...sometimes I stole too."

## V.    CRIMINAL HISTORY

When asked about his criminal history, Mr. Bertoldo described three CDC commitments, one for 16-months ("GTA or burglary"), one for two years ("GTA or burglary"), and a life sentence for the controlling case.

According to available information, Mr. Bertoldo has both a juvenile and an adult criminal history. As a juvenile, he was first arrested on 7/13/64 (age 13) for suspicion f carrying a switch blade knife; he was counseled and released. He was next arrested on 12/23/64 (age 14) for suspicion of inhaling glue and placed on six months' probation. As an adult, he was first arrested on 4/2/69 (age 18) for minor in possession of alcohol and fined. On 5/11/69, he was again arrested for misdemeanor drunk driving and fined. He was next arrested on 9/1/69 for possession of a Molotov cocktail and taking a vehicle without the owner's consent; he was released. On 9/19/69, he was arrested for grand theft auto, fined, and placed on three years' probation. On 4/28/70 (age 19), he was arrested for robbery, fined, and again placed on three years' probation. On 1/28/71 (age 21), he returned late to Biscailuz work Furlough Center (which was apparently listed as an escape from County jail in one record); no disposition was shown. On 1/9/72 (age 22), he was arrested for battery on a peace officer and disturbing the peace; no disposition was given. He was again arrested on 1/16/72 for possession of marijuana; again, no disposition was shown. On 5/30/75 (age 24), he was arrested for possession of a controlled substance; the case was a District Attorney reject. Probation was revoked on the 1970 robbery case on 6/18/76 (age 25), and he was sentenced to State prison (first CDC commitment). On 4/21/78 (age 27), he was arrested for burglary and sentenced to two years in State prison, consecutive with a forgery charge of 4/12/78 (second CDC commitment). On 11/1/78, he was again arrested for use/under the influence of a controlled substance and placed in County jail for five days. He was also arrested on 3/3/79 (age 28) for grand theft auto; no disposition was shown. On 4/13/81 (age 30), he committed the controlling offense. He was convicted by jury trial on 7/10/84 third CDC commitment).

Inmate Name: Robert Bertoldo     CDC Number: C 94377     Date of Evaluation: 10/20/2004     Page 7

Since his incarceration for the controlling offense, Mr. Bertoldo has received ten 115 violations.

| | |
|---|---|
| 4/10/00 | Refusal to submit to a urinalysis |
| 1/27/00 | Possession of morphine/positive urinalysis |
| 1/13/00 | Possession of an inmate manufactured hypodermic syringe |
| 4/10/95 | Non expendable property (several items of clothing, disc player, 10 tapes) |
| 5/31/94 | Positive urinalysis (cocaine) |
| 7/24/89 | Stimulants and sedatives (methamphetamine) |
| 5/8/89 | Force and violence |
| 3/1/88 | Fist fight |
| 2/17/88 | Threatening an officer |
| 4/13/85 | Assault on staff |

It should be noted that five of the above violations (50 percent) were related to substance abuse, while four of the remaining five (40 percent) were violent/potentially violent. However, the violent violations were between 1985 and 1989, while the substance abuse violations were between 1989 and 2000. In fact, only four years ago, he was still involved in drug offenses. During the current interview, he stated that he became active in AA/NA in 2000, thereafter apparently replacing AA/NA with participation in religious activities. Between 6/23/88 and 1/7/97, he also received twelve 128 counseling violations. At the present time, it appears that his risk for violent violations is minor; however, his risk for substance abuse related offenses seems higher. Clearly, continued adherence to some form of group beliefs is critical to insure that he does not "fall off the wagon."

On the positive side, it should be noted that Mr. Bertoldo received numerous laudatory chronos between 2002 and 2004, all of which documented his prosocial changes.

## VI.   SUBSTANCE ABUSE

Mr. Bertoldo said that he began to drink alcohol when he was 13 years old and had a history of blackouts: "I drank to get drunk...I was an alcoholic." When he was 13 years old, he also started to sniff glue, continuing for four years. Between 14 years of age and into his 20's, he also used barbiturates and various pills: "That was the party life." In the 1960's, he said that he used LSD over 100 times. When he reached his 20's, he also began to use intravenous heroin (addict) and cocaine (heavily but denied addiction). For many years, he also used marijuana. He said that he tried methamphetamine two times in his 40's. He was never involved in a community rehabilitation program. As noted above, it should be recalled that he received five 115 violations between 1989 and 2000 for substance abuse related offenses. Therefore, at this time he appears to be clean and sober - but his sobriety has probably not stood the test of enough time to insure prolonged sobriety under stress.

## VII.    INSTITUTIONAL ACTIVITIES

At the present time, Mr. Bertoldo indicated that he has been assigned as a teachers aide and tutor for the past three months. Past assignments included vocational drafting, vocational optical, vocational computer, vocational silk screen, vocational sewing machine repair, and arts in correction; he has also functioned as a porter and clerk. Mr. Bertoldo reported that he has completed two vocational certificates in drafting and optical. He also noted that he has his optician's license. According to work supervisor reports, Mr. Bertoldo received satisfactory to exceptional work ratings between 2/21/01 and 7/10/03 (clerk).

Mr. Bertoldo has exhibited some evidence of a self help orientation. He indicated that he began AA/NA participation in 2000, stopped in 2002 or 2003 when he became deeply involved in Christian pursuits, and started going again in August 2004. He added that he was the AA/NA chairperson for two years and that he would go to AA "if the Board recommends it." Further discussion about AA/NA participation suggested that he might have some legitimate reasons for his hesitancy in becoming more involved. He indicated that he was in Bible study and anger management programs in 2003 and is currently taking a Crimenon correspondence course. Records noted that he was involved in AA/NA in 1995 and 2001 and was the NA chairperson in 2002. Also confirmed were completions of Breaking Barriers in 1992 and 1993, a Breaking Barriers video program in 2001, Alternatives to Violence in 1993, Morals and Values in 1993, Amer-I-Can in 1992, and anger management in 2004. In addition, he was a Men's Advisory Council (MAC) representative in 1999.

Mr. Bertoldo indicated that he is a Christian, attends religious services three days/week, and reads the Bible "constantly." He reported that he has several leisure time activities which he enjoys, including beading, drawing, and listening to Christian music. He said that he would like to exercise but has "a bad back." While chuckling, he denied any boredom.

## VIII.    MEDICAL AND PSYCHIATRIC HISTORY

Mr. Bertoldo reported that his health is marked by lower back pain. He also wears a brace on his right leg due to "drop foot...a nerve was severed from a gunshot wound in '75 or '76...it was drug related...I got shot three times, and they did surgery...I was hospitalized for two weeks...a bullet is lodged in my hip bone...I got no feeling in the right leg." Hepatitis C was diagnosed in 1998; he has received no treatment and is asymptomatic. He mentioned that he is concerned because of chronic tremors. He wears bifocal lenses. His hearing, appetite, and sleep are reportedly good. He indicated that he takes Motrin occasionally for back pain. Other than the above, he denied any history of serious illnesses, injuries, or surgeries. A Unit Health Record note of 8/18/04 described a slip-and-fall injury during 2004.

When asked about his mental health history, Mr. Bertoldo denied any treatment, psychiatric hospitalizations, or psychotropic medication.

Nine prior BPT evaluations were present in Mr. Bertoldo's Central File. All evaluators concurred in the diagnosis of antisocial personality disorder; later evaluations added polysubstance abuse/dependence. Overall, the reports documented the slow emergence of positive change and the decrease of dangerousness over time (from above average to average). All questioned his personal statements of increased insight and growing self awareness and had variable opinions about the genuineness of his remorse and acceptance of personal responsibility.

<u>5/19/86</u>

Dr. Willis of CCI-Tehachapi proposed the diagnosis of antisocial personality disorder. The report noted that "the prognosis seems guarded since he has had a long history of antisocial acting out since 1969."

<u>6/24/87</u>

Dr. Willis reported that there were no significant changes since the 1986 report.

<u>3/18/88</u>

Dr. Matychowiak of CCI-Tehachapi proposed the diagnosis of antisocial personality disorder. The report indicated that "he probably shows some beginning chance of change and improvement but needs more time...insight is limited."

<u>8/27/88</u>

Dr. Charlens of CCI-Tehachapi also proposed the diagnosis of antisocial personality disorder. The report stated that "this writer agrees with the conclusions and statements in the report of 5/14/86...level of insight and self understanding are low...there is little to suggest that he could conform without external controls."

<u>10/15/91</u>

Dr. Tavoularis of CCI-Tehachapi proposed diagnoses of polydrug abuse and antisocial personality disorder. The report concluded that "it is difficult to assess whether the self-professed introspection of the last year is heralding a definitive change in the antisocial character pathology in this man...close observation over the next year or so may give evidence to whether or not he is maturing or whether his verbalized self criticisms are for `show'...his impulse control (is) average for this inmate population; his propensity for violence has probably dropped to at least average for this inmate population."

<u>7/7/93</u>

Dr. Mennuti of CSP-RJD proposed diagnoses of mixed substance abuse disorder and antisocial personality disorder. During the interview, Mr. Bertoldo admitted that he was associating "with a 'bad' crowd between 1985 and 1989 and was involved, as a middle man, in some drug distribution at CCI...he appeared to be more open and honest than he has been in prior interviews...he accepts responsibility for his role in (the offense)...the inmate appears to have begun making psychological changes... violence potential outside a controlled setting in the past is considered to have been above average and at present has decreased and is considered to be average."

<u>3/7/95</u>

Dr. Saunders of CSP-RJD proposed diagnoses of polysubstance abuse and antisocial personality disorder. The report indicated that "Mr. Bertoldo demonstrates remorse for the commitment offense...has improved somewhat in his ability to conform to social norms with respect to lawful behavior...demonstrates some failure to plan ahead and some rationalization of having hurt others...he has made only the most indirective efforts to decrease his risk of (drug) relapse...insight oriented psychotherapy is not indicated, and is perhaps contraindicated."

<u>9/19/00</u>

Dr. Freitas of CSP-CVSP proposed diagnoses of polysubstance dependence and antisocial personality disorder. The report noted that Mr. Bertoldo "expressed limited remorse for his actions...limited awareness regarding his involvement in this offense...acknowledges the wrongfulness of actions....offers a limited explanation for his involvement in this offense, except to note how escalating circumstances resulted in a conflict, and that this death was the result of the criminal life style choices (the reasonable risks) made by both the inmate and the victim."

<u>12/28/00</u>

Dr. Freitas's diagnoses and conclusions remained unchanged in this revised report.

IX.    CLINICAL ASSESSMENT

A.  CURRENT MENTAL STATUS/TREATMENT NEEDS

Mr. Bertoldo presented as a stocky Hispanic male of 53. He is 5'9" tall and weighs 180 pounds. His pepper and salt hair was short and parted in the middle; he had a white brush mustache and gray sideburns. He wore glasses and a gold wedding ring; a tattoo was visible on his left arm. His grooming was good. During the interview, Mr. Bertoldo was pleasant and cooperative. His speech was clear, and he said that he is bilingual with

better English than Spanish language skills. For the most part, he appeared to be sincere and forthright. He presented as bright with some preoccupation with religion. However, at times, he began to ramble in a tangential fashion; he seemed to enjoy embellishing long stories (perhaps as a method to deflect the Evaluator or even himself from the meat of an uncomfortable topic). His mood and affect were within normal limits through much of the evaluation. However, towards the end of the session - and most especially when he was asked about the controlling offense - he broke down into tears which persisted for several minutes after the session ended. It appeared that he had significant difficulty handling his culpability for the crime and the dynamics which led to his drug use and criminality. It was as he was exploring these issues that he first became notably tangential and almost loose and later broke into tears. Mr. Bertoldo was oriented x 4 with an average fund of general information. His ability to abstract was fair to good. His short-term auditory memory was good to fair, although distractibility may have interfered with his efficiency. His responses suggested that he might prove intermittently oppositional and passive aggressive towards those in authority. Given his history, this probably represents an improvement in his impulse control.

Mr. Bertoldo stated that his greatest personal strength was "...I think...a lot of guys come to me and ask my opinion on things...I do a lot of counseling...I must show this somehow." He indicated that his greatest personal weakness was "(sigh)...I got so many...my ears...sometimes I hear things and dwell on it too much." When asked if he considers himself a criminal, he replied, "Yes, I lived a criminal life." He said that his greatest source of personal pride is "I used to be so prideful...(Q)...my intelligence...I would manipulate with it...now it's my art work." He reported that the biggest change in him since incarceration has been "I think the way I see things now...(Q)...anger...(Q)...now I got more empathy."

Mr. Bertoldo denied any past or present auditory or visual hallucinations. He also denied any current depression or suicidal ideation. From him description, past bouts of depression appeared to be situational in nature: "It was when I was coming down off of drugs number one." He admitted to a history of suicidal ideation as a teenager: "I ran away from home...I'd go somewhere." When asked about prior suicide attempts, he remarked, "I OD'd I don't know how many times...I didn't think what it meant then...I didn't know why." He denied any past or present homicidal ideation. Socially, Mr. Bertoldo described himself as "more of a loner...I may be rough on people...I always been the same...I'm starting to understand a lot of things in my past...now I'm more interested in people...I like then...I learned to put my trust in the Lord instead of people...I always had a best friend...now it's the Lord." He denied any obvious paranoid ideation.

From his current presentation, Mr. Bertoldo did not appear in need of acute psychiatric intervention. However, his current emotional lability and periodic tangential and loose thinking suggested that he might benefit from further evaluation and intermittent monitoring. His history and personal statements appeared to confirm his history of substantial substance abuse, as well as his narcissistic (me-me-me), antisocial, and

suspicious orientation towards others and society. He also described himself as a loner with a history of limited social skills. However, on the plus side, these characterological deficits appear to be diminishing with time and Mr. Bertoldo's expanded allegiance to prosocial groups (12-step and religious).

### B. DIAGNOSTIC IMPRESSION

AXIS I       *Clinical Syndrome*
303.90 Alcohol dependence in sustained remission in a structured setting
304.00 Opioid dependence in sustained remission in a structured setting
305.60 Cocaine abuse in sustained remission in a structured setting
History of polysubstance abuse/dependence (inhalant, hallucinogen, cannabis, barbiturates)

AXIS II       *Personality Disorder*
301.7 Antisocial personality disorder NOS with narcissistic, avoidant, and paranoid features (slowly improving)

AXIS III       *Physical Disorder*
Hepatitis C
"Drop foot" subsequent to gunshot wounds in 1975
History of "pigeon toes" as child

AXIS IV       *Severity of Psychosocial Stressors*
Moderate to Severe (3-4): Incarceration

AXIS V       *Global Assessment of Functioning 0-100*
Current GAF: 70

### X. PLANS IF GRANTED RELEASE

If granted release, Mr. Bertoldo reported that he plans to live with his mother in Los Angeles: "I did have a job offer...my friend has the only company that puts up boxing rings West of the Mississippi...to be fair to him, I couldn't do it...I sold things here, some artwork...I'm looking into putting my art on the internet...I'm a carver...I have current letters and receipts for my art sales." When asked what he anticipated might be his greatest problem should he parole, Mr. Bertoldo responded, "I don't see any problem." When asked specifically about relapse prevention plans, he vaguely remarked, "I got with two half way houses, Christian homes...I'm looking into that as an alternative to going home...I don't have letters yet."

Overall, Mr. Bertoldo's parole plans appeared somewhat vague and perhaps overly optimistic in assuming that he could be self supporting through sales of his carvings. In addition, it was of some concern that he was unable to anticipate any parole problems - and especially that he did not appear to have considered the possibility of drug relapse. In that area, his plans seemed to be very vague and not carefully considered. In point of fact, the same deficit has been noted in past BPT reports.

## XI.    RISK FOR VIOLENCE

Review of clinical and research data on violence assessment has indicated that risk for violence is typically evaluated by addressing similar elements, including history/background and clinical presentation. Prediction of dangerousness must also take into account a third factor, management of future risk. In other words, are there protections already in place which will assist the individual when placed in a situation which in the past led to violence. Actuarial factors have also been studied as they relate to future violence. Risk assessment factors may be considered static (unchanging) or dynamic (changing). For the purposes of the current assessment, the inmate will be evaluated in each of these three domains. Estimates of risk for violence in each domain will be stated categorically - low, moderate, or high.

### A.    HISTORY/BACKGROUND

A reliable and universally accepted method of predicting future behaviors has been the analysis of background and past behaviors. There is a temporal stability to this information which tends to be static (unchangeable) in nature. In other words, given that the bulk of data feeding into this estimate is historical, then by definition this score is not amenable to significant change regardless of the number of years of incarceration.

Available information indicated that the inmate was raised in a mildly dysfunctional family, in that his alcoholic birth father was violent towards family members before Mr. Bertoldo was born and had no interest in maintaining contact with his children after he divorced his wife. Apparently, the family lived on welfare benefits for much of Mr. Bertoldo's growing up period, and he was probably exposed to antisocial belief systems through assorted family members and friends. Being singled out for special classes due to being "pigeon-toed" - and thus incurring the teasing of his peers - may also have negatively impacted on his social skills. In fact, he described himself as a life-long loner. He also described himself as a follower who "followed my brothers and friends." In fact, it appeared that his brothers may have been involved in antisocial and drug-related activities. On the positive side, he was apparently exposed to a stepfather between ages five and 13 with whom he developed a caring relationship. Unfortunately, it appeared that this man was not accepted by his brothers and left precipitously just as Mr. Bertoldo entered puberty. His statements suggested that he never really developed a close, supportive relationship with his second stepfather, whom he resented and who eventually led him to flee from the family home. Although he denied any history of abuse, his description of early sexuality

in concert with an older adult female when he was only nine years old clearly suggested that he was sexually abused over a period of at least three years. By the age of 13, he was already abusing alcohol and drugs. Within a few short years, he had matured into a full-blown alcoholic and heroin addict. At first his school functioning suffered as he began to ditch school almost constantly (finally dropping out). His relationship history was short-term and promiscuous, while his employment history was spotty and unstable. In fact, it appeared that drug sales was his primary support. His criminal acting out began in adolescence and escalated in adulthood, so that by the time of the controlling offense he already had served two prior CDC commitments. Since his third incarceration, he exhibited adjustment difficulties, including several violent and/or potentially violent violations early one followed by several substance abuse related violations as recently as 2000. In addition, he admitted to being involved in institutional drug sales for a few years in the past. It has only been for the past three to four years that he seems to have maintained his sobriety and engaged in more prosocial programming. Based on the above information, it appeared that Mr. Bertoldo presented at moderate to moderately high risk for violence, most especially if he again returns to substance abuse.

### B.    CLINICAL PRESENTATION

The inmate's clinical presentation is also relevant to any assessment of dangerousness. Some variables, such as a mental health diagnosis and chronic substance abuse, may extend from the past into the present - therefore encompassing both static and dynamic elements. In addition, research has described a significant association between antisocial and psychopathic personality traits, criminality, and violence. Furthermore, clinical factors such as maturity, responsibility, insight, and impulse control contribute to the extent to which past high risk behavior patterns are exhibited in the present and/or will be exhibited in the future.

During the evaluation, the inmate presented almost like a poster boy for psychopathy. Historically, and in some cases currently, he exhibited multiple signs of psychopathy, including grandiosity, a high need for stimulation, pathological lying, manipulativeness, lack of remorse/guilt, shallow affect, callousness, a parasitic lifestyle, poor behavioral controls, promiscuity, early behavior problems, lack of realistic long-term plans, impulsivity, irresponsibility, inability to accept responsibility for him own actions, juvenile delinquency, and revocation of conditional release. Although he seems to be developing some maturity and insight at the present time, it is still unclear whether this is for "show" or genuine. He seems to have "flashbulb" insight; it operates for moments at a time and rapidly dissipates completely. He has displayed some evidence of self help orientation, including past involvement in AA/NA, completion of several self help groups, and present devotion to religious activities. However, it is unclear just how much these forces have affected him, in that his parole plans still appeared to be vague and failed to address key issues, including substance abuse relapse prevention. On the positive side, Mr. Bertoldo does appear to be moving in the right direction at this time. The above information suggested that Mr. Bertoldo presented at moderate risk for violence. This estimate

would increase in the event that he again abuses alcohol and illegal drugs.

### C.     MANAGEMENT OF FUTURE RISK

It can be assumed that the inmate will be exposed to a variety of situations in the community which may have led to violence in the past and which will try his coping skills. Therefore, it is also important to determine whether or not it is likely that the inmate will be exposed to significant stress and/or destabilizers, as well as evaluating the nature and extent of community support and how the inmate will respond to that support.

In this inmate's case, a key destabilizer would obviously be substance abuse relapse. Due to the nature of him proclivity for substance abuse, he will remain at a higher risk for substance use/abuse than will people in the general population without his particular substance abuse history. At the present time, he does not appear to fully comprehend this factor and so has failed to take clearcut before-the-fact steps to prevent relapse. He does have some mild community support, but it is questionable just how much influence family members would have on him - given their lack of positive influence in the past. In addition, it appeared that he still has relationship problems with his stepfather - and yet plans to move in with him and his mother. This might well create a highly stressful situation with which he would prove unable to cope adequately. His ability to comply with remediation efforts is slowly improving -but he still seems to have a way to go. Therefore, the probability of parole success seems guarded at this time. Based on the above data, it appeared that Mr. Bertoldo was at moderately low to moderate risk for future violence, especially if he proves unable to maintain his sobriety.

### XII.     CONCLUSION

In summary, Mr. Bertoldo's crime might be seen as instrumental, in that the crime represented a callous plan to satisfy greed and resulted in obtaining the victim's property at the expense of his life. There may also have been an affective component to the crime, in that the murder seemed to have been committed in the heat of the moment in an unpremeditated manner due to anger exacerbated by substance abuse. Currently, Mr. Bertoldo indicated that he felt threatened and in need of defending himself; however, he also admitted that his criminal/drug life style was involved in the controlling case.

When asked what he would like to emphasize to BPT regarding him readiness for parole, Mr. Bertoldo made the following statement:

> "The responsibility I've taken on...I say something, and I do it...I've taken interest more in people, in having concern for them...I never been at this point before (followed by multiple relatively extraneous comments)."

When asked what he would change if he could alter only one thing in his life, Mr. Bertoldo replied, "Not having drugs." When asked what role substance abuse played for him, he commented, "Nothing...I thought I could look better and talk better...it was the power I had...girls and guys would do things for me for drugs...it was the power trip." Mr. Bertoldo's responses suggested emerging insight; however, as his insight increases, it also appears that he becomes less emotionally controlled and more labile.

Therefore, based on the above information, Mr. Bertoldo presents with both positive and negative factors for parole. On the positive side, Mr. Bertoldo has a current classification score of zero, which he has maintained since 11/20/01. His most recent 115 violation was in 2000, and the second half of his 115 violations were all substance abuse related - suggesting far less violence but also impulse control deficits, at least until 2000 when he began to participate in AA/NA and later in Christian groups. He has displayed a modicum of behavioral ability to refrain from blatantly undesirable activities and a periodically applied capacity to focus more on prosocial programming. If he can hold to the gains which began in 2000 for a longer period of time, this would tend to prove the stability of these changes. Since incarceration, Mr. Bertoldo earned his GED and completed two vocational certificates and his optician's license. His work ratings for the past few years have been satisfactory or better. He has been involved in several self help programs and appeared to be very devout in his religious convictions. He maintains some community contacts, and it appears that these individuals would be supportive in the event of parole.

On the other hand, Mr. Bertoldo had a long history of criminality and two prior CDC terms before the controlling offense. He relied primarily on drug sales to support himself, and his addictions were the guiding factor in his life. Most importantly, he has a history of significant antisocial thinking and behaviors. Given the nature of personality disorders, such traits are slow in decreasing or changing. He appears to have turned a positive corner in 2000. Only time will tell whether or not these positive changes - and his ability to maintain his sobriety - will remain and grow.

Overall, risk assessment measures suggested that the inmate poses a moderate likelihood of becoming involved in a violent offense if released into the free community. This estimate takes into account the inmate's cultural background, language issues (if any), personal, social, and criminal history, institutional programming, community/social support, release plans, maturation, and current clinical presentation. In addition, there is the caveat that such an assessment is at least partially based on the likelihood of continued abstinence from any substance abuse.

Based on the above information, Mr. Bertoldo would benefit from further exposure to substance abuse programming, whether within his religious group or within 12 step programs. He might also be an appropriate referral to a SAP or similar program, where he would be exposed to a sober living environment and the possibility of locating future sober living community environments. Clearly, he needs to work on his parole plans, with special attention to relapse prevention planning. He might also benefit from further

vocational training and/or upgrading in order to enhance his employability when paroled. From his current presentation, he did not appear to be in need of psychiatric intervention. In addition, he does not currently present as a candidate for any significant or noteworthy change as a result of psychotherapeutic intervention, from which he is effectively precluded by virtue of his GP status. As noted in Dr. Saunders's BPT report, insight-based psychotherapy might even be contraindicated for him. However, he might benefit from exposure to self help literature, especially if given the opportunity for discussion afterwards.

Elaine L. Mura, Ph.D.
Forensic Psychologist
Lifer Program/Forensic Services Unit
Health Care Services Division
California Department of Corrections

November 9, 2004
Date Signed

CHUCKAWALLA VALLEY STATE PRISON
BLYTHE, CALIFORNIA

## BPT LIFE-TERM MENTAL HEALTH EVALUATION
(Revised 1998)

| | |
|---|---|
| INMATE: | BERTOLDO, ROBERT |
| CDC#: | C-94377 |
| DOB: | 12-10-50 |
| EVAL. DATE: | REVISED 12-28-00 |

## Psychosocial Assessment

### I. Identifying Information

The inmate was informed of the nature of this evaluation, that it was not confidential and that prior to writing this evaluation his C-File and medical records would be reviewed. He stated that he understood and would cooperate. This inmate was seen for approximately 1.5 hours

This is the 5th BPT Mental Health Evaluation for this 49 year old White male. He was convicted, at the age of 30, in Los Angeles County of Second Degree Murder in 1984. He received a 19-year-to-life sentence. His C-File indicated two prior felony convictions, one for robbery in 1976 and for burglary/forgery in 1978. There were approximately 7 misdemeanor arrests/convictions. Since being in the CDC he has had ten 115's, including three in the past year for possession of inmate manufactured syringe, possession of morphine/positive urinalysis test and a refusal to take a urinalysis test. Between 1985 and 1995 he had seven 115's, including positive urinalysis, possession of stimulants and sedatives, assault on a staff, threatening staff, fist fight and use of force/violence. The record indicated that this inmate has twice been assaulted in prison, once, in 1975, he was stabbed in the abdomen and in 1988 he was stabbed in the face.

### II. Developmental History

This inmate provided an unremarkable developmental and childhood medical history. He did not indicate any history of behavioral or emotional problems and provided no history of either physical or sexual abuse

### III. Education

The inmate stated that he dropped out of El Monte High School, in El Monte, CA during the 10th grade in 1967. He noted a significant history of school truancy prior to dropping out. He has no history of special education classes. He obtained his GED in 1986 while in prison. He has also completed the following classes: anthropology (correspondence course from Ohio State); Breaking Barriers (basic, advanced and as group facilitator); Alternatives to Violence (basic, advanced and as group facilitator); Ameri-I-Can (self-help group); Morals and Values (self-help group); church sponsored seminars; Child



Abuse Prevention Foundation; Criminon (correspondence self-help program) and a correspondence course by Set Free Ministries.

## IV. Family History

This inmate was born on 12-10-50 in Visalia, CA. His natural parents are Pete Bertoldo (80's) and Josephine Christian (75). His parents divorced when he was 3 years old and he was raised by his mother. He has had limited contact with his father, who he has not seen since 1979. His mother currently resides in El Monte, CA. He was four brothers and one sister. One brother (Ignacho) died of cancer at the age of 49. He has not seen his oldest brother in 30 years. His last family visit was in 1996 by his mother and sister. He stated that between 1990-96 they would visit him 3-4 times per year. He phones his family on a weekly basis, including one brother who lives in Florida.

## V. Psychosexual Development

The inmate described himself as exclusively heterosexual and unconflicted regarding his sexual orientation. He did not provide any genetic, medical, social or developmental history suggestive of a disturbance in gender identity. The record does not indicate and he did not volunteer any information that would suggest aggressive, high-risk sexual conduct or of deviant sexual behavior.

## VI. Marital History

He indicated that he has been married two times. From 1982-91 to Maria. They had no children. He stated that they married while he was in county jail for the committing offense. He married again in 1992 to his current wife, Carol age 49, who resides in Los Angeles. They have no children. She has retired from working at Lockheed due to an accident at work. He said she was a friend from high school he had always kept in contact with. He has one child from a high school relationship. Her name is Lisa Mendoza (33). He has had only one contact with her, at birth, and was not involved in raising her. Currently he calls his wife about twice a week, indicating that she visits him on a once every two month basis, but has been unable to recently due to his 115's.

## VII. Military History

None

## VIII. Employment History

This inmate provided an intermittent employment history, beginning at age 16 up until his arrest, of working for his brothers installing patios and flooring. While in the CDC his has received vocational certificates in drafting and as an optical technician. He said he is currently licensed as an optical technician in CA and is in the process of updating his continuing education requirement. His current position is in the "clothing room." He has also served a year on the Men's Advisory Council, worked as a special purchase clerk and in the Arts in Corrections program.

## IX. Substance Abuse History

This inmate described a pattern of drug and alcohol abuse, beginning at age 13 with alcohol. By age 19 he described himself as an "alcoholic." In 1975, at the age of 25, he began using heroin and described himself as a life-long maintenance user without becoming severely addicted. He noted past use of barbiturates, stimulants, cocaine, LSD

and amphetamines. He said he had very little interest in marijuana. He also described a heavy involvement in a drug life-style that included dealing drugs. He stated that he has never participated in any formal drug treatment program and that AA/NA are not for him. He acknowledged a certain degree of denial regarding his having a drug/alcohol problem. He also stated that he may be rationalizing, but that the easy availability of drugs at CVSP and his back pain can mostly account for his recent relapse with drug use here in prison. He did mention some interest in seeking out some alternative treatments to AA/NA.

## X. Mental Health/Medical History

He does not report any history of mental health treatment. There have been no psychiatric hospitalizations, prescription of psychotropic medications or outpatient treatment. He stated that he has never attempted suicide. He described his health as "fair." He did not provide any history of of serious head injury or seizures. He noted a "soft shoe Chrono" for the wearing of a tennis show to accommodated a leg/ankle brace. He called his condition "drop foot" and said it was related to the severing of a nerve in his leg due to a gun shot wound he received in an argument (he did not want to elaborate on this event). He recently (9/00) had a lump in his chest biopsied and is waiting for the results. He described chronic back pain since he suffered a work-related injury in the CDC in 1986. He said he was diagnosed with Hepatitis C in 1996.

## XI. Plans if Granted Release (Please note that this evaluation is based exclusively on information presented by the inmate).

Level of Support. This inmate has plans to reside with his wife in Los Angeles, CA after he paroles.

Work History. This inmate provided an unstable work history, limited by his chronic drug/alcohol abuse and antisocial life style. Within the CDC he has obtained several vocational certificates and has licensed as an optical technician. He has also worked at a variety of responsible positions within the CDC.

Financial /Vocational Plans. This inmate indicated that when he returns to the community he has a job offer from a friend to help setup boxing rings for professional fights. He also hopes to pursue employment as an optician.

Institutional Adjustment. This inmate's adaptation to prison has been mixed. He has worked in responsible positions and learned new job skills, some of them certificated and he has completed his GED. On the other hand he has an extensive history of disciplinary problems and drug use in prison, not to mention three drug related 115's this past year. Until this recent drug relapse his record for the past 5 years appears to have been fairly good.

Overall, this inmate's parole discharge plan is rated poor to fair.

## Clinical Assessment

### XII. Current Mental Status/Treatment Needs

This is a 5' 9", 150 lb., White male, olive complexion, with thick white mustache and black hair. He related to this interviewer in a pleasant and talkative manner. He was not defensive and presented in a fairly open manner. He sat upright and maintained good eye contact but had to move about because of back pain. He was oriented x3. Speech was clear and coherent. Affect was generally appropriate to thought content. Intellectual functioning appeared in the average range. There was no evidence of a perceptual disorder. He denied any history of hallucinations or delusions. There was no evidence of a formal thought disorder or associational disturbances. He stated that he is without suicidal ideation.

| | |
|---|---|
| Axis I: | 304.80 Polysubstance Dependence (ETOH, heroin and methamphetamines) |
| Axis II: | 301.7 Antisocial Personality Disorder |
| Axis III: | Physical Disorders or Conditions: hepatitis C, chronic back pain, nerve damage to right leg |
| Axis IV: | Psychosocial Stressors: minimal |
| Axis V: | Current GAF: 74 |

Psychotropic Medications: None

Alerts: None

### XIII. Review of Life-Crime

This inmate provided a report of his committing offense that is generally consistent with the available record. He stated that he had been involved in putting together drug deals with the victim, who bought and sold drugs. He said the victim owed him $400 and he visited to collect what he was owed. A physical fight ensued and they both tried to grab a knife nearby. The defendant controlled the knife and stabbed the victim. As he ran he entered a room where there was gun on the desk, when the victim threatened to get him he shot the victim in the head, killing him. He admitted stealing many personal items from the victim's person as well as his home. He claims he did not go their with the intent to harm the victim or to rob him and was unarmed when he arrived. He said he shot and killed the victim because he took seriously his threat to seek revenge.

### XIV. Assessment of Dangerousness

In assessing the question of dangerousness this evaluator would note that mental health professionals are not able to predict future acts of dangerous behavior with significant predictive validity. However, they are able to evaluate relevant risk factors associated with relapse and reoffense:

High-Risk Factors: prior felony criminal record; the offense involved use of lethal force and the death of the victim; inmate was an active participant in the offense; the death of the victim was intentional; drug/alcohol abuse was involved; personality disorder diagnosis; there was no immediate threat to the inmate; the victim was extremely vulnerable (these latter two are based on the victim being killed by the gun shots); overall adaptation to prison-life has been very mixed; limited awareness regarding his involvement in this offense.

<u>Low-Risk Factors</u>: admits his role in the offense; acknowledges the wrongfulness of actions; expressed remorse for his actions; inmate has support in the community.

This evaluator would note that criminal mindedness and criminal intent were the primary elements of this offense and that circumstantial and psychological factors were secondary. The inmate offers a limited explanation for his involvement in this offense, except to note how escalating circumstances resulted in a conflict, and that this death was the result of the criminal life-style choices (the reasonable risks) made by both the inmate and the victim.

## XV. Observations/Comments/Recommendations

<u>Does the inmate have a diagnosed major mental disorder</u>? Based on the available record and this evaluation process, in this evaluator's clinical judgment, this inmate does not have a major mental disorder requiring mental health treatment. Also, there is no record to indicate a pre-existing major mental illness that could have been a factor in his committing offense. No treatment recommendation is offered.

<u>Does the inmate have a diagnosed personality disorder</u>? Based on this evaluation process, this inmate appears to have a personality disorder in the moderate to severe range. He would receive some benefit from a continuing participation in a self-help process.

<u>Does the inmate have a diagnosed substance abuse problem</u>? This inmate has a lengthy history of polysubstance and alcohol abuse starting at a young age (he noted using alcohol as early as age 13). He described himself as addicted to alcohol and a heavy maintenance user of heroin most his adult life. Substance abuse also appears to have played a role in this inmate's participation in the committing offense, but more on the level of involvement in a drug/criminal life-style. He appears to have used drugs and been involved in drug distribution off and on throughout is incarceration. This inmate would benefit from participating in AA/NA on a weekly basis or other similar treatment programs. If paroled he should maintain a presence in AA/NA as well.

Respectfully Submitted,

Gary A. Freitas, Ph.D.
Clinical Psychology

CHUCKAWALLA VALLEY STATE PRISON
BLYTHE, CALIFORNIA

BPT LIFE-TERM MENTAL HEALTH EVALUATION
(Revised 1998)

INMATE:        BERTOLDO, ROBERT
CDC#:          C-94377
DOB:           12-10-50
EVAL. DATE:    9-19-00

## Psychosocial Assessment

### I. Identifying Information

The inmate was informed of the nature of this evaluation, that it was not confidential and that prior to writing this evaluation his C-File and medical records would be reviewed. He stated that he understood and would cooperate. This inmate was seen for approximately 1.5 hours

This is the 5th BPT Mental Health Evaluation for this 49 year old White male. He was convicted, at the age of 30, in Los Angeles County of Second Degree Murder in 1984. He received a 19-year-to-life sentence. His C-File indicated two prior felony convictions, one for robbery in 1976 and for burglary/forgery in 1978. There were approximately 7 misdemeanor arrests/convictions. Since being in the CDC he has had ten 115's, including three in the past year for possession of inmate manufactured syringe, possession of morphine/positive urinalysis test and a refusal to take a urinalysis test. Between 1985 and 1995 he had seven 115's, including positive urinalysis, possession of stimulants and sedatives, assault on a staff, threatening staff, fist fight and use of force/violence. The record indicated that this inmate has twice been assaulted in prison, once, in 1975, he was stabbed in the abdomen and in 1988 he was stabbed in the face.

### II. Developmental History

This inmate provided an unremarkable developmental and childhood medical history. He did not indicate any history of behavioral or emotional problems and provided no history of either physical or sexual abuse.

### III. Education

The inmate stated that he dropped out of El Monte High School, in El Monte, CA during the 10th grade in 1967. He noted a significant history of school truancy prior to dropping out. He has no history of special education classes. He obtained his GED in 1986 while in prison. He has also completed the following classes: anthropology (correspondence course from Ohio State); Breaking Barriers (basic, advanced and as group facilitator); Alternatives to Violence (basic, advanced and as group facilitator); Ameri-I-Can (self-help group); Morals and Values (self-help group); church sponsored seminars; Child



BPT MH EVAL        CVSP        1        C-94377        BERTOLDO, R.

Abuse Prevention Foundation; Criminon (correspondence self-help program) and a correspondence course by Set Free Ministries.

## IV. Family History

This inmate was born on 12-10-50 in Visalia, CA. His natural parents are Pete Bertoldo (80's) and Josephine Christian (75). His parents divorced when he was 3 years old and he was raised by his mother. He has had limited contact with his father, who he has not seen since 1979. His mother currently resides in El Monte, CA. He was four brothers and one sister. One brother (Ignacho) died of cancer at the age of 49. He has not seen his oldest brother in 30 years. His last family visit was in 1996 by his mother and sister. He stated that between 1990-96 they would visit him 3-4 times per year. He phones his family on a weekly basis, including one brother who lives in Florida.

## V. Psychosexual Development

The inmate described himself as exclusively heterosexual and unconflicted regarding his sexual orientation. He did not provide any genetic, medical, social or developmental history suggestive of a disturbance in gender identity. The record does not indicate and he did not volunteer any information that would suggest aggressive, high-risk sexual conduct or of deviant sexual behavior.

## VI. Marital History

He indicated that he has never been married two times. From 1982-91 to Maria. They had no children. He stated that they married while he was in county jail for the committing offense. He married again in 1992 to his current wife, Carol, age 49, who resides in Los Angeles. They have no children. She has retired from working at Lockheed due to an accident at work. He said she was a friend from high school he had always kept in contact with. He has one child from a high school relationship. Her name is Lisa Mendoza (33). He has had only one contact with her, at birth, and was not involved in raising her. Currently he calls his wife about twice a week, indicating that she visits him on a once every two month basis, but has been unable to recently due to his 115's.

## VII. Military History

None

## VIII. Employment History

This inmate provided an intermittent employment history, beginning at age 16 up until his arrest, of working for his brothers installing patios and flooring. While in the CDC his has received vocational certificates in drafting and as an optical technician. He said he is currently licensed as an optical technician in CA and is in the process of updating his continuing education requirement. His current position is in the "clothing room." He has also served a year on the Men's Advisory Council and worked as a special purchase clerk as well in the Arts in Corrections program.

## IX. Substance Abuse History

This inmate described a pattern of drug and alcohol abuse, beginning at age 13 with alcohol. By age 19 he described himself as an "alcoholic." In 1975, at the age of 25, he began using heroin and described himself as a life-long maintenance user without

becoming severely addicted. He noted past use of barbiturates, stimulants, cocaine, LSD and amphetamines. He said he had very little interest in marijuana. He also described a heavy involvement in a drug life-style that included dealing drugs. He stated that he has never participated in any formal drug treatment program and that AA/NA are not for him. He acknowledged a certain degree of denial regarding his having a drug/alcohol problem. He also stated that he may be rationalizing, but that the easy availability of drugs at CVSP and his back pain can mostly account for his recent relapse with drug use here in prison. He did mention some interest in seeking out some alternative treatments to AA/NA.

## X. Mental Health/Medical History

He does not report any history of mental health treatment. There have been no psychiatric hospitalizations, prescription of psychotropic medications or outpatient treatment. He stated that he has never attempted suicide. He described his health as "fair." He did not provide any history of of serious head injury or seizures. He noted a "soft shoe Chrono" for the wearing of a tennis show to accommodated a leg/ankle brace. He called his condition "drop foot" and said it was related to the severing of a nerve in his leg due to a gun shot wound he received in an argument (he did not want to elaborate on this event). He recently (9/00) had a lump in his chest biopsied and is waiting for the results. He described chronic back pain since he suffered a work-related injury in the CDC in 1986. He said he was diagnosed with Hepatitis C in 1996.

## XI. Plans if Granted Release (Please note that this evaluation is based exclusively on information presented by the inmate).

Level of Support. This inmate has plans to reside with his wife in Los Angeles, CA after he paroles.

Work History. This inmate provided an unstable work history, limited by his chronic drug/alcohol abuse and antisocial life style. Within the CDC he has obtained several vocational certificates and has licensed as an optical technician. He has also worked at a variety of responsible positions within the CDC.

Financial /Vocational Plans. This inmate indicated that when he returns to the community he has a job offer from a friend to help setup boxing rings for professional fights. He also hopes to pursue employment as an optician.

Institutional Adjustment. This inmate's adaptation to prison has been mixed. He has worked in responsible positions and learned new job skills, some of them certificated and he has completed his GED. On the other hand he has an extensive history of disciplinary problems and drug use in prison, not to mention three drug related 115's this past year. Until this recent drug relapse his record for the past 5 years appears to have been fairly good.

Overall, this inmate's parole discharge plan is rated poor to fair.

## Clinical Assessment

### XII. Current Mental Status/Treatment Needs

This is a 5' 9", 150 lb., White male, olive complexion, with thick white mustache and black hair. He related to this interviewer in a pleasant and talkative manner. He was not defensive and presented in a fairly open manner. He sat upright and maintained good eye contact but had to move about because of back pain. He was oriented x3. Speech was clear and coherent. Affect was generally appropriate to thought content. Intellectual functioning appeared in the average range. There was no evidence of a perceptual disorder. He denied any history of hallucinations or delusions. There was no evidence of a formal thought disorder or associational disturbances. He stated that he is without suicidal ideation.

| | |
|---|---|
| Axis I: | 304.80 Polysubstance Dependence (ETOH, heroin and methamphetamines) |
| Axis II: | 301.7 Antisocial Personality Disorder |
| Axis III: | Physical Disorders or Conditions: hepatitis C, chronic back pain, nerve damage to right leg |
| Axis IV: | Psychosocial Stressors: minimal |
| Axis V: | Current GAF: 74 |

Psychotropic Medications: None

Alerts: None

### XIII. Review of Life-Crime

This inmate provided a report of his committing offense that is generally consistent with the available record. He stated that he had been involved in putting together drug deals with the victim, who bought and sold drugs. He said the victim owed him $400 and he visited to collect what he was owed. A physical fight ensued and they both tried to grab a knife nearby. The defendant controlled the knife and stabbed the victim. As he ran he entered a room where there was gun on the desk, when the victim threatened to get him he shot the victim in the head, killing him. He admitted stealing many personal items from the victims person as well as his home. He claims he did not go their with the intent to harm the victim or to rob him and was unarmed when he arrived. He said he shot and killed the victim because he took seriously his threat to seek revenge.

### XIV. Assessment of Dangerousness

In assessing the question of dangerousness this evaluator would note that mental health professionals are not able to predict future acts of dangerous behavior with significant predictive validity. However, they are able to evaluate relevant risk factors associated with relapse and reoffense:

High-Risk Factors: prior felony criminal record; the offense involved use of lethal force and the death of the victim; inmate was an active participant in the offense; the death of the victim was premeditated; drug/alcohol abuse was involved; personality disorder diagnosis; there was no immediate threat to the inmate; the victim was extremely vulnerable (these latter two are based on the victim being killed by the gun shots); overall adaptation to prison-life has been

very mixed; expressed limited remorse for his actions; limited awareness regarding his involvement in this offense.

<u>Low-Risk Factors</u>: admits his role in the offense; acknowledges the wrongfulness of actions; inmate has support in the community.

This evaluator would note that criminal mindedness and criminal intent were the primary elements of this offense and that circumstantial and psychological factors were secondary. The inmate offers a limited explanation for his involvement in this offense, except to note how escalating circumstances resulted in a conflict, and that this death was the result of the criminal life-style choices (the reasonable risks) made by both the inmate and the victim.

## XV. Observations/Comments/Recommendations

<u>Does the inmate have a diagnosed major mental disorder?</u> Based on the available record and this evaluation process, in this evaluator's clinical judgment, this inmate does not have a major mental disorder requiring mental health treatment. Also, there is no record to indicate a pre-existing major mental illness that could have been a factor in his committing offense. No treatment recommendation is offered.

<u>Does the inmate have a diagnosed personality disorder?</u> Based on this evaluation process, this inmate appears to have a personality disorder in the moderate to severe range. He would receive some benefit from a continuing participation in a self-help process.

<u>Does the inmate have a diagnosed substance abuse problem?</u> This inmate has a lengthy history of polysubstance and alcohol abuse starting at a young age (he noted using alcohol as early as age 13). He described himself as addicted to alcohol and a heavy maintenance user of heroin most his adult life. Substance abuse also appears to have played a role in this inmate's participation in the committing offense, but more on the level of involvement in a drug/criminal life-style. He has appears to have used drugs and been involved in drug distribution off and on throughout is incarceration. This inmate would benefit from participating in AA/NA on a weekly basis or other similar treatment programs. If paroled he should maintain a presence in AA/NA as well.

Respectfully Submitted,

Gary A. Freitas, Ph.D.
Clinical Psychology

Richard J. Donovan Correctional Facility

# BOARD OF PRISON TERMS PSYCHIATRIC EVALUATION

### JUNE CALENDAR 1995

### March 7, 1995

For this evaluation, the inmate's Central File and Medical File were reviewed and inmate Bertoldo, CDC# C-94377, was interviewed on March 6, 1995 between 1:55 p.m. and 3:00 p.m. Mr. Bertoldo understood that this was not an ordinary doctor/patient relationship and waived confidentiality for the purposes of this Board report.

Mr. Bertoldo has had three previous psychological or psychiatric reports to the Board of Prison Terms during this incarceration. The most recent was by Dr. S. Mennuti dated 7/7/93.

### COMMITMENT OFFENSE:

Mr. Bertoldo has a total sentence of nineteen years to life. He received fifteen years to life for Murder, Second Degree and a one year enhancement for Use of a Deadly Weapon - Knife, and he received a three year consecutive sentence for Grand Theft Person. The date of the offense was 4/13/81 and the date of the sentencing was 9/25/84. Mr. Bertoldo was found guilty by jury in the death of his victim John Simerly, who was stabbed and shot in his own home. More details of the offense and indications of the type of evidence against Mr. Bertoldo can be found in the Probation Officer's report in the Central File. Around the time of the arrest and conviction, Mr. Bertoldo denied involvement. In his BPT Psychiatric Interview with M. Tavoularis, M.D. in 1991, it was noted that Mr. Bertoldo did not wish to discuss the instant offense in any detail and became tearful when he was asked to. In his August 1993 BPT Psychological Report with Dr. Mennuti, Mr. Bertoldo reported that he had been involved in drug dealing with the victim for some time and that he was attempting to collect a drug debt when the victim pulled a knife, Mr. Bertoldo gained control of it, then stabbed and shot the victim with a .22 caliber pistol he found in the victim's desk.

BERTOLDO, ROBERT    C-94377    RJDCF    JS/kmd    3/7/95



Copy sent to inmate ___3-9-95___

BPT CONTINUED
PAGE 2

**COMMITMENT OFFENSE - CONTINUED:**
In his interview, on 3/6/95, Mr. Bertoldo asked if he had to
talk about the commitment offense. He said he didn't like
thinking or talking about it and that he would like to start
getting over it. He said he would prefer if I read Dr.
Mennuti's report or the last Parole Board transcript because
it was the "same thing, things haven't changed." He asked
why I had asked, since "It was morbid, there was blood all
over," and that it was painful for him but not for the Board
or for this evaluator.

**RELEVANT PSYCHOSOCIAL FACTORS:**
No new information on the psychosocial factors regarding the
commitment offense was obtained during this interview.

**PRIOR OFFENSES:**
Mr. Bertoldo had approximately eight prior convictions
between 1969 and 1979. These included convictions for
Attempted Second Degree Robbery (Mr. Bertoldo reports it was
Burglary), Forgery, Unlawful Taking of a Motor Vehicle, and
Misdemeanor Drunk Driving. He also had probation extended
or revoked on approximately four occasions.

**DISCIPLINARIES:**
Mr. Bertoldo's disciplinary history can be found in his
Central File. Since his 1993 Board of Prison Terms Report,
there has been one CDC 115 disciplinary write up for a
positive UA (cocaine) after a family visit, for which he
still maintains his innocence. There is one CDC 128
Custodial Counseling Chrono in his Central File dated
9/30/93 of which Mr. Bertoldo says he was not aware. He
reported he did not recall any disagreement or shouting with
anyone at work change. He did report that he thought he had
a 128 because a man in a nearby cell was caught with an item
of hobby equipment which belonged to Mr. Bertoldo in
approximately 1993.

**MENTAL HEALTH TREATMENT:**
There is no history of previous mental health treatment.

**EDUCATIONAL ACTIVITIES:**
No formal schools since the last Board of Prison Terms

BERTOLDO, ROBERT    C-94377    RJDCF    JS/kmd    3/7/95

BPT CONTINUED
PAGE 3

**COMMITMENT OFFENSE:**
Report. Mr. Bertoldo reports that he is trying to help
start a cultural studies program at RJD as he is interested
in Mestizo, Aztec, and Mayan culture.

**SELF-HELP ACTIVITIES:**
There are a few recent chronos in Mr. Bertoldo's file
indicating self help activities. He reports that he is
still active in the Alternatives to Violence Program as a
facilitator and was active in Breaking the Barriers but he
says there have been no recent activities in that
organization. He says he is active in K.A.I.R.O.S. and is
amazed that people come into the prison for no pay to help
people they don't know. He says he is struggling with his
beliefs about Jesus Christ and thinking about reading the
Bible. He says it has changed some of his beliefs about
living by a code of honor and that now he believes honor has
a lot more to do with self-esteem.

Mr. Bertoldo reports that he has not become involved in
Alcoholics Anonymous or Narcotics Anonymous on a regular
basis. He says he has gone a few times and that there is
"Nothing keeping me from it...neglect, pure neglect." He
acknowledged that the Board recommended him to go to
anonymous groups two years ago.

**OCCUPATIONAL ACTIVITIES:**
Mr. Bertoldo reports that he is continuing in his Vocational
Optical Class and that he will be taking an America Board of
Optometry test in November. He says he left the class for a
while when he became the Men's Advisory Council Chairman on
his facility and that he is now back in the Vocational
Optical Class. He says his attendance is good and his
reports are good. Chronos in his Central File indicate that
he was making slow progress in his Vocational Optical
Training in 1993. In the past, he has completed training in
Vocational Drafting.

**CURRENT NEEDS:**
Mr. Bertoldo expresses few current needs. He reports some
involvement with his family and with the religious
organization, K.A.I.R.O.S., and he really seems to enjoy his
hobby work. He reports that he had some depressed mood when

BERTOLDO, ROBERT    C-94377    RJDCF    JS/kmd    3/7/95

BPT CONTINUED
PAGE 4

his brother died of cancer approximately four months ago.

**MAJOR MEDICAL ILLNESSES:**
Mr. Bertoldo reports no serious current medical illnesses.
He wears a brace on his right leg secondary to foot drop.

**RESPONSIBILITY:**
Mr. Bertoldo admits committing the instant offense.  Beyond
that, he had very little to say about it.  See the
Commitment Offense section above.

**SELF-AWARENESS:**
Mr. Bertoldo demonstrates some awareness of his own emotions
and those of others.

**REMORSE:**
Mr. Bertoldo demonstrates remorse for the commitment offense
by reporting how difficult it is for him to talk about it
and he also mentions the effect on the daughter of the
victim, who he says was present at his last Board hearing.

**PLANS AT DISCHARGE:**
Mr. Bertoldo reports that if he receives a parole date, he
plans to continue work as a draftsman or optician.  He also
has done previous work in patio installing.  He reports that
he would like to go to school to learn to cut hair and
possibly one day open up a shop for himself.  He has some
fairly realistic ideas about the wages for these types of
work and the expenses he would have outside of prison.  He
also reports that he would live with his wife, who is a
homeowner.  He says she and the rest of his family,
including his in-laws and his mother and step-father, are
supportive of him.  He says he and his wife have no
children.

**MENTAL STATUS EXAMINATION:**
Mr. Bertoldo was a well developed man of medium build, who
looked approximately his age of 44.  He was neatly dressed
in regulation CDC clothing and wore a very small amount of
jewelry.  He had a thick mustache and a small beard and
hygiene appeared good.  His posture and affect were relaxed.
He was cooperative and open with most of the interview with
the exception of discussing his commitment offense.  He

BERTOLDO, ROBERT    C-94377    RJDCF    JS/kmd    3/7/95

**BPT CONTINUED**
**PAGE 5**

reported his mood was usually good but that he had some
sadness around the time of his brother's death four months
ago. There was no evidence of delusions, hallucinations,
paranoia, obsessions, nor suicidal nor homicidal ideas. His
speech was normal in rate, volume and amount. His awareness
of his own emotions seemed fair. His ability to reason
abstractly was good as demonstrated by interpreting
proverbs. For example about spilled milk he said, "What's
done is done, repair it and go on." Recent and long term
memory seemed good.

**DIAGNOSIS:**
Axis I:    Polysubstance Abuse by History (alcohol,
           methamphetamine, and heroin).
Axis II:   Anti-social Personality Traits.
Axis III:  Right Foot Drop Corrected with a Brace.
Axis IV:   Incarceration (psychosocial stressors).
Axis V:    GAF - 67 (100 point scale of global functioning).

**CONCLUSIONS:**
Mr. Bertoldo has improved somewhat in his ability to conform
to social norms with respect to lawful behavior. He
demonstrates some failure to plan ahead and some
rationalization of having hurt others. These are antisocial
personality traits.

Mr. Bertoldo has a history of substance abuse that was more
or less directly related to the commitment offense. He has
made only the most indirective efforts to decrease his risk
of relapse.

Mr. Bertoldo does not seem to have any major nonsubstance
abuse mental illnesses. He clearly has some discomfort with
his circumstances, but almost as clearly there is little
discomfort with his own beliefs. In such a situation,
insight oriented psychotherapy is probably useless and
possibly counterproductive.

**BERTOLDO, ROBERT    C-94377    RJDCF    JS/kmd    3/7/95**

BPT CONTINUED
PAGE 6

**RECOMMENDATIONS:**
I recommend that Mr. Bertoldo be allowed to pursue self-help
activities at his own pace.  Insight oriented psychotherapy
is not indicated, and is perhaps contraindicated.
Reevaluation may eventually be helpful.


JOHN SAUNDERS, M.D.
Staff Psychiatrist


BERTOLDO, ROBERT    C-94377    RJDCF    JS/kmd    3/7/95

### Richard J. Donovan Correctional Facility

## PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
## AUGUST 1993 CALENDAR

### July 7, 1993

A.   This is the sixth report to the Board on this 42 year old, Caucasian male serving a term of nineteen years to life for murder in the second degree.

B.   This report is based on a detailed review of Central File and a two hour interview. The interview was for the sole purpose of preparing this report.

Since the last report to the Board, the inmate has remained disciplinary free. This is in contrast to his early disciplinary record which indicates five serious CDC 115's between April, 1985 and July, 1989. The July, 1989 CDC 115 was for the use of stimulants, which the inmate acknowledges. He also acknowledges that he was associating with a "bad" crowd at that time and was involved, as a middle man, in some drug distribution at CCI. He maintains that he has been drug/alcohol free since then and has had no contact with drugs. He participated briefly in AA while at CCI. He stated that he stopped going to AA since he was using drugs at the time and felt like a hypocrite. He also felt that since many other participants were doing the same thing, that the program was not helpful. Since the last report, the inmate has completed a vocational drafting program (September, 1991) and is currently half way through the Optical Program as a lens grinder.

In November, 1992 the inmate was married to a woman he has known for approximately twenty-five years. He plans to live with his wife in Los Angeles when he is paroled from prison.

BERTOLDO, ROBERT    C-94377    RJDCF/SD    (dgo) 7-8-93



Copy sent to inmate ___JUL 09 199__

**BPT**
**Page 2**

In addition to getting married in 1992, the inmate attended numerous self help groups. He completed the following:

1) The Basic Alternatives to Violence Program in January, 1992 and Alternatives to Violence Program follow up meetings from then until October, 1992.

2) Advanced Alternatives to Violence Program in April, 1992.

3) Breaking Barriers Program in April, 1992. He has subsequently functioned as a facilitator in the program from May 1992 to the present.

4) The AMER-I-CAN Program in June, 1992 as part of his program in the Optical Training Program.

He reports that the Alternatives to Violence Program has had a profound effect on him and he shows a good understanding of the philosophy, techniques, and applications of this program. His understanding of the Breaking Barriers Program is less then that of Alternatives to Violence Program. He acknowledges that because he has been a facilitator in the program, he has not worked as hard as he could to apply it to his own life. He reports that his understanding and participation in the AMER-I-CAN Program has been perfunctory and was a requirement in his Optical Training Program. He has not participated in AA/NA, partially as a result of being so involved in other programs and partially as a resistance to it. A fair amount of time during the interview was spent discussing this with the inmate and the importance of a committed, long term involvement in AA/NA.

**BERTOLDO, ROBERT    C-94377    RJDCF/SD    (dgo) 7-8-93**

BPT
Page 3

C.   During the interview, the inmate was courteous and
     cooperative.  He appeared to be more open and honest
     then he has been in prior interviews.  Unlike earlier
     interviews, he talked openly about the commitment
     offense and, with mild prodding, was able to discuss it
     in detail.  He accepts responsibility for his role in
     it.  According to the inmate, he had been involved in
     drug dealings with the victim for some time.  While
     attempting to collect a drug debt from the victim, a
     struggle ensued and the victim pulled a knife.  He
     acknowledges gaining control of the knife and stabbing
     the victim multiple times.  After finding a .22 Caliber
     pistol in the victims desk, he began exiting the
     premises.  As he passed the victim, who was lying on
     the floor, the victim attempted to say something to him
     and he shot him once in the head.  The inmate expresses
     genuine remorse for the effects this has had on the
     victim's family and his own family.  When asked to
     discuss his feelings towards killing the victim, the
     inmate acknowledges that he has avoided exploring this
     in depth but realizes he must do it at some time.

     The inmate's mental status exam is within normal limits
     with no evidence of a thought disorder, organic
     disorder, or mood disorder.  The inmate appears to have
     begun making psychological changes.  This is evidenced
     by his remaining disciplinary free since 1989, active
     participation in self help programs such as
     Alternatives to Violence and Breaking Barriers, and his
     increased honesty and willingness to discuss the
     commitment offense and prior CDC 115's.  Additionally,
     he appears more willing to accept his responsibility
     for these and to avoid making excuses for himself.

**BERTOLDO, ROBERT    C-94377    RJDCF/8D   (dgo) 7-8-93**

BPT
Page 4

D.   **PSYCHOLOGICAL DIAGNOSIS:**

Axis I:    Mixed Substance Abuse Disorder (Alcohol,
           Methamphetamines, Heroin).

Axis II:   Antisocial Personality Disorder.
Axis V:    GAF ( on a scale of 0 to 90) is 80.

All of the previous reports have agreed on the above
diagnoses.  His juvenile and adult history are
characteristic of the diagnosis of antisocial
personality.  The essential feature of this disorder is
a pattern of irresponsible and antisocial behavior
beginning in childhood or early adolescence and
continuing into adulthood.

E.   **PSYCHOLOGICAL CONCLUSIONS:**

1. General Conclusions.

   a.    The diagnosed psychopathology, while not
         directly related to the commitment offense,
         strongly predisposed him to commit it.

   b.    During an observation in the institution, the
         inmate has begun to make psychological
         changes.  While these are in the right
         direction, they are relatively recent and
         must be maintained over a longer period of
         time.  Additionally, while they are a good
         beginning, significant other change must
         occur.  This has also been discussed at
         length with the inmate.

   c.    In a less controlled setting, such as a
         return to the community, the inmate's ability
         to hold his present gains is good if he is
         able to refrain from using drugs or alcohol.

BERTOLDO, ROBERT     C-93477     RJDCF/SD   (dgo)  7-8-93

BPT
Page 5

2.  Suggested action.  If the inmate is not paroled,
    he should continue his present program in the
    vocational optical program.  Continued
    participation in self help groups is desirable and
    a committed, long term participation in AA/NA is
    critical to his continuing growth.  In the future,
    the Board may want to consider his participation
    in the Category "X" and/or Category "T" Programs
    since it is likely that he would benefit from
    them.

3.  Parole and release.  If this inmate is to be
    paroled or released, consideration should be given
    to the following:

    a.  The inmate's violence potential outside a
        controlled setting in the past is considered
        to have been above average and at present,
        has decreased and is considered to be
        average.

    b.  As a condition of parole, the inmate should
        be required to continue participation in
        AA/NA and participate in mandatory drug
        testing.

F.  Recommendations to the Classification Committee.
    None at this time.


S. A. MENNUTI, Ph.D.
Clinical Psychologist



BERTOLDO, ROBERT     C-94377     RJDCF/SD     (dgo) 7-8-93

*PSYCHIATRIC CONSULTATION*
*CCI TEHACHAPI*

*BERTOLDO, Robert, C-94377, Psychiatric Evaluation for Unit IV-B, BPT, 10-5-91.*

## IDENTIFYING INFORMATION:

This is a 40-year-old (12-9-50) man of mixed Italian and Mexican descent who is serving a sentence of 15 years to life for second degree murder, the offense in 1981, conviction in 1984. There are several psychiatric evaluations on record. This dictation is for the second documentation hearing to the Board of Prison Terms.

## MATERIAL USED FOR REPORT:

In preparation for this report, I reviewed the inmate's C-File, his medical jacket, and carried out a psychiatric interview.

## CIRCUMSTANCES OF THE OFFENSE:

The inmate is convicted of stabbing and shooting a wealthy contractor in his home as part of a robbery. This information is gleaned from the C-File. The inmate did not wish to discuss the instant offense in any detail.

## PAST HISTORY:

The inmate was born in Visalia but left and was the youngest of five children. His father was an alcoholic and his parents separated, his mother taking him and his siblings to Los Angeles to her parents when the inmate was just a baby, and he was essentially raised in the home of his maternal grandparents until he reached the school age. He denies juvenile problems, went to the eleventh grade and says he quit after his mother remarried, and he resented his stepfather's attempt to impose discipline. He says he left the home then, got a job with his brother working in construction and began using alcohol heavily. He said he tried a variety of drugs, prefering alcohol and marijuana, and sold drugs for a while, but got out of that because it meant always having to "watch your back." He said that his first arrest was in 1976, probably for public intoxication, but that he received a CDC term shortly thereafter for grand theft and then with violation of parole, a second CDC term for burlary in 1988, and then the instant offense occurred shortly after his 1980 parole.

## MEDICAL HISTORY:

The inmate complains of back injury in the past. He wears a splint on his right foot because of a foot drop and has arthritic complaints in a variety of his bodily joints. He said that he was stabbed on his thorax in 1975 for refusing to carry out


COPY TO INMATE
VIA CC-1


orders of the Mexican Mafia, and then was stabbed in the face about three years ago on the IV-A yard also by EME.

<u>INTERIM HISTORY</u>:

The inmate said that he has not involved himself in any drug treatment program except to attend some A.A. meetings, but he has felt that people there are not motivated for help. He visits with his mother, brother, and sister, and just completed vocational drafting course. His last 115 was in July of 1989 for possession of stimulants and sedatives.

<u>MENTAL STATUS</u>:

Mental status examination reveals a well-developed, dark-skinned male appearing his given age who was alert and cooperative for the interview. He says that in the past year or so he has begun to recognize what a "shit" he has been, for example, treating his ex-girlfriend and his mother poorly but not looking at that or acknowledging it until recently. He said he was married in 1981 but his relationship deteriorated when he came to prison, that he continued drug use, but insists that he did not get involved in active prison gangs and that is why he ended up getting stabbed. He says that he is not certain why he has began to reflect on past behaviors and has a desire to change, particularly to be helpful to his mother in the future. He notes that when he talks to "youngsters" on the yard, he finds himself saying things that he recalls were said to him in the past and it causes him to reflect. Although he said he did not wish to discuss the instant offense, he became tearful when I inquired, and told me that as a result of that killing, a lot of people were hurt, not only the victim's family, but also his own, and that he has only in the last year or so he begun to deal with feelings about all of this. He said that he does not anticipate getting out of prison until he is in his late 40's and believes that he should prepare himself to make a living when he gets out. He would like to learn barbering and take a college course in small business management with an eye toward going into business for himself after his eventual parole. There was no evidence of major mental illness. The inmate was not delusional, nor hallucinated. He did not show signs of major affective disorder.

<u>DIAGNOSIS</u>:

My diagnostic impressions:

AXIS I:     POLY-DRUG ABUSE BY HISTORY.
AXIS II:    ANTISOCIAL PERSONALITY DISORDER.
AXIS III:   RECURRENT OSTEOARTHRITIS WITH PARESIS
            OF THE RIGHT LEG.
AXIS IV:    ONE (EVALUATION ONLY).


BERTOLDO    C-94377    CCI-Tehachapi:sb    Unit IV-B    10-15-91

AXIS V:      SIXTY TO SEVENTY.

PROGNOSIS AND RECOMMENDED TREATMENT:


It is difficult to assess whether the self-professed
introspection of the last year is heralding a definitive change
in the antisocial character pathology in this man.  He has had a
serious drug problem, and even if motivated to remain drug free,
he has never learned how to do so.  Close observation over the
next year or so may give evidence to whether or not he is
maturing or whether his verbalized self-criticisms are for
"show."  If genuine, he should be encouraged to involve himself
in psychotherapeutic efforts including self-help groups.  At the
moment he has been offended by superficial issues in A.A. that
have very little, if any, to do with the 12 Step Program.  I
would assess his impulse control to be average for this inmate
population, his propensity for violence has probably dropped to
at least average for this inmate population.


MARJORIE TAVOULARIS, M.D.
Senior Psychiatrist


BERTOLDO    C-94377    CCI-Tehachapi:sb    Unit IV-B    10-15-91

PSYCHIATRIC CONSULTATION
CCI TEHACHAPI

BERTOLDO, C-94377, Psychiatric Evaluation for Unit IV-B, BPT, 8-27-88.

This is apparently the fourth report to the Board on this 38-year-old native of Visalia in Tulare County, who is currently serving time for murder in the second degree. This inmate was interviewed for the purpose of this report only. This report is based on that interview as well as a review of the record of the inmate.

The inmate initiated the interview by producing a copy of his most recent Psychiatric Report and complained about the statement of "Anti-Social type". He also complained that the interview took "five minutes". The inmate expressed displeasure and announced that he was going to time their interview and depressed a button on his stop-watch/wrist watch.

This writer agrees with the conclusions and statements in the report of May 14, 1986 except that the inmate is of Mexican descent.

Now, as then, he presents himself with satisfactory atten- tion span, verbalizations and intellectual level. He is able to communicate clearly and appropriately. He denies suicidal ideation and homosexual experiences. There is no stated psychic distress.

The interview was punctuated however by frequent groans, shifts in posture, winces and risings from his chair, com- plaining that "I threw my back out yesterday."

Overall, the inmate shows no remarkable changes from earlier reported interview and level of insight and self-understanding are low.

Psychiatric Diagnosis:  ANTI-SOCIAL PERSONALITY.

Conclusion:  The criminal history of this inmate is directly related to the above diagnosis. There is little to suggest that he could conform without external controls.

Recommendation:  Continue present program.

A.M. CHARLENS, Ph.D.
Staff Psychologist

PSYCHIATRIC CONSULTATION
CCI TEHACHAPI

Bertoldo, C-94377, Psychiatric Evaluation for Unit IV-B,
3-18-88, BPT.

On 3-18-88 the file was reviewed and the inmate interviewed
for preparation of this report only.  Previous psychiatric
evaluations in the file of 5-19-86 and 6-24-87 noting
personality disorder anti-social type.

On present examination this 37-year-old man indicates he
knows he is a lifer.  He questioned whether he had to go to
group.  He then gave quite an intense account of having just
gotten started in classes in drafting.  There was a long
waiting list and he had just gotten in.  It would take a
year and a half or two years to complete and he wants very
much to stay in this class and hopes that any required stress
assessment group or any other group can be delayed until
after completion of trade.  He also has completed his GED.
General background has already been reported by Dr. Willis.
He currently indicates he has a foot drop on the right and
wears a brace.  This occurred after a gunshot wound.  He
uses Motrin for arthritis.  He otherwise seems to be okay.
He denies undue anxiety or depression.  He generally indicates
he is doing better at staying calm.  In three or four years
he only has one write-up for a verbal difference.  He gives
quite an impassioned account of the impact of the drafting
teaching on him and his desire to complete trade.

On present mental examination there was no evidence of
psychosis, there was no evidence of organic impairment.  He
appeared to be of average intelligence.  He does indeed
function as a personality disorder.  He probably shows some
beginning chance of change and improvement but needs more
time.  Insight is limited.

Diagnostic impression PERSONALITY DISORDER ANTI-SOCIAL TYPE.

Diagnose psychopathology as part of his present offense.
During observation in the institution he seems to me to be
just now beginning to show evidence of some significant change.
Conditions of parole would need to include quite close super-
vision of associates and activities.  Maintenance of regular
work of substance would help his self-worth system and would
lesson his need to impress others.  Recommendation basically
is that he first complete trade and then subsequent to that
be considered for stress assessment unit evaluation concerning
improvement and his ability to handle himself.

F.A. MATYCHOWIAK, M.D.
Psychiatric Consultant

PSYCHIATRIC CONSULTATION
CCI TEHACHAPI

Bertoldo, Robert, C-94377, Psychiatric Consultation, BPT,
Unit IV-A, 6/24/87

This patient is a 35-year-old, White, separated male, who was
seen previously in May 1986. He is due to be released possibly
about 1991, he thinks. Since I saw him in May 1986 he has had no
essential change, he has had no 115's, he is working and going
to school. He recently took a GED test and is waiting on the
results. He states he has about 80 points or so. He describes
to me his educational and vocational goals, which seem to be
realistic and sensible both for himself and for the good of
society.

CHARLES D. WILLIS, M.D.
Diplomate American Board of
Psychiatry and Neurology

COPY TO INMATE
VIA CC-1_____

PSYCHIATRIC CONSULTATION
CCI TEHACHAPI

C 94377 >

Bertoldo, Robert, C-04377, Psychiatric Consultation, BPT-AD 82/8,
CCI-Tehachapi, 5/14/86.

HISTORY:

The patient is a 35-year-old, white, separated male who is on his
third prison tour as of 1984.  He was sentenced for 19 years to life
for murder in the second degree with grand theft.  He states his
case is on appeal.  He possibly could be released in 1994.  He has
a prior prison conviction for grand theft auto and also burglary for
which he did time.

PAST HISTORY:

Date of birth 12/10/50 in Visalia, California.  His father is still
living.  He knew him some of the time, but his parents split when he
was young.  He had a step-father with whom he had a good relationship.
His mother is living and she raised him.  He has three brothers and
one sister, all older than he.  He completed the 10th grade of school
and has worked as a patio installer.  He has a Roman Catholic back-
ground, but does not attend.  Now he does attend since being in prison
some protestant services.  He is not depressed and he sleeps and eats
good.  He denies suicidal thinking.  He legally married Maria Mendoza
in 1981 and they have no children.  He has also had a common-law
relationship with a woman called Carol Morengi.  He received a gunshot
wound to his chest in 1975 requiring operative intervention.  Subse-
quent to this gunshot wound, he also had a right foot drop for which
he wears a special brace.  He denies VD history. He was seen briefly
for a situational problem by a Soledad Prison psychiatrist.  He denies
homosexual contact and had his first coitus when he was 16 years of
age.  He had his first arrest in 1969 and since then has had multiple
arrests.  He has no military history.  He uses beer quite a bit, but
does not consider himself an alcoholic.  He does not smoke.  He has
used Cocaine, LSD and Heroin, in fact, selling Heroin in order to
support his habit.

MENTAL STATUS:

The patient is a mature, white male in no acute distress who relates
rather easily.  His attention span and stream of talk are satisfactory.
He is not depressed and no hallucinations, delusions or significant
dreams are elicited.  His I.Q. responses seem to be in the average
range.  He is oriented as to time, place and person, and memory is
grossly intact.  His insight seems poor and his judgment poor, also,
comprehension is poor.  His self-concept is, "I know I've done wrong.
I feel I'm a nice person.  I like to help out a lot."  His three wishes
are (1) Get out of here (2) Be with my family (3) Live right.  He was
able to explain a couple of proverbs given to him for abstraction,
but missed some others.  He asked me no significant questions.

SUMMARY AND DISCUSSION:

We have here a man who reveals no sign of psychosis or organic brain syndrome. He diagnostically can be seen as an ANTI-SOCIAL PERSONALITY 301.70. He is responsible for his actions. Prognosis seems guarded since he has had a long history of anti-social acting out since 1969.

CHARLES D. WILLIS, M.D.
Diplomate American Board of
Psychiatry and Neurology

Bertoldo, Robert, C-04377        CCI-Tehachapi        bs        5/19/86

LIFE PRISONER EVALUATION REPORT

SUBSEQUENT PAROLE CONSIDERATION HEARING #5

June 2006 CALENDAR

BERTOLDO, Robert                                C-94377

Copy to
Inmate via CCI
5-12-06

## I.    COMMITMENT FACTORS:

### A.    LIFE CRIME:

Count I, Murder 2nd, With Use of a Deadly Weapon, Knife (187/12022 (b). Count 2, Grand Theft Person (487 (2) PC).
Weapons:  Knife and .22 caliber pistol
Commitment County: Los Angeles, Case Number: A527117
Victim: John Simerly, Age: 49
Date received by the California Department of Corrections: 10-22-84
Sentence: 15 years to Life plus 4 years Enhancement; total term 19 years + Life.
MEPD: 7-7-95 (Minimum Eligible Parole Date)

1.    Summary of Crime

On April 13, 1981, between the hours of 10:30 a.m. and 2:30 p.m., the victim John Simerly was murdered in his residence at 2056 Avocado Terrace, Hacienda Heights. The subsequent autopsy revealed that the victim had been shot in the face with a .22 caliber pistol and had been stabbed approximately 16 times. That afternoon, Dale Rogers the victim's son-in-law, discovered the body of the victim. At the time the victim was found with no wallet and his watch and necklace, which he had been wearing earlier that day, were missing. On April 15, 1981, Mr. Bertoldo stopped for a routine traffic violation. At that time he was searched by the officer and was found to be in possession of a .22 caliber pistol. It was determined that this particular weapon had been taken at the time of the murder of Mr. John Simerly and was considered to be the murder weapon. A subsequent investigation revealed that Mr. Bertoldo had pawned Mr. Simerly's necklace at a local pawnshop. Furthermore, the investigating officers conducted a search of Mr. Bertoldo's girlfriend's apartment and found Mr. Simerly's rifles, safe, and a quilt bearing blood stains (Probation Officer's Report, pages 3 and 4).

2.    Prisoner's Version

My counselor Mr. Olearnick has suggested / advised I introduce my insight of events which lead to the demise of Mr. John D. Simerly. I am grateful for Mr. Olearnick's suggestion because this writing has helped me to better estimate / evaluate what motivated my actions back then, and to now equate them to the attributes of practices I have today.

I have separated myself from the manner and mode of thought I had twenty-five years ago; to what I now recognize could have been the influence / motivation to what happen between Mr. Simerly and I on the day of his death. I am not some psychoanalyst but I have asked myself a few



Life Prisoner Evaluation Report
Subsequent Parole Consideration Hearing #5
BERTOLDO                          ROBERT
C-94377
Page 2

questions about that day, these are some:

I knew then and know today that II never hated or disliked Mr. Simerly, we had worked together, we'd ate together, and drank together, and we had never argued like we did that day, so why did I kill him?

Mr. Simerly kept a reputation about himself as though, anyone who would hurt him intentionally or other wise would be hurt back with an obligation of punishing them terribly. John David Simerly carried weapons with him at all times or was known to - I myself knew that his belt buckle turned into a fighting knife. I know and saw how he had brutally treated one man who Mr. Simerly thought did him wrong and John David Simerly did as much damage as he could to that man and he hurt him bad. After hearing Mr. Simerly say to me that he would get me and that I would pay for hurting him and knowing him as I did then: in my mind then, I knew I had to shot him before he ended up shooting me. I knew and believed that more than anything else that day.

There was definitely something deferent about Mr. Simerly that day and even when we were fighting for the knife I knew I had to stop him in whatever way I could. My mind set then was, that I couldn't call the police because the police were the enemy – I was taught in the neighborhood that we were never to trust the police but I know now that if I would have trusted in the police and would have called them right after the fight, things may have been different for Mr. Simerly.

I grew up in neighborhoods where there were gangs, I as not a gang member but that mentality was in our schools. Bold gang members were our role models and heroes of the day. Moralistically looking back is like light years in comparison to the mode of thought I carry today. Growing up I was around people who would drink and so I knew how to interact whit people ho were intoxicated, like wise with people who were under the influence of drugs. So it was normal for me, never giving thought to the instability of peoples character when there in an altered state of mind. There was a phone call placed to Mr. Simerly prior to going there, I should have known he was under the influence. Once arriving at his house we had a couple of drinks and he was obviously doing more prior to me getting there. Seeing how blitz he was I could have left, but I had dealt with Simerly many times before while he was intoxicated; my mistake.

Today, I can not and do not stay around anymore who is under the influence of anything, I do not allow myself to speak to anyone while there under the influence. I personally am acquainted with the destruction drugs and alcohol causes and have developed abhorrence to its devastation and ruin.

My bible says, "Do not be unequally yoked together with unbelievers. For what fellowship had righteousness with lawlessness? And what communion has light darkness "and" have no fellowship with the unfruitful works of darkness. : I have found Jesus Christ sufficient of overcome the power of sin, I've found that for the past six years, while submitting myself to the obedience to God's Work (the Bible) I can refrain from many of the old things that lead me to a negative mind-set, which I had prior to meeting Christ.

Life Prisoner Evaluation Report
Subsequent Parole Consideration Hearing #5
BERTOLDO                    ROBERT
C-94377
Page 3

I use to think I was so smart with the knowledge of the world, but I know now the only knowledge that counts, is the knowledge and wisdom of the Lord who gives us the wisdom generously, God's word promises that.

While doing an ethics study, taught through Coast Line College, it states that religion has more influence on the ethical behavior of contemporary humans than all the philosophy in history. Whole communities and nations have adopted the teachings of the Jewish law or the Christian way as models for ethical behavior. In the past six years as I've walked with Christ teachings I've earned so much about the way I use to live my life in the past. My Life's morals were bent, and no more blame goes to the ones who raised me, but to myself for I made the rebellious choices in my life at a young age, which lead me to acquaint and relate myself to David Simerly and the events which took place that day.

Most of all with this writing I want the B.P.H. to understand that in no way am I giving justification for my actions of that day, or for life style which lead up to that. There is no justifying the taking of a life prematurely. What I want the board to know is the insight I've gained through a mournful repentance shown to me through Jesus. Most of the guilt and shame I've carried through out these past twenty five years has stemmed from the fact that I liked Mr. John David Simerly. Through my repentance I found it was one of the hardest things to contend with about myself, and of what happened.

Knowing now that living my life with bent ethics and morals this wouldn't have happen, and current reality says that I can not go back and relive the past or altar it; even punishment does not altar the past and must have an end, but a mistake or wrongdoing will live on forever if not forgiven, and that has been one of the keys to unlock the reproach and blame I carried of myself and which also kept me from progressing into a godly man. Through God's forgiveness I was able to mourn for my sinful life and repent from it.

What has been a stepping stone and example pf repentance for me was a bible study I taught on Matt. 5:4 "blesses are those who mourn for they shall be comforted". I finished the study with two examples of repentance; One of Peter (Matt. 26:74, 75) after he heard the third cry of a rooster and one of Judas (Matt. 27:3-) after he saw Christ was condemned. Both men disowned Jesus and they both repented. One of them, Peter, wept bitterly and the other, Judas, went and hanged himself.

Many people are sorry only for the "effect" of their sin or for being caught, that's worldly sorrow, we can mourn our sin with a godly sorrow.

I have come to know that I am a redeemed and repentant man and that God has forgiven me for my sinful past. Only through this spiritual process have I been able to live my life in a positive way, but I gain every day by God's conformation of my daily living by sending someone by to visit me who is in need to be consoled, ask for godly guidance, fellowship or just to pray. I can tell you that God has certainly given me insight to my past.

Life Prisoner Evaluation Report
Subsequent Parole Consideration Hearing #5
BERTOLDO                         ROBERT
C-94377
Page 4

Thank you for the time you've given to these words and I pray they will be considered.

3. Aggravating/Mitigating Circumstances

a. Aggravating Factors:

The crime involved great bodily harm and great violence.
The defendant used a weapon at the time of the commission of the crime.
The defendant was engaged in a pattern of violent conduct, which indicates a serious danger to society.
The defendant's prior convictions as an adult and juvenile are numerous and of an increasing seriousness.
The defendant has served prior prison terms.
The defendant's prior performance on probation was unsatisfactory.

Noted: Inmate Bertoldo's aggravating factor of premeditation is being removed from his current board report because the facts of the case, as stated in the appeal, does not fully disclose that his particular crime was indeed premeditated. However, if the Board of Prison Terms feels that this aggravating factor should remain, than this should be noted in his board hearing so future board reports can be annotated properly.

b. Mitigating Factors

None.

B. **MULTIPLE CRIMES:**

Count 1, Robbery 2nd, (211 P.C.)
Weapons: Screwdriver
Commitment County: Los Angeles, Case # A259026
Victims: Unknown
Date Received CDC: 6-25-1976
Sentenced: 6months to 20 years

1. Summary of Crime:

The summary for this particular crime was unable to be ascertained because his current Central File does not contain any information concerning this crime and his previous CDC#'s, B-74636 and C-06110, were never ordered for review. However, the above listed achieves were ordered on 7-19-2004, and will be reviewed upon arrival.

Life Prisoner Evaluation Report
Subsequent Parole Consideration Hearing #5
BERTOLDO                          ROBERT
C-94377
Page 5

2.  Prisoner's Version:

"These crimes, which took place twenty-five to thirty years ago and being the age of 53, my memory is not what it used to be.  However, I am willing to attempt to answer any questions to the best of my recollection."  A full rendition of Bertoldo's summary of crime is located in the Miscellaneous section of the Central File.

Count 1 and 2, Forgery, (470 P.C.)
Weapons: None
Commitment County: Los Angeles, Case #: A343002
Victims: Unknown
Date Received by CDC: 6-26-1979
Sentenced: 2 years, both counts

1.  Summary of Crime:

The summary for this particular crime was unable to be ascertained because his current c-file does not contain any information concerning this crime and his previous CDC#'s, B-74636 and C-06110, were never ordered for review. However, the above listed achieves were ordered on 7-19-2004, and will be reviewed upon arrival.

2.  Prisoner's Version:

These crimes which took place twenty-five to thirty years ago and being the age of 53 my memory is not what it used to be, but I am willing to attempt to answer any questions to the best of my recollection. A full rendition of Bertoldo's summary of crime is located in the miscellaneous section of the c-file.

II.    **PRE-CONVICTION FACTORS:**

A.    **JUVENILE RECORD:**

1.  Arrest, 7-13-64, Suspicion of carrying a switchblade knife, 13 years old.  Counseled and released.
2.  Arrest, 12-23-64, Suspicion of inhaling glue, 14 years old.  6 months probation.

B.    **ADULT CONVICTIONS AND ARRESTS:**

1.  Arrest, 4-2-69, Minor in Possession of Alcohol, 18 years old.  $48.00 fine and four (4) days Jail, suspended.
2.  Arrest, 5-11-69, Misdemeanor Drunk Driving.  $200.00 fine and 25 days Jail, suspended.
3.  Arrest, 9-1-69, Possession of Material – Device for Arson, and Taking a Vehicle without Owner's Consent.  Released.

Life Prisoner Evaluation Report
Subsequent Parole Consideration Hearing #5
BERTOLDO                          ROBERT
C-94377
Page 6

4.   Arrest, 9-19-69, Grand Theft – Auto.  $150.00 fine and 3 year's probation.
5.   Arrest, 4-28-70, Robbery, 19 year old.  $300.00 fine and 3 year's probation.  Probation was revoked on 6-18-76, and defendant was sentenced to State Prison for the term prescribed by Law.
6.   Arrest, 1-28-71, Late Return to Biscailuz Work Furlough Center, 20 years old.  No disposition shown.
7.   Arrest, 11-11-71, Minor in Possession of Alcohol.  One year probation and one day County Jail, suspended.
8.   Arrest, 1-9-72, Battery on Peace Officer and Disturbing the Peace, 21 years old.  No disposition shown.
9.   Arrest, 1-16-72, Possession of Marijuana.  No disposition shown.
10.  Arrest, 5-30-75, Possession of Controlled Substance, 24 years old.  Prosecution rejected.
11.  Arrest, 4-21-78, Burglary, 27 years old.  Dispo unknown.
12.  Arrest, 11-29-78, Use/Under Influence of Controlled Substance.  Dispo unknown.
13.  Arrest, 3-3-79, Grand Theft Auto, 28 years old.  No disposition shown.
14.  Arrest, 6-26-79, Forgery.  Sentenced 2 years State Prison.

C.   **PERSONAL FACTORS:**

Bertoldo was born in Visalia, California, the youngest of five children.  His father was an alcoholic and his parents separated when he was an infant.  His mother moved to Los Angeles, taking her children with her.  He was essentially raised in the home of his maternal grandparents until he reached school age.  He completed school through the eleventh grade, quitting after his mother remarried.  He resented the discipline his stepfather brought to the home.

Prior to his incarceration, his employment was sporadic.  He had employment with several contractors laying floors, installing aluminum siding and patios.

Bertoldo was not married prior to his current commitment to CDC.  He does maintain a continuing relationship with Carol Lee Marangi.  On November 19, 1992, Bertoldo married Carol at the Richard J. Donovan Correctional Facility.  His wife has consistently visited him on a bi-monthly basis.

III.   **POST-CONVICTION FACTORS:**

A.   **SPECIAL PROGRAMMING/ACCOMMODATIONS:**

Bertoldo was informed of the Americans with Disabilities Act (ADA) and he does not have a disability as defined under the ADA.

Life Prisoner Evaluation Report
Subsequent Parole Consideration Hearing #5
BERTOLDO                          ROBERT
C-94377
Page 7

**B.    CUSTODY HISTORY:**

| Date: | Received at: | Custody Level: |
|---|---|---|
| 10-22-84 | CIM-Reception Center | Close B |
| 12-24-84 | CTF-Central | Medium A |
| 04-26-85 | San Quentin | Medium A |
| 04-28-86 | CCI-IV-A | Medium A |
| 11-10-87 | CCI-IV-B | Medium A |
| 12-10-91 | RJD | Medium A |
| 03-16-98 | CVSP | Medium A |

**C.    THERAPY & SELF-HELP ACTIVITIES:**

Inmate Bertoldo received the following CDC 128-B for his participation in the Narcotics Anonymous (NA) program at Chuckawalla Valley State Prison (CVSP): 9/3/04, 10/4/04, 1/3/05, 9/30/05, and 12/30/05.

On 3/24/05, Inmate Bertoldo received a CDC 128-B and a certificate of completion for successfully completing (20) twenty hours of Friends Outside Creative Conflict Resolution Workshop (Anger Management).

Inmate Bertoldo received the following CDC 128-B for his participation in The Most Excellent Way (T.M.E.W.), an alternative Biblical Ministry to Alcoholics Anonymous (AA) and Narcotics Anonymous (NA) at CVSP: 8/27/05 and 1/10/06.

Bertoldo received a CDC 128-B dated 1-8-04 and two Special Educational project dated 12/03 and 12/05 for his participation in the "Breakfast with Santa" project at CVSP

Bertoldo also received a letter from the children's Hunger Relief Fund complementing him for his generous contribution.

**D.    DISCIPLINARY HISTORY:**

**Report of CDC 128A's**

| 1-7-97 | Performance | RJD |
|---|---|---|
| 1-10-96 | Failure to Report to Class | RJD |
| 12-8-95 | Failure to Report to Class | RJD |

Life Prisoner Evaluation Report
Subsequent Parole Consideration Hearing #5
BERTOLDO                          ROBERT
C-94377
Page 8

| | | |
|---|---|---|
| 5-1-95 | Failure to Report to Class | RJD |
| 4-19-95 | Failure to Report to Class | RJD |
| 4-15-95 | Unauthorized Clothing | RJD |
| 9-30-93 | Disrespect/Misbehavior | RJD |
| 4-8-92 | Out of Bounds | RJD |
| 11-7-88 | Disruptive Behavior | CCI |
| 6-23-88 | Verbal Disrespect-Staff | CCI |

### Report of CDC 115's

| | | |
|---|---|---|
| 4-10-00 | Refusal to Submit to U/A | CVSP |
| 1-27-00 | Possession of Morphine/Positive U/A Test | CVSP |
| 1-13-00 | Possession of I/M Manufactured Hypodermic Syringe | CVSP |
| 4-10-95 | Non-Expendable Property | RJD |
| 5-31-94 | Positive U/A Test | RJD |
| 7-24-89 | Stimulants and Sedatives | CCI |
| 5-8-89 | Force and Violence | CCI |
| 03-1-88 | Fist Fight | CCI |
| 2-17-88 | Threatening an Officer | CCI |
| 4-13-85 | Assault on Staff | CTF |

**E.   OTHERS:**

Inmate Bertoldo was last seen by the Board of Prison Terms on 6-8-05. Before the hearing, Bertoldo elected to waive his hearing and stipulate to unsuitability for a period of one year due to Bertoldo needing to complete more self-help programs. The Board of Prison Terms elected to accept Bertoldos stipulation and recommended that Bertoldo get more self-help classes, stay disciplinary free, and earn positive chronos.

**IV.   FUTURE PLANS:**

**A      RESIDENCE:**

Upon parole, Bertoldo plans to reside with his wife, Carol Lee Bertoldo, at 6234 Strickland Avenue, Los Angeles, California. Her phone number is (213) 255-6441.

**B.   EMPLOYMENT:**

Bertoldo states he holds certificates as an optician and drafting, and he also has job skills in silk screening, aluminum patio installation, and flooring.  Bertoldo has anticipating sending out petitions for release/suitability and letters of support to friends, family members, and fellow Christians, and has received extensive feedback.  Bertoldo is planning on starting his own

Life Prisoner Evaluation Report
Subsequent Parole Consideration Hearing #5
BERTOLDO                              ROBERT
C-94377
Page 9

business, titled Aztec Times 6234 Strickland Ave, Los Angeles Ca #(213) 255-6441, samples of
his work located in the misc. section of his C-file.

C.    **ASSESSMENT:**

Bertoldo's future plans seem to be well thought out and realistic. He has continued support from
his wife, and the ministry. He has satisfactory residence plans and has completed many trades in
order to find employment. His current plans to open his own business selling prints will be
obtainable with continued support, which he seems to have. Bertoldo could benefit from making
back up residence and employment plans just in case his primary plans do not materialize.

V.    **USINS:**

Bertoldo has no holds, warrants, or detainers at this time.

VI.    **SUMMARY:**

A.    Not applicable, per Memorandum dated 8-5-04, signed by Cheryl Pliler, Deputy Institutions
Division, Subject: Temporary Elimination of the Risk or Threat Assessment in the Modal
Board Report Format.

B.    Prior to release, Bertoldo would benefit from:

1. Remaining disciplinary free.
2. Participating in any available self-help groups and therapy groups.
3. Earn positive chronos.

C.    This Board Report is based on an interview with Inmate Bertoldo on 3-29-06 and 4-10-06
lasting approximately 3 hours, and a complete review of the Central File lasting approximately
1 hour.

D.    The inmate was afforded an opportunity to examine his Central File and declined the request.

E.    No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings
Remedial Plan for effective communication.

Life Prisoner Evaluation Report
Subsequent Parole Consideration Hearing #5
BERTOLDO                          ROBERT
C-94377
Page 10

Prepared by:                          Reviewed by:

J. OLEARNICK                          S. SAPP
Correctional Counselor I              Correctional Counselor II
Facility "A"                          Facility "A"

BOARD OF PRISON TERMS                                                                STATE OF CALIFORNIA
# LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING
☒ PAROLE CONSIDERATION HEARING #5
☐ PROGRESS HEARING

**INSTRUCTIONS**
TO CDC STAFF:   DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE LIFE TERM STARTS TO PRESENT.
TO BPT STAFF:   FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT 2290-2292, 2410 & 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 8-19-2003 to 8-18-04 | | | **PLACEMENT:** Bertoldo remains housed at Chuckawalla Valley State Prison (CVSP-II). <br><br> **CUSTODY:** Medium A custody. <br><br> **VOCATIONAL:** None noted this review period. <br><br> **ACADEMICS:** Bertoldo received a certificate of recognition for his successful completion of "How to" Evangelism course dated 9-23-04. <br><br> **WORK RECORD:** He was assigned as the Chapel Relief Clerk until 6-19-04, and received Exceptional Work Supervisor's Reports. From 6-19-04 till 6-23-04, he was temporarily assigned to a 3RD watch porter position. On 6-23-04, he was reassigned to a tutor position for the bridging program. He continues to receive outstanding recommendations for his performance. <br><br> **GROUP ACTIVITIES:** Bertoldo continues to support the Veterans Group at CVSP. He also has participated with the "Breakfast with Santa" project, Anger Management, and has started tutoring for the bridging program at CVSP. <br><br> **PSYCHIATRIC TREATMENT:** None noted this review period. <br><br> **PRISON BEHAVIOR:** He remains disciplinary free this review period. <br><br> **OTHER:** Bertoldo has received laudatory chronos dated 7-19-03, 7-12-04, and 7-28-04 reflecting his outstanding behavior at his work assignments and while housed in the dormitory. Bertoldo also received a Cert. of Appreciation for his support of the veterans Group of Chuckawalla. |

| CORRECTIONAL COUNSELOR I SIGNATURE <br> J. OLEARNICK, CC-1 | CORRECTIONAL COUNSELOR II SIGNATURE <br> S. SAPP, CC-11 | DATE <br> 3-9-06 |
|---|---|---|
| **NAME** <br> BERTOLDO, Robert <br> BPT 1004 (REV 7/86) | **CDC NUMBER** <br> C94377 | **INSTITUTION** <br> CVSP | **CALENDAR** <br> June 2006 | **HEARING DATE** |

BOARD OF PRISON TERMS                                                                STATE OF CALIFORNIA

**LIFE PRISONER: POSTCONVICTION PROGRESS REPORT**

- ☐ DOCUMENTATION HEARING
- ☒ PAROLE CONSIDERATION HEARING #5
- ☐ PROGRESS HEARING

**INSTRUCTIONS**
TO CDC STAFF:    DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE LIFE TERM STARTS TO PRESENT.
TO BPT STAFF:    FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT 2290-2292, 2410 & 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 8-19-2004 to 8-18-05 | | | **PLACEMENT:** Bertoldo remains housed at Chuckawalla Valley State Prison (CVSP-II). |
| | | | **CUSTODY**: Medium A custody. |
| | | | **VOCATIONAL:** None noted this review period. |
| | | | **ACADEMICS**: Bertoldo received a letter from Mt. Neb. Prison Ministry indicating he successfully completed "Fundamentals of Faith dated 1-21-05. Bertoldo also completed the Potter's House "A" Chapel Apologetic Class 1 & 2 dated 7-12-05. |
| | | | **WORK RECORD:** He remained assigned to the A2 tutor position for the bridging program. He continues to receive outstanding recommendations for his performance. |
| | | | **GROUP ACTIVITIES:** Bertoldo has become a participant in NA and T.M.E.W. at CVSP. |
| | | | **PSYCHIATRIC TREATMENT:** None noted this review period. |
| | | | **PRISON BEHAVIOR**: He remains disciplinary free this review period. |
| | | | **OTHER:** Bertoldo received the following laudatory chrono's for this review period. 11-19-04 for this positive participation in the CVSP (Lobby) craft program since his arrival. 5-21-05 for his active participation in the Potter's House Church at CVSP. 7-6-05 for his completion of two Biblical classes Apologetics and Biblical Finance. |

| CORRECTIONAL COUNSELOR I SIGNATURE J. OLEARNICK, CC-1 | CORRECTIONAL COUNSELOR II SIGNATURE S. SAPP, CC-11 | DATE |
|---|---|---|

| NAME BERTOLDO, Robert | CDC NUMBER C94377 | INSTITUTION CVSP | CALENDAR June 2006 | HEARING DATE |
|---|---|---|---|---|

BPT 1004 (REV 7/86)

**PAGE 2 of 3**

STATE OF CALIFORNIA

BOARD OF PRISON TERMS
## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING
☒ PAROLE CONSIDERATION HEARING #5
☐ PROGRESS HEARING

**INSTRUCTIONS**
TO CDC STAFF:    DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE LIFE TERM STARTS TO PRESENT.
TO BPT STAFF:    FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT 2290-2292, 2410 & 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 8-19-05 to Present | | | **PLACEMENT:** Bertoldo remains housed at Chuckawalla Valley State Prison (CVSP-II). <br><br> **CUSTODY:** Medium A custody. <br><br> **VOCATIONAL:** None noted this review period. <br><br> **ACADEMICS:** Bertoldo received certificate of completed for the course "Letter to the Roma's" offered by set free Prison Ministries dated 11-25-05. Bertoldo also received a certificate if completion for the course. The way to Happiness" offered by Criminon dated 1-5-06. Facility, Bertoldo received progress report for the course "Personal Financing Planning" in which he received a "C" average and has completed all assignments for the course. <br><br> **WORK RECORD:** He remains assigned to the A2 Bridge Tutor position and received above average to exceptional work Supervisor reports. <br><br> **GROUP ACTIVITIES:** Bertoldo has become a participant in NA and T.M.E.W. at CVSP. <br><br> **PSYCHIATRIC TREATMENT:** None noted this period review period. <br><br> **PRISON BEHAVIOR:** He remains disciplinary free this period. <br><br> **OTHER:** Bertoldo received a CDC 128B, date unknown, commending his donation at religious material to CVSP'S religious program. <br> Bertoldo also received a CDC 128-D noted 12/00 for his participation in the "Breakfast with Santa " Project. |
| CORRECTIONAL COUNSELOR I SIGNATURE <br> J. OLEARNICK, CC-1 | CORRECTIONAL COUNSELOR II SIGNATURE <br> S. SAPP, CC-11 | | DATE |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| BERTOLDO, Robert | C94377 | CVSP | June 2006 | |

BPT 1004 (REV 7/86)

**PAGE 3 of 3**

| LIFE PRISONER EVALUATION REPORT |
| :---: |
| SUBSEQUENT PAROLE CONSIDERATION HEARING #4 |
| NOVEMBER 2004 CALENDAR |

**BERTOLDO, Robert**                    C-94377

Copy to
Inmate via CCI
8.18.04 4 ec

## I.    COMMITMENT FACTORS:

### A.    LIFE CRIME:

Count I, Murder 2nd, With Use of a Deadly Weapon, Knife (187/12022 (b). Count 2, Grand Theft Person (487 (2) PC).
Weapons:  Knife and .22 caliber pistol
Commitment County: Los Angeles, Case Number: A527117
Victim: John Simerly, Age: 49
Date received by the California Department of Corrections: 10-22-84
Sentence: 15 years to Life plus 4 years Enhancement; total term 19 years + Life.
MEPD: 7-7-95 (Minimum Eligible Parole Date)

1.    Summary of Crime

On April 13, 1981, between the hours of 10:30 a.m. and 2:30 p.m., the victim John Simerly was murdered in his residence at 2056 Avocado Terrace, Hacienda Heights. The subsequent autopsy revealed that the victim had been shot in the face with a .22 caliber pistol and had been stabbed approximately 16 times. That afternoon, Dale Rogers the victim's son-in-law, discovered the body of the victim. At the time the victim was found with no wallet and his watch and necklace, which he had been wearing earlier that day, were missing. On April 15, 1981, Mr. Bertoldo was stopped for a routine traffic violation. At that time he was searched by the officer and was found to be in possession of a .22 caliber pistol. It was determined that this particular weapon had been taken at the time of the murder of Mr. John Simerly and was considered to be the murder weapon. A subsequent investigation revealed that Mr. Bertoldo had pawned Mr. Simerly's necklace at a local pawn shop. Furthermore, the investigating officers conducted a search of Mr. Bertoldo's girlfriend's apartment and found Mr. Simerly's rifles, safe, and a quilt bearing blood stains (Probation Officer's Report, pages 3 and 4).

2.    Prisoner's Version

"I pray the members of the BPT panel will understand my explanations for my following summary. I believe that after twenty-three years I have come to a point in my life of accepting all the responsibilities of the crime and the extent of harm caused. I also believe there needs to be a time to restore and amend for all who were victimized and to dwell on this crime in order to bring it to summary, which has been very emotional for me. At my previous hearing, I expressed hesitation at revisiting the crime scene by recounting the crime all over again. I am in full cooperation of answering any questions posed to me by the panel to help resolve any concerns by BPT. Knowing that one of my many responsibilities of the BPT is evaluation, I believe that my



Life Prisoner Evaluation Report
Subsequent Parole Consideration Hearing #4
BERTOLDO
C-94377
Page 2

spontaneous response to any questions put forward by the panel may better be evaluated rather than a calculated answer that took a few days to think about."

A full rendition of Bertoldo's summary of crime is located in the Miscellaneous section of the Central File.

3. Aggravating/Mitigating Circumstances

a. Aggravating Factors:

-The crime involved great bodily harm and great violence.
-The defendant used a weapon at the time of the commission of the crime.
-The offense was premeditated.
-The defendant was engaged in a pattern of violent conduct, which indicates a serious danger to society.
-The defendant's prior convictions as an adult and juvenile are numerous and of an increasing seriousness.
-The defendant has served prior prison terms.
-The defendant's prior performance on probation was unsatisfactory.

b. Mitigating Factors

-None.

B. **MULTIPLE CRIMES:**

Count 1, Robbery 2nd , (211 P.C.)
Weapons: Screwdriver
Commitment County: Los Angeles, Case # A259026
Victims: Unknown
Date Received CDC: 6-25-1976
Sentenced: 6months to 20 years

1. Summary of Crime:

The summary for this particular crime was unable to be ascertained because his current Central File does not contain any information concerning this crime and his previous CDC#'s, B-74636 and C-06110, were never ordered for review. However, the above listed achieves were ordered on 7-19-2004, and will be reviewed upon arrival.

2. Prisoner's Version:

"These crimes, which took place twenty-five to thirty years ago, and being the age of 53, my memory is not what it used to be. However, I am willing to attempt to answer any questions to the

Life Prisoner Evaluation Report
Subsequent Parole Consideration Hearing #4
BERTOLDO
C-94377
Page 3

best of my recollection." A full rendition of Bertoldo's summary of crime is located in the Miscellaneous section of the Central File.

Count 1 and 2, Forgery, (470 P.C.)
Weapons: None
Commitment County: Los Angeles, Case #: A343002
Victims: Unknown
Date Received by CDC: 6-26-1979
Sentenced: 2 years, both counts

1. Summary of Crime:

   The summary for this particular crime was unable to be ascertained because his current c-file does not contain any information concerning this crime and his previous CDC#'s, B-74636 and C-06110, were never ordered for review. However, the above listed achieves were ordered on 7-19-2004, and will be reviewed upon arrival.

2. Prisoner's Version:

   These crimes which took place twenty-five to thirty years ago and being the age of 53 my memory is not what it used to be, but I am willing to attempt to answer any questions to the best of my recollection. A full rendition of Bertoldo's summary of crime is located in the miscellaneous section of the c-file.

## II.    PRE-CONVICTION FACTORS:

### A.    JUVENILE RECORD:

1. Arrest, 7-13-64, Suspicion of carrying a switchblade knife, 13 years old. Counseled and released.
2. Arrest, 12-23-64, Suspicion of inhaling glue, 14 years old. 6 months probation.

### B.    ADULT CONVICTIONS AND ARRESTS:

1. Arrest, 4-2-69, Minor in Possession of Alcohol; 18 years old. $48.00 fine and four (4) days Jail, suspended.
2. Arrest, 5-11-69, Misdemeanor Drunk Driving. $200.00 fine and 25 days Jail, suspended.
3. Arrest, 9-1-69, Possession of Material – Device for Arson, and Taking a Vehicle Without Owner's Consent. Released.
4. Arrest, 9-19-69, Grand Theft – Auto. $150.00 fine and 3 year's probation.
5. Arrest, 4-28-70, Robbery, 19 year old. $300.00 fine and 3 year's probation. Probation was revoked on 6-18-76, and defendant was sentenced to State Prison for the term prescribed by Law.

Life Prisoner Evaluation Report
Subsequent Parole Consideration Hearing #4
BERTOLDO
C-94377
Page 4

6.  Arrest, 1-28-71, Late Return to Biscailuz Work Furlough Center, 20 years old.  No disposition shown.
7.  Arrest, 11-11-71, Minor in Possession of Alcohol.  One year probation and one day County Jail, suspended.
8.  Arrest, 1-9-72, Battery on Peace Officer and Disturbing the Peace, 21 years old.  No disposition shown.
9.  Arrest, 1-16-72, Possession of Marijuana.  No disposition shown.
10. Arrest, 5-30-75, Possession of Controlled Substance, 24 years old.  Prosecution rejected.
11. Arrest, 4-21-78, Burglary, 27 years old.  Sentenced 2 years State Prison, consecutive with Forgery charge (4-12-78).
12. Arrest, 4-12-78, Forgery.  Sentenced 2 years State Prison.
13. Arrest, 11-1-78, Use/Under Influence of Controlled Substance.  5 days County Jail.
14. Arrest, 3-3-79, Grand Theft Auto, 28 years old.  No disposition shown.

*E HAS ME DOING CRIME WHILE IN PRISON*

C.  **PERSONAL FACTORS:**

Bertoldo was born in Visalia, California, the youngest of five children.  His father was an alcoholic and his parents separated when he was an infant.  His mother moved to her parent's house in Los Angeles, taking her children with her.  He was essentially raised in the home of his maternal grandparents until he reached school age.  He completed school through the eleventh grade, quitting after his mother remarried.  He resented the discipline his stepfather brought to the home.

Prior to his incarceration, his employment was sporadic.  He had employment with several contractors laying floors, installing aluminum siding and patios.

Bertoldo was not married prior to his current commitment to CDC.  He does maintain a continuing relationship with Carol Lee Marangi.  On November 19, 1992, Bertoldo married Carol at the Richard J. Donovan Correctional Facility.  His wife has consistently visited him on a bi-monthly basis.

III.  **POST-CONVICTION FACTORS:**

A.  **SPECIAL PROGRAMMING/ACCOMMODATIONS:**

Bertoldo was informed of the Americans with Disabilities Act (ADA) and he does not have a disability as defined under the ADA.

Life Prisoner Evaluation Report
Subsequent Parole Consideration Hearing #4
BERTOLDO
C-94377
Page 5

### B.  CUSTODY HISTORY:

| Date: | Received at: | Custody Level: |
|---|---|---|
| 10-22-84 | CIM-Reception Center | Close B |
| 12-24-84 | CTF-Central | Medium A |
| 04-26-85 | San Quentin | Medium A |
| 04-28-86 | CCI-IV-A | Medium A |
| 11-10-87 | CCI-IV-B | Medium A |
| 12-10-91 | RJD | Medium A |
| 03-16-98 | CVSP | Medium A |

### C.  THERAPY & SELF-HELP ACTIVITIES:

On 1-6-04, Bertoldo received a certificate of Appreciation for his continuous and dedicated support to the Veterans Group of CVSP (VGC).  Authored by T. Carpenter (VGC Group Sponsor)

On 1-8-04, Inmate Bertoldo was acknowledged for his contribution for the "Breakfast with Santa" project. His time and effort played a part in making the event a tremendous success.

On 1-20-2004, Inmate Bertoldo received a certificate of participation for Chuckwalla Valley State Prison's Anger Management Program. The author of the certificate is unknown because of an illegible signature.  (Noted: Bertoldo has stated that he did complete the Anger Management Course of 2003; however, there is no documentation in Bertoldo's Central File reflecting this completion.)

On 7-22-04, Bertoldo received a Memorandum allowing him to have tutor materials in his bed area. Bertoldo became a tutor for the bridging program on 7-22-04.

### D.  DISCIPLINARY HISTORY:

Inmate Bertoldo has remained disciplinary free since his last Board of Prison Term Hearing which was held on 11-20-02.

### E.  OTHERS:

Inmate Bertoldo was last seen by the Board of Prison Terms on 11-20-2002. In that hearing the Board of Prison Terms recommended that Bertoldo remain disciplinary free, participate in self-help and therapy classes when available, and cooperate with clinicians in the completion of a clinical evaluation. Upon reviewing his Central File, Bertoldo was commended for his

Life Prisoner Evaluation Report
Subsequent Parole Consideration Hearing #4
BERTOLDO
C-94377
Page 6

participation as the chairman of the Narcotics Anonymous program at Chuckwalla Valley State Prison, on 7-31-2002 and 9-19-2002. However, since those recommendations, there has been no further documented evidence that Bertoldo has continued with his Narcotics Anonymous (N/A) classes at Chuckwalla Valley State Prison. Upon interviewing Bertoldo concerning his lack of participation in the NA classes, he stated that due to being persecuted because of his belief in Jesus Christ he no longer viewed attendance as productive. It should be noted that Bertoldo has attended anger management and attends church on a regular basis.

## IV. FUTURE PLANS:

### A RESIDENCE:

Upon parole, Bertoldo plans to reside with his wife, Carol Lee Bertoldo, at 6234 Strickland Avenue, Los Angeles, California. Her phone number is (213) 255-6441.

### B. EMPLOYMENT:

Bertoldo states he holds certificates as an optician and drafting, and he also has job skills in silk screening, aluminum patio installation, and flooring. Bertoldo is anticipating sending out petitions for release/suitability and letters of support to friends, family members, and fellow Christians. As of this date, they have not been received. Bertaldo further states that he has a guaranteed employment offer from Master Built Boxing, 4301 East Valley Blvd., Los Angeles, CA 90032, telephone #(323) 225-9628. The last letter that was received from Master Built Boxing was in 2002 and there are no current letters reflecting the same job offer. However, Bertoldo does state that an updated letter is being sent in.

### C. ASSESSMENT:

Bertoldo's overall parole plans are reasonable to accomplish. He has a secure residence in which to reside and seems to have family for added support. However, Bertoldo's employment plans need some improvement. Bertoldo does have many trades with which to find employment, and his plans for employment at Master Built Boxing is outdated. Bertoldo should be taking this opportunity to inquire about more employment opportunities in his residential area. Solidifying his employment plans would be a huge stride in making his employment opportunities more of a success.

## V. USINS:

Bertoldo has no holds, warrants, or detainers at this time.

Life Prisoner Evaluation Report
Subsequent Parole Consideration Hearing #4
BERTOLDO
C-94377
Page 7

VI.    **SUMMARY:**

A.    Inmate Bertoldo's crime was conducted in a cruel, callous, violent, and brutal nature. The stabbing of the victim sixteen times and then shooting him while lying on the ground was vicious and without compassion. Upon discussing the crime with Bertoldo, he seems to have heart felt remorse for the overall crime, but does continue to down play his role in the situation blaming the victim for his heinous actions.

Next, Bertoldo's institutional adjustment has been outstanding. He has received numerous laudatory chronos from housing unit staff depicting his behavior as helpful and cooperative in his daily living activities. Bertoldo has also received laudatory chronos from work supervisors portraying him as cooperative and supportive as it relates to his job performance. Also, Bertoldo has remained disciplinary free since his last board report which is a tremendous accomplishment. Overall, Bertoldo has adjusted his life style to function above average in an institutional setting.

Bertoldo has also adhered to most of Board of Prison Terms recommendations. He has remained disciplinary free and has already scheduled an appointment to meet with the psychiatrist to update his psychological report. However, Bertoldo did decide to discontinue participating in the self help and therapy classes that are offered at CVSP. Using his spiritual preference as an excuse for stopping his participation in the Narcotics Anonymous class, this decision seems to be a personal excuse for not liking how the class was run. Since his crime was committed due to a large part of narcotics and alcohol, it would seem that participating in both the NA and AA classes would benefit him immensely. This personal choice of stopping the limited classes offered at CVSP seems it would only hurt Bertoldo rather then help him.

Finally, considering the viciousness of the crime and his personal choice not to adhere to all of BPT recommendations, and the rest of the information contained in this lifer report, it is this writers opinion that inmate Bertoldo would pose a moderate degree of risk if released from prison at this time.

B.    Prior to release, Bertoldo would benefit from:

1. Remaining disciplinary free.
2. Participating in any available self-help groups and therapy groups.

C.    This Board Report is based on an interview with Inmate Bertoldo on 7-28-04 and 7-29-04 lasting approximately two hours, and a complete review of the Central File lasting approximately two hours.

D.    The inmate was afforded an opportunity to examine his Central File and accepted. Bertoldo reviewed his Central File on 8-9-2004 for an Olsen Review and made no objections to its contents.

Life Prisoner Evaluation Report
Subsequent Parole Consideration Hearing #4
BERTOLDO
C-94377
Page 8

**E.**  No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan for effective communication.


Prepared by:                                      Reviewed by:


J. OLEARNICK                                      S. SAPP
Correctional Counselor I                          Correctional Counselor II
Facility "A"                                       Facility "A"

BOARD OF PRISON TERMS

LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

STATE OF CALIFORNIA

☐ DOCUMENTATION HEARING
☒ PAROLE CONSIDERATION HEARING #4
☐ PROGRESS HEARING

INSTRUCTIONS

TO CDC STAFF:    DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE LIFE TERM STARTS TO PRESENT.

TO BPT STAFF:    FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT 2290-2292, 2410 & 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 8-19-2002 to 8-18-2003 | | | **PLACEMENT:** Bertoldo remained housed at Chuckawalla Valley State Prison (CVSP-II). <br><br> **CUSTODY:** Medium A custody. <br><br> **VOCATIONAL:** None noted this review period. <br><br> **ACADEMICS:** None noted this period. <br><br> **WORK RECORD:** He is assigned as a Chapel Relief Clerk and receives Exceptional Work Supervisor's Reports. <br><br> **GROUP ACTIVITIES:** Bertoldo has supported the Veterans Group at CVSP and is an avid member of the church services. <br><br> **PSYCHIATRIC TREATMENT:** None noted this review period. <br><br> **PRISON BEHAVIOR:** He has remained disciplinary free this period. <br><br> **OTHER:** Bertoldo has received numerous laudatory chronos dated 7-31-02, 8-23-02, and 7-19-02 reflecting his courteous and outstanding behavior at his job assignment and in the dormitory. |

| CORRECTIONAL COUNSELOR I SIGNATURE J. OLEARNICK, CC-1 | CORRECTIONAL COUNSELOR II SIGNATURE S. SAPP, CC-11 | DATE 8/9/04 |
|---|---|---|
| **NAME** BERTOLDO, Robert <br> BPT 1004 (REV 7/86) | **CDC NUMBER** C94377 | **INSTITUTION** CVSP | **CALENDAR** NOVEMBER 2004 | **HEARING DATE** |

BOARD OF PRISON TERMS                                                          STATE OF CALIFORNIA
CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 8-19-2003 to Present | | | **PLACEMENT:** Bertoldo remains housed at Chuckawalla Valley State Prison (CVSP-II). |
| | | | **CUSTODY:** Medium A custody. |
| | | | **VOCATIONAL:** None noted this review period. |
| | | | **ACADEMICS:** None noted this period. |
| | | | **WORK RECORD:** He was assigned as the Chapel Relief Clerk until 6-19-04, and received Exceptional Work Supervisor's Reports. From 6-19-04 till 6-23-04, he was temporarily assigned to a 3 watch porter position. On 6-23-04, he was reassigned to a tutor position for the bridging program. He continues to receive outstanding recommendations for his performance. |
| | | | **GROUP ACTIVITIES:** Bertoldo continues to support the Veterans Group at CVSP. He also has participated with the "Breakfast with Santa" project, Anger Management, and has started tutoring for the bridging program at CVSP. |
| | | | **PSYCHIATRIC TREATMENT:** None noted this period. |
| | | | **PRISON BEHAVIOR:** He remains disciplinary free this period. |
| | | | **OTHER:** Bertoldo has received laudatory chronos dated 7-19-03, 7-12-04, and 7-28-04 reflecting his outstanding behavior at his work assignments and while housed in the dormitory. |

**ORDER:**

- [ ] BPT date advanced _____ months.
- [ ] PBR date advanced _____ months.
- [ ] BPT date affirmed without change.
- [ ] PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**

- [ ] Previously imposed conditions affirmed.
- [ ] Add or modify _____

- [ ] Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| BERTOLDO, Robert | C94377 | CVSP | NOVEMBER 2004 | |

BPT 1004 (REV 7/86)                    **PAGE 2 OF 2**                    PERMANENT ADDENDA

| LIFE PRISONER EVALUATION |
| --- |
| SUBSEQUENT PAROLE CONSIDERATION HEARING #3 |
| October 2002 CALENDAR |

**BERTOLDO, ROBERT**                          **C-94377**

Copy to
Inmate via CCI
8/2/02 yoL

## I.    COMMITMENT FACTORS:

### A.    LIFE CRIME:

Count 1, Murder 2nd, With Use of a Deadly Weapon, Knife (187/12022 (b). Count 2, Grand Theft Person (487 (2) PC).
Weapons:  Knife
Commitment County: Los Angeles, Case Number: A527117
Victim: John Simerly, Age: 49
Date received by the California Department of Corrections: 1-22-84
Sentence: 15 years to Life plus 4 years Enhancement.
MEPD: 9-9-94 (Minimum Eligible Parole Date)

### 1.   Summary of Crime

On April 13, 1981, between the hours of 10:30 a.m. and 2:30 p.m., the victim, John Simerly was murdered in his residence at 2056 Avocado Terrace, Hacienda Heights. The subsequent autopsy revealed that the victim had been shot in the face with a .22 caliber pistol and had been stabbed approximately 16 times. That afternoon Dale Rogers, the victim's son-in-law discovered the victim's body. At the time the victim was found there was no wallet on his person and his watch and necklace, which he had been wearing earlier during the day, were missing. On April 15, 1981, Mr. Bertoldo was stopped for a routine traffic violation. At that time he was searched by the officer who found a .22 caliber pistol. It was consequently discovered that this particular weapon had been taken at the time of the murder of Mr. John Simerly and was considered to be the murder weapon. The subsequent investigation revealed that Mr. Bertoldo had pawned Mr. Simerly's necklace at a pawn shop. The investigating officers conducted a search of Mr. Bertoldo's girlfriend's apartment and found Mr. Simerly's rifles, safe, along with its contents, and a quilt bearing blood stains (Probation Officer's Report, pages 3 and 4).

### 2.   Prisoner's Version

The following is the inmate's version: "In my past two Board hearings, I was asked by the Board of Prison Terms (BPT) panel to describe in full detail what happened in the controlling facts of this case. Nothing has changed from these facts which are documented in the transcripts of the last two Board hearings. For approximately twenty years now I have come to grips with a lot of the questions that were put to me by the BPT panel members. I realized that I could not answer some of those questions or would not answer by saying I could not remember. I don't have all the answers but I know that the reason I could not answer was because of the guilt and shame of the crime. I continue to carry that guilt and shame and as hard as it is, I better understand the severity



Life Prisoner Evaluation
Subsequent Parole Consideration Hearing #3
BERTOLDO
C-94377
Page 2

of the crime. I have never heard any consideration as to the fact that all the weapons used in the crime resulting were his weapons. And the fact is that I never went to his home with a weapon or intentions of using any weapons."

**B.    AGGRAVATING & MITIGATING CIRCUMSTANCES:**

1.    Aggravating Factors

    a.    The crime involved great bodily harm and great violence.

    b.    The defendant used a weapon at the time of the commission of the crime.

    c.    The offense was premeditated.

    d.    The defendant was engaged in a pattern of violent conduct, which indicates a serious danger to society.

    e.    The defendant's prior convictions as an adult and juvenile are numerous and of an increasing seriousness.

    f.    The defendant has served prior prison terms.

    g.    The defendant's prior performance on probation was unsatisfactory.

2.    Mitigating Factors

    a.    None.

**II.    PRE-CONVICTION FACTORS:**

**A.    JUVENILE RECORD:**

1.    Arrest, 7-13-64, Suspicion of carrying a switchblade knife, 13 years old. Counseled and released.

2.    Arrest, 12-23-64, Suspicion of inhaling glue, 14 years old. 6 months probation.

**B.    ADULT CONVICTIONS:**

1.    Arrest, 4-2-69, Minor in Possession of Alcohol, 18 years old. $48.00 fine and four (4) days Jail, suspended.

2.    Arrest, 5-11-69, Misdemeanor Drunk Driving. $200.00 fine and 25 days Jail, suspended.

3.    Arrest, 9-1-69, Possession of Material – Device for Arson, and Taking a Vehicle Without Owner's Consent. Released.

4.    Arrest, 9-19-69, Grand Theft – Auto. $150.00 fine and 3 years probation.

5.    Arrest, 4-28-70, Robbery, 19 year old. $300.00 fine and 3 years probation. Probation was revoked on 6-18-76, and defendant was sentenced to State Prison for the term prescribed by Law.

6.    Arrest, 1-28-71, Late Return to Biscailuz Work Furlough Center, 20 years old. No disposition shown.

7.    Arrest, 11-11-71, Minor in Possession of Alcohol. One year probation and one day County

Life Prisoner Evaluation
Subsequent Parole Consideration Hearing #3
BERTOLDO
C-94377
Page 3

8. Arrest, 1-9-72, Battery on Peace Officer and Disturbing the Peace, 21 years old. No disposition shown.

9. Arrest, 1-16-72, Possession of Marijuana. No disposition shown.

10. Arrest, 5-30-75, Possession of Controlled Substance, 24 years old. Prosecution rejected.

11. Arrest, 4-21-78, Burglary, 27 years old. Sentenced 2 years State Prison, consecutive with Forgery charge (4-12-78).

12. Arrest, 4-12-78, Forgery. Sentenced 2 years State Prison.

13. Arrest, 11-1-78, Use/Under Influence of Controlled Substance. 5 days County Jail.

14. Arrest, 3-3-79, Grand Theft Auto, 28 years old. No disposition shown.

C.   **PERSONAL FACTORS:**

Bertoldo was born in Visalia, California, the youngest of five children. His father was an alcoholic and his parents separated when he was an infant. The mother moved to her parent's house in Los Angeles, taking her children with her. He was essentially raised in the home of his maternal grandparents until he reached school age. He completed school through the eleventh grade, quitting after his mother remarried. He resented the discipline his stepfather brought to the home.

Prior to his incarceration, his employment was sporadic. He had employment with several contractors laying floors, installing aluminum siding and patios.

Bertoldo was not married prior to his current commitment to CDC. He maintained a continuing relationship with Carol Lee Marangi. On November 19, 1992, Bertoldo married Carol at the Richard J. Donovan Correctional Facility. Bertoldo's last visit with his wife was in December of 1999. Inmate Bertoldo's visiting privileges were temporarily suspended due to his being found guilty of a Rules Violation Report for a positive drug test.

III.   **POST-CONVICTION FACTORS:**

A.   **SPECIAL ACCOMMODATIONS/DISABILITY**

Bertoldo was informed of the Americans with Disabilities Act (ADA) and he does not have a disability as defined under the ADA.

B.   **CUSTODY HISTORY:**

| Date: | Received at: | Custody Level: |
|-------|--------------|----------------|
| 10-22-84 | CIM-Reception Center | Close B |
| 12-24-84 | CTF-Central | Medium A |
| 04-26-85 | San Quentin | Medium A |

Life Prisoner Evaluation
Subsequent Parole Consideration Hearing #3
BERTOLDO
C-94377
Page 4

| | | |
|---|---|---|
| 04-28-86 | CCI-IV-A | Medium A |
| 11-10-87 | CCI-II-B | Medium A |
| 12-10-91 | RJD | Medium A |
| 03-16-98 | CVSP | Medium A |

## D.   DISCIPLINARY HISTORY:

Bertoldo's disciplinary records since reception include the following rules violations: 4-13-85, Assault on Staff; 2-17-88, Threatening Staff; 3-1-88, Fist Fight; 5-8-89, Force and Violence; 7-24-89, Stimulants and Sedatives; 5-31-94, Positive Urinalysis Results; 4-10-95, Non-expendable Property; 1-13-00, Possession of an Inmate Manufactured Hypodermic Syringe; 1-27-00, Possession of Morphine/Positive Urinalysis Test; 4-10-00, Refused to Submit to a U/A. Custodial Counseling includes: 6-23-88, Veiled Threats Towards Staff; 11-7-88, Disruptive Behavior in Class; 4-8-92, Out of Bounds; 9-30-93, Disrespect to Staff; 4-15-95, Unauthorized Clothing; 4-19-95, Failure to Report; 5-1-95, 5-8-95 and 11-10-96, Participation; 1-7-97, Performance.

## E.   THERAPY & SELF-HELP ACTIVITIES:

Received a Certificate of Completion from 11-8-2000 to 2-20-2001, for completing 12 Narcotics Anonymous meetings, and the One Day At A Time program.

Per CDC-128B dated 1-2-2001, Bertoldo attended a total of 10 Narcotics Anonymous (NA) meetings (note: staff signature is illegible).

Per CDC-128B dated 4-4-2001, he attended a total of 10 NA meetings (staff signature illegible).

On 4-8-2001, he received a Certificate of Achievement in recognition of having met the requirements of participation in the Seminar of Christian Discipleship.

Per CDC-128B dated 7-17-2001, signed by Kevin Mack, Staff Sponsor, Bertoldo is a current member in good standing in the CVSP NA group. He participated in 11 meetings and other functions, and is also a member of the executive body. He attended a total of 12 Alcoholics Anonymous (AA) meetings, per CDC-28B dated 1-16-2002 and authored by B. Griffin, Staff Sponsor.

Per CDC-128B dated 3-30-2002, signed by R. Perez, Bertoldo is a member of the NA group at CVSP-II. Per CDC-128B dated 7-9-2002, signed by R. Perez, Bertoldo attended a total of 12 NA meetings.

Life Prisoner Evaluation
Subsequent Parole Consideration Hearing #3
BERTOLDO
C-94377
Page 5

Bertoldo received Certificates of Completion for the following programs:

| | |
|---|---|
| 05-09-01 | One-to-One Discipline |
| 09-02-01 | Baptismal Certificate (upon confession of his faith) |
| 06-05-02 | Breaking Barriers |

From 1-21-2000 through May 2002, he attended the Rehabilitation by Regeneration course offered by Set-Free Prison Ministries. Certificates in Miscellaneous section of his Central File.


F.  **LAUDATORY/WORK CHRONOS:**

Per CDC-128B, authored by Robert Porter, Associate Warden (Acting), Complex II, Bertoldo was commended for serving as a facilitator for the Breaking Barriers Video Program. As a result of his efforts, the program was highly successful.


G.  **EDUCATION:**

Bertoldo has a GED, and he has successfully completed the following education courses:

1. Bertaldo received an Acknowledgement as a Fellow of the National Academy of Opticians.
2. Ordering Ophthalmic Lenses on 11-27-2000
3. Basic Optical Principles on 11-27-2000
4. Presbyopia on 11-27-2000
5. Basic Bible Study on 3-28-2001 (all certificates are in the Miscellaneous section of Inmate Bertoldo's Central File).
6. Designated as a Certified Optician effective 1996, expired 12-31-99; renewed copy expires 12-31-2002.


IV.  **FUTURE PLANS:**

A.  **RESIDENCE:**

Upon parole, Bertoldo plans to reside with his wife, Carol Lee Bertoldo, at 6234 Strickland Avenue, Los Angeles, California. Her phone number is (213) 255-6441.


B.  **EMPLOYMENT:**

Bertoldo states he is a Certified Optician, and he also has job skills in drafting, silk screening, aluminum patio installation, and flooring. Bertoldo is anticipating letters of support and offers of employment. As of this date, they have not been received.

Life Prisoner Evaluation
Subsequent Parole Consideration Hearing #3
BERTOLDO
C-94377
Page 6


**C.    USINS STATUS:**

Bertoldo has no Holds, Warrants or Detainers.


**V.    SUMMARY:**

**A.**    Bertoldo has attempted to take advantage and incorporate the BPT recommendations into his daily life activities. He appears to have matured since his last BPT Hearing. This writer notes that Bertoldo was assigned to vocational programs and removed due to reasons noted in the Work Record section of this BPT Report. This writer recommends that Bertoldo participate in, and complete, vocational programs that are available to him. During this time period, and after careful review of his Central File, this writer believes that Bertoldo would pose a moderate degree of threat to the public if released from prison.

**B.**    Prior to release, Bertoldo would benefit from:

1. Remaining disciplinary free.
2. Participating in any available self-help groups and therapy groups.
3. Upgrade vocationally.

**C.**    This Board Report is based on one-and-a-half hour interview with Inmate Bertoldo, a complete review of his Central File, and incidental contact as his assigned counselor.

**D.**    The inmate was afforded an opportunity to examine his central file and accepted. Bertoldo reviewed his Central File for an Olsen Review on 7-23-2002 and made no objections to its contents.


Prepared by:                                          Reviewed by:


F. GONZALEZ                                          G. MCKINNEY
Correctional Counselor I                             Correctional Counselor II
Facility "A"                                         Facility "A"

BOARD OF PRISON TERMS                                                                STATE OF CALIFORNIA
## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING
☒ PAROLE CONSIDERATION HEARING #3
☐ PROGRESS HEARING

**INSTRUCTIONS**
TO CDC STAFF:    DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE LIFE TERM STARTS TO PRESENT.
TO BPT STAFF :   FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
                 ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT 2290-2292, 2410 & 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| **YEAR** | **BPT** | **PBR** | |
| 8-19-2000 to 8-18-2001 | | | **PLACEMENT & CUSTODY**: Bertoldo remained housed at Chuckawalla Valley State Prison (CVSP-II) under Medium A Custody, Classification Score (CS) of 12, Work Group/Privilege Group, A1/A. He was seen by UCC on 10-31-2000 for his Post Board Review and Annual Review. Committee noted BPT recommendations and advised inmate to continue present program. |

**VOCATIONAL/ACADEMICS**: None noted this review period.

**GROUP ACTIVITIES**: Bertoldo participated in the Breaking Barriers Video Program, and he was an active participant in Narcotics Anonymous (NA) as a member and serving as Chairman.

**PSYCHIATRIC TREATMENT**: He was given a Mental Health Evaluation on 9-19-2000, which determined there was no record indicating a pre-existing major mental illness that could have been a factor in his commitment offense. Based on the evaluation process, the inmate appears to have a personality disorder in the moderate to sever range. He has a lengthy history of poly-substance abuse and alcohol abuse. The Clinical Psychologist recommended that Bertoldo continue to participate in a self-help process, especially in AA/NA on a weekly basis. He also advised Bertoldo to continue his involvement with AA/NA if and when he paroles.

**MEDICAL TREATMENT**: Bertoldo was placed on Light Restricted Duty status, per CDC-128C dated 5-9-2001.

**PRISON BEHAVIOR**: He has remained disciplinary free this period.

**WORK ASSIGNMENT**: He is assigned as a Clothing Room Clerk and receives Exceptional Work Supervisor's Reports.

**LAUDATORY CHRONOS**: None noted this period.

| CORRECTIONAL COUNSELOR SIGNATURE F. GONZALEZ, CC-1 | CORRECTIONAL COUNSELOR II SIGNATURE G. MCKINNEY, CC-1/4 | DATE 8-15-02 |
|---|---|---|

| NAME BERTOLDO, ROBERT | CDC NUMBER C94377 | INSTITUTION CVSP | CALENDAR OCTOBER 2002 | HEARING DATE |
|---|---|---|---|---|

BPT 1004 (REV 7/86)                                      **PAGE 1 OF 2**

BOARD OF PRISON TERMS                                                                            STATE OF CALIFORNIA
CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
| YEAR | BPT | PBR | |
|---|---|---|---|
| 8-19-2001 to Present | | | **PLACEMENT & CUSTODY**: Bertoldo remains housed at Chuckawalla Valley State Prison (CVSP-II) under Medium A Custody, Classification Score of 0, Work Group/Privilege Group, A1/A. He was seen by UCC on 11-20-2001 for his Annual Review. Committee advised inmate to continue present program. **VOCATIONAL/ACADEMICS**: None noted this review period. **GROUP ACTIVITIES**: Bertoldo is an active participant in Narcotics Anonymous, and also participated in Alcoholics Anonymous per CDC-128B dated 10-4-2001, signed by B. Griffin, Staff Sponsor. **PSYCHIATRIC TREATMENT**: None noted this period. **MEDICAL TREATMENT**: Medical chrono is noted, dated 5-9-2001, expired on 11-9-2001. **PRISON BEHAVIOR**: He remains disciplinary free this period. **WORK ASSIGNMENT**: He is assigned as a Clothing Room Clerk and receives Exceptional Work Supervisor's Reports. **LAUDATORY CHRONOS**: His efforts were commended for serving as facilitator in the Breaking Barriers Program. As a result of his work, the program was highly successful. |

**ORDER:**
- ☐ BPT date advanced _____ months.
- ☐ PBR date advanced _____ months.
- ☐ BPT date affirmed without change.
- ☐ PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**
- ☐ Previously imposed conditions affirmed.
- ☐ Add or modify _____

☐ Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| BERTOLDO, ROBERT | C94377 | CVSP | OCTOBER 2002 | |

BPT 1004 (REV 7/86)                     **PAGE 2 OF 2**                     **PERMANENT ADDENDA**

STATE OF CALIFORNIA
CDC 101 (1/92)

DEPARTMENT OF CORRECTI

# WORK SUPERVISORS REPORT

| GRADES | GRADE | | GRADE | |
|---|---|---|---|---|
| 1-EXCEPTIONAL | 1 | A. DEMONSTRATED SKILL AND KNOWLEDGE | 2 | F. TEAMWORK AND PARTICIPATI |
| 2-ABOVE AVERAGE | 1 | B. ATTITUDE TOWARD FELLOW INMATES AND WORDERS | 2 | G. LEARNING ABILITY |
| 3-SATISFACTORY | 1 | C. ATTITUDE TOWARD SUPERVISORS AND STAFF | 1 | H. USE OF TOOLS AND EQUIPMEN |
| 4-BELOW AVERAGE | 2 | D. INTEREST IN ASSIGNED WORK | 1 | I. QUALITY OF WORK |
| 5-UNSATISFACTORY | 1 | E. EFFORT DISPLAYED IN ASSIGNED WORK | 1 | J. QUANTITY OF WORK |

| PAY STATUS: FROM: $ 0 | TO: $ 0 | FROM: JOB NO. TEA-A.003 | TO: JOB NO. TEA-A.003 |
|---|---|---|---|
| TOTAL #Hours Assigned: 420 | | TOTAL # Hours Worked: 420 | |

| INMATE ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF | PERIOD COVERED BY REPORT |
|---|---|---|---|
| A/B BRIDGING | 6-23-'04 | ASSISTING STUDENTS & INSTRUCTOR | 10-1-05 thru 12-31-05 |

RECOMMENDED FOR: ☐ REASSIGNMENT ☒ RETAIN ☐ PAY INCREASE ☐ PAY DECREASE    INMATES INITIALS:

COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE)
**IS KNOWLEDGEABLE, CONSCIENTIOUS, RESPONSIBLE**

CODE OF SAFE PRACTICES REVIEWED
SUPV'S INITIALS: _RH_    INMATE'S INITIALS

| SUPERVISOR R. HENRY | LENGTH OF SUPERVISION 18 MONTHS | WORK DETAIL A2-BRIDGING TUTOR | ETHNICITY MEX |
|---|---|---|---|
| INMATES NAME BERTOLDO    A2-213L | CDC NUMBER C94377 | INSTITUTION C.V.S.P. | DATE 12-30-2005 |

---

STATE OF CALIFORNIA
CDC 101 (1/92)

DEPARTMENT OF CORE

# WORK SUPERVISORS REPORT

| GRADES | GRADE | | GRADE | |
|---|---|---|---|---|
| 1-EXCEPTIONAL | 1 | A. DEMONSTRATED SKILL AND KNOWLEDGE | 2 | F. TEAMWORK AND PARTICIPATI |
| 2-ABOVE AVERAGE | 1 | B. ATTITUDE TOWARD FELLOW INMATES AND WORDERS | 2 | G. LEARNING ABILITY |
| 3-SATISFACTORY | 1 | C. ATTITUDE TOWARD SUPERVISORS AND STAFF | 1 | H. USE OF TOOLS AND EQUIPMEN |
| 4-BELOW AVERAGE | 2 | D. INTEREST IN ASSIGNED WORK | 1 | I. QUALITY OF WORK |
| 5-UNSATISFACTORY | 1 | E. EFFORT DISPLAYED IN ASSIGNED WORK | 1 | J. QUANTITY OF WORK |

| PAY STATUS: FROM: $ 0 | TO: $ 0 | FROM: JOB NO. TEA-A.003 | TO: JOB NO. TEA-A.003 |
|---|---|---|---|
| TOTAL #Hours Assigned: ALL | | TOTAL # Hours Worked: ALL | |

| INMATE ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF | PERIOD COVERED BY REPORT |
|---|---|---|---|
| A/B BRIDGING | 6-23-'04 | HELPING STUDENTS AND INSTRUCTOR | 1-1-06 thru 6-30-06 |

RECOMMENDED FOR: ☐ REASSIGNMENT ☒ RETAIN ☐ PAY INCREASE ☐ PAY DECREASE    INMATES INITIALS:

COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE)
**IS KNOWLEDGEABLE, CONSCIENTIOUS AND RESPONSIBLE**

CODE OF SAFE PRACTICES REVIEWED
SUPV'S INITIALS: _RH_    INMATE'S INITIALS

| SUPERVISOR R. HENRY | LENGTH OF SUPERVISION 24MONTHS | WORK DETAIL A2 BRIDGING TUTOR | ETHNICITY MEX |
|---|---|---|---|
| INMATES NAME BERTOLDO    A2-216L | CDC NUMBER C94377 | INSTITUTION C.V.S.P. | DATE 6-30-06 |

CDC 101 (1/92)

## WORK SUPERVISORS REPORT

| GRADES | GRADE | | GRADE | |
|---|---|---|---|---|
| 1-EXCEPTIONAL | 1 | A. DEMONSTRATED SKILL AND KNOWLEDGE | 1 | F. TEAMWORK AND PARTICIPATI( |
| 2-ABOVE AVERAGE | 1 | B. ATTITUDE TOWARD FELLOW INMATES AND WORDERS | 2 | G. LEARNING ABILITY |
| 3-SATISFACTORY | 2 | C. ATTITUDE TOWARD SUPERVISORS AND STAFF | 2 | H. USE OF TOOLS AND EQUIPMEN |
| 4-BELOW AVERAGE | 2 | D. INTEREST IN ASSIGNED WORK | 1 | I. QUALITY OF WORK |
| 5-UNSATISFACTORY | 2 | E. EFFORT DISPLAYED IN ASSIGNED WORK | 2 | J. QUANTITY OF WORK |

PAY STATUS: FROM: $ 0 TO: $ 0 FROM: JOB NO. TEA-A.003 TO: JOB NO. TEA-A.003

TOTAL #Hours Assigned: 427.5 | TOTAL # Hours Worked: 427.5

| INMATE ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF | PERIOD COVERED BY REPORT |
|---|---|---|---|
| A/B BRIDGING | 6-23-'04 | HELPING STUDENTS AND INSTRUCTOR | 1-1-'05 thru 3-31-'( |

RECOMMENDED FOR: ☐ REASSIGNMENT ☒ RETAIN ☐ PAY INCREASE ☐ PAY DECREASE

INMATES INITIALS: RB

COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE)
IS KNOWLEDGEABLE, CONSCIENTIOUS AND RESPONSIBLE

CODE OF SAFE PRACTICES REVIEWED SUPV'S INITIALS: INMATE'S INITIALS: RB

| SUPERVISOR R. HENRY | LENGTH OF SUPERVISION 9 MONTHS | WORK DETAIL A2 BRIDGING TUTOR | ETHNICITY MEX |
|---|---|---|---|
| INMATES NAME BERTOLDO    A2213L | CDC NUMBER C94377 | INSTITUTION C.V.S.P. | DATE 3-31-'05 |

*INMATE*

---

STATE OF CALIFORNIA
CDC 101 (1/92)

## WORK SUPERVISORS REPORT

DEPARTMENT OF CORRECTIONS

| GRADES | GRADE | | GRADE | |
|---|---|---|---|---|
| 1-EXCEPTIONAL | 1 | A. DEMONSTRATED SKILL AND KNOWLEDGE | 1 | F. TEAMWORK AND PARTICIPATION |
| 2-ABOVE AVERAGE | 1 | B. ATTITUDE TOWARD FELLOW INMATES AND WORDERS | 2 | G. LEARNING ABILITY |
| 3-SATISFACTORY | 2 | C. ATTITUDE TOWARD SUPERVISORS AND STAFF | 2 | H. USE OF TOOLS AND EQUIPMENT |
| 4-BELOW AVERAGE | 2 | D. INTEREST IN ASSIGNED WORK | 1 | I. QUALITY OF WORK |
| 5-UNSATISFACTORY | 2 | E. EFFORT DISPLAYED IN ASSIGNED WORK | 2 | J. QUANTITY OF WORK |

PAY STATUS: FROM: $ 0 TO: $ 0 FROM: JOB NO. TEA-A.003 TO: JOB NO. TEA-A.003

TOTAL #Hours Assigned: 448.0 | TOTAL # Hours Worked: 431.5

| INMATE ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF | PERIOD COVERED BY REPORT |
|---|---|---|---|
| A/B BRIDGING | 6-23-'04 | HELPING STUDENTS AND INSTRUCTOR | 4-1-'05 thru 6-30-'05 |

RECOMMENDED FOR: ☐ REASSIGNMENT ☒ RETAIN ☐ PAY INCREASE ☐ PAY DECREASE

INMATES INITIALS: RB

COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE)
IS KNOWLEDGEABLE, CONSCIENTIOUS AND RESPONSIBLE

CODE OF SAFE PRACTICES REVIEWED SUPV'S INITIALS: RWH INMATE'S INITIALS: RB

| SUPERVISOR R. HENRY | LENGTH OF SUPERVISION 12 MONTHS | WORK DETAIL A2 BRIDGING TUTOR | ETHNICITY MEX |
|---|---|---|---|
| INMATES NAME BERTOLDO    A2-257L | CDC NUMBER C94377 | INSTITUTION C.V.S.P. | DATE 6-30-'05 |

*INMATE*

☐ HOL

---

STATE OF CALIFORNIA
CDC 101 (1/92)

## WORK SUPERVISORS REPORT

DEPARTMENT OF CORRECTI(

| GRADES | GRADE | | GRADE | |
|---|---|---|---|---|
| 1-EXCEPTIONAL | 1 | A. DEMONSTRATED SKILL AND KNOWLEDGE | 2 | F. TEAMWORK AND PARTICIPATI( |
| 2-ABOVE AVERAGE | 1 | B. ATTITUDE TOWARD FELLOW INMATES AND WORDERS | 2 | G. LEARNING ABILITY |
| 3-SATISFACTORY | 1 | C. ATTITUDE TOWARD SUPERVISORS AND STAFF | 1 | H. USE OF TOOLS AND EQUIPMEN |
| 4-BELOW AVERAGE | 2 | D. INTEREST IN ASSIGNED WORK | 1 | I. QUALITY OF WORK |
| 5-UNSATISFACTORY | 1 | E. EFFORT DISPLAYED IN ASSIGNED WORK | 1 | J. QUANTITY OF WORK |

PAY STATUS: FROM: $ 0 TO: $ 0 FROM: JOB NO. TEA-A.003 TO: JOB NO. TEA-A.003

TOTAL #Hours Assigned: 448 | TOTAL # Hours Worked: 434

| INMATE ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF | PERIOD COVERED BY REPORT |
|---|---|---|---|
| A/B BRIDGING | 6-23-'04 | HELPING STUDENTS AND INSTRUCTOR | 7-1-'05 thru 9-30-'05 |

RECOMMENDED FOR: ☐ REASSIGNMENT ☒ RETAIN ☐ PAY INCREASE ☐ PAY DECREASE

INMATES INITIALS: RB

COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE)
IS KNOWLEDGEABLE, CONSCIENTIOUS AND RESPONSIBLE

CODE OF SAFE PRACTICES REVIEWED SUPV'S INITIALS: RWH INMATE'S INITIALS: RB

| SUPERVISOR R. HENRY | LENGTH OF SUPERVISION 15 MONTHS | WORK DETAIL A2 BRIDGING TUTOR | ETHNICITY MEX |
|---|---|---|---|
| INMATES NAME BERTOLDO    A2-213L | CDC NUMBER C94377 | INSTITUTION C.V.S.P. | DATE 9-30-'05 |

6-23-04 | 04-174

STATE OF CALIFORNIA
CDC 101 (1/92)

**WORK SUPERVISORS REPORT**

DEPARTMENT OF CORRECTI

| GRADES | GRADE | | | GRADE | |
|---|---|---|---|---|---|
| 1-EXCEPTIONAL | 1 | A. DEMONSTRATED SKILL AND KNOWLEDGE | | 1 | F. TEAMWORK AND PARTICIPATIO |
| 2-ABOVE AVERAGE | 1 | B. ATTITUDE TOWARD FELLOW INMATES AND WORDERS | | 2 | G. LEARNING ABILITY |
| 3-SATISFACTORY | 2 | C. ATTITUDE TOWARD SUPERVISORS AND STAFF | | 2 | H. USE OF TOOLS AND EQUIPMEN |
| 4-BELOW AVERAGE | 2 | D. INTEREST IN ASSIGNED WORK | | 1 | I. QUALITY OF WORK |
| 5-UNSATISFACTORY | 2 | E. EFFORT DISPLAYED IN ASSIGNED WORK | | 2 | J. QUANTITY OF WORK |

PAY STATUS: FROM: $ 0 TO: $ 0 FROM: JOB NO. TEA-A.003 TO: JOB NO. TEA-A.003

| TOTAL #Hours Assigned: 427.5 | | TOTAL # Hours Worked: 427.5 | |
|---|---|---|---|
| INMATE ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF | PERIOD COVERED BY REPORT |
| A/B BRIDGING | 6-23-'04 | HELPING STUDENTS AND INSTRUCTOR | 1-1-'05 thru 3-31-'0 |

RECOMMENDED FOR: ☐ REASSIGNMENT ☒ RETAIN ☐ PAY INCREASE ☐ PAY DECREASE

INMATES INITIALS *RB*

COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE)
IS KNOWLEDGEABLE, CONSCIENTIOUS AND RESPONSIBLE

CODE OF SAFE PRACTICES REVIEWED
SUPV'S INITIALS:          INMATE'S INITIALS: *RB*

| SUPERVISOR | LENGTH OF SUPERVISION | WORK DETAIL | ETHNICITY |
|---|---|---|---|
| R. HENRY | 9 MONTHS | A2 BRIDGING TUTOR | MEX |

| INMATES NAME | | CDC NUMBER | INSTITUTION | DATE |
|---|---|---|---|---|
| BERTOLDO | A2213L | C94377 | C.V.S.P. | 3-31-'05 |

*INMATE*

---

ATE OF CALIFORNIA
DC 101 (1/92)

**WORK SUPERVISORS REPORT**

DEPARTMENT OF CORRECTION

| GRADES | GRADE | | | GRADE | |
|---|---|---|---|---|---|
| EXCEPTIONAL | 2 | A. DEMONSTRATED SKILL AND KNOWLEDGE | | 2 | F. TEAMWORK AND PARTICIPATION |
| ABOVE AVERAGE | 2 | B. ATTITUDE TOWARD FELLOW INMATES AND WORDERS | | 2 | G. LEARNING ABILITY |
| SATISFACTORY | 2 | C. ATTITUDE TOWARD SUPERVISORS AND STAFF | | 2 | H. USE OF TOOLS AND EQUIPMENT |
| BELOW AVERAGE | 3 | D. INTEREST IN ASSIGNED WORK | | 2 | I. QUALITY OF WORK |
| UNSATISFACTORY | 3 | E. EFFORT DISPLAYED IN ASSIGNED WORK | | 2 | J. QUANTITY OF WORK |

AY STATUS: FROM: $ 0 TO: $ 0 FROM: JOB NO. TEA-A.003 TO: JOB NO. SAME

| OTAL #Hours Assigned: 455 | | TOTAL # Hours Worked: 454.5 | |
|---|---|---|---|
| MATE ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF | PERIOD COVERED BY REPORT |
| A/B BRIDGING | 6-23-04 | HELPING STUDENTS AND INSTRUCTOR | 9-21-04 thru 12-31-0 |

---

STATE OF CALIFORNIA
CDC 101 (1/92)

**WORK SUPERVISOR'S REPORT**

DEPARTMENT OF CORRECTIONS

| GRADES | GRADE | | | GRADE | |
|---|---|---|---|---|---|
| 1 – EXCEPTIONAL | 2 | A. DEMONSTRATED SKILL AND KNOWLEDGE | | 2 | F. TEAMWORK AND PARTICIPATION |
| 2 – ABOVE AVERAGE | 2 | B. ATTITUDE TOWARD FELLOW INMATES AND WORKERS | | 2 | G. LEARNING ABILITY |
| 3 – SATISFACTORY | 2 | C. ATTITUDE TOWARD SUPERVISORS AND STAFF | | 2 | H. USE OF TOOLS AND EQUIPMENT |
| 4 – BELOW AVERAGE | 2 | D. INTEREST IN ASSIGNED WORK | | 2 | I. QUALITY OF WORK |
| 5 – UNSATISFACTORY | 2 | E. EFFORT DISPLAYED IN ASSIGNED WORK | | 2 | J. QUANTITY OF WORK |

PAY STATUS: FROM: $ NON-PAY TO: $ NON PAY FROM: JOB NO. TEA-A.003 TO: JOB NO. TEA-A.003

| TOTAL # Hours Assigned: 422.5 | | TOTAL # Hours Worked: 422.5 | |
|---|---|---|---|
| INMATE ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF | PERIOD COVERED BY REPORT |
| A/B BRIDGING | 6-23-04 | HELPING STUDENTS & INSTRUCTOR | 6-23-04 / 9-23-04 |

RECOMMENDED FOR: ☐ REASSIGNMENT ☒ RETAIN ☐ PAY INCREASE ☐ PAY DECREASE

INMATE'S INITIALS *RB*

MMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE)
TRYS HARD, DOES GOOD WORK. RESPONSIBLE

CODE OF SAFE PRACTICES REVIEWED
SUPV'S INITIALS:          INMATE'S INITIALS: *RB*

| SUPERVISOR | LENGTH OF SUPERVISION | WORK DETAIL | ETHNICITY |
|---|---|---|---|
| R. HENRY | 3 MONTHS | TUTOR | MEX |

| INMATE'S NAME | | CDC NUMBER | INSTITUTION | DATE |
|---|---|---|---|---|
| BERTOLDO R. | A2-213L | C94377 | CVSP | 9-23-04 |

STATE OF CALIFORNIA
CDC 101 (1/92)  **WORK SUPERVISOR'S REPORT**  DEPARTMENT OF CORRECTIONS

| GRADES | GRADE | | GRADE | |
|---|---|---|---|---|
| 1 = EXCEPTIONAL | 2 | A. DEMONSTRATED SKILL AND KNOWLEDGE | 2 | F. TEAMWORK AND PARTICIPATION |
| 2 = ABOVE AVERAGE | 2 | B. ATTITUDE TOWARD FELLOW INMATES AND WORKERS | 2 | G. LEARNING ABILITY |
| 3 = SATISFACTORY | 2 | C. ATTITUDE TOWARD SUPERVISORS AND STAFF | 3 | H. USE OF TOOLS AND EQUIPMENT |
| 4 = BELOW AVERAGE | 3 | D. INTEREST IN ASSIGNED WORK | 3 | I. QUALITY OF WORK |
| 5 = UNSATISFACTORY | 3 | E. EFFORT DISPLAYED IN ASSIGNED WORK | 3 | J. QUANTITY OF WORK |

PAY STATUS:   FROM: $          TO: $          FROM: JOB NO.          TO: JOB NO.

TOTAL # Hours Assigned:          TOTAL # Hours Worked:

| INMATE ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF *ATTENDANCE REPORT WORKING WITH ASSIGNED CHAPLIN ON YARD TYPEING* | PERIOD COVERED BY REPORT |
|---|---|---|---|
| CHAPEL CLK.A.021 | 06/22/02 | | 10/15/03  1/22/04 |

---

STATE OF CALIFORNIA
CDC 101 (1/92)  **WORK SUPERVISOR'S REPORT**  DEPARTMENT OF CORRECTIONS

| GRADES | GRADE | | GRADE | |
|---|---|---|---|---|
| 1 = EXCEPTIONAL | 2 | A. DEMONSTRATED SKILL AND KNOWLEDGE | 2 | F. TEAMWORK AND PARTICIPATION |
| 2 = ABOVE AVERAGE | 2 | B. ATTITUDE TOWARD FELLOW INMATES AND WORKERS | 2 | G. LEARNING ABILITY |
| 3 = SATISFACTORY | 2 | C. ATTITUDE TOWARD SUPERVISORS AND STAFF | 3 | H. USE OF TOOLS AND EQUIPMENT |
| 4 = BELOW AVERAGE | 3 | D. INTEREST IN ASSIGNED WORK | 1 | I. QUALITY OF WORK |
| 5 = UNSATISFACTORY | 3 | E. EFFORT DISPLAYED IN ASSIGNED WORK | 3 | J. QUANTITY OF WORK |

PAY STATUS:   FROM: $          TO: $          FROM: JOB NO.          TO: JOB NO.

TOTAL # Hours Assigned:          TOTAL # Hours Worked:

| INMATE ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF *ATTENDANCE REPORT WORKING WITH CHAPLIN TYPEING* | PERIOD COVERED BY REPORT |
|---|---|---|---|
| CHAPEL CLK.A.021 | 06/22/02 | | 7/10/03 – 10/15/03 |

---

STATE OF CALIFORNIA
CDC 101 (1/92)  **WORK SUPERVISOR'S REPORT**  DEPARTMENT OF CORRECTIONS

| GRADES | GRADE | | GRADE | |
|---|---|---|---|---|
| 1 = EXCEPTIONAL | 3 | A. DEMONSTRATED SKILL AND KNOWLEDGE | 2 | F. TEAMWORK AND PARTICIPATION |
| 2 = ABOVE AVERAGE | 3 | B. ATTITUDE TOWARD FELLOW INMATES AND WORKERS | 2 | G. LEARNING ABILITY |
| 3 = SATISFACTORY | 2 | C. ATTITUDE TOWARD SUPERVISORS AND STAFF | 3 | H. USE OF TOOLS AND EQUIPMENT |
| 4 = BELOW AVERAGE | 3 | D. INTEREST IN ASSIGNED WORK | 3 | I. QUALITY OF WORK |
| 5 = UNSATISFACTORY | 3 | E. EFFORT DISPLAYED IN ASSIGNED WORK | 3 | J. QUANTITY OF WORK |

PAY STATUS:   FROM: $          TO: $          FROM: JOB NO.          TO: JOB NO.

TOTAL # Hours Assigned:          TOTAL # Hours Worked:

| INMATE ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF *TYPING KEEPING TRACK OF ATTENDANCE REPORT WORKING WITH CHAPLIN* | PERIOD COVERED BY REPORT |
|---|---|---|---|
| CHAPEL CLK.A.021 | 06/22/02 | | 4/20/03 – 7/10/03 |

RECOMMENDED FOR:   ☐ REASSIGNMENT   ☒ RETAIN   ☐ PAY INCREASE   ☐ PAY DECREASE   INMATE'S INITIALS: *RB*

COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE)          CODE OF SAFE PRACTICES REVIEWED
*GOOD WORKER*          SUPV'S INITIALS: *(SS)*          INMATE'S INITIALS: *RB*

| SUPERVISOR | LENGTH OF SUPERVISION | WORK DETAIL | ETHNICITY |
|---|---|---|---|
| *S. Smith* | 3 MTHS | A-2W CHAPEL CLK | HISP |

| INMATE'S NAME | CDC NUMBER | INSTITUTION | DATE |
|---|---|---|---|
| BERTOLDO | C94377 | C.V.S.P. | 7/10/03 |

# NARCOTICS ANONYMOUS
## ATTENDANCE RECORD

| Inmate Name | CDC# | Dorm/Bed |
|---|---|---|
| BERTOLDO, R. | C94377 | A2-213 Low |

| Date | Sponsors Initial | Comments |
|---|---|---|
| 1) 8-2-04 | A. Smalley | NA |
| 2) 8-3-04 | AS | NA |
| 3) 8-9-04 | AS | NA |
| 4) 8-16-04 | AS | 30 Day Chip |
| 5) 8-23-04 | AS | NA |
| 6) 8-30-04 | AS | NA |
| 7) 9-13-04 | AS | NA |
| 8) 9-20-04 | AS | 60 Day Chip |
| 9) 9-27-04 | AS | NA |
| 10) 10-13-04 | AS | NA |
| 11) 10-18-04 | AS | N/A |
| 12) 10-22-04 | AS | 90 Day Certificate |
| 13) 10-25-04 | AS | NA |
| 14) 11-15-04 | TJ | NA |
| 15) 11-22-04 | TJ | NA |
| 16) 11-29-04 | TJ | NA |
| 17) 12-6-04 | TJ | NA |
| 18) 12-13-04 | TJ | NA |
| 19) 12-20-04 | TJ | NA |
| 20) 1-3-00 | TJ | NA |
| 21) 1/31/05 | TJ | NA |
| 22) | | |
| 23) | | |
| 24) | | 6 Month Chip |
| 25) | | |
| 26) | | |
| 27) | | |
| 28) | | |
| 29) | | |
| 30) | | |
| 31) | | |

# NARCOTICS ANONYMOUS
## ATTENDANCE RECORD

| Inmate Name | CDC# | Dorm/Bed |
|---|---|---|
| BERTOLDO, R. | C94377 | A2-213 Low |

| Date | Sponsors Initial | Comments |
|---|---|---|
| 32) | | |
| 33) | | |
| 34) | | |
| 35) | | |
| 36) | | 9 Month Chip |
| 37) | | |
| 38) | | |
| 39) | | |
| 40) | | |
| 41) | | |
| 42) | | |
| 43) | | |
| 44) | | |
| 45) | | |
| 46) | | |
| 47) | | |
| 48) | | 1 Year Certificate |
| 49) | | |
| 50) | | |
| 51) | | |
| 52) | | |
| 53) | | |
| 54) | | 18 Month Chip |
| 55) | | |
| 56) | | |
| 57) | | |
| 58) | | |
| 59) | | |
| 60) | | |
| 61) | | |
| 62) | | |



## Coastline Community College
## Student Test Report On Quiz 2  A

Course #:    8012

Course Title: Bus 120

Day/Time:.          TV

Instructor:   Ondracek, T.

Description: Personal Financial Planning

Term/Year:  Spring2005

---

### Student Name:  BERTOLDo(C94377), RO
### Student ID:    00973996          Code:

| | Possible Pts. | Raw | Objective | Subj./Essay | Percent | Grade |
|---|---|---|---|---|---|---|
| QUIZ 2: | 25.00 | 22.00 | 22.00 | 0 | 88.00% | B |

| Response Description: | <dash>    correct response | <#>   multiple marks | <space>   no response |
|---|---|---|---|
| | <alphabet> student's incorrect response | <*>   bonus test item | |

| Test Items: | 1-5 | 6-10 | 11-15 | 16-20 | 21-25 | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Test Key: | C,D,D,C,C | B,C,A,E,C | A,C,A,D,C | A,B,A,B,D | B,E,E,D,D | | | | |
| Answers | -,-,-,-,- | -,D,-,-,- | -,-,-,-,- | -,-,-,E,B | -,-,-,-,- | | | | |

Remarks:

---

Student's Answer to Multiple Mark Question:

No multiple mark answers or answer keys found on this test.



# Coastline Community College
## Student Test Report On Quiz 4  A

Course #:    8012

Course Title: Bus 120

Day/Time:          TV

Instructor:   Ondracek, T.

Description: Personal Financial Planning

Term/Year: Spring2005

**Student Name:  BERTOLDo(C94377), ROBERT**

**Student ID:    00973996          Code:**

| | Possible Pts. | Raw | Objective | Subj./Essay | Percent. | Grade |
|---|---|---|---|---|---|---|
| QUIZ 4: | 25.00 | 24.00 | 24.00 | 0 | 96.00% | A |

| Response Description: | <dash>    correct response | | | | <#>    multiple marks | | <space>    no response | |
|---|---|---|---|---|---|---|---|---|
| | <alphabet> student's incorrect response | | | | <*>    bonus test item | | | |

| Test Items: | 1-5 | 6-10 | 11-15 | 16-20 | 21-25 | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Test Key: | C,A,C,A,A | B,C,B,A,A | A,C,C,B,C | E,D,C,D,D | E,A,A,A,C | | | | |
| Answers | -,-,-,-,- | -,-,-,-,- | -,-,-,-,- | -,-,-,-,B | -,-,-,-,- | | | | |

Remarks:

Student's Answer to Multiple Mark Question:

No multiple mark answers or answer keys found on this test.

# Coastline Community College
## Progress Report

| | | | | | |
|---|---|---|---|---|---|
| Course #: | 8012 | Instructor: | Ondracek, T. | Date: | 04/05/05 |
| Course Title: | Bus 120 | Description: | Personal Financial Planning | Total No. of Tests: | 8 |
| Day/Time: | TV | Term/Year: | Spring2005 | Code: | |

Student ID:   00973996
Name:   BERTOLDo(C94377), RO .

| No. | Date | Test Name | Description | Possible Points | Score |
|---|---|---|---|---|---|
| 1 | / / | Quiz 1 | | 25.00 | 20.00 |
| 2 | / / | Quiz 2 | | 25.00 | 22.00 |
| 3 | / / | Quiz 3 | | 0.00 | |
| 4 | / / | Quiz 4 | | 0.00 | |
| 5 | / / | Midt 1 | | 140.00 | 112.00 |
| 6 | / / | MTPENAL1 | | 0.00 | |
| 7 | / / | Finl 1 | | 0.00 | |
| 8 | / / | Xtra 1 | | 0.00 | |

| Comments: | | Total | 190.00 | 154.00 |
|---|---|---|---|---|
| | | Score % | | 81.05 |
| | | | | |

# Coastline Community College
## Progress Report

| | | | | |
|---|---|---|---|---|
| Course #: | 8012 | Instructor: | Ondracek, T. | Date: | 06/06/05 |
| Course Title: | Bus 120 | Description: | Personal Financial Planning | Total No. of Tests: | 8 |
| Day/Time: | TV | Term/Year: | Spring2005 | Code: | |

ID:     00973996
Name:     BERTOLDo(C94377), ROBERT .

| No. | Date | Test Name | Description | Possible Points | Score |
|---|---|---|---|---|---|
| 1 | / / | Quiz 1 | | 25.00 | 20.00 |
| 2 | / / | Quiz 2 | | 25.00 | 22.00 |
| 3 | / / | Quiz 3 | | 25.00 | 24.00 |
| 4 | / / | Quiz 4 | | 25.00 | 24.00 |
| 5 | / / | Midt 1 | | 140.00 | 112.00 |
| 6 | / / | MTPENAL1 | | 0.00 | |
| 7 | / / | Finl 1 | | 140.00 | 98.00 |
| 8 | / / | Xtra 1 | | 0.00 | |

| Comments | | | |
|---|---|---|---|
| | Total | 380.00 | 300.00 |
| | Score % | | 78.94 |
| | Overall Total | 380.00 | |
| | Overall Score % | | 78.94 |
| | Overall Grade | | C |

FOR THE YEAR OF 2006

# PETITION FOR RELEASE/ SUITABILITY
## & 
## LETTER IN SUPPORT

This petition is in favorable alliance for the parole release and/or to find the person we know as Robert Bertoldo suitable for parole.

To The Board of Prison Terms hearing the suitability for parole of Robert Bertoldo

I the undersigned am aware that the person of Robert Bertoldo has been incarcerated for the past twenty-five years, for the crime of murder in the second degree. I am also aware that the state of California implements diversity in it's sentencing laws. I as a citizen of the United States, believe that twenty-five (25) years has been a long time for any man in prison who has not been on a campaign of violence and has yet to be found suitable for release.

With consideration to the pain and anguish to all who have suffered and were affected by the occurrence of the crime mentioned above, there must also be the same volume of consideration given to the time for healing and the time for closure. With attentive consideration to "Diversity in sentencing" coupled with the use of the "Matrix system," which is the only legal rule-stick for measuring how much time is enough for a second degree sentence; I am in support for the release of Robert Bertoldo.

My relationship with Mr. Bertoldo will continue with him upon his release from prison and we look forward to a positive one. I confidently believe that Robert Bertoldo is suitable for parole and would not pose any risk of danger to society or a threat to public safety if released from prison, with confidence that Robert will conduct his life in an unequivocally favorable and constructive nature. Along with my name on this petition is my staunch allegiance to remain steadfast in / as, a friend, a relative, a concerned citizen or fellowship with Robert in his Christian faith; I would like to acknowledge that my name here in this petition is indefinite for future hearings and to carry the same function as a letter in support.

As a relative of Robert Bertoldo's family I feel grieved with the present circumstance, but firmly believe that a reality to this matter is closely related to time, in which; time is also one of the main factors connected with healing and closure to situations such as the one at hand. As family members we feel that time in prison is also an obligation as Robert's debt for the crime which was committed and believe that after twenty-five yeas, it is time for Robert to come home and /or be found suitable for release. As a member of Robert's family I will give him my solemn assurance that upon his reentry to the community; it will be one with the full support of his family. We want the B.P.T. to know that our engagement with Robert will be one of sincere concern to his welfare and with positive family contact for him when ever possible and / or needed. We understand that reentry into society for Robert or for anyone who has been away for twenty-five years can be difficult; but for Robert it will doubtlessly be done with a loving family that is in full support of his well being. Robert is certainly well aware that as a family our door is always open to him for any strength, or reinforcement he may possibly need. We as a family ask the B.P.T. to take into consideration the past twenty-five years, and pray for closure to all of this by finding Robert suitable to come home to us.

As a friend of Robert Bertoldo and a willing participant as a support system, I pledge to keep an open means of communication with Robert so that he may feel confident in the positive nature for our friendship. Exercising my support as a petitioner / Citizen I would like to be with out doubt that the Board of Prison Terms can recognize we as citizens and honest members of our communities can be a possitive catalyst for Robert's reentry in being an asset to the community and welcome him.

As a concerned Citizen I believe we are all responsible for upholding the laws that govern us with in our socially respectable environments, and that our communities be filled with orderly and honest, productive people. In the degree as a concerned citizen, I believe that those who preside over the responsibility of administering those laws which govern us, do so with out bias or relevance to political agendas, but by the rules in place governing administrative law; which would uphold "Diversity in sentencing" through the "Matrix system."
I as a citizen am concerned if a man is being held in prison beyond his allotted time, and after reviewing the matrix governing Robert's incarceration of twenty-five years; I am in irreversible favor of Mr. Robert Bertoldo's suitability for release.

## DECLARATION AND PRAYER

I declare, that my concern for Mr. Robert Bertoldo's release is one of sincerity, and will ;

Pray that those entrusted to the administration of the law will seek there hearts to find the true reason why we are a society governed by laws; the important responsibility entrusted to them for administering those laws as they are written, and that they find Mr. Robert Bertoldo suitable for release.

FOR THE YEAR OF 2006

## PETITIONERS IN SUPPORT FOR THE RELEASE AND/OR PAROLE SUITABILITY OF ROBERT BERTOLDO

If there be any question to my support please call for verification

Petitioners name: *JOHN FLONGS*

Phone: *323 225 9628    323 254 7886*   HOME

Address: *1304 N. AVE. 57   LA   90042*

Relative............☐ Friend............☒ Christian Fellow............☐ Concerned Citizen............☒

Petitioners name:

Phone:

Address:

Relative............☐ Friend............☐ Christian Fellow............☐ Concerned Citizen............☐

Petitioners name:

Phone:

Address:

Relative............☐ Friend............☐ Christian Fellow............☐ Concerned Citizen............☐



As a friend of Robert Bertoldo and a willing participant as a support system, I pledge to keep an open means of communication with Robert so that he may feel confident in the positive nature for our friendship. Exercising my support as a petitioner / Citizen I would like to be with out doubt that the Board of Prison Terms can recognize we as citizens and honest members of our communities can be a possitive catalyst for Robert's reentry in being an asset to the community and welcome him.

As a concerned Citizen I believe we are all responsible for upholding the laws that govern us with in our socially respectable environments, and that our communities be filled with orderly and honest, productive people. In the degree as a concerned citizen, I believe that those who preside over the responsibility of administering those laws which govern us, do so with out bias or relevance to political agendas, but by the rules in place governing administrative law; which would uphold "Diversity in sentencing" through the "Matrix system."
I as a citizen am concerned if a man is being held in prison beyond his allotted time, and after reviewing the matrix governing Robert's incarceration of twenty-five years; I am in irreversible favor of Mr. Robert Bertoldo's suitability for release.

## DECLARATION AND PRAYER

I declare, that my concern for Mr. Robert Bertoldo's release is one of sincerity, and will ;

Pray that those entrusted to the administration of the law will seek there hearts to find the true reason why we are a society governed by laws; the important responsibility entrusted to them for administering those laws as they are written, and that they find Mr. Robert Bertoldo suitable for release.

*John Flores*

I Believe Mr. Bertold deserves a another
Chance at Life as a regular Human Being.
I know that he Loesis Totally Paid for
his Moment of Weakness. He is a good
Person, and with this Behind him he will
Be a Good Citizen, *Johny Flores*

FOR THE YEAR OF 2006

## PETITIONERS IN SUPPORT FOR THE RELEASE AND/OR
## PAROLE SUITABILITY OF ROBERT BERTOLDO

If there be any question to my support please call for verification

Petitioners name: DAVID G. LAKE

Phone: 714-774-1796

Address: 1236 Rovenna St
Anaheim CA 92501

Relative............□ Friend............□ Christian Fellow............□ Concerned Citizen............□

Petitioners name: MARK SCOTT

Phone: (951) 264-0465

Address: 474 W Bristol St
CORONA CAL 92879

Relative............□ Friend............□ Christian Fellow............□ Concerned Citizen............□

Petitioners name: David Castillo

Phone: (714) 531-7910

Address: 11925 Heil Ave
Fountain Vallay Ca 92708

Relative............□ Friend............□ Christian Fellow............□ Concerned Citizen............□

FOR THE YEAR OF 2006

## PETITIONERS IN SUPPORT FOR THE RELEASE AND/OR PAROLE SUITABILITY OF ROBERT BERTOLDO

If there be any question to my support please call for verification

Petitioners name: RAUL AGUILAR

Phone: 909 539-7516

Address: 5034 HOLT BLVD. A-19
MONTCLAIR CA. 91763

Relative............☐ Friend............☐ Christian Fellow............☑ Concerned Citizen............☐

Petitioners name: Anthony Orosco Jr.

Phone: (909) 6363831

Address: 11838 #49 Central Ave.
Chino, Ca. 91710

Relative............☐ Friend............☐ Christian Fellow............☐ Concerned Citizen............☒

Petitioners name: Rose Ramirez

Phone: (626) 851-3734 / (626) 253-7816

Address: P.O. Box 2373 / 3929 Walnuthaven Dr
Covina CA 91722

Relative............☐ Friend............☐ Christian Fellow............☐ Concerned Citizen............☒

FOR THE YEAR OF 2006

## PETITIONERS IN SUPPORT FOR THE RELEASE AND/OR
## PAROLE SUITABILITY OF ROBERT BERTOLDO

If there be any question to my support please call for verification

Petitioners name: CRYSTAL Pereyra

Phone: 909 984 0408

Address: 932 N Palm Ave
Ontario CA. 91762

Relative............☐ Friend............☐ Christian Fellow.......☒ Concerned Citizen............☐

Petitioners name: Melissa Pereyra

Phone: 909 984 0408

Address: 932 N Palm Ave
Ontario CA 91762

Relative............☐ Friend............☐ Christian Fellow.........☒ Concerned Citizen............☐

Petitioners name: Irma Knori

Phone: (626) 960 8453

Address: 3467 Robinette Ave.
Baldwin Park, CA 91706

Relative............☐ Friend............☐ Christian Fellow............☒ Concerned Citizen............☐

FOR THE YEAR OF 2006

## PETITIONERS IN SUPPORT FOR THE RELEASE AND/OR PAROLE SUITABILITY OF ROBERT BERTOLDO

If there be any question to my support please call for verification

Robert Bertoldo C94377

Petitioners name: SUSAN MARANGI

Phone: 661 3059974

Address: 811 BALDWIN RD, BAKERSFIELD CA 93304

Relative............☒ Friend...........☐ Christian Fellow............☐ Concerned Citizen..........☒

Petitioners name: Robert Bertoldo C94377

Phone: 760 5866793

Address: 3950 Waring Rd. apt # 123 Oceanside California 92056

Relative...........☒ Friend............☐ Christian Fellow............☐ Concerned Citizen...........☐

Petitioners name: Robert Bertoldo C94377

Phone: VANESSA RIVERA

Address: 6000 HILLANDALE DRIVE # 7
523 420 1447

Relative............☐ Friend............☐ Christian Fellow............☐ Concerned Citizen...........☒

2, BERTOLDO   C 94377    BPT

FOR THE YEAR OF 2006

## PETITIONERS IN SUPPORT FOR THE RELEASE AND/OR PAROLE SUITABILITY OF ROBERT BERTOLDO

If there be any question to my support please call for verification

---

Petitioners name: *Josephine Christian*

Phone: 626-579-3367

Address: 12606 Pineville St,
El Monte ca. 91732

*Mother*
Relative...........X Friend...........X Christian Fellow...........X Concerned Citizen...........X

---

Petitioners name: *Ruben Garcia*

Phone: 626-442-4262

Address: 12652 Pineville St
El Monte CA. 91732

Relative...........☑ Friend...........☐ Christian Fellow...........☐ Concerned Citizen...........☐

---

Petitioners name: *Irene Marquez*

Phone: 626-448-4877

Address: 12602 Pineville St
El Monte Calif 91732

Relative...........☑ Friend...........☐ Christian Fellow...........☐ Concerned Citizen...........☐

---

copied from original

R BALLESTEROS    5/31/06

Bertoldo    C 94377
AZ-216ᴸ

FOR THE YEAR OF 2006

## PETITIONERS IN SUPPORT FOR THE RELEASE AND/OR PAROLE SUITABILITY OF ROBERT BERTOLDO

If there be any question to my support please call for verification

Petitioners name: George Whitehead

Phone: 626 - 443 - 7203

Address: 2609 Santa Anita Avenue
El Monte, California, 91733-2222

Relative............□  Friend............☒ Christian Fellow............□  Concerned Citizen............☒

Petitioners name: Lilia Whitehead

Phone: 626 - 443 - 7203

Address: 2609 S Anita Ave
El Monte California, 91733-2222

Relative............□  Friend............☒ Christian Fellow............□  Concerned Citizen............☒

Petitioners name:

Phone:

Address:

Relative............□  Friend............□ Christian Fellow............□  Concerned Citizen............□

FOR THE YEAR OF 2006

### PETITIONERS IN SUPPORT FOR THE RELEASE AND/OR PAROLE SUITABILITY OF ROBERT BERTOLDO

If there be any question to my support please call for verification

Petitioners name: Ulric Ray Arcides

Phone: (909) 627-2356

Address: 13252 17th Street Chino, CA 91710

Relative............□ Friend............☒ Christian Fellow............☒ Concerned Citizen............□

Petitioners name: ANGEL OROZCO

Phone: (909) 973-4796

Address: 912 HUNT AVE. POMONA, CA 91766

Relative............□ Friend............□ Christian Fellow............☒ Concerned Citizen............□

Petitioners name: RAY VALENZUELA

Phone: (909) 331-9722

Address: 2246 GOLDCREST AVENUE ONTARIO CA 91761

Relative............□ Friend............□ Christian Fellow............☒ Concerned Citizen............□

FOR THE YEAR OF 2006

**PETITIONERS IN SUPPORT FOR THE RELEASE AND/OR
PAROLE SUITABILITY OF ROBERT BERTOLDO**

If there be any question to my support please call for verification

---

Petitioners name: MAGBALENA DELGADO

Phone: 305-829-8834

Address: 13165 SW. 49th Cut

Miramar, FL. 33027

Relative.....X....☐ Friend............☐ Christian Fellow............☐ Concerned Citizen............☐

---

Petitioners name: Pedro DELGADO PEDRO

Phone: 305-829-8834

Address: 13165 SW, 49th Cut

Miramar, FL. 33027

Relative....X....☐ Friend............☐ Christian Fellow............☐ Concerned Citizen............☐

---

Petitioners name: Alonzo S. BERTOLDO

Phone: (786) 313-0066

Address: 7136 N.W 169 St

Miami Lakes FL 33015

Relative....X....☐ Friend............☐ Christian Fellow............☐ Concerned Citizen............☐

FOR THE YEAR OF 2006

## PETITIONERS IN SUPPORT FOR THE RELEASE AND/OR PAROLE SUITABILITY OF ROBERT BERTOLDO

If there be any question to my support please call for verification

---

Petitioners name: _Andrew R. Bertoldo_

Phone: _305-953-8900_

Address: _12850 W Golf Dr._

_Miami, Fla 33167_

Relative........X......☑ Friend............☐ Christian Fellow............☐ Concerned Citizen............☐

---

Petitioners name: _VIVIAN BERTOLDO_

Phone: _305-829-8834_

Address: _13165 SW 49 Ct_

_MIRAMAR, FL 33027_

Relative..........X....☑ Friend............☐ Christian Fellow............☐ Concerned Citizen............☐

---

Petitioners name: _Pete Bertoldo_

Phone: _305-829-8834_

Address: _13165 SW. 49th Cut_

_Miramar, FL 33027_

Relative....X.....☑ Friend............☐ Christian Fellow............☐ Concerned Citizen............☐

FOR THE YEAR OF 2006

## PETITIONERS IN SUPPORT FOR THE RELEASE AND/OR PAROLE SUITABILITY OF ROBERT BERTOLDO

If there be any question to my support please call for verification

Petitioners name: Virginia Sandoval

Phone: 562 923 - 4643

Address: 8540 Cherokee, Dr.

Downey, Ca. 90241

Relative............☐ Friend............☑ Christian Fellow............☐ Concerned Citizen............☐

Petitioners name: Dana Urena

Phone: 562 - 299 - 7341

Address: 8540 Cherokee Dr.

Downey, Ca. 90241

Relative............☐ Friend............☑ Christian Fellow............☐ Concerned Citizen............☐

Petitioners name: MARGIE BERTOLDO.

Phone: 559 - 925 - 8672.

Address: 774 BALBOA AVE.

LEMOORE, CA. 93245.

Relative............☑ Friend............☐ Christian Fellow............☐ Concerned Citizen............☐

FOR THE YEAR OF 2006

## PETITIONERS IN SUPPORT FOR THE RELEASE AND/OR PAROLE SUITABILITY OF ROBERT BERTOLDO

If there be any question to my support please call for verification

Petitioners name: Robert Bertoldo. C94377

Phone: Julie Rivera

Address: 6209 Strickland Ave.
LA CA 90042

Relative..........☒ Friend............☐ Christian Fellow............☐ Concerned Citizen............☐

Petitioners name: Robert Bertoldo C94377

Phone: Anthony Rivera

Address: 6209 Strickland ST
LA CA 90042

Relative..........☒ Friend............☐ Christian Fellow............☐ Concerned Citizen............☐

Petitioners name: Robert Bertoldo C94377

Phone: Robert Marangi

Address: 1058 Irving Ave #B
Glendale, CA 91201

Relative..........☒ Friend............☐ Christian Fellow............☐ Concerned Citizen............☐

FOR THE YEAR OF 2006

## PETITIONERS IN SUPPORT FOR THE RELEASE AND/OR
## PAROLE SUITABILITY OF ROBERT BERTOLDO

If there be any question to my support please call for verification

Petitioners name: Robert Bertoldo C94377
Phone: 623 780 7642
Address: 24611 N. 62ND AVE
ARizona, 85310
SANDY BIRD

Relative............☑ Friend............☐ Christian Fellow............☐ Concerned Citizen............☐

Petitioners name: Robert Bertoldo C94377
Phone: 818 241 5431
Address: 315 EAST CALiFORNia ✳A
GLENDALE, CALiFORNIA 91206
JOSE RAMIREZ

Relative............☐ Friend............☐ Christian Fellow............☐ Concerned Citizen............☑

Petitioners name: Robert Bertoldo C94377
Phone: 760 586 6793
Address: 3950 WARING Rd. ✳123
Oceanside, Calif. 92056
JONAthAN MARANG

Relative............☑ Friend............☐ Christian Fellow............☐ Concerned Citizen............☐

FOR THE YEAR OF 2006

### PETITIONERS IN SUPPORT FOR THE RELEASE AND/OR
### PAROLE SUITABILITY OF ROBERT BERTOLDO

If there be any question to my support please call for verification

Petitioners name: ROBERT BERTOLDO - C94377

Phone: 818 240 3593

Address: 1058 IRVING AVE #B
Glendale CA 91201

Lillian Fabiano

Relative............☑ Friend............☐ Christian Fellow............☐ Concerned Citizen............☐

Petitioners name: Robert BERTOLDO  C94377

Phone: 818-241-5431

Address: 315 E California #A
Glendale, Ca 91206
Judy mac Bradley

Relative............☐ Friend............☑ Christian Fellow............☐ Concerned Citizen............☐

Petitioners name: Robert BERToldo  C94377

Phone: 626 797 7223

Address: 823 Sacramento - Altadena Ca.
NICOLE Harris

Relative............☐ Friend............☑ Christian Fellow............☐ Concerned Citizen............☐

April 9, 2006

LETTER OF SUPPORT
FOR THE PAROLE RELEASE OF
MY HUSBAND ; ROBERT BERTOLDO

Dear Chairperson & members of Panel,

My name is Carol Bertoldo and I am the wife and confidant of Robert Bertoldo.
I have known Robert since 1966 and since our teen years we have grown closely together
through our school days, our dating, our living together as common law and now married for the
past thirteen years. I have seen him through his tribulations and those times of joys in his life.
Since our first acquaintance in our teen years Robert has remained steadfast in his sincere
concern for me and I for him, truly he has shown me alot about a loving and having a forgiving
heart.

Robert has been convicted of killing a man; which I believe was an interrelational situation
( friendship/business ), because Robert and I have cultivated a confidence with each other
through out the years, we have talked about the circumstances of the crime.
Through Robert I understand that the regrettable incedent that day, evolved from a fight which
took less than five minutes to unfold. With those five minutes in time twenty-five years ago,
there's an unjust and unfair depiction surrounding Robert's life. The tragedy those five minutes
caused was devastating for all involved, but those five minutes do not make up the sum of
Robert's life; today Robert lives his life with the freedom of Christ in his heart and is genuinely
pursuing God's Word.
For over a year now Robert has endeavored the challenge of entrepreneurship, when we speak
by phone ( which is twice a week ) he is always inspiring me with his insight in the preparation
of launching our own business.
Prior to going to prison Robert started to live a dark life style with the people he would aquaint
himself with, but Robert has not been that way all his life, Robert was always respectful to my
grandparents who loved Robert, my parents also loved Robert too; when Robert was
hospitalized from a life saving surgery he was taken in by my parents to convalesce and
recoup in there home, but that was the relationship Robert had with my parents.
Robert was also close with his family too. growing together I remember sharing the holidays
with each others families, we would visit with his mother on a regular basis, he was close with
his brothers and sister they were good family ties both with my family and with his.
Robert has kept long relationships with friends,and the families on our street found Robert
reliable and responsible to allow there children to go with Robert and I to different places such
as parks, the zoo, or friendly places to enjoy the day.
Some of the lives which Robert has touched are more than willing to sign his petition for release
which has been sent in to be submitted for Robert's B.P.H. last year and this year.
I have seen Robert bond with friends in the most remarkable way in how people will take a
comfortable liking to him. Most of the time that Robert worked it was in the field of aluminum
awnings and he and his brother were co-owners for several years. Robert has shown me
much about love, kindness, hope and faith with in our life time of knowing each other and most
of all I wait for his return home with a loving anticipation.
Today I see Robert as a strong person rooted in the Christian faith which we share in and I see
he has taken hold of a positive direction, he is so excited when he talks to me about the
ministries that he is involved with at the church there at the prison. He is also very creative
with his art-work which will also be the foundation of an art gallery wib-site which he and I are
currently in the process of establishing, and we pray that we'll have our inaugural this year.
Robert's style of art-work is certainly marketable and has proven to be so with the small
demand he currently has and has yet to tap into the grand vehicle of web-site marketing. But it
will be Robert's love for God to do good, his passion for the art and his adherence to
maintaining a positive attitude, resourcefulness and inventive flare which will be the pulse for
the start of this entrepreneur undertaking.

Robert and I will be living together as husband and wife in a small three bedroom house; one of the bedrooms will be converted into Robert's office/studio as he will be working from our home. Robert will have access to transportation as I own a truck and car. We are active in creating a fellowship with Calvary Chapel of Pasadena, the church which Robert and I will be attending upon his release.

Only because I am forbidden to be present with you to give my testimony about Robert on the day of his hearing, I pray you will give an honest and fare consideration to what I have conveyed in this letter - I am not eloquent in words but please understand what I ask is that you not just use those five minutes in time to reach a conclusion. Robert has touched many lives in a positive way and he continues doing so even from prison - I know we must not forget the enormity and seriousness of a life taken, so please, I ask that Robert's life not be lost also. I believe Robert was sentenced to be given a second chance, I ask to trust that Robert is most definitely not the same person as when he first entered prison, and that he be found suitable to come home, thank you very much for your time in reading this letter.

For any questions please,
do not hesitate to call me at home:
323-255-6441

In graciouse supplicaton

Mrs. Carol L.M. Bertoldo

Bertoldo  C94377

April 12, 2006

Ref: Letter in support.

To: The Board of Prison Terms &
    those Members Hearing the
    Case of Robert Bertoldo

Dear Members of the B.P.T. Panel

I am the mother of Robert Beroldo, and write this letter with all the sincerity of a loving mother, and as a compassionate and humble Christian Woman I must say I also write this letter keeping all involved with this hearing process in prayer.

It has been twenty-five years since Robert has been incarcerated for a crime in which he committed. The length of a quarter century is a substantial amount of time. Time enough for a five year old boy to grow into a man and have gone through all the mental and physical changes a boy goes through to become a man. During that period, one thing will be an obvious and prevalent fact ; the man will no longer be the child. Most people will unquestionably show some type of significant change with in a span of twenty-five years and equivocally for the good or for the bad, whether on a deserted island, or in a prison in California.
Fortunately by the Grace of God Robert has shown a conformity to a right standard of morality. His direction is inclined toward virtuous principals which is totally in contrary to his past mode of thinking and past life-style.
Because Robert has been the youngest of three brothers and one sister, we have always had the close relationship as a mother and son. In all truthfulness and with out bias, I now see a humble wisdom in Robert which I've never seen in his life.
I as a mother and Christian woman, have prayed for Robert's salvation and exceptance of Jesus Christ as his Redeemer, for many, many years.
When Robert was arrested for the crime which he is in prison for today, I was crushed and my heart ached for all who suffered through this horrible situation. I can assure this Board Panel that a mother goes through an agonizing torment as we think of the reasons why our children choose destructive paths.
Through it all I have always placed Robert in God's Hands and in the year of 2000 God heard my prayers and poured out His Grace upon Robert. Robert has surrendered his will over to Jesus Christ, to Lord over his life. There is a passage in the bible which describes my thought of Robert accurately "Therefore, if anyone is in Christ he is a new creation; old things have passed away ; behold, all things have become new "...
I am eighty-five years of age and can tell you that I know my son and speak to him at an average of once a week, he is not the same man as when he first went into prison, he is a Christian now following Christ's teachings and through out my child's life , even on the day I gave him birth does not compare to his exceptance of the Lord which has made me the happiest...

Now I pray that the Board Hearing Robert's suitability for parole will see in him the same change which I see in him and will consider that change enhanced with the twenty-five years of his incarceration to allow him to come home that I may enjoy God's new creation.

I thank you for your time in considering these words and may God bless your hearts.

Respectfully submitted

*Josephine Christian*
Josephine Christian

copied from original

R BALLESTEROS CC1  5/31/06

6/7/06

To Whom it may Concern
My Name is Elenore Silva I have
Been a friend of Robert and
his family for many years
Now and my reason for
Writing this letter in
Hopes that it will Reach
you Befor his next parole
Date I Would like to share
that I am aware of the many
programs he has Been particepting
in according to his letter
that I Been Recieving from
I can only say that I
Hear and see progress in
this man and with all
Do Respect to the parole
Board I Hope and pray
that you will take this
letter in to Conservation as
you made your Decision
in Robert Case

Sincerly
Mrs Elenore Silva

**Camp Pastor Ministries**
**P.O. Box 7084**
**Desert Center CA 92239**

March 25, 2005

Board of Prison Terms
1515 K Street, Ste. 600
Sacramento, CA 95814

Re: Letter of support for parole
    Robert Bertoldo (C 94377)
    Chuckawalla Valley State Prison

For many years our ministry has been conducting weekly Protestant church services and self-help type programs at Chuckawalla Valley State Prison. We first met Robert in the 2002 and he has over the years faithfully attended our weekly services.

Over the period of time that we have known Robert we have observed changes in his attitude. Upon accepting Jesus Christ as his Savor and Lord, he has demonstrated a strong desire to change his life. Robert has participated in a number of bible based self-help courses. He successfully completed the Anger Management course that we taught and took the training seriously. We have also noted that Robert has consistently shown a positive attitude and is very disciplined in all that he does.

Based upon the changes that we have seen in Robert we believe that he could successfully fit back into society upon his release.

Yours truly,

Chaplain Ben Vivian

FOR THE YEAR OF 2004

# PETITION FOR RELEASE/ SUITABILITY
### &
# LETTER IN SUPPORT

This petition is in favorable alliance for the parole release and/or to find the person we know as Robert Bertoldo suitable for parole.

To The Board of Prison Terms hearing the suitability for parole of Robert Bertoldo

I the undersigned am aware that the person of Robert Bertoldo has been incarcerated for the past twenty-three years, for the crime of murder in the second degree. I am also aware that the state of California implements diversity in it's sentencing laws. I as a citizen of the United States, believe that twenty-three (23) years has been a long time for any man in prison who has not been on a campaign of violence and has yet to be found suitable for release. With consideration to the pain and anguish to all who have suffered and were affected by the occurrence of the crime mentioned above, there must also be the same volume of consideration given to the time for healing and the time for closure. With attentive consideration to "Diversity in sentencing" coupled with the use of the "Matrix system," which is the only legal rule-stick for measuring how much time is enough for a second degree sentence; I am in support for the release of Robert Bertoldo.

My relationship with Mr. Bertoldo will continue with him upon release from prison and we look forward to a positive one. I confidently believe that Robert Bertoldo is suitable for parole and would not pose any risk of danger to society or a threat to public safety if released from prison, with confidence that Robert will conduct his life in an unequivocally favorable and constructive nature. Along with my signature on this petition is my staunch allegiance to remain steadfast in / as, a friend, a relative, a concerned citizen or fellowship with Robert in his Christian faith; I would like to acknowledge that my signature here in this petition is indefinite for future hearings and to carry the same function as a letter in support.

As a relative of Robert Bertoldo's family I feel grieved with the present circumstance, but firmly believe that a reality to this matter is closely related to time, in which; time is also one of the main factors connected with healing and closure to situations such as the one at hand. As family members we feel that time in prison is also an obligation as Robert's debt for the crime which was committed and believe that after twenty-three yeas, it is time for Robert to come home and /or be found suitable for release. As a member of Robert's family I will give him my solemn assurance that upon his reentry to the community, it will be one with the full support of his family. We want the B.P.T. to know that our engagement with Robert will be one of sincere concern to his welfare and with positive family contact for him when ever possible and / or needed. We understand that reentry into society for Robert or for anyone who has been away for twenty-three years can be difficult; but for Robert it will doubtlessly be done with a loving family that is in full support of his well being. Robert is certainly well aware that as a family our door is always open to him for any strength, or reinforcement he may possibly need. We as a family ask the B.P.T. to take into consideration the past twenty-three years, and pray for closure to all of this by finding Robert suitable to come home to us.

As a friend of Robert Bertoldo and a willing participant as a support system, I pledge to keep an open means of communication with Robert so that he may feel confident in the positive nature for our friendship. Exercising my support as a petitioner / Citizen I would like to be with out doubt that the Board of Prison Terms can recognize we as citizens and honest members of our communities can be a possitive catalyst for Robert's reentry in being an asset to the community and welcome him.

As a concerned Citizen I believe we are all responsible for upholding the laws that govern us with in our socially respectable environments, and that our communities be filled with orderly and honest, productive people. In the degree as a concerned citizen, I believe that those who preside over the responsibility of administering those laws which govern us, do so with out bias or relevance to political agendas, but by the rules in place governing administrative law; which would uphold "Diversity in sentencing" through the "Matrix system."
I as a citizen am concerned if a man is being held in prison beyond his allotted time, and after reviewing the matrix governing Robert's incarceration of twenty-three years; I am in irreversible favor of Mr. Robert Bertoldo's suitability for release.


## DECLARATION AND PRAYER

I declare, that my concern for Mr. Robert Bertoldo's release is one of sincerity, and will ;

Pray that those entrusted to the administration of the law will seek there hearts to find the true reason why we are a society governed by laws; the important responsibility entrusted to them for administering those laws as they are written, and that they find Mr. Robert Bertoldo suitable for release.

FOR THE YEAR OF 2004

## PETITIONERS IN SUPPORT FOR THE RELEASE AND/OR PAROLE SUITABILITY OF ROBERT BERTOLDO

**Petitioners name:** ELEANOR GALLARDO

**Phone:** (626) 961-2005

**Address:** 621 N. 5TH STREET, LA PUENTE, CA. 91744

AS A FRIEND TO ROBERT BERTOLDO AND FAMILY I FEEL THAT HIS YEARS OF INCARCERATION HAVE SERVED AS FAIR COMPENSATION AS A DEBT TO SOCIETY FOR HIS CRIME AND SHOULD ENABLE HIM TO BE CONSIDERED FOR RELEASE AND/OR PAROLE.

THANK YOU RESPECTABLY,

Relative............☐ Friend............☑ Christian Fellow............☐ Concerned Citizen............☐
AND PERSONAL FRIEND

**Petitioners name:** Josephine Christian

**Phone:** (626) 579-3367

**Address:** 12606 Pineville St, El Monte, CA. 91732

as a Mother of Robert Bertoldo I ask for forgiveness first, then I then I pray that those instrusted to the Administration of the law will find it in the hearts to send my son home, Respectably thank you.

Relative............☐ Friend............☐ Christian Fellow............☑ Concerned Citizen............☐
Mother of R. B.

**Petitioners name:**

**Phone:**

**Address:**

Relative............☐ Friend............☐ Christian Fellow............☐ Concerned Citizen............☐

FOR THE YEAR OF 2004

## PETITIONERS IN SUPPORT FOR THE RELEASE AND/OR PAROLE SUITABILITY OF ROBERT BERTOLDO

Petitioners name:

Phone:

Address:

Relative...........☐ Friend...........☐ Christian Fellow...........☐ Concerned Citizen...........☐

Petitioners name: *Lilla Whitehead*

Phone: 626 - 443 - 7203

Address: 2609 Santa Anita Avenue
El Monte, California, 91733 - 2222

Relative...........☐ Friend...........☒ Christian Fellow...........☐ Concerned Citizen...........☐

Petitioners name: ~~Roberto Bertoldo~~ George Whitehead

Phone: 626 - 443-7203

Address: 2609 Santa Anita Avenue
El Monte, California, 91733 - 2222

Relative...........☐ Friend...........☒ Christian Fellow...........☐ Concerned Citizen...........☐

FOR THE YEAR OF 2004

## PETITIONERS IN SUPPORT FOR THE RELEASE AND/OR PAROLE SUITABILITY OF ROBERT BERTOLDO

Petitioners name: RUBEN GARCIA

Phone: 626-442 4262

Address: 12652 PINEVILLE ST. EL MONTE. CAL.

I AM IN SUPPORT OF ROBERTS RELEASE
I BELIEVE HE HAS LEARNED FROM HIS
CRIME, TO LEAD A GOOD AND FREE LIFE.

Relative............□  Friend............☒  Christian Fellow............□  Concerned Citizen............□

Petitioners name: Monica Garcia

Phone: SAME

Address: SAME

Relative............□  Friend............☒  Christian Fellow............□  Concerned Citizen............□

Petitioners name:

Phone:

Address:

Relative............□  Friend............□  Christian Fellow............□  Concerned Citizen............□

FOR THE YEAR OF 2004

**PETITIONERS IN SUPPORT FOR THE RELEASE AND/OR
PAROLE SUITABILITY OF ROBERT BERTOLDO**

Petitioners name: Lillian POBLAND

Phone: 818 240 3593

Address: 1058 IRVING AVE #B
Glendale, CA 91201

Relative...........☐ Friend...........☐ Christian Fellow...........☐ Concerned Citizen.......✓☐

Petitioners name: CAROLINE MENDOZa

Phone: 818 943-4542

Address: 15012 Mayall ST.
Mission Hills, CA 91345

Relative...........☐ Friend...........☐ Christian Fellow....✓....☐ Concerned Citizen...........✓☐

Petitioners name: Roxana Gastelum

Phone: 818 994-9795

Address: 15035 Sylvan ST
Van Nuys, CA 91411

Relative...........☐ Friend...........☐ Christian Fellow...........☐ Concerned Citizen...........✓☐

FOR THE YEAR OF 2004

## PETITIONERS IN SUPPORT FOR THE RELEASE AND/OR PAROLE SUITABILITY OF ROBERT BERTOLDO

Petitioners name: CAROL BERTOLDO

Phone: 1-323-255644

Address: 6234 STRICKLAND AVE
LOS ANGELES CALIF. 90042

Relative..WIFE..☐  Friend...........☐  Christian Fellow..✓........☐  Concerned Citizen...........☐

Petitioners name: RAYMOND Anthony Rivera

Phone: 1-323-255-3640

Address: 6209 STRICKLAND AV.
LOS Angeles CA 90042

Relative...........☐  Friend...........☐  Christian Fellow...........☒  Concerned Citizen...........☒

Petitioners name: Jose n Ramirez

Phone: 1 818 241 5431

Address: 315 E CALIEWFORNIN
GLendale 91286

Relative...........☐  Friend...........☐  Christian Fellow......✓....☐  Concerned Citizen..........✓

FOR THE YEAR OF 2004

## PETITIONERS IN SUPPORT FOR THE RELEASE AND/OR PAROLE SUITABILITY OF ROBERT BERTOLDO

Petitioners name: Linda Bertoldo Onopa

Phone: 562) 923 6042

Address: 11724 Vultee St.
Downey, Ca 90241

Relative:..........☑ Friend...........☐ Christian Fellow............☐ Concerned Citizen............☐

Petitioners name: Paul A. Onopa

Phone: 562) 923 6042

Address: 11724 Vultee St.
Downey, Ca 90241

Relative...........☑ Friend...........☐ Christian Fellow............☐ Concerned Citizen............☐

Petitioners name: Juan Rodriguez

Phone: 1- 909) 629-0605

Address: 1248 So Gibbs St.
Pomona, Ca 91766

Relative...........☐ Friend...........☑ Christian Fellow............☐ Concerned Citizen............☐

FOR THE YEAR OF 2004

## PETITIONERS IN SUPPORT FOR THE RELEASE AND/OR PAROLE SUITABILITY OF ROBERT BERTOLDO

Petitioners name: *Eddie Sandoval*

Phone: 562/ ~~xxxx~~ 923 4643

Address: 8540 Cherokee
Downey, Ca 90241

Relative............☑ Friend............☐ Christian Fellow............☐ Concerned Citizen............☐

Petitioners name: *Nadine Onopa*

Phone: 562) 923 6042

Address: 11724 VanTee St.
Downey, Ca 90241

Relative............☐ Friend............☐ Christian Fellow............☐ Concerned Citizen............☑

Petitioners name: *ARMANDO Hernandez*

Phone: 562) 261- 4025

Address: 12407 S. ATLANTIC AVE #1
LYNWOOD, CA. 90280

Relative............☐ Friend............☐ Christian Fellow............☑ Concerned Citizen............☑

FOR THE YEAR OF 2004

## PETITIONERS IN SUPPORT FOR THE RELEASE AND/OR
## PAROLE SUITABILITY OF ROBERT BERTOLDO

Petitioners name:
David De La Rocha

Phone:
562-686-3365

Address:
13122 E. Chestnut St  Whittier, CA 90602

Relative...........☐ Friend...........☐ Christian Fellow...........☐ Concerned Citizen...........☑

Petitioners name:
Charlie Yanez

Phone:
562-686-3953

Address:
8425 S. Friends Avenue Whittier, CA 90602

Relative...........☐ Friend...........☐ Christian Fellow...........☐ Concerned Citizen...........☑

Petitioners name:
Desaree Hernandez

Phone:
562-650-5737

Address:
11734 Vultee St. Downey, CA 90241

Relative...........☑ Friend...........☐ Christian Fellow...........☐ Concerned Citizen...........☐

FOR THE YEAR OF 2004

## PETITIONERS IN SUPPORT FOR THE RELEASE AND/OR PAROLE SUITABILITY OF ROBERT BERTOLDO

Petitioners name: SANDY L BIRD

Phone: 623-780.7642

Address: 24611 N. 62nd DvE

Glendale, AZ- 85310

Relative..........☒ Friend...........☐ Christian Fellow...........☐ Concerned Citizen...........☐

Petitioners name: Carolyn Mowrey

Phone: 818-353-2609

Address: 9841 Cabanas St

Tujunga, Ca 91042

Relative...........☐ Friend.........☒ Christian Fellow...........☐ Concerned Citizen...........☒

Petitioners name: Denise Sepaher

Phone: 1-310-9374921

Address: 1508 Harper St

Redondo Beach Ca

Relative..........☒ Friend...........☐ Christian Fellow...........☐ Concerned Citizen...........☐

FOR THE YEAR OF 2004

## PETITIONERS IN SUPPORT FOR THE RELEASE AND/OR
## PAROLE SUITABILITY OF ROBERT BERTOLDO

Petitioners name: *Deny Sepaher*

Phone: 310-9374922

Address: 310- 924 1508 Warper St     1-310-9374921
Redondo Beach. Ca

Relative............□  Friend............□  Christian Fellow............□  Concerned Citizen............□

Petitioners name: *Ro Bauer*

Phone: -1-818-249-8037

Address: 5961 Fairway St
Monrose, Caly.

Relative............□  Friend............□  Christian Fellow............□  Concerned Citizen............☒

Petitioners name: *Christopher Bird*

Phone: 1-623-7807642

Address: 24611 W.62nd DVE
Glendale, AZ-85310

Relative............☒  Friend............□  Christian Fellow............□  Concerned Citizen............□

FOR THE YEAR OF 2004

## PETITIONERS IN SUPPORT FOR THE RELEASE AND/OR PAROLE SUITABILITY OF ROBERT BERTOLDO

---

Petitioners name: _Alonzo S. Bertoldo_

Phone: _(305) 825 - 2775_

Address: _6425 Cow Pen Rd Apt P 101_

_Zip 33014 Miami Lakes FL_

Relative....✓...□ Friend............□ Christian Fellow............□ Concerned Citizen............□

---

Petitioners name: _Pete Bertoldo_

Phone: _(305) 829 - 8834_

Address: _13165 SW 49th cut_

_Miramar, FL. 33027_

Relative....✓...□ Friend............□ Christian Fellow............□ Concerned Citizen............□

---

Petitioners name: _PEDRO DELGADO_

Phone: _(305) 822-9829_

Address: _148 E 40 St_

_HIALEAH, FL 33013_

Relative............□ Friend............□ Christian Fellow............□ Concerned Citizen............□

FOR THE YEAR OF 2004

## PETITIONERS IN SUPPORT FOR THE RELEASE AND/OR
## PAROLE SUITABILITY OF ROBERT BERTOLDO

Petitioners name: MAGDALENA DELGADO

Phone: (305) 822-9829

Address: 148 E 40 St

NIALEAH, FL 33013

Relative............☑ Friend............☐ Christian Fellow............☐ Concerned Citizen............☐

Petitioners name: VIVIAN BERTOLDO

Phone: (305) 829-8834

Address: 13165 SW 49 Ct

MIRAMAR, FL 33027

Relative..........☑ Friend............☐ Christian Fellow............☐ Concerned Citizen............☐

Petitioners name: ANDY BERTOLDO

Phone: (305) 819-2401

Address: 17801 NW 79 Pl.

MIAMI, FL 33015

Relative............☑ Friend............☐ Christian Fellow............☐ Concerned Citizen............☐

FOR THE YEAR OF 2004

## PETITIONERS IN SUPPORT FOR THE RELEASE AND/OR PAROLE SUITABILITY OF ROBERT BERTOLDO

Petitioners name: Denise M. Bertoldo - Castro

Phone: (559) 572-2640

Address: 12208 Hanford Armona Rd. # D.
Hanford, CA 93230

Relative..........☑ Friend............□ Christian Fellow............□ Concerned Citizen............□

Petitioners name: MARGIE H. BERTOLDO.

Phone: (559) 925-8672.

Address: 774 BALBOA AVE.
LEMOORE, CA 93245.

Relative............☑ Friend............□ Christian Fellow............□ Concerned Citizen............□

Petitioners name: Bobby Castro

Phone: (559) 591-6774

Address: 1500 Gerald Ave.
Dinuba CA 93618

Relative............□ Friend............□ Christian Fellow............☑ Concerned Citizen............□

FOR THE YEAR OF 2004

## PETITIONERS IN SUPPORT FOR THE RELEASE AND/OR
## PAROLE SUITABILITY OF ROBERT BERTOLDO

Petitioners name: Millie Plastaras

Address: 11809 Townley Drive Whittier, CA 90606

Phone: 562 - 696 - 3844

Relative............□ Friend............□ Christian Fellow............□ Concerned Citizen............☑

Petitioners name: John Plastaras

Address: 11809 Townley Drive Whittier, CA 90606

Phone: 562-696-3844

Relative............□ Friend............□ Christian Fellow............□ Concerned Citizen............☑

Petitioners name: Laura Salazar

Phone: 562 - 397-4741

Address:

Relative............□ Friend............□ Christian Fellow............□ Concerned Citizen............☑

FOR THE YEAR OF 2004

## PETITIONERS IN SUPPORT FOR THE RELEASE AND/OR
## PAROLE SUITABILITY OF ROBERT BERTOLDO

Karla Bravo
Petitioners name:
(323) 529-2308
Phone:
13333 Paramont Blvd. SothGate. Ca. 90280.
Address:

Relative...........□ Friend...........☑ Christian Fellow...........□ Concerned Citizen...........□

Petitioners name:
Maribel Alvarez
Phone: (562) 529-7069
Address: 13333 Paramont Blvd SouthGate, CA 90280

Relative...........□ Friend...........□ Christian Fellow...........□ Concerned Citizen...........☑

Petitioners name: Virginia Sandoval
Phone: 562) 923 4643
Address: 8540 Cherokee.
Downey, Ca 90241

Relative...........☑ Friend...........□ Christian Fellow...........□ Concerned Citizen...........□

FOR THE YEAR OF 2004

## PETITIONERS IN SUPPORT FOR THE RELEASE AND/OR
## PAROLE SUITABILITY OF ROBERT BERTOLDO

Petitioners name: Devon Hernandez

Phone: 562-556-8361

Address: 11734 Vultee St Downey CA, 90241

Relative............☑ Friend............☐ Christian Fellow............☐ Concerned Citizen............☐

Petitioners name: George Plastaras

Phone: 562-556-8360

Address: 11809 Townley Drive Whittier, CA 90606

Relative............☐ Friend............☑ Christian Fellow............☐ Concerned Citizen............☐

Petitioners name: Rebecca Hernandez

Phone: 562-869-9422

Address: 11643 Patton Road Downey, CA 90241

Relative............☐ Friend............☐ Christian Fellow............☐ Concerned Citizen............☑

FOR THE YEAR OF 2004

## PETITIONERS IN SUPPORT FOR THE RELEASE AND/OR PAROLE SUITABILITY OF ROBERT BERTOLDO

*Abel Valles*

Petitioners name:

Phone: *1- 626) 945 7786*

Address:

Relative............□ Friend............□ Christian Fellow............□ Concerned Citizen............□ ✓

Petitioners name: *Edmundo Sandoval*

Phone: *562) 923 4643*

Address: *8540 Cherokee*
*Downey, Ca 90241*

Relative............☑ Friend............□ Christian Fellow............□ Concerned Citizen............□

Petitioners name: *David Sandoval*

Phone: *562) 923 4643*

Address: *8540 Cherokee*
*Downey, Ca 90241*

Relative............☑ Friend............□ Christian Fellow............□ Concerned Citizen............□

FOR THE YEAR OF 2004

### PETITIONERS IN SUPPORT FOR THE RELEASE AND/OR PAROLE SUITABILITY OF ROBERT BERTOLDO

Petitioners name: Vanissa Rivera

Phone: 323 256 8933

Address: 6000 Hillandale Dr.
Los Angeles, CA. 90042

Relative...........□ Friend...........□ Christian Fellow..✗........□ Concerned Citizen............☑

Petitioners name: JUDY A. MacBRADLEY

Phone: 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

Address: 315 E CALIFORNIA #A
GLENDALE, CA 91206

Relative:...........□ Friend...✗........□ Christian Fellow.✗........□ Concerned Citizen............□

Petitioners name: Julie Rivera

Phone: 323 255-3640

Address: 8209 Strickland
LA CA 90042

Relative...........□ Friend...........□ Christian Fellow............□ Concerned Citizen............☑

FOR THE YEAR OF 2004

## PETITIONERS IN SUPPORT FOR THE RELEASE AND/OR
## PAROLE SUITABILITY OF ROBERT BERTOLDO

Petitioners name:
Lori . Lopez

Phone:
562-861-9635

Address:
11724 Vultee St Downey CA 90241

Relative............□ Friend............□ Christian Fellow............□ Concerned Citizen............☑

Petitioners name:
David Lopez

Phone:
562 861 9635

Address:
11724 Vultee St Downey, CA 90241

Relative............□ Friend............□ Christian Fellow............□ Concerned Citizen............☑

Petitioners name:
Saul Olguin

Phone:
562-858-2120

Address:
14130 Beverly Blvd Apt #3 Whittier, CA 90604

Relative............□ Friend............□ Christian Fellow............□ Concerned Citizen............☑

Mrs. Carol Bertoldo                              October 26, 2004
6234 Strickland Ave.
Los Angeles, California
Zip. Code 90042

To the B.P.T. hearing for
Robert Bertoldo.

Dear Board Person's,
I write to you as the wife and friend of Robert Bertoldo, and in doing so
I find it hard to literate through the feelings of anticipatence and optimism.
Through my anticipation, I will explain that while Robert has been incarcerated
I have lost my Father, my Brothers and this year, my Mother; which has been an
emotional rollercoaster for me.   Because of these sets of circumstances I have
become the matriarch of my brother's children and granchildren.
I am fifty three years of age and need the aid which Robert can provide for the
household of this family, but it's not just the need we have for Robert which
I wish to convey to you; the anticipation is knowing that Robert will be an asset
to the family, Robert calls us by phone twice a week and I come to rely on
his advise to me on all matters to the family as I explain to Robert all that
happens with-in the hoseholds of our family's .  He has not failed to be helpful
in his counsel to us and believe through his faithfulness as a Christian man and
responsibility he will be a good example to the children.
Through my optimism, I can only ask the Board Panel to please look for the change in Robert which
we have seen and have been experiencing with him for the past few years ; this is not Robert's
first time infront of you, so I know that since Robert is under such close scrutny, you will agree
there is a possitive change in Robert.
As much as the family would like to make things right for all who were affected by this circumstance,
no one can ever change the actions of the past; but the person can change, and Robert most diffintey
has...
I would like the Board to know that Rober will be welcomed home by all of us and will be living
with me as husband and wife.  He will have access to all there is at my home including transpertation.
At the moment I am looking into the process of advertising Robert's artistic works which he has been
doing from prison via the internet .  Robert has had success in selling his art work at a substancial
price and I am confident that Robert would also be a financial asset to our home.

I along with the children will pray for a favorable out come to your decission at Robert's hearing,
and we all thank you very much for the time you have taken to read this letter as it was writen with
all our honesty, love, and support.


                                              Respectfully writen

                                              *Carol Bertoldo*
                                              Carol L.M. Bertoldo

Mrs. Josie Christian October 26, 2004
12606 Pineville St.
El Monte, Calif. 91732

Respectfully, to the Board of Prison terms.

Dear Panel, I am the mother of Robert Bertoldo and write to you as a mother in full support of the suitability for my son to come home.

I am a retired woman at the age of 79 and married to a retired sheet-metal worker who has recently gone through heart surgery. It has been rather difficult in these past years to go and visit Robert who is now four to five hours drive from us. I would like the B.P.T. to know that although we do not go to see Robert, that we support him now and are willing to help him with what ever support we can help him with upon his release from prison. Robert phones us at least once a week and has stayed in close contact with us through out his incarceration. As Robert's mother it has been vary hard for me seeing Robert grow up in his rebellious attitude since he was a child, since early on he has been a loner and has wanted to do things as he wanted to do, but as of a few years back, I have heard Robert express himself in a totally different way now. Since the year of 2000 Robert has allowed the Lord Jesus Christ to come into his life and lead him in a biblical way.     As a Christian woman and Robert's mother, I can honestly say, in looking at Robert's entire life, he has never allowed any one or anything into his life to help him out, not until now . Robert has allowed a great change to happen in his life. He desires a benevolence in his life and even from prison he shows a positive attitude towards others.

As a mother I have lost one of my sons and know the heart wrenching agony one goes through in losing a love one - so I can tell you that in all honesty, I would rather see Robert stay in prison if I knew that his release would lead him to continue living a life as he was prior to his arrest ! But I truly believe that Robert is a repentive man now and has earned his release from prison by what he shows now in heart and mind. I believe Robert can be a positive influence to others and can be productive in a community. He is creative in his art work which is versatile in many mediums ( woods, drawings and paintings ) and am sure he can maintain a living from this gift. He will also be a great help to us that are older and need a hand around our households, being he is the youngest in the family.

I will pray that you can also see in Robert the true change in repentance he has made and use this with all fairness in the decision you come to for the suitability of Robert's release.

I will also keep you in prayer, for I know you have a great task of responsibility to protect all communities through the unbiased deductions you must make when coming to a decision of suitability.    Thank you for your time, and consideration to my plead for Robert's suitability for parole.

Respectfully,

*Josie Christian*

Mrs. Josie Christian

NAME and NUMBER

CDC-128-B (Rev. 4/74)

BERTOLDO, R.        C14377        A2-216L

BERTOLDO, C14377, has completed all 4 phases of the Breaking Barriers, self-help, course consisting of Changing Directions, A Foundation, Challenge of Change, Barriers to Change, Comfort Zones, The Self-Talk Cycle, Building Self-Esteem, Motivation, The Tool Kit (goal setting as a skill and visualization), and The Challenge is Yours (habits, attitudes, beliefs and expectations).

Original: C-File
CC: CC-II
INSTRUCTOR
Inmate

*R. Henry*

R. HENRY
INSTRUCTOR

DATE        8/1/06        **LAUDATORY CHRONO**

GENERAL CHRONO

*Ex. J*

NAME and NUMBER

CDC-128-B (Rev. 4/74)

BERTOLDO, R.                    C94377                    A2-213L

Inmate, ROBERT BERTOLDO, CDC# C94377, has been an asset to the Bridging Program. I/M BERTOLDO has performed his duties as a Bridging Tutor with dedication. I/M BERTOLDO will be missed by the staff and students. Due to the efforts of I/M BERTOLDO, many students have achieved a better understanding of life skills. Bridging is a self help mandated program by the Dept. of Corrections. The contributions made by I/M BERTOLDO to the Bridging program will be missed by this institution.

Original: C-FILE
    CC: Inmate
         Originator

R. Henry
Bridging Instuctor, C.V.S.P.

DATE        8/3/06              **LAUDATORY CHRONO**

GENERAL CHRONO

CDC-128-B (Rev. 4/74)

NAME and NUMBER   __BERTOLDO, R  C94377__

This chrono is to verify that the above named individual is a current member in good standing in the Chuckawalla Narcotics Anonymous Group and functions. This individual has participated in [ 11 ] meetings of N.A. , and also continues to show a positive attitude and interest in this self-help organization. The above individual is a willing participant in the group discussions and his actions and motivation inspire the other inmates in the group towards positive interaction. Those who appreciate sobriety enjoy it responsibly.

cc:  C-File
     N.A. File
     Inmate

T. TAVERNER
NARCOTICS ANONYMOUS STAFF SPONSOR

DATE     1/3/05                          C.V.S.P.                          GENERAL CHRONO

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS
CDC-128B (REV.4/74)

**Name :** Bertoldo, R.          **CDC#**    C-94377       **Dorm:**  A2-213L

Inmate has successfully completed Twenty (20) hours of Friends Outside Creative Conflict Resolution Workshop (Anger Management).

*K. Barney*
K. Barney

Original: C-File
    cc: F.O.S.
        Inmate

**DATE:** 3-24-2005

Case Management Specialist
Chuckawalla Valley State Prison
Ext 6354

(INFORMATIVE CHRONO)                    **GENERAL CHRONO**

**NAME and NUMBER** ROBERT BERTOLDO  **C-94377 A2-213L**          CDC-128-B (Rev. 4/74

Inmate Bertoldo became an active member of the Potter's House Church here at Chuckawalla Valley State Prison A-Facility since September of the year 2000. From the beginning of his commitment in the faith as a Christian believer he's had an noteworthy record of attendance, averaging 3-4 services per week, not including Bible studies . This equates to approx. 200 meetings per year.

Inmate Bertoldo has successfully completed the "One to One" Bible study of 9 weeks, 24 week course of the "Self-Confrontation" through the Biblical Counseling Foundation; has completed "Spiritual Warfare" study which is a part of the Ministerial training program for equipping men with God's Word who become part of the Body of Christ. He has also completed the "How to" Evangelism course a seven week course ,along with working the 40 day plan in devotional reading of the "Purpose Driven Life. Currently he has completed the first 28 weeks of the "Apologetics class and is participating weekly, he has also been selected to assist in ministry of" The most Excellent Way International", who's mission is in supporting, counseling, encouragement and prayer for a Christian solution to chemical dependency.

Inmate Bertoldo's participation in this group rehabilitation activity is consistent with the Institution's mission of providing Inmates with opportunities to successfully return to society.

CC:  C-file
     CCI
     Inmate
     Writer

_Dean Parker_

Dean E. Parker
Protestant Chaplain

**DATE** May 21, 2005          Laudatory Chrono          INST: CVSP  **GENERAL CHRONO**

NAME and NUMBER  Bertoldo, R.  C94377

Inmate **Bertoldo**, is a current member, in good standing, in the Narcotics Anonymous program, on Facility "A", at Chuckawalla Valley State Prison.  He has attended 6 meetings in this quarter, July-September 2005. He has demonstrated a willingness to participate in the NA program and has taken an active part in group discussions as well as helping others.  He has also taken an active part in the current twelve-step study and inspires others to join in.  He should be commended for his positive attitude, by working through the goals and standards set in the NA program.

Orig:  C-file
  cc:  CC-I
       N.A. File
       Inmate

E.  Pride
Staff Sponsor
Chuckawalla Valley State Prison

Date: 09/30/05      Laudatory - Narcotics Anonymous Participation      General Chrono

---

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS
CDC 128-B (rev. 4/74)

NAME and NUMBER      Bertaldo, R.      C-94377

HOUSING/BED    A2-213L

Inmate Bertaldo, R. has attended 9 meetings  during the October - December 2005 quarter . This continued participation in group discussions reflects a willingness to remain sober and an eagerness to develop good habits that will achieve his sincere desired goals of rehabilitation upon his release. Inmate Bertaldo, R. should be commended for his positive attitude, volunteer participation and contributions to the success of the Narcotics Anonymous Program.

Orig:  C-FILE
  cc:  CCI
       INMATE COPY

DATE:   12/30/05

LAUDATORY CHRONO

E. Pride
NA Staff Sponsor
CHUCKAWALLA VALLEY STATE PRISON

NAME and NUMBER: BERTOLDO, BOBBY        CDC#: C-94377        CDC-128-B (Rev. 4/74)

    This chrono is being generated, to acknowledge the participation of inmate Bertoldo, C-94377, A02-213L, in the "Breakfast with Santa" project. Bertoldo contributed his conscientious effects in the construction of toys, displays, and other items for the children in the community, for whom this project was organized. The time and effort displayed by inmate Bertoldo greatly contributed to the success of the event.

ORIGINAL: C-FILE
    CC: WRITER
        INMATE (A02-213L)

                       R. DAVIS, S. V. I.

DATE: December 2005        GENERAL CHRONO        INST: CVSP

NAME and NUMBER          **BERTOLDO, R.    (C-94377 / A2-213L)**          CDC-128-B (Rev. 4/74)

This chrono is being generated, to acknowledge the participation of inmate Bertoldo, R. (C-94377, A2 / 213L) in

the "Breakfast With Santa" project. Bertoldo contributed his conscientious efforts in the construction of toys,

displays, and other items for the children in the community, for whom this project was organized. The time and

effort displayed by inmate Bertoldo greatly contributed to the success of the event.

**ORIGINAL: C-FILE**
**CC: WRITER**
**INMATE**                                          R. DAVIS, S.V.I.

DATE       1/08/04                    **C.V.S.P.**                    GENERAL CHRONO

NAME and NUMBER    BERTOLDO, ROBERT C-94377 A2-213L          CDC-128-B (Rev. 4/74)

This Laudatory Chrono is to inform the reader of Inmate Bertoldo's participation in and completion of the "Anger Management Course 2003". This program was offered and supervised by Chaplain Ben and Germain Vivian; with all home work and lessons recorded by them.
Inmate Bertoldo has shown his interest in this program by maintaining a regular attendance, and competed all 13 lessons and home work within the allocated thirteen (13) week period  (November 2003 to February 7, 2004).
Inmate Bertoldo's participation in this constructive activity is consistent with the institutions mission of providing inmates with opportunities of being successful in there re-entry to society.

CC:  C-file
     CCI
     Inmate
     Writer

Jay L. Abbs
Correctional Plant Manager II

Dean E. Parker
Protestant Chaplain

DATE May 18, 2004          Laudatory Chrono          INST: CVSP  **GENERAL CHRONO**

NAME and NUMBER  BERTOLDO, R. #C-94377  A2-213L                    CDC-128-B (Rev. 4/74

This laudatory chrono is being written to inform the reader as to the outer character of Inmate R. Bertoldo as I have known and observed I/m Bertoldo for the past four years.  Having had the responsibility of a supervisor making sure the I/m's under my direction are not disruptive or prone to antagonizing other I/m's while performing there job. In my view of Mr. Bertoldo I've always observed him as showing a congenial and honest disposition with out any inclination towards an excited and/or insensitive temperament.  I've never held a glimpse of Mr. Bertoldo in a fit of rage, furious with peers or authority, or combative with other I/m's.  To the contrary Mr. Bertoldo has modeled himself with qualities distinguishing good will, cordial, and of an obliging nature.
In conclusion I believe Mr. Robert Bertoldo is a repentive man and a good candidate for parole.

CC:   C-file

      CCI
      Inmate
      Writer

Mr. J. LOPEZ   M&SS I

DATE  July 8, 2004          (Informational/Laudatory chrono)          INST: CVSP   **GENERAL CHRONO**

NAME and NUMBER  BERTOLDO, R. C-94377  A2-213L                    CDC-128-B (Rev. 4/74)

This is being written as an Officer's assessment of the observed activity and demeanor of Inmate Robert Bertoldo. As a Corrections Officer which supervises and maintains security in the housing unit in which Inmate Robert Bertoldo resides, I can render a concise account of I/M Bertoldo's daily activities, and his composure while he engages with other I/M's in his natural state of character. I can account that for five days out of the week, I can be sure to find I/M Bertoldo at one of three places; at work, at the yard chapel or at his bedside studying or working on his hobby-craft. I see I/M Bertoldo as a positive influence on his peers and he maintains a reputable presence with other I/M's as well as Officers. Inmate Bertoldo has maintain this favorable attitude for approximately the past two years and I believe it is a sincere one.

My closing assessment of I/M Bertoldo is that his positive character has progressed him to being one of the exemplar Inmates in the Housing Unit.

CC:  C-file
      CCI
      Inmate
      Writer

                                                          C/O  A. FIGUEROA

DATE  JULY 12, 2004          (Informational/Laudatory chrono)          INST: CVSP  **GENERAL CHRONO**

**NAME and NUMBER** BERTOLDO, R. C-94377  A2-213L

CDC-128-B (Rev. 4/74

As laudatory ;  this chrono will express favorable language in it's description of Inmate Robert Bertoldo.
For the past four years now I've worked in the capacity of a Corrections Officer at C.V.S.P., in which times I've been in position to take prime observance of I/M Bertoldo.  Through my conversations and watching his interactions with other I/M 's I've surmised that I/M Bertoldo has made positive changes in his lifestyle and conduct, and can be worthy in deserving esteem towards his progress and responsibility to the direction in which was recommended to him at his last B.P.T. hearing.

CC:   C-file
      CCI
      Inmate
      Writer

C/O  J. BAKER

**DATE** JULY 28, 2004            (Informational/Laudatory chrono)            INST: CVSP   **GENERAL CHRONO**

NAME and NUMBER    BERTOLDO, ROBERT    C94377    CDC-128-B (Rev. 4/74)

This laudatory chrono is to congratulate inmate BERTOLDO for attending six (6) meetings as of August 30, 2004, the Chuckawalla Valley State Prison (CVSP) Narcotics Anonymous (NA) program. Inmate BERTOLDO has been a faithful and active member of the NA group.

Inmate BERTOLDO has been diligent and punctual every week. His devotion and input in group discussions makes the CVSP NA group possible and successful. He continues to offer his services in that capacity on a weekly basis and is an inspiration and asset to the group. We need more member like him to spread the word, "It works if you work it."

Inmate BERTOLDO should be praised at this time for his dedication and extraordinary efforts within the NA group.

*A. Smalley*

A. Smalley,
NA Sponsor

cc:    C-File
       Inmate

**DATE: 9/03/04**        INFORMATIONAL/LAUDATORY CHRONO            GENERAL CHRONO


CDC128-B (REV4/74)

NAME AND NUMBER:    **BERTOLDO**        **C94377**

Inmate **BERTOLDO**, is a current member, in good standing, in the Narcotics Anonymous program, on Facility "A", at Chuckawalla Valley State Prison.    Inmate **BERTOLDO**, has attended **9 meetings** in this quarter, **JULY-SEPTEMBER 2004.** He has demonstrated a willingness to participate in the NA program and has taken an active part in group discussions as well as helping others. He has also taken an active part in the current twelve-step study and inspires others to join in. Inmate **BERTOLDO**, should be commended for his positive attitude, by working through the goals and standards set in the NA program.

*A. Smalley*

Orig: C-File
  cc: CC-I
      N.A. File
      Inmate

A. SMALLEY
Staff Sponsor
Chuckawalla Valley State Prison

**Date:** 10/04/04        **LAUDATORY- NARCOTICS ANONYMOUS PARTICIPATION**        GENERAL CHRONO

**NAME and NUMBER** BERTOLDO, R. C-94377                                    CDC-128-B (Rev. 4/74

This Laudatory Chrono is being written to inform the reader of the change in behavior this writer has observed in the I/M Robert Bertoldo.
From approximately January 2000, when this I/M was first received on A-Facility C.V.S.P. I have seen an honest change in his attitude, health, and programming.
Upon the receiption of I/M Bertoldo, I had observed him to have had an undernourished look of approx. 130lbs. and of a dubious character/personality; but on the day of this writing I/M Bertoldo seems to reflect a totally opposite personality and appearance of 180lbs..

Inmate Bertoldo's attitude and character is exemplified through his willingness to contiually lend a helping hand with in the housing unit, the cooperative character of I/M Bertoldo is demenstrated on a daily basis and is a possitive influence with in his housing community.
After two years of suppervising I/M Bertoldo in his housing unit, it is of my oppinion that I/M Bertoldo has begun to repair and change his life from the person I first saw

CC:   C-file
      CCI
      Inmate                                         C/O  J. RODRIGUEZ
      Writer

**DATE** September 19, 2003              Laudatory Chrono              INST: CVSP  **GENERAL CHRONO**

State of California

Department of Corrections
Chuckawalla Valley State Prison

# Memorandum

Date    :

To    :    Mail Room Sergeant

Subject    APPROVAL FORM-CORRESPONDENCE COURSE

Inmate's Name: _BERTOLDO_    _ROBERT_    CDC #: _C94377_
                    Last                First

Housing: _A2 - 213L_

Name of Course: _THE WAY TO HAPPINESS (TM) EXT. COURSE_

Vendor: _CRIMINON WEST U.S._

Materials Requested: _PAPPER-BACK BOOKS & TEST PAPPERS_

Form of Payment:    ☑ Private Citizen    ☐    Trust Withdrawal
                    Payment sent directly to vendor        Must have trust withdrawal
                                        form from inmate trust
                                        account attached.

Inmate solely responsible for all financial costs.    _YES_

~~APPROVED~~/DISAPPROVED                ~~APPROVED~~/DISAPPROVED

Supervisor of Correctional            Custody Captain
Education Programs

cc: Inmate, SCEP, R&R
Original to: Mail Room Sergeant

NOTE:    1)    NO METAL SPIRAL NOTEBOOKS, TOOLS, CONSTRUCTION
             KITS OR OTHER PARAPHERNALIA. NO HARDCOVER BOOKS
             WITHOUT PRIOR APPROVAL, (TITLE 15, SECTION 3138(F) (1)).
             NO AUDIO TAPES WITHOUT PRIOR APPROVAL

        2)    NO CONTRACTOR OR ARRANGEMENT SHOULD BE MADE
             WITH THE VENDOR PRIOR TO APPROVAL OF THIS COURSE
             BY THE CAPTAIN AND THE SCEP.



CRIMINON *West U.S.*
PO Box 9091, Glendale, CA. 91226-9976

Dear Robert,                                    2-15-05

Hello and welcome back to The Way to Happiness Extension Course!  My name is Renee and I am your new course supervisor. Thank you so much for your letter explaining what happened a year of two ago. And I'm so, so glad that you have taken it on yourself to carry on, in spite of Criminon West's unintentional failure to not keep in touch with you.  I sincerely apologize on behalf of all of our staff. I can assure you that I won't let that happen again.  I have been a Criminon Supervisor for many years and I am proud to say I have never let a student down. I'm very glad to have you on board as my latest student too, especially since you are doing such a great job.

Here are your scores:

Lesson # 6 100% Excellent!
Lesson #7     -1 Very, very good!
Lesson #8-#12 All 100% Excellent!
Lesson # 13  -1 and 1/2  Very, very good!
Lesson #14-18  All 100% Excellent!
Lesson # 19 -1/2 Very, very good!
Lesson #20   -1 Very, very good!

February 3, 2006

Robert,

Good to hear from you knowing that all is well in your service to Christ our Lord.
Your willingness to acknowledge all the blessings that God has shown you regardless of
your current circumstance is an indication of maturing in the Christ. Recall that four of
Paul's letters were written in a Roman dungeon for a crime of preaching Christ.
Nevertheless, the theme of the book of Philippians is having Joy regardless of your
circumstances. Furthermore, Paul encouraged people in Caesars Palace to rejoice in the
Lord while he was in a cold Roman prison. I pray that you develop this mindset.

As for your request for a program wiling to accept you, I have enclosed some information
that might be of use. However, you would need to contact them along with a reference
from your chaplain. Please follow through with this and contact me on the outcome.

Finally, your question regarding a home church, your welcome to attend Calvary Chapel
of Pasadena. Should you prefer another let me know and I will send you a listing of other
churches.

God bless you and I hope to hear from you soon.

In His Service,





**NEW DIRECTIONS, INC.**
11303 Wilshire Boulevard, VA Building 116
Los Angeles, CA 90073-1003
Administration (310) 914-4045
Program (310) 914-5966
Facsimile (310) 914-5495

May 3, 2006

Robert Bertoldo
Chuckawalla Valley State Prison
C94377/A2-213L
P.O. Box 2349
Blythe, CA 92226

Dear Robert:

I received your letter dated 04/28/06 and appreciate your interest in New Directions, Inc. As our brochure
states:

"New Directions helps homeless veterans get off of the streets, out of emergency shelters and in contact with
much needed services-including medical, psychiatric, veterans benefits and long-term housing.

New Directions offers a 24-bed Assessment Center which includes supportive services and social model
detoxification and 200 long-term transitional housing beds for up to two years in four facilities.

New Directions offers job training in the Culinary Arts and <u>Computer Technology</u>-as well as employment
and permanent housing placement, and extensive aftercare services."

In order to be eligible for our program, an individual must be a veteran who has not been dishonorably
discharged from military service and must be homeless with a substance abuse problem.

So, if you are eligible for our program, simply contact us upon your release.

Sincerely,

Achée Stevenson
Program Management Coordinator



**NEW DIRECTIONS, INC.**
11303 Wilshire Boulevard, VA Building 116
Los Angeles, CA 90073-1003
Administration (310) 914-4045
Program (310) 914-5966
Facsimile (310) 914-5495

May 3, 2006

Robert Bertoldo
Chuckawalla Valley State Prison
C94377/A2-213L
P.O. Box 2349
Blythe, CA 92226

Dear Robert:

I received your letter dated 04/28/06 and appreciate your interest in New Directions, Inc. As our brochure states:

"New Directions helps homeless veterans get off of the streets, out of emergency shelters and in contact with much needed services-including medical, psychiatric, veterans benefits and long-term housing.

New Directions offers a 24-bed Assessment Center which includes supportive services and social model detoxification and 200 long-term transitional housing beds for up to two years in four facilities.

New Directions offers job training in the Culinary Arts and Computer Technology-as well as employment and permanent housing placement, and extensive aftercare services."

In order to be eligible for our program, an individual must be a veteran who has not been dishonorably discharged from military service and must be homeless with a substance abuse problem.

So, if you are eligible for our program, simply contact us upon your release.

Sincerely,

Achee Stevenson
Program Management Coordinator



**FROM:    NEW DIRECTIONS INC.**
**ASSESSMENT CENTER**
**11303 Wilshire Blvd #116**
**Los Angeles CA. 90073**

## PROGRAM DESCRIPTION

*New Directions* is a complete treatment and rehabilitation program where veterans may reside for up to two years. **For graduates of SAP or SATF prison programs we offer a fast track program of six months.** Housed in bldg 116 at the West LA VA complex is our Addictions program which specifically addresses issues and behaviors concerning alcohol and drug addiction. Housed in bldg 257 located on the same grounds is *New Directions North* our dual diagnosis program, which specifically handles clients with both mental health issues as well as drug and alcohol problems. **We also provide a program for women veterans located at 12536 Mitchell Ave in West Los Angeles.** All of our programs offer eight week Anger Management courses PTSD counseling, Parenting courses as well as random drug and alcohol testing by our certified staff. We are a twelve step based program and follow the principles and traditions as outlined in the Big Book of Alcoholics Anonymous. *Phase 1* of the program, which concentrates on treatment, is six to nine months. *Phase 2*, which concentrates on rehabilitation and re-entry to the community with continuous total abstinence from drugs and alcohol, may be up to two years.

**If you have any questions or require any other information, please feel free to contact me at 310 914-5966 ext 300**
**Sincerely,**

Anthony Belcher

Assessment Center
Supervisor New Directions Inc

*I can do all things*
*through Christ who*
*strengthens me.*
*Philippians 4:13*

# U-TURN FOR CHRIST

*A Ministry Of Restoration*

May 9, 2006

Mr. Robert Bertoldo,

This is concerning a request for information and enrollment into our program.

U-Turn for Christ is a two-month minimum residential program that survives strictly by private donations of individuals such as you. We are not a state nor government funded, nor do we put you on any sort of government aid while you are here.

We are a working ministry involved with volunteer work in the community. The majority of this work is with the surrounding Calvary Chapels, as well as the Bible College. You will be doing anything from vacuuming carpets to landscaping. We are also a non-smoking ministry.

The way we are able to keep our doors open is I ask an eight hundred dollar donation from every individual that enters this program. This helps cover the cost of housing and other expenses involved in this type of ministry. **We know that individuals such as yourself, just coming out of prison, cannot afford the $800.00 donation we ask for, so we ask that you just bring us your gate money less your bus fare to Perris, Ca.**

It would be exciting to have you here while the Lord ministers to your heart. Please contact us as soon as possible so that we know whether or when to be expecting your arrival. God Bless!

Sincerely,

Sarah J. Box
Administrative Assistant



LOS ANGELES TRADE-TECH
**LATTC**
A Community College

Monday, May 22, 2006

Hello,

Thank you for your interest in Los Angeles Trade-Technical College. Enclosed are the materials you requested from our campus, College Catalog and Schedule of Classes. You can also view them on our website at: www.lattc.edu.

If you would like more information about our enrollment process go to: www.lattc.edu/dept/tmat/matriculation.htm.

Please visit our web page for the most current information regarding registration. If you have any questions, call 213- 763-5337 the College Information Center.


Thank you,

Los Angeles Trade-Technical College

Our campus is located at 400 West Washington Boulevard, Los Angeles, CA 90015.

General Information:     We are accepting applications for the Summer Sessions and Fall Semester.

Summer Sessions: I.     June 12 – July 15, 2006
II.     July 17 – August 19, 2006

Fall Semester:  September 5, 2006



 **Employment
Development
Department**
State of California

# M  E  M  O  R  A  N  D  U  M

**To:**   Robert Bertoldo                                    **Date:**    June 8, 2006
CVSP A2-216L C-94377
PO Box 2349                                      **File No.:**
Blythe, Ca. 92226

Paul E Bringas Veteran Rep.                        Phone 626 304-7938
**From:**   1207 E Green St.
Pasadena, Ca. 91106

**Subject:**   Pasadena Job Services

Mr. Robert Bertoldo

I received your letter and there is a multitude of services you can receive from our Foothill Employment and Training Connection Work-Source Center here in Pasadena. Thank you for your letter and we are looking forward to helping you find employment.

I am a Veteran Representative, and if you were in the military you can be placed in my program, but if you are not a veteran, we have a California Department of Corrections Job Agent that can work with you. His name is Mr. Tony Raygoza,he can be reached at 626 450-6250. The Work-Source Center has free computer use, resume workshops, interviewing workshops, supportive service money to help with maybe new steel toed boots, monthly bus pass, tools for on the job. You may also be eligible for training, or on the job training (OJT). Enclosed please find some literature on our EDD/FETC Work-Source Center and EDD Veteran Fact Sheet and other information. Please contact me or Tony when released and I or Tony will meet with you.

This is the first step to helping yourself.

_____

Paul E Bringas Veteran Representative

DE 16 Rev. 14 (10-02) (INTRANET)                                    CU

# City of Los Angeles
## CALIFORNIA

CLIFFORD W. GRAVES
GENERAL MANAGER

COMMUNITY DEVELOPMENT
DEPARTMENT

1200 W. 7TH STREET
LOS ANGELES, CA 90017

ANTONIO VILLARAIGOSA
MAYOR

June 21, 2006

Robert Bertoldo
Chuckawalla Valley State Prison
P.O. Box 2349
C-94377 / A2-216L
Blythe, CA  92226

Dear:  Mr. Bertoldo

Our network of nearly 50 WorkSource Career Centers can help you search and locate the ideal position for your needs.  We have contacts with hiring businesses of all types throughout the Los Angeles region.  Our trained WorkSource experts can put you in touch with these businesses and prepare you for the interview process.  Each WorkSource Center is in close contact with the entire network to ensure that each candidate is visible throughout the region.

If you do not know what direction to take your job search, we can provide skills assessments, technology training, and detailed labor market information.  In many of our WorkSource Centers, personalized counseling and planning can be accessed in multiple languages.

We also provide expert guidance for economically disadvantaged workers, mid-career transitions, disabled workers, recent high school and college graduates, veterans and dislocated workers.

So, if you are looking for a job, let WorkSource California give your search a jump-start. Call your local WorkSource Center for more information from the enclosed brochure or call 1-800-FOR-A-JOB (1-800-367-2562) for WorkSource Center locations nearest you.

Sincerely,

Gregory Burks
Business Services & Marketing Director
Workforce Development Division

MC:PS:LM:cg
Enclosure

AN EQUAL EMPLOYMENT OPPORTUNITY - AFFIRMATIVE ACTION EMPLOYER



# VICTORY OUTREACH CHURCH

## — *Oxnard* —

**FERNANDO FRANCO**
SENIOR PASTOR

July 25, 2006

To Whom It May Concern:

This letter is in reference to Mr.Robert Bertoldo
Who is accepted to our Christian Recovery Home.

As a resident of our VO-Home . He will be involed in prayer, bible studies, church
events and other ministry – related ativities .

VictoryOutreach is a non-profit Christian – oriented ministry called to the task of
the serving the community focusing on substance abuse , alcoholism, gang violence ,
and other life controlling habits . we emphasize in restoring the family unit .
VictoryOutreach provides

Assistants to individuals whose lives have been disrupted by drugs and alcohol
abuse .

Our home is a one year commitment and Robert will not be able to work till after 9
mos. In the home .
If you have any questions feel free to call me @ (805) 988-4102

**Frank Garcia**
Home Director

MAILING ADDRESS
P. O. BOX 547  •  PORT HUENEME, CALIFORNIA  93044
(805) 986-8862  •  FAX: (805) 986-8866
WEBSITE: www.victoryoutreach.org.  •  E-Mail: info@victoryoutreachoxnard.org



# Mt. Nebo Prison Ministry

2015 North Dobson, Ste. 4 PMB 7 • Chandler, Arizona 85224

January 21, 2005

To Whom It May Concern;

Inmate Robert Bertoldo C-94377 has successfully completed our 13 chapter correspondence Bible study 'Fundamentals of the Faith. He did an excellent job.

by grace alone

Chuck Holmes
Director/MNPM

"reaching out with the truth and the love of Christ"



**CHILDREN'S**

**HUNGER RELIEF FUND**

P.O. BOX 96012, Washington, DC 20090-6012
ADMINISTRATIVE OFFICES
182 Farmers Lane, Suite 200
Santa Rosa, CA 95405
le: 707-528-8000 • fax: 707-525-1310
www.chrf.org • hunger@chrf.org

February 16, 2005

Dear Friend,

I want to personally thank you for your generous gift of $500.00. We want to say a special thank you to all those who have responded so generously to the ongoing appeal for the Tsunami victims. As promised, 100% of these donations will go directly to local relief and development efforts. Please take a moment to visit www.usafreedomecorp.gov then click on "Donate Now" to see that President Bush has listed Children's Hunger Relief Fund as a charitable organization that is helping tsunami disaster victims.

It's impossible for most of us to imagine what the victims of this disaster have gone through – and continue to go through as they try to rebuild their lives. Most of us will never know the anguish of not being able to feed our own children for days on end. For many of the Tsunami victims, and millions of other poor parents around the world, this anguish is a daily reality.

Poverty is the real enemy in the war to save children's lives. If we really want to change a child's life forever, we need to empower the parents to feed and care for their children themselves. In addition to our feeding programs, Children's Hunger Relief Fund devotes considerable resources to this very goal: **helping families help themselves.** This includes micro-enterprise loan programs, vocational training and sustainable agriculture projects. The attached brochure describes some of our successful programs in Nicaragua, which have helped that nation rebuild from a devastating civil war. We believe that the same strategy of breaking the cycle of poverty will be critical for the tsunami victims. We are working with groups in India and Sri Lanka who are meeting the immediate survival needs of the people while also helping the victims rebuild self-sufficiency. We'll share more about these efforts in another letter.

It's amazing how little it can take to change a family's life – forever. We've made micro-loans of as little as $50 that have enabled fathers (and mothers!) to start or improve a business that moved them from barely surviving to making enough profit to expand and hire more people. Families that couldn't feed themselves are now feeding others! Even better, over 95% of the loans are repaid, and the money is then loaned out again to other families. **The bottom line is even more healthy children with a much brighter hope for their futures.**

On behalf of our children

Colonel V. Doner
Chairman

P.S. Your gift of $50 can help a family start their own business. A $25 gift can help fund a self-sustaining food garden. The families you help will pay back the original seed capital to help other families, so your gift will keep on giving! *Thank you for helping us break the cycle of poverty in children's lives!*

**The Most Excellent Way**

*"And now I will show you*
## The Most Excellent Way"
### . . . LOVE!
*I Corinthians 12:31 NIV*

"The Most Excellent Way" believes the addicted person can be totally freed from bondage by HOPE and FAITH in Jesus Christ, by the POWER and LOVE of God's indwelling Holy Spirit, by KNOWING God, and by LIVING Biblical principles. Our purpose is to provide loving environments around the world where troubled sinners may receive *LOVE, ACCEPTANCE* and *FORGIVENESS,* and hear the Gospel of Jesus Christ. "The Most Excellent Way" is a non-profit organization. Gifts are tax deductible, and used solely to:

### Win
*Jesus said to His disciples:*
*"Go into all the world and preach the good news to all creation."*
*Mark 16:15 NIV*

### Disciple
*Jesus said: "Therefore go and make disciples of all nations, baptizing them in the name of the Father, and of the Son and of the Holy Spirit, and teaching them to obey everything I have commanded you. And surely I will be with you always to the very end of the age."*
*Matthew 28:18-20 NIV*

### Send
*Jesus said: "You will receive power when the Holy Spirit comes on you; and you will be my witnesses in Jerusalem, and in all Judea and Samaria, and to the ends of the earth."*
*Acts 1:8 NIV*

◆ ◆ ◆

## The Most Excellent Way
INTERNATIONAL MINISTRY HEADQUARTERS
1177 Pacifica Place, Encinitas, CA 92024
760-635-3945 • 800-548-8854
FAX: 760-635-3946
Email: director@mostexcellentway.org
Website: www.mostexcellentway.org

## From the Director *(continued)*

lovely daughter, *Dory*, and *Pastor Pavel Khakimov, Russian Church of Evangelical Christian Baptists, Sacramento, CA*.

The *Nitzsche family* ministered to alcoholics in their home for thirty years in East Germany. (Just imagine bringing addicted souls into your home to help them sober up, making them a part of your family, and sharing the Gospel with them during Communist control.) They are now missionaries in Ukraine, while their sons continue ministering in Germany. (Dory attends Bible college in Berlin.) They hope to translate "The Most Excellent Way" Ministry Manual into German.

*Pastor Khakimov* is interested in starting TMEW in his church. (There are more than 100,000 Ukrainian and Russian immigrants in his community.)

The *Wests* will have traveled the earth this year, tirelessly sharing the love of Jesus in such far away places as Japan, China, Germany and Ukraine. May the Lord continue to bless and strengthen them as they spread the Gospel for the glory of God!

We thank God for all His missionaries He has brought our way, who have a heart for souls in bondage to drugs and alcohol, and their families. Please join us in prayer for them all.

### U.S.A.

• **MAINE**
*Rick* and *Shelley Martin* report the KICK IT weekly meeting at *Longcreek Youth Facility* in *South Portland* is regularly attended by 23 young men, all of whom have accepted the Lord. WOW! Is God good or what? They are learning and believing there is hope for their lives when they are released.

Rick, Shelley and others from the TMEW meeting in their church in *Beddeford* drive to *Park Avenue Church of God, Portland,* Tuesday evenings to support the new meeting started there in July. It's a rough area, with much prostitution, gang and drug activity. *Sr. Pastor Frank Sicilian* was extremely impressed with the first

meeting which drew 22 people. A great healing by the Holy Spirit took place. Rick and Shelly believe this TMEW meeting is going to be a shining light for Jesus in that area.

• **TEXAS**
*Randy Heath* of *Grace Baptist Church, Lufkin,* has moved on from leading the weekly TMEW meetings. The Lord gave him a vision to open an out-reach coffee shop ministry in the downtown area. As he waits for a permanent location, the Lord has opened an incredible opportunity for ministry within the City Hall! Imagine! A Christian ministry within the walls of a secular institution! Randy reports that 15 people showed up for the first meeting, and 10 at the second meeting. "We are serving a light lunch at each meeting. I think we are going to be able to reach people who can't come to the Tuesday and Friday night meeting."

• **NEW JERSEY**
*Pastor Frank Pino* writes: "God continues to do a mighty work [in *Jersey City*]. We were given the South Street Mission! To continue this work, we added food, restoration services and medical services, all at no cost to the recipients! We renamed it *His Hands Mission.* There will also be The Most Excellent Way meetings here."

• **CALIFORNIA**
*Chuckawalla Valley State Prison* in *Blythe* has it's own ministry team under the guidance of *Chaplin Dean Parker. Daniel Sanderson, Juan Moreno Anthony and Robert Bertoldo* are *living free* in Christ, and ministering to their peers with TMEW, through their church "The Potter's House." Robert writes: "This Bible study [Ten Attitudes] is a Godsend because I'd been looking for an alternative to AA/NA programs. The 12 steps focus on self, and I need God."

*May the Lord bless you as you share with others the love, acceptance and forgiveness available to all by faith in Jesus, the gift of God! Glenn Wright*

State of California

*Semester Start*
*Aug 29*

*Semester Ends*
*Dec 29, 05*

Department of Corrections

# Memorandum

Date : **7-20-05**

To : Mailroom Sergeant

Subject: APPROVAL FORM – CORRESPONDENCE COURSE

Inmates Names: **BERTOLDO   ROBERT**   CDC # **C94377**
                  LAST       FIRST

                                        Housing: **A2-213**

Name of Course: **PHILOSOPHY 120 – ETHICS**

Vendor: **COASTLINE COMMUNITY COLLEGE BOOKSTORE**

Materials Requested: **TAPE CASS., TEST PAPPERS, PAPERBACK BOOKS**

Form of Payment:    ☑ Private Citizen        ☐ Trust Withdrawal
                        Payment sent directly to vendor       Must have trust withdrawal form
                                              Inmate trust account attached

Method requested to receive hard cover books:

☑ Request the hard covers be removed. Mailroom has authorization to remove the hard covers and the inmate is then able to take possession of the book.

☐ Request the hardcover books be placed in his facility library. Inmate will have access to the hardcover books in his facility library *only*. He will use CVSP's Library/Law Library policies and procedures in checking out these hard cover correspondence course books. These books must be checked out once a week on a continuous basis. Once he has competed his course, the inmate can request the hardcover books be donated, sent home or returned to the correspondence school at his expense.

☐ Request the bookstore removes hard covers from books; the Mailroom will receive and forward these materials to the SCEP.

Inmate solely responsible for all financial costs.

(APPROVED)/DISAPPROVED                  (APPROVED)/DISAPPROVED

*Cornelio Ynson*                             *8-5*
Supervisor of Correctional Education Programs      Custody Captain

cc: Inmate
     SCEP
     Receiving and Release

Note:    1) No metal spiral notebooks, tools, construction kits or other paraphernalia. No Hardcover books without prior approval (see option above). (Title 15, Section 3138(F)(1).) No audio tapes without prior approval.
        2) No contract or arrangement should be made with the vendor prior to approval of this course by the Captain and SCEP.
        3) Course videos will be kept in library. The inmate will make arrangements with his proctor for viewing the videos.

State of California                                                      Department of Corrections

# Memorandum

Date    :

To      :    Mailroom Sergeant

Subject:    APPROVAL FORM – CORRESPONDENCE COURSE

Inmates Name: BERTOLDO   ROBERT   CDC #: C 94377
               Last        First

Housing: A2- 213L

Name of Course: SET FREE PRISON MINISTRIES

Vendor: EMMAUS BIBLE COLLEGE /CHRISTIAN BOOK STORES

Materials Requested: BOOKS / TEST PAPERS

Form of Payment:    ☐ Private Citizen            ☐ Trust Withdrawal
                       Payment sent directly to vendor        Must have trust withdrawal form.
                                           Inmate trust account attached

Method requested to receive hard cover books:

☐ Request the hard covers be removed.  Mailroom has authorization to remove the hard covers and the inmate is then able to take possession of the book.

☒ Request the hardcover books be placed in his facility library.  Inmate will have access to the hardcover books in his facility library *only*.  He will use CVSP's Library/Law Library policies and procedures in checking out these hard cover correspondence course books. These books must be checked out once a week on a continuous basis.  Once he has completed his course, the inmate can request the hardcover books be donated, sent home or returned to the correspondence school at his expense.

☐ Request the bookstore removes hard covers from books; the Mailroom will receive and forward these materials to the SCEP.

Inmate solely responsible for all financial costs.

APPROVED/DISAPPROVED                          APPROVED/DISAPPROVED

_____ 5-18-01     _____
Supervisor of Correctional Education Programs        Custody Captain

cc:  Inmate
     SCEP
     Receiving and Release

Note:    1) No metal spiral notebooks, tools, construction kits or other paraphernalia.   No Hardcover books without prior approval (see option above). (Title 15, Section 3138(F)(1).) No audio tapes without prior approval.
2) No contract or arrangement should be made with the vendor prior to approval of this course by the Captain and SCEP.

State of California                                                                 Department of Corrections

# Memorandum

Date    :

To      :    Mailroom Sergeant

Subject:    APPROVAL FORM – CORRESPONDENCE COURSE

Inmates Names: BERTOLDO   ROBERT   CDC # C94377
                         LAST            FIRST

Housing: A2-213 LOW

Name of Course: PERSONAL FINANCIAL PLANNING – BUSINESS 120

Vendor: COASTLINE COMMUNITY COLLEGE

Materials Requested: PAPERBACK BOOKS / TAPE CASS. / PAPERS

Form of Payment:    ☑ Private Citizen              ☐ Trust Withdrawal
                       Payment sent directly to vendor        Must have trust withdrawal form
                                                              Inmate trust account attached

Method requested to receive hard cover books:

☐    Request the hard covers be removed. Mailroom has authorization to remove the hard covers
     and the inmate is then able to take possession of the book.

☐    Request the hardcover books be placed in his facility library. Inmate will have access to the
     hardcover books in his facility library *only*. He will use CVSP's Library/Law Library policies and
     procedures in checking out these hard cover correspondence course books. These books
     must be checked out once a week on a continuous basis. Once he has competed his course,
     the inmate can request the hardcover books be donated, sent home or returned to the
     correspondence school at his expense.

☒    Request the bookstore removes hard covers from books; the Mailroom will receive and forward
     these materials to the SCEP.

Inmate solely responsible for all financial costs.

⟨APPROVED/DISAPPROVED⟩                          ⟨APPROVED⟩DISAPPROVED

_____              _____
Supervisor of Correctional Education Programs( a )    Custody Captain

cc:  Inmate
     SCEP
     Receiving and Release

Note:    1) No metal spiral notebooks, tools, construction kits or other paraphernalia. No Hardcover books
         without prior approval (see option above). (Title 15, Section 3138(F)(1).) No audio tapes without
         prior approval.
         2) No contract or arrangement should be made with the vendor prior to approval of this course by
         the Captain and SCEP.
         3) Course videos will be kept in library. The inmate will make arrangements with his proctor for
         viewing the videos.

CDC 1617 (Rev. 4/02)



# CRIMINON

"There is no person alive who cannot make a new beginning."
– The Way to Happiness

*Does hereby certify that*

## Roberto Bertoldo

*Has satisfactorily attained the requirements necessary and is hereby awarded a Certificate of Completion of*

## The Way To Happiness Course

This ___05___ day of ___Jan___ 20 ___06___

Certificate # ___8233___

_____Renee D.._____
Extension Course Supervisor

_____Bob Veach_____
**CRIMINON** Executive Director

Trademark 2000
CRIMINON® is a TRADEMARK owned
by The Association For Better Living
And Education and is used with its permission

The Way To Happiness is a Trademark owned by
The L. Ron Hubbard Library and is used with its permission
© 2000 The Way to Happiness Foundation
All Rights Reserved. - Printed in USA



POTTER'S HOUSE LEADERSHIP AWARD

This certificate is hereby presented to

for your dedicated service to the body of Christ

in the Potter's House at C.V.S.P.

Presented this 12th day of May, 2006.

ROBERT BERTOLDO

Therefore, my beloved brethren, be steadfast, immovable,
always abounding in the work of the Lord,
knowing that your labor is not in vain in the Lord.
- I Corinthians 15:58.

Dean Parker, Chaplain

# The Potter's House
# APOLOGETICS CLASS IV

## CERTIFICATE OF INDIVIDUAL ACCOMPLISHMENT

But sanctify the Lord God in your hearts: and be ready always to give an answer to every man that asketh you a reason of the hope that is in you with meekness and fear: Having a good conscience; that, whereas they speak evil of you, as of evildoers, they may be ashamed that falsely accuse your good conversation in Christ. For it is better, if the will of God be so, that ye suffer for well doing, than for evil doing. I Peter 3:15-17

### THIS IS TO CERTIFY THAT

## ROBERT BERTOLDO

HAS SUCCESSFULLY COMPLETED A FORTY-TWO (42) WEEK ADVANCED BIBLE THEOLOGY COURSE

JULY 31, 2006
_____
DATE

_____
PROTESTANT CHAPLAIN

# CERTIFICATE OF COMPLETION

THIS IS TO CERTIFY THAT

## ROBERT BERTOLODO

HAS COMPLETED ALL 4 PHASES

OF THE 6

BREAKING BARRIERS SELF HELP STUDY PROGRAM

AUGUST 1, 2006

R. HENRY
BRIDGING INSTRUCTOR CV.SP

# "Life Skills Series for Inmates and Parolees"

## BEYOND ANGER

### R. BERTOLDO C94377

*Has Successfully Completed*
*Classroom Participation In:*

**SESSION 1**
1. Repressed Anger
2. Six Faces of Anger
3. The Cost of Repressed
   And Misdirected Anger
4. Understanding Anger
5. Patterns of Behavior
6. Basic Rights
7. Learning Behavior
8. Resisting Change

**SESSION 2**
1. Healing Repressed Anger
2. Six-Step Process of
   Healing
3. Intercepting Your Anger
   Pattern
4. Intercept Tools
5. Intercept Practice Sheet
6. A Letter of Commitment
7. Ongoing Healing

**SESSION 3**
1. "Forgiveness Is a Gift You
   Give Yourself"
2. Confronting Resentment
3. Resentment Fixates Us at
   the Point of Pain
4. Steps to Achieving
   Forgiveness

**SESSION 4**
1. Relationship Regrets
2. Principles of
   Reconciliation
3. Realistic Expectations

_C Dellmo_
**NA Sponsor**

AUG 0 1 2006
**Date**

Friends Outside National Organization

Awards this certificate to

*Bertoldo, R.*

in recognition of completion of

# Creative Conflict Resolutions

A comprehensive, three-day training in anger management and conflict resolution.

*Pike Housler?*
Mike Gonzalez, Lead Facilitator

*Kathy Barney*
Kathy Barney, Co-Facilitator

*Gretchen Newby*
Gretchen Newby, Executive Director

Date    3-24-2006

This certificate is printed in black ink on parchment paper with blue and gold border, and only the original is valid as proof of completion of the program.
Friends Outside National Organization, PO Box 4085, Stockton, CA 95204



# POTTER'S HOUSE "A" CHAPEL

## APOLOGETIC CLASS I

### CERTIFICATE OF INDIVIDUAL ACCOMPLISHMENT

"But sanctify the Lord god in your hearts: and be ready always to give an answer to every man that asketh you a reason of the hope that is in you, with meekness and fear: having a good conscience; that, whereas they speak evil of you, as of evildoers, they may be ashamed that falsely accuse your good conversation in Christ. For it is better, if the will of God be so, that ye suffer for well doing, than for evildoing".

I Peter 3:15-17

## THIS IS TO CERTIFY THAT

# ROBERT BERTOLDO

HAS SUCCESSFULLY COMPLETED A FORTY-TWO WEEK (42) ADVANCE BIBLE THEOLOGICAL COURSE

JULY 12, 2005
DATE

CHAPLAIN SIGNATURE

# POTTER'S HOUSE "A"

## CHAPEL

### APOLOGETIC CLASS II

CERTIFICATE OF INDIVIDUAL ACCOMPLISHMENT

"Will a man rob God? Yet ye have robbed me. But ye say, Wherein have we robbed thee? In tithes and offerings. Ye are cursed with a curse: for ye have robbed me, even this whole nation. Bring ye all the tithes into the store house, that there may be meat in mine house, and prove me now herewith, saith the Lord of host, if I will not open you the windows of heaven, and pour you out a blessing, that there shall not be room enough to receive it. And I will rebuke the devourer for your sakes, and he shall not destroy the fruits of your ground; neither shall your vine cast her fruit before the time in the field, saith the Lord of host.

Malachi 3:8-11

THIS IS TO CERTIFY THAT

# ROBERT BERTOLDO

HAS SUCCESSFULLY COMPLETED A TWELVE-WEEK (12)
ADVANCE BIBLE THEOLOGICAL COURSE ON BUDGET & FINANCE

JULY 12, 2005
DATE

CHAPLAIN SIGNATURE

# The Potter's House

# APOLOGETICS CLASS III

## CERTIFICATE OF INDIVIDUAL ACCOMPLISHMENT

For the wrath of God is revealed from heaven against all ungodliness and unrighteousness of men, who hold the truth in unrighteousness; Because that which may be known of God is manifest in them; for God hath shewed it unto them. For the invisible things of him from the creation of the world are clearly seen, being understood by the things that are made, even his eternal power and Godhead; so that they are without excuse. Romans 1:18-20

### THIS IS TO CERTIFY THAT

## ROBERT BERTOLDO

HAS SUCCESSFULLY COMPLETED A SEVENTEEN (17) WEEK ADVANCED BIBLE THEOLOGY COURSE

ON CREATION AND SCIENCE

August 12, 2005
DATE

PROTESTANT CHAPLAIN

# Special Educational Projects

Chuckawalla Valley State Prison

This Certificate is awarded to

## BOBBY BERTOLDO

presented this day

DECEMBER, 2005

## BREAKFAST WITH SANTA

For outstanding participation in the above project

*Ruth Davis*

Ruth Davis, SVI

*C. Ynson*

C. Ynson, SCEP



# CERTIFICATE OF APPRECIATION

## THIS CERTIFICATE OF APPRECIATION IS GRATEFULLY PRESENTED TO:

### ROBERT BERTOLDO

THIS CERTIFICATE IS TO RECOGNIZE *ROBERT BERTOLDO* IN OUR HEARTFELT APPRECIATION FOR HIS UNSELFISH SUPPORT & DEDICATION TO THE VETERANS GROUP OF CHUCKAWALLA.

PRESENTED THIS _6th_ DAY OF _January_ 2004.

VGC CHAIRMAN

VGC GROUP SPONSOR

GA75-451

©WALCOTTS INC. 1898  LITHO IN U.S.A.



# Certificate of Participation

## ROBERT BERTOLDO

SO ALL WILL KNOW THAT THE AFOREMENTIONED HAS
PARTICIPATED IN
CHUCKAWALLA VALLEY STATE PRISON'S
ANGER MANAGEMENT PROGRAM.

Given this 20th day of January, 2004

_____
Instructor

T.E. Vaughn



# Certificate of Completion

*This Certifies That*

**Robert Bertoldo**

Has Completed Self Confrontation

Based on Biblical Counsel Foundation

And is hereby awarded this certificate

in

**BLYTHE CALIFORNIA**

City and State

On this 5th day of **August**, 2004

*Drew Parker*

Chaplain



# Certificate of Recognition



is awarded this certificate in recognition of

## ROBERT BERTOLDO

COMPLETION of "HOW TO" EVANGELISM COURSE

this 23rd day of September

in the year 2004

Signed

Dean Parker, Chaplain





# Special Educational Projects

Chuckwalla Valley State Prison

This Certificate is awarded to:

## ROBERT BERTOLDO

presented this day

DECEMBER 2003

## BREAKFAST WITH SANTA

For outstanding participation in the above project

Ruth Davis, SPA

Vance Kahle, SCEP



## *Set Free Prison Ministries*

### Rehabilitation by Regeneration



NAVPRESS



*This certifies that*

**ROBERT BERTOLDO**

*has successfully completed*

**JOURNEY THROUGH THE BIBLE**

*by correspondence*

02/22/2001



Correspondence School Director

---



**WHAT THE BIBLE TEACHES**

*by correspondence*

02/22/2001



Correspondence School Director

---



**BEGINNING A NEW LIFE**

*by correspondence*

01/23/2001



Correspondence School Director

---



**MEN WHO MET THE MASTER**

*by correspondence*

09/18/2000



Correspondence School Director

---



**BORN TO WIN**

*by correspondence*

01/21/2000



Correspondence School Director





# Set Free Prison Ministries

### Rehabilitation by Regeneration


NAVPRESS



*This certifies that*
**ROBERT BERTOLDO**
*has successfully completed*
**LESSONS FOR CHRISTIAN LIVING**
*by correspondence*
**07/09/2001**

*Phil Wagner*
_____
Correspondence School Director



## LESSONS ON CHRISTIAN LIVING
*by correspondence*
**06/25/2001**



*Phil Wagner*
_____
Correspondence School Director



**BASIC CHRISTIAN DOCTRINE**
*by correspondence*
**05/11/2001**



*Phil Wagner*
_____
Correspondence School Director



## LESSONS ON ASSURANCE
*by correspondence*
**4/4/01**



*Phil Wagner*
_____
Correspondence School Director



## THE GOOD NEWS
*by correspondence*
**03/14/2001**



*Phil Wagner*
_____
Correspondence School Director



## *Set Free Prison Ministries*

### Rehabilitation by Regeneration



NAVPRESS



*This certifies that*
ROBERT BERTOLDO
*has successfully completed*
**SERVING OTHERS**
*by correspondence*
11/21/2001



Phil Wagner
_____
Correspondence School Director

---



**DEVELOPING YOUR FAITH**
*by correspondence*
10/29/2001



Phil Wagner
_____
Correspondence School Director

---



**GROWING AS A CHRISTIAN**
*by correspondence*
09/17/2001



Phil Wagner
_____
Correspondence School Director

---



**TALKING WITH CHRIST**
*by correspondence*
09/13/2001



Phil Wagner
_____
Correspondence School Director

---



**DOING TIME WITH JESUS**
*by correspondence*
07/24/2001



Phil Wagner
_____
Correspondence School Director



# *Set Free Prison Ministries*

### R e h a b i l i t a t i o n   b y   R e g e n e r a t i o n



NAVPRESS

*This certifies that*

**ROBERT BERTOLDO**
*has successfully completed*

**THE SPIRIT-FILLED CHRISTIAN**
*by correspondence*

**09/17/2004**





*Correspondence School Director*

---



**THE SPIRIT FILLED CHRISTIAN**
*by correspondence*
09/16/2004



*Correspondence School Director*

---



**YOUR LIFE IN CHRIST**
*by correspondence*
03/19/2003



*Correspondence School Director*

---



**GOSPEL OF JOHN**
*by correspondence*
05/30/2002

*Correspondence School Director*



*Set Free Prison Ministries*
*Rehabilitation by Regeneration*

NAVPRESS

*This certifies that*
**ROBERT BERTOLDO**
*has successfully completed*
**THE LETTER TO THE ROMANS**
*by correspondence*
11/25/2005

Correspondence School Director

# Criminon West U.S.

PO Box 9091, Glendale CA 91226-9976

August 27, 2000

ROBERT BERTOLDO - C94377
CHUCKAWALLA VALLEY STATE PRISON
A2-213L
P.O.BOX 2349
BLYTHE, CA  92226

Dear ROBERT:

We were very pleased to receive your request to start "The Way To Happiness(TM)" Extension Course.

Our purpose is to help with the rehabilitation of inmates and we consider this course a vital step in the process. We have had some great success with it and hope that you will too.

We have limited resources due to the fact that all of the course materials and books are donated by private individuals and the lessons are read and scored by volunteers who are not paid. So we are sending you this letter to ensure that you really want to do the course and have the time to do it.

We will expect you to do at least one lesson per week and we will send you the stamped envelopes to return the lessons to us. The only expense of yours will be your time.

So please confirm that you do in fact want to do "The Way To Happiness(TM)" Extension Course by filling out the enrollment form below. Mail this letter back to us in the envelope enclosed and we will be happy to send the materials to you so you can get started.

We look forward to having you on the course!

Name: _ROBERT BERTOLDO_ ID #: _C 94377_

Institution: _CVSP_          Referred by: _____

Address: _P.O.BOX 2349_      City: _BLYTHE_

State/Zip: _CA. 92226_

14312

)                                    )

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**DEPT 100**

| Date: | SEPTEMBER 13, 2007 | | | |
|---|---|---|---|---|
| Honorable: | PETER ESPINOZA | Judge | JOSEPH M. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH004764

In re,
ROBERT BERTOLDO,
         Petitioner,

On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

---

different from those justifying the denial of parole. See *In re Jackson* (1985) 39 Cal.3d 464, 479. The Board indicated that the Petitioner was denied parole for three years because of the nature of the Petitioner's commitment offense, his somewhat recent drug-related rules violations, and his unfavorable psychological report. These reasons were sufficient to justify a three-year denial.

       Accordingly, the petition is denied.

       The court order is signed and filed this date. The clerk is directed to send notice.

       A true copy of this minute order is sent via U.S. Mail to the following parties:

Robert Bertoldo
C-94377
California Substance Abuse Treatment Facility
P.O. Box 5248
Corcoran, California 93212

State of California- Department of Justice
Office of the Attorney General
110 West A Street, Suite 1100
P.O. Box 85266
San Diego, California 92186-5266
Attn: Ms. Cynthia Lumely

| Minutes Entered |
|---|
| 09-13-07 |
| County Clerk |

*Ex. M*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

COURT OF APPEAL - SECOND DIST.

**FILED**

NOV - 9 2007

JOSEPH A. LANE          Clerk

_____ **Deputy Clerk**

|  |  |
|---|---|
| In re | B203102 |
| ROBERT BERTOLDO, | (L.A.S.C. Nos. A527117, BH004764) |
| on | O R D E R |
| Habeas Corpus. |  |

THE COURT*:

    The petition for writ of habeas corpus, filed October 26, 2007, has been read and considered.

    The petition is denied.

_____     _____     _____

  *MALLANO, Acting P. J.          VOGEL, J.          ROTHSCHILD, J.

*Ex. N*

S158916

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

In re ROBERT BERTOLDO on Habeas Corpus

---

The petition for writ of habeas corpus is denied.

SUPREME COURT
FILED

JUN 11 2008

Frederick K. Ohlrich Clerk

_____
Deputy

GEORGE
_____
Chief Justice

EX. O

## CERTIFICATE OF SERVICE BY MAIL

( C.C.P. sec. 1013 (a) & 2015.5 )


I the undersigned, hereby declare that I Am over the age of eighteen years
and I am a Party to the foregoing class of action.

That on this 23rd, day of July, 2008.  I delegated to prison authorities
the task of filing by U.S. mail the following documents :


    .1. One Original Writ of Habeas Corpus with
       EExhibits A - O, along with one copy
       of Original.


For which were addressed to the below named :
       Clerk of U.S. District Court,

       880 Front Street, Room 4290

       San Diego, CA. 92101-8900.


I declare under the penalty of perjury that the above certificate of service
is true and correct.


Executed on this 23rd. day of July, 2008. at Corcoran, CA.93212-5248.


Robert Bertoldo
DECLARANT.

Signature.

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

**I (a) PLAINTIFFS**

Robert Bertoldo

FILING FEES PAID
Yes ✓  No
IFP MOTION FILED
Yes  No
COMPLAINT CO
Court

FILED
AUG 2 1 2008
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

Clark, et al

**(b) COUNTY OF RESIDENCE OF FIRST LISTED** Kings
**PLAINTIFF**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Robert Bertoldo
PO Box 5248
Corcoran, CA 93212
C-94377

**ATTORNEYS (IF KNOWN)**

'08 CV 1551 IEG PCL

**II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)**

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III

**III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX**
**(For Diversity Cases Only)  FOR PLAINTIFF AND ONE BOX FOR DEFENDANT**

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business in This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

**IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).**

## 28 U.S.C. 2254

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reappointment |
| ☐ Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ Miller Act | ☐ 315 Airplane Product Liability | | ☐ 625 Drug Related Seizure of Property 21 USC881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury - Product Liability | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment &Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 RR & Truck | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 650 Airline Regs | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 690 Other | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities Exchange |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | **LABOR** | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC |
| ☐ Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☒ 530 General | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ Security Act | | ☐ 950 Constitutionality of State |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**

☒ 1 Original Proceeding
☐ 2 Removal from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23

**DEMAND $**

Check YES only if demanded in complaint:
**JURY DEMAND:** ☐ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY (See Instructions):**  JUDGE ___  Docket Number ___

DATE  8/21/2008

# 154366   6/22/08
TAC   $5.00

SIGNATURE OF ATTORNEY OF RECORD



CR

**UNITED STATES
DISTRICT COURT**
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

**# 154366    — TC**

**August 22, 2008
11:16:11**

**Habeas Corpus**
USAO #.: 08CV1551
Judge..: IRMA E GONZALEZ
Amount.:                    $5.00 MO
Check#.: 12333705862

**Total—>  $5.00**

FROM: ROBERT BERTOLDO
      VS
      CLARK ET AL